## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GREEN PARTY OF CONNECTICUT, ET AL., | : | CIVIL NO  3:06CV1030 (RNC) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| JEFFREY GARFIELD, ET AL. | : | MARCH 18, 2008 |

### CORRECTED DECLARATION OF JONATHAN PELTO

Jonathan Pelto, having been duly sworn, deposes and says as follows:

1.  My name is Jonathan Pelto  From 1985 to 1993 I served as a member of the Connecticut House of Representatives, representing the 54th House District (Mansfield and the University of Connecticut). During the course of my legislative tenure, I served on a number of legislative committees and leadership positions – including as Deputy Majority Leader of the House and Chairman of the House Screening (Rules) Committee  I was a long-time member of the Appropriations Committee (chairman of the Higher Education Sub-Committee) and the Education Committee  At various times, I also served on the Legislative Management Committee, the Finance Revenue and Bonding Committee, as well as the Public Health and General Law Committees.

    In addition to these legislative positions, I served as the Political Director for the Connecticut Democratic Party from 1987-1992  During the course of my political career I have worked on a number of political campaigns including Sam Gejdenson for Congress (1980), Toby Moffett for US Senate (1982), Gary Hart for President (1984, 1988) and managed or directed the gubernatorial campaigns for Governor William O'Neill (1986), Bill Cibes (1990) and Barbara Kennelly (1998)  Over the past 30 years I have also assisted numerous candidates for the Connecticut State Senate and State House of Representatives.

    I make these statements based on my personal knowledge and observations.  I gathered the data cited throughout this affidavit from publicly filed reports, including  all 2006 campaign finance reports for the political action committees (PACs) associated with the four legislative caucuses and their leaders.  For each caucus, I recorded the total amount raised and the amounts raised from lobbyists, lobbyist related PACs and from ad books   I have collected similar data for a number of previous campaign cycles

2.  I hold a bachelors degree in Public Policy from the University of Connecticut and attended both the University of Connecticut's School of Law and UConn's graduate program in Political Science  My primary academic focus and research in graduate school was on Connecticut campaign finance system and the role campaign money plays in Connecticut politics

3. Upon leaving the General Assembly in 1993, I joined the law and lobbying firm of Robinson & Cole to set up a "grassroots" or "indirect" lobbying practice. In 1997, I left Robinson & Cole to set up my own company, Impact Strategies Inc., which specializes in the design and implementation of strategic communications programs aimed at influencing the development of public policy in Connecticut

The conventional definition of an "indirect" or "grassroots" lobbyist is a person who develops and implements programs, in conjunction with a direct lobbyist, that are aimed at influencing the political environment surrounding an issue and thereby providing the lobbyist with a greater chance of success.

Instead of direct communication with legislators, the "indirect" or "grassroots" lobbyist seeks to educate, persuade and mobilize targeted groups of people to speak out in favor or opposition to a particular public policy issue, thereby working to convince a legislator that there is important public or political support in favor or opposition to a particular course of action.

Since the role of "indirect" or "grassroots" lobbyist is not presently defined in Connecticut's State Statues and I am not compensated for "lobbying" activities such as communicating with legislators or other public officials about policy issues, I am not required to register as a lobbyist However, I work closely with registered lobbyists on most of my projects

As state legislator and then as an "in-direct" lobbyist (with a total of more than 30 years of experience in Connecticut politics and government), I am well aware of the strategies and tactics lobbyists utilize and the issues surrounding the lobbying profession At one time or another, I have worked closely with almost every major Connecticut lobbyist and lobby firm.

As a direct result of my own personal experiences and my work with lobbyist, clients and legislators, it is clear to me that the impact and influence of lobbyists, and especially campaign donations provided by lobbyists, or donated through lobbyists, has grown dramatically over the past two decades.

In fact, I am convinced that today, lobbyist funds – and funds solicited by lobbyists – have become such an important part of the process that legislative action is often directly influenced by the desire to keep lobbyists satisfied so that legislators can maintain adequate funding for political campaigns

4. When I first ran in 1984, lobbyist and special interest money was already a factor in providing incumbents with the ability to garner greater campaign funds and maximize the role of incumbency. However, the overall cost of campaigns was still relatively low and candidates could and did run successful political campaigns without being forced to rely on the lobbyist based fundraising system, which includes funds directly from lobbyists, funds from lobbyist-controlled PACs and funds raised by lobbyists from their clients.

5. Now, twenty-two years later, the cost of campaigns and the role of lobbyist and special interest donations make it hard to imagine that a person could succeed politically without relying on lobbyist and their fundraising apparatus, unless they were so wealthy that they could personally pay for their own campaign activities or so single issue oriented that they could raise sufficient funds from that single special interest

6. Although lobbyists have an extraordinary array of tools that they can utilize to influence policymakers and the public policy making process, campaign donations from lobbyists, lobbyist controlled or related PACs and funds raised by lobbyists from their clients, have become their primary weapon of choice.

## 7. **Why Lobbyists Donate:**

My personal experience is that lobbyists, lobbyist related PACs and clients of lobbyists make campaign donations for two primary purposes. First, lobbyists know that campaign donations are the most effective and appreciated means for rewarding legislators and legislative caucuses for supporting their legislation. In addition, lobbyists donate because they believe that campaign donations are an effective way to promote and ensure greater access to legislators and the legislative process

The net effect is that legislators and legislative leaders have come to rely on lobbyists, lobbyist related PACS and lobbyist's clients to provide the most significant share of the money used in election and re-election efforts. Lobbyists know that providing these funds will, in return, gain them appreciation and vital access to the individual legislators and legislative leaders that they support

Campaign donations are not only used to reward those legislators who support their clients and their bills, but as a way to preserve lines of communication, even among legislators who have opposed their clients and their bills. From my experience, lobbyists, lobbyist related PACs and clients of lobbyists provide funds because they have a very real concern and fear that if they do not provide significant financial support, legislators and especially legislative leaders, will be upset, angry and will, in retribution, deny them future access.

In my case, despite my voting record, I'd receive campaign donations from lobbyists and special interest groups that I generally voted against. This process was particularly visible in what are called "turf wars" between organized groups of professionals such as the ophthalmologists versus the optometrists. I quickly learned that no matter how I voted, I could usually expect checks from both constituencies, although it was true that one side might be more generous then the other depending on how I cast my vote.

In any case, lobbyists and legislators understand that political donations are the single most efficient and effective way for lobbyists to preserve or expand their clout and their ability to influence the outcome of legislative issues.

**8. Donations Lead to Greater Access to Legislators and the Legislative Process:**

Although the conventional wisdom, backed by my personal experience, is that legislators don't usually tie their vote to whether a lobbyist gave a campaign donation or the amount of funds given, it is absolutely clear that the lobbyists who play such a critical role in the fundraising process are ensuring themselves greater access to the public policy making process.

Although, as a state legislator (including my time as a legislative leader), I often forgot how much any particular lobbyist or PAC had given to my campaigns, the influence that past donations (or the hope for future donations) had on me and the public policy making process was very clear and of significant importance.

I found that access to the policy making process was often driven by familiarity with the messenger on any given issue. If I had ten phone messages waiting for me when I came off the House Floor or when I arrived at the State Capitol, I generally returned those messages where I recognized the caller's name or where the phone number indicated that the call originated in my legislative district. Despite my inability to recall the exact amount of a particular donation, I generally recognized or remembered (even to this day) the names of those who provided me with the political support and campaign donations I needed to fund my campaigns.

Furthermore, if that familiar donor was actually waiting to meet with me (and anyone who has been to the Legislative Office Building knows lobbyists are omnipresent) the legislator-lobbyist interaction would take precedence over returning phone calls or almost any other activity.

In addition, while legislators would, of course, deny that they ever allowed campaign donations to actually guide a voting decision, it was – and is – common operating procedure for legislators (especially leadership) to strategically work to keep as many lobbyists as possible, happy or satisfied, in order to facilitate more successful fundraising down the road.

For example, as Chairman of the Democratic House Screening Committee, my primary responsibilities included (1) facilitating the flow of legislation on the House Floor, (2) making sure that bills were properly drafted and reflected the Leadership's concerns and position, (3) making sure that Committee Chairs and rank and file Democrats got their bills and issues through the process and (4) whenever possible, providing lobbyists with a final opportunity to modify legislation, as needed.

From my personal and direct experience, there is no doubt that the present legislative process is designed, at least in part, to ensure that as many lobbyists as possible go home happy, or at least satisfied (meaning that as many lobbyist as possible need to have enough legislative victories to prove to their clients that they are effective representatives for their issues).

The existing legislative process, and the related need to keep lobbyists happy, or at least satisfied, means that there are times legislative action may result in legislation that is contrary

to the public interest. Even when lobbyist desires and public interest are not necessarily at odds, it was certainly my experience that public policy was sometimes subordinated to the needs of the lobbyists.

### 9.   The Role Lobbyists Play in Fundraising and how Lobbyists Donations are Solicited:

With over 30 years of experience, as a state legislator, a legislative leader and then as someone who works closely with lobbyists and their clients, I've seen first hand as lobbyists and lobbyist related PACS have become increasingly more important to the fundraising process. Lobbyists are themselves an important source of campaign contributions. Legislative candidates traditionally solicit lobbyists directly for donations. In addition, lobbyists serve as the primary conduit to the funds that can from their clients and from the array of interest groups that try to influence public policy

Legislators and especially legislative leaders expect lobbyists to raise campaign funds by donating themselves and soliciting their clients to donate to the legislator and the PACs associated with that legislator.

As a legislative leader I participated in numerous meetings in which a lobbyist or group of lobbyists were asked to raise funds for an upcoming fundraiser. Legislative leaders go so far as to hand out lists of prospective donors organized by each lobbyist's list of clients. In this way, the message is effectively sent that leaders are well aware of which clients go with which lobbyists and that legislators are hoping and expecting "strong" participation by each of the lobbyist's as they work to raise funds from their clients.

When it comes to the fundraisers themselves, individual lobbyists will often arrive at a candidate or caucus committee fundraiser with a number of checks, including their own contributions and those of their clients. Better organized lobbyists even arrive with an envelope of checks and a list indicting which clients have donated what amounts and whether additional client donations will be forthcoming

In addition, rather than participate in broader candidate or caucus fundraisers, lobbyists will often sponsor or host a specific candidate or caucus committee fundraiser for the leader or their PAC so that their clients or a particular constituency that they represent can donate as a group. In this way, lobbyists can better ensure that they have the full attention of the legislators – and legislators are reminded that the most efficient way to raise funds from those clients or constituency is via the lobbyist who can bring his or her clients together for such an endeavor.

Finally, some lobbyists or lobbyist related PACs will schedule a series of fundraisers for each party's caucus one day after another so that each caucus's leadership is sure to recognize the benefit of that lobbyist's work when it comes to providing political funds.

Traditionally, lobbyist and client donations enter the political process and end up benefiting individual legislators in one of two important ways.

First, candidates, particularly incumbents, solicit donations directly from lobbyists and lobbyist related PACs. Second, leaders rely almost exclusively on lobbyists, lobbyist related PAC funds and donations from clients of lobbyists to fund the on-going political action committees that are formed by legislative leaders on behalf of their legislative caucuses.

Many individual legislators rely on lobbyists, their related PACS and their clients to provide funds for their campaigns. Solicitations can either be in the form of a letter requesting funds or an invitation to an actual fundraising event in which the lobbyists attend, sometimes with a client or two, but often on their own. The lobbyist often makes a personal donation and provides checks from one or more of their clients.

During my tenure in the Connecticut Legislature (1984-1993) it was almost unheard of for a rank and file member (that is a legislator who is not a legislative leader) to hold a fundraising in Hartford (outside of their legislative district). Lobbyist and lobbyist funds were most often solicited in conjunction with district based fundraising events. However, in the last few years it has become common for legislators, even freshman, to hold fundraisers in Hartford in order to make it easier for lobbyists to give money. In fact, in the past election cycle or two, even non-incumbents candidates have scheduled successful fundraisers in Hartford in an attempt to attract greater lobbyist funds.

## 10. Caucus and Leadership PACS:

The second mechanism for funneling lobbyist, lobbyist related PAC funds and donations from clients of lobbyists into political campaigns – donations to caucus and leadership PACs – has become an increasingly important source of funds.

During the 2006 election cycle, legislative leadership raised over $1.974 million into their caucus related PACs. Of that amount, approximately $1.579 or about 80% came from lobbyists, lobbyist related PACs or from "ad books" produced in conjunction with caucus events.

The amount of funds raised by caucus PACs has been steadily increasing over the past ten years.

In the early 1980s, the Connecticut Legislative caucuses began to take over the traditional role that was played by the political parties when it came to recruiting and supporting legislative candidates. While individual candidates continued to develop and implement their own particular campaign strategies, the legislative caucuses dramatically increased their level of involvement and assistance in legislative races. Legislative leaders began to use their positions to raise significant amounts of money into their own on-going political action committees so that they could, in turn, provide targeted legislative races with additional funds and campaign services.

By 1986, legislative leaders were using these on-going political committees to hire and assign campaign staff to help individual candidates. As this new centralized and coordinated campaign management system took shape, these committees expanded the types of services

they provided candidates including retaining the services of pollsters and direct mail consultants to develop appropriate campaign materials for use by their candidates and caucus members.

Today, legislative leaders spend a significant amount of their time and energy raising funds for these types of caucus-funded political activities. Almost all of the funds raised for these efforts come from lobbyists and their PACs.

**CHART 1:**     **THE ROLE OF LOBBYIST, LOBBYIST RELATED PACS AND ADS:**

*Percent of lobbyists, lobbyist related PACS and Ads funding leadership political action committees during the 2006 election cycle.*

| *PAC Name* | *Percent of funds from lobbyists, lobbyist related PACS and ads* |
|---|---|
| **SENATE DEMOCRAT PACs:** | |
| Sen. Dem. Campaign Com. | 78% |
| Com. for a Dem. Senate Maj. | 41% |
| Democrats United | 90% |
| People for Excellence in Gov't | 82% |
| Senate Dems. Victory PAC | 96% |
| **HOUSE DEMOCRATS PACs** | |
| House Dem. Campaign Com. | 85% |
| United House Democrats | 76% |
| Capitol Democrats | 61% |
| CT Dem Leadership Coalition | 80% |
| New Majority Democrats | 72% |
| Victory PAC | 40% |
| House Democrats 2006 | 82% |
| Women in the House | 79% |
| Democratic Energy Com | 87% |
| House Democratic Majority PAC | 87% |
| **SENATE REPUBLICANS** | |
| Senate Rep. Vision 21 | 86% |
| Senate Rep. Golf Tournament | 90% |
| Senate Rep. Campaign Committee | 91% |
| Senate Rep. Leadership Committee | 88% |
| Republican Majority Committee | 91% |
| New Republican Majority Com. | 78% |

**HOUSE REPUBLICANS**

| | |
|---|---|
| House Republican Camp. Com. | 67% |
| House Republican Maj. Com. | 65% |
| GOP Leadership Fund | 87% |
| House Republican Victory Fund | 59% |
| GOP Vision PAC | 83% |
| New Friends PAC | 41% |

*Source: 2006 campaign finance reports filed with the Secretary of the State's Office*

As the above charts reflect, over the past six years, legislative leaders have begun to set up multiple on-going political committees so that they can maximize the amount of money they can raise from lobbyists and lobbyist PACs. With only one caucus or leader related on-going political committees, legislative leaders must face the fairly strict contribution limitations on how much an individual lobbyist or lobbyist PAC can give to their caucus or leadership PAC. However, by setting up multiple on-going political action committees, legislative leaders can go back and solicit lobbyists and lobbyist PACs over and over again, often raising significantly more money from a given lobbyist or lobbyist PAC then would otherwise be legally allowable

By setting up multiple committees, lobbyists are provided expanded opportunities to be supportive and win the favor of legislative leaders

The proliferation of leadership or caucus PACs has taken place in both the State Senate and State House of Representatives and within both major political parties.

For example, in the late 1980s, the House Democratic Caucus had one major political action committee called the House Democratic Campaign Committee. This leadership/caucus PAC was controlled by the Democratic Speaker of the House and was the centralized vehicle for raising and spending funds in support of Democratic candidates running for the House.

By comparison, the present Democratic Speaker of the House has set up or controls a total of eight or more on-going political action committees.

This election cycle also provides a snapshot into the way lobbyists and lobbyist related PACs are maximizing their relationship with these caucus and leadership committees.

The following charts reflect how the House Democrats and House Republicans maximize the amount of money they raised from lobbyists and lobbyist PACs during the 2006 election cycle. As the charts indicate, by setting up multiple on-going political committees, legislative leaders are able to solicit multiple donations from the same lobbyist or lobbyist related PAC. In some cases, the total raised is well above what could otherwise be legally donated if the leader had only one on-going political committee. A similar situation can be found when reviewing contributions to the caucus PACs related to the Senate Democrats and Senate Republicans.

For example, AT&T provided PACs associated with the House Democratic Caucus with a total of eight (8) contributions for a total of $8,350 well over the amount that would have been allowed had the House Democrats had only one caucus related PAC. At the same time, AT&T provided House Republican related PACs with two (2) donations totaling $3,000.

The same donation pattern occurred with other significant firms or organizations that have a lobbying presence during the legislative process. Anthem Blue Cross, for example made a total of eight (8) contributions to House Democratic related PACS for a total of $3,700 while making four (4) for a total of $900 to PACs associated with the House Republican caucuses.

Chart 2 (A and B) highlight some of the PACS that made the most contributions to caucus related PACS.

**CHART 2:       Multiple Donations to Legislative Caucuses from Lobbyists and
                 Lobbyist Related PACs:**

**2A:  House Democratic Leadership Committees (selected Lobbyist PAC contributions)**

**House Democrats Campaign Committee**

| | |
|---|---|
| Anthem Blue Cross PAC | $250 |
| AT&T Employee PAC | $2,000 |
| CBIA PAC | $500 |
| IAC | $250 |
| Northeast Utilities PAC | $500 |
| Murtha Cullina | $250 |
| Robinson & Cole | $250 |
| UI PowerPAC | $250 |
| United Technologies PAC | $250 |
| Updike Kelly PAC | $500 |

**New Majority Democrats**

| | |
|---|---|
| Anthem Blue Cross PAC | $500 |
| AT&T Employee PAC | $500 |
| CBIA PAC | $500 |
| Halloran & Sage | $500 |
| IAC | $250 |
| Murtha Cullina | $250 |
| UI PowerPAC | $250 |
| Updike Kelly PAC | $500 |

**United House Democrats**

| | |
|---|---|
| Anthem Blue Cross PAC | $400 |
| AT&T Employee PAC | $2,000 |
| CBIA PAC | $500 |
| Halloran & Sage | $250 |
| IAC | $250 |

| | |
|---|---|
| Murtha Cullina | $250 |
| Northeast Utilities PAC | $700 |
| Robinson & Cole | $1,000 |
| Tobin Carberry | $500 |
| UI PowerPAC | $250 |
| United Technologies PAC | $250 |

**Capitol Democrats PAC**

| | |
|---|---|
| AT&T Employee PAC | $1,250 |
| Northeast Utilities PAC | $2,000 |

**Victory PAC**

| | |
|---|---|
| CBIA PAC | $500 |
| IAC | $250 |
| UI PowerPAC | $1,450 |

**House Democrats 2006**

| | |
|---|---|
| Anthem Blue Cross PAC | $1,000 |
| AT&T Employee PAC | $1,000 |
| CBIA PAC | $1,000 |
| Halloran & Sage | $500 |
| IAC | $1,000 |
| Murtha, Cullina | $250 |
| Northeast Utilities PAC | $1,000 |
| UI PowerPAC | $250 |
| United Technologies PAC | $250 |
| Updike Kelly PAC | $100 |

**Women in the House**

| | |
|---|---|
| AT&T Employee PAC | $100 |
| Northeast Utilities PAC | $300 |
| Updike Kelly PAC | $200 |

**Democratic Energy PAC**

| | |
|---|---|
| Northeast Utilities PAC | $500 |
| UI PowerPAC | $250 |
| Updike Kelly PAC | $125 |

**Connecticut Democratic Leadership Coalition**

| | |
|---|---|
| Anthem Blue Cross PAC | $250 |
| AT&T Employee PAC | $250 |
| CBIA PAC | $500 |
| IAC | $350 |
| Northeast Utilities PAC | $550 |
| Robinson & Cole | $250 |
| Tobin Carberry | $150 |

| | |
|---|---|
| UI PowerPAC | $250 |
| United Technologies PAC | $250 |
| Updike Kelly PAC | $600 |

**House Democratic Majority PAC**

| | |
|---|---|
| Anthem Blue Cross PAC | $250 |
| AT&T Employee PAC | $1,250 |
| Murtha Cullina | $2,000 |
| Northeast Utilities PAC | $1,200 |
| Tobin Carberry | $250 |
| UI PowerPAC | $1,000 |
| Updike Kelly PAC | $600 |

*Source:  2006 campaign finance reports filed with the Secretary of the State's Office*

**2B:  House Republican Leadership Committees (selected Lobbyist PAC contributions)**

**House Republican Campaign Committee**

| | |
|---|---|
| Anthem Blue Cross PAC | $500 |
| AT&T | $1,000 |
| CBIA | $1,000 |
| CT Lawyers for Excellence | $1,000 |
| Insurance Association of CT | $250 |
| Northeast Utilities PAC | $1,000 |
| UI PowerPAC | $250 |
| United Technologies PAC | $250 |

**GOP Vision PAC** 2006

| | |
|---|---|
| Anthem Blue Cross PAC | $250 |
| CT Lawyers for Excellence | $1,000 |
| Insurance Association of CT | $250 |
| Northeast Utilities PAC | $250 |
| UI PowerPAC | $250 |
| United Technologies PAC | $250 |

**House Republican Majority Committee**

| | |
|---|---|
| Anthem Blue Cross PAC | $500 |
| AT&T | $2,000 |
| CBIA | $1,000 |
| CT Lawyers for Excellence | $2,000 |
| Insurance Association of CT | $250 |
| Northeast Utilities PAC | $2,000 |
| UI PowerPAC | $250 |
| United Technologies PAC | $1,000 |

**GOP Leadership Fund**

| | |
|---|---|
| Anthem Blue Cross PAC | $500 |
| CBIA | $500 |
| Insurance Association of CT PAC | $550 |
| Northeast Utilities | $500 |
| UI PowerPAC | $150 |
| United Technologies PAC | $150 |

*Source: 2006 campaign finance reports filed with the Secretary of the State's Office*

**11. Ad Books:**

In addition to direct contributions from lobbyist and lobbyist related PACs, the advent and massive expansion in the use of program or advertising books during the 1990s has provided lobbyists and their clients with a legal mechanism for giving candidates contributions over and above the legal limits that constrain individuals and political action committees. The program or ad book exemption allows legislators to tap into corporate funds, a funding source that was completely illegal prior to the fundraising "reform" that created the ad book exemption.

Legislators, and especially the Legislative Caucuses, have turned to corporate funded advertisements as an extraordinarily important campaign funding source.

Under Connecticut State Law, political campaigns can accept corporate donations of up to $250 for the purchase of an advertisement that is part of a "program or ad book." This corporate loop-hole allows a candidate or caucus PAC to collect a significant amount of money above what they could otherwise raise from lobbyists and their clients.

A report prepared by the State Elections Enforcement Commission and released on February 14, 2006 estimated that the total amount raised by legislative candidates from ad book sales in the previous election cycle exceeded $1,000,000 and that "incumbents received 11.6 times the amount that challengers received." In addition, legislative caucus PACs raised nearly $400,000 more from corporate advertisements, accounting for nearly 20% of the funds raised by these types of committees.

During the present 2006 election cycle, incumbent legislators and caucus PACs continue to turn to the use of corporate ads, most of which are generated by lobbyists. The flow of corporate ads to key leadership PACs can be seen in the following table:

**CHART 3:**  *Ad book donations to leadership political action committees during the 2006 election cycle.*

| PAC Name | Total Raised | Funds from Ads | Percent from Ads |
|---|---|---|---|

**SENATE DEMOCRAT PACs:**

| | | | |
|---|---|---|---|
| Sen. Dem. Campaign Com. | $247,348 | $55,458 | 22% |
| Com. for a Dem. Senate Maj. | $38,555 | $4,250 | 11% |
| Democrats United | $43,300 | $10,300 | 24% |
| People for Excellence In Gov't | $63,400 | $23,625 | 37% |
| Senate Dems Victory PAC | $10,500 | $2,000 | 20% |
| | | | |
| **HOUSE DEMOCRATS PACs** | | | |
| House Dem. Campaign Com. | $181,738 | $45,778 | 25% |
| United House Democrats | $168,328 | $50,100 | 30% |
| Capitol Democrats | $81,700 | $9,500 | 12% |
| CT Dem Leadership Coalition | $61,795 | $20,700 | 33% |
| New Majority Democrats | $83,350 | $19,350 | 24% |
| Victory PAC | $51,100 | $5,050 | 11% |
| House Democrats 2006 | $83,875 | $17,050 | 20% |
| Women in the House | $37,270 | $6,550 | 18% |
| Democratic Energy Committee | $7,523 | $0 | 0% |
| House Democratic Majority PAC | $217,081 | $37,300 | 17% |
| | | | |
| **SENATE REPUBLICANS** | | | |
| Senate Rep. Vision 21 | $69,175 | $19,750 | 29% |
| Senate Rep. Golf Tournament | $64,525 | $16,750 | 26% |
| Senate Rep. Campaign Committee | $49,350 | $15,750 | 32% |
| Senate Rep. Leadership Committee | $10,300 | $3,250 | 33% |
| Republican Majority Committee | $25,300 | $5,250 | 22% |
| New Republican Majority Com. | $9,500 | $3,000 | 32% |
| | | | |
| **HOUSE REPUBLICANS** | | | |
| House Republican Camp. Com | $75,180 | $20,310 | 27% |
| House Republican Maj. Com | $117,145 | $23,300 | 20% |
| GOP Leadership Fund | $27,380 | $9,350 | 34% |
| House Republican Victory Fund | $17,690 | $9,725 | 55% |
| GOP Vision PAC | $12,150 | $4,500 | 37% |
| New Friends PAC | $33,351 | $0 | 0% |

*Source: 2006 campaign finance reports filed with the Secretary of the State's Office*

Once again, by creating multiple caucus or leadership PACS, legislative leaders have found an effective means to sidestep the limitation that no individual corporate entity provide more than $250 in corporate donations. As the following data reveals, lobbyists and their clients help legislative leaders and legislative caucuses by purchasing ads for more than one of the caucus related PACs.

For example, Brown Rudnik, a major law firm in Hartford with a significant government relations and lobbying division headed by the former Speaker of the Connecticut House of Representatives provided PACs associated with the House Democratic Caucus with a total of five (5) ads for $1,250, well over the one ad for $250 that would otherwise have been legally

allowed had the House Democrats had only one caucus related PAC. At the same time, Brown Rudnik provided House Republican related PACs with four (4) ads totaling $1,000.

The same donation pattern occurred with many other lobbyist firms or organizations that have a major lobbying presence during the legislative process. Robinson & Cole, another major Connecticut law firm with a major governmental relations and lobbying practice purchased Seven (7) advertisements with House Democratic related PACS and six (6) with PACs associated with the House Republican caucuses.

Chart 4 (A and B) highlight some of the lobbyist related firms and organizations that purchased the most advertisements from caucus related PACS.

### *CHART 4A:*     *House Democratic Leadership Committees.*
   *Ad book purchases by lobbyists or lobbyist PACs*

**House Democratic Campaign Committee**

| | |
|---|---|
| Alliance Energy | $250 |
| Anthem Blue Cross/Blue Shield | $250 |
| AT&T | $250 |
| Brown Rudnick | $250 |
| CBIA | $250 |
| Halloran & Sage | $250 |
| Gaffney, Bennett | $250 |
| Levin, Powers | $250 |
| Murtha Cullina | $250 |
| Robinson & Cole | $250 |
| Schepkar | $250 |
| Sullivan & LeShane | $250 |
| Tobin Carberry | $250 |
| United Illuminating | $250 |

**Capitol Democrats:**

| | |
|---|---|
| Gaffney, Bennett | $250 |
| United Illuminating | $250 |

**New Majority Democrats**

| | |
|---|---|
| Alliance Energy | $250 |
| AT&T | $250 |
| Brown Rudnick | $250 |
| CBIA | $250 |
| CT Association of Health Plans | $250 |
| Halloran & Sage | $250 |
| Gaffney, Bennett | $250 |
| Levin, Powers | $250 |
| Robinson & Cole | $250 |
| Schepker | $250 |

| | |
|---|---|
| Sullivan & LeShane | $250 |
| Tobin Carberry | $250 |
| United Illuminating | $250 |

**United House Democrats**

| | |
|---|---|
| Alliance Energy | $250 |
| Anthem Blue Cross/Blue Shield | $250 |
| CT Association of Health Plans | $250 |
| Halloran & Sage | $250 |
| Levin, Powers | $250 |
| Robinson & Cole | $250 |
| United Illuminating | $250 |

**Victory PAC**

| | |
|---|---|
| CBIA | $250 |
| Halloran & Sage | $250 |
| IAC | $250 |
| Roy & LaRoy | $250 |
| Tobin Carberry | $250 |
| United Illuminating | $250 |

**Connecticut Democratic Leadership Coalition**

| | |
|---|---|
| Alliance Energy | $250 |
| Anthem Blue Cross/Blue Shield | $250 |
| Brown Rudnick | $250 |
| CBIA | $250 |
| Halloran & Sage | $250 |
| Gaffney, Bennett | $250 |
| IAC | $250 |
| Levin, Powers | $250 |
| Robinson & Cole | $250 |
| Roy & LaRoy | $250 |
| Schepker | $250 |
| Sullivan & LeShane | $250 |
| United Illuminating | $250 |

**House Democrats Majority Pac**

| | |
|---|---|
| Alliance Energy | $250 |
| AT&T | $250 |
| Brown Rudnick | $250 |
| CT Association of Health Plans | $250 |
| Halloran & Sage | $250 |
| Levin, Powers | $250 |
| Murtha, Cullina | $250 |
| Robinson & Cole | $250 |
| Roy & LaRoy | $250 |

| | |
|---|---|
| Schepker | $250 |
| Sullivan and LeShane | $250 |
| Tobin, Carberry | $250 |
| United Illuminating | $250 |

**House Dems 2006**

| | |
|---|---|
| CBIA | $250 |
| Gaffney, Bennett | $250 |
| IAC | $250 |
| Robinson & Cole | $250 |
| Roy & LaRoy | $250 |
| Sullivan & LeShane | $250 |
| United Illuminating | $250 |

**Women in the House**

| | |
|---|---|
| Brown Rudnik | $250 |
| CT Association of Health Plans | $250 |
| Levin, Powers | $250 |
| Robinson & Cole | $250 |
| Roy & Laroy | $250 |
| Sullivan & LeShane | $250 |

*Source:  2006 campaign finance reports filed with the Secretary of the State's Office*

***CHART 4B:***     ***House Republican Leadership Committees.***
Ad book purchases by lobbyists or lobbyist PACs

**House Republican Campaign Committee**

| | |
|---|---|
| Anthem Blue Cross | $250 |
| AT&T | $250 |
| Brown Rudnick | $250 |
| CBIA | $250 |
| Connecticut Assoc. of Health Plans | $250 |
| Halloran & Sage | $250 |
| Gaffney, Bennett | $250 |
| Levin, Powers | $250 |
| Robinson & Cole | $250 |
| Schepker | $250 |
| Sullivan & LeShane | $250 |
| Tobin Carberry | $250 |
| United Illuminating | $250 |

**GOP Vision PAC**

| | |
|---|---|
| AT&T | $250 |
| Brown Rudnick | $250 |

| | |
|---|---|
| Connecticut Assoc. of Health Plans | $250 |
| Gaffney, Bennett | $250 |
| Levin, Powers | $250 |
| Murtha Cullina | $250 |
| Robinson & Cole | $250 |
| Schepker | $250 |
| Sullivan & LeShane | $250 |
| Tobin Carberry | $250 |
| United Illuminating | $250 |

**House Republican Majority Committee**

| | |
|---|---|
| Anthem Blue Cross | $250 |
| Brown Rudnick | $250 |
| CBIA | $250 |
| Connecticut Assoc. of Health Plans | $250 |
| Gaffney, Bennett | $250 |
| IAC | $250 |
| Levin, Powers | $250 |
| Robinson & Cole | $250 |
| Roy & Laroy | $250 |
| United Illuminating | $250 |

**House Republican Victory Fund**

| | |
|---|---|
| Anthem Blue Cross | $250 |
| Brown Rudnick | $250 |
| CBIA | $250 |
| Connecticut Assoc. of Health Plans | $250 |
| Halloran & Sage | $250 |
| Gaffney, Bennett | $250 |
| Robinson & Cole | $250 |
| Tobin Carberry | $250 |
| United Illuminating | $250 |

**GOP Leadership Fund**

| | |
|---|---|
| AT&T | $250 |
| CBIA | $250 |
| Connecticut Assoc. of Health Plans | $250 |
| IAC | $250 |
| Robinson & Cole | $250 |
| Roy & LaRoy | $250 |
| United Illuminating | $250 |

**New Friends PAC**

| | |
|---|---|
| CBIA | $250 |
| Connecticut Assoc. of Health Plans | $250 |
| Gaffney, Bennett | $250 |

| | |
|---|---|
| Robinson & Cole | $250 |
| Roy & LaRoy | $250 |
| Tobin Carberry | $250 |
| United Illuminating | $250 |

*Source: 2006 campaign finance reports filed with the Secretary of the State's Office*

Again, a similar situation can be found when reviewing contributions to the caucus PACs related to the Senate Democrats and Senate Republicans

## 12. Individual Donations to Multiple Leadership and Caucus PACs

In addition to lobbyists and PACs maximizing their impact by providing donations to multiple political committees controlled by legislative leaders, there are also examples where individuals who have also used this technique to provide contributions that would otherwise exceed the amount an individual is allowed to donate to a single entity.

During the 2006 campaign cycle, a prime example of this approach can be found by reviewing the contribution pattern of Daniel Gressel of Stamford, Connecticut

*2006 Campaign donations by Daniel Gressel*

| **Senate Republican Committees** | **Amount** |
|---|---|
| Senate Republican Leadership Committee | $1,000 |
| Senate Republican Campaign Committee | $1,000 |
| Senate Republican Vision 21 | $1,000 |
| Republican Majority Committee | $1,000 |
| New Republican Majority Committee | $1,000 |

| **House Republican Committee** | **Amount** |
|---|---|
| House Republican Victory Fund | $250 |
| GOP Leadership Fund | $1,000 |
| House Republican Campaign Committee | $1,000 |
| House Republican Majority Committee | $1,000 |
| GOP Vision PAC | $1,000 |
| New Republican Majority Committee | $1,000 |

## 13. Lobbyist Funds and their Impact on Public Policy:

From my own personal experience and through conversations with dozens of legislators, I believe the vast majority of legislators, at least off-the-record and in secret, would confirm that the connection between lobbyists and campaign fundraising now has a profound impact on the public policy making process.

Although it is seldom, if ever, stated outright, no incumbent legislator fails to appreciate the need to keep lobbyists "satisfied" and "happy" so that these lobbyists will, in turn, provide campaign donations and solicit their clients to provide campaign donations.

The need to respect, preserve and promote this symbiotic relationship is particularly true for legislative leaders who are not only raising money for their own campaigns, but are leading the effort to raise far greater resources to fund the caucus' election program.

A common way that this system influences actual legislative decision making is the regular attention leaders give to making sure major lobbyists have sufficient victories so that although an individual client may not be happy the majority of clients appreciate the lobbyists' effort.

As Deputy Majority Leader and Chairman of the House Screen Committee responsible for overseeing the flow of legislation on the floor of the House of Representatives, I understand that a key component of my responsibility was to make sure that lobbyists had particular access to the process and that attention was being paid by the legislative leadership to try and accommodate as many lobbyist requests as possible.

When a true assessment is made of the influence lobbyist money has been having on the process it becomes crystal clear that the public financing and lobbyist ban that was adopted by the Connecticut Legislature in 2005, and further enhanced in 2006 was a reasonable, understandable and necessary step to eliminate the inappropriate influence that was corrupting the legislative process.

### 14. Why the Session Ban on Lobbyist Donations Failed to Solve the Problem

Prior to the enactment of the law in question, the Connecticut General Assembly had operated under a complete ban on donations from lobbyists and lobbyist related PACs during the legislative session. The "session ban" was intended to respond to the perception that allowing campaign donations during the legislative session created the appearance the legislators were selling their votes in return for campaign donations.

The session ban on lobbyist and lobbyist related PAC donations was adopted with significant fan-fare, but the actual statute was designed to allow lobbyist resources to continue to pour into political coffers. To compensate for the inability to raise funds during the legislative session, legislators scheduled fundraisers for immediately before or immediately after the legislative session. In fact, it has become common practice for all four legislative caucuses to hold major fundraisers for one – or more – of their committees the evening before the legislative session or even the morning the session begins.

Since funds must be deposited by the time the Legislative Session begins at 10am on the first Wednesday following the first Monday in odd number years, there is a traditional rush to the bank following the breakfast fundraisers on opening day.

To ensure as much time for fundraising as possible, the statute exempted the period between the first session of each term and the second session of each term, so in fact, the ban really only covers approximate 90 days during the odd numbered years and 120 days during the even numbered years that accompany election day.

With the even numbered year legislative sessions ending in May, six months before election-day, legislators and legislative leaders have ample time to hold fundraisers designed to recruit lobbyist donations in time for the fall elections

**15. Expanding the Lobbyist ban to spouses and dependent children is a necessary step.**

Since the Connecticut General Assembly's goal was to significantly limit the ability of lobbyists and lobbyist controlled PACs from inappropriately and unduly influencing Connecticut's electoral process, expanding the ban on lobbyist donations to their spouses and dependent children was a necessary step considering how common it was and easily it would be for lobbyists to get around the ban without such a provision.

Traditionally, it has been very common for Connecticut candidates to ask larger donors to maximize their contribution amounts by having spouses, or even children, contribute as well.

Unfortunately, quantifying the extent of this practice is extraordinarily difficult to complete because many candidates have traditionally provided the Secretary of State's Office with incomplete or inaccurate campaign reports when it comes to identifying lobbyist or lobbyist spouse contributions

However, the 2006 election cycle does provide an opportunity to examine how often large contributions come from spouses in the same household. According to campaign finance reports filed by the Governor M. Jodi Rell, Mayor John Destefano and Mayor Dannel Malloy about 15% of all contributions of $1,000 or more came from households in which at least one other resident also contributed in excess of $1,000.

**Major Contributions to 2006 Gubernatorial Candidates from donors in the same household:**

| Candidate | # of contributions Of $1,000 or more | # from same household | % of major contributions |
|-----------|--------------------------------------|-----------------------|--------------------------|
| **Destafano** | **930** | **140** | **15%** |
| **Malloy** | **603** | **89** | **15%** |
| **Rell** | **1177** | **167** | **14%** |

*Source: 2006 campaign finance reports filed with the Secretary of the State's Office*

In addition to situations in which both lobbyists and lobbyist spouses have made donations to candidates, a second common situation in Connecticut is for an individual who doesn't want their name to show up on the campaign finance report to have that person's spouse make the contribution.

- 20 -

From my personal experience raising campaign donations for myself and for numerous state-wide and legislative candidates, had the Connecticut Legislature failed to ban campaign donations from lobbyist spouses and dependent children, the system would have largely remained unchanged since lobbyists would have simply donated their funds via a member of their immediate family

## 16. Lobbyists Still Have Significant Tools to Use to Lobby Legislators:

While the new legislation eliminates the pivotal role of lobbyists and lobbyist related PACs, when it comes to funding political campaigns, lobbyists still have plenty of legal and appropriate techniques and tools that they can continue to use to influence legislation on behalf of their clients.

In fact, with financial handouts no longer legal, lobbyists will be forced to spend more time actually educating and persuading legislators and policy makers that their arguments have merit rather then relying on the generosity of their campaign donations to win over legislative supporters

As lobbyists seek to influence legislators they can continue to use the following techniques;

- Setting up meetings between clients and legislators
- Meetings with legislators to discuss client issues and legislation
- Providing legislators with fact sheets and information on behalf of clients
- Proving legislators with language for bills or amendments
- Testifying at public hearings
- Recruiting clients and experts to testify at public hearings
- Arranging legislators visits with clients
- Arranging constituent meetings with legislators
- Working with clients, constituents, campaign donors to contact and persuade legislators to support their issues
- Working with clients to properly thank legislators for their support (other than with campaign donations).

In addition, while the new law significantly restricts the role lobbyists can play in bundling donations for candidates and on-going political committees, lobbyists will still be able to perform an incredibly valuable role by informing clients about legislator's upcoming activities, including upcoming political events and fundraisers.

By serving as a conduit for the vitally important information, lobbyists are not completely prohibited from participating in the fundraising process. Under the new campaign finance law, lobbyists will still be able to play a role in fundraising by informing clients about ways in which they can thank legislators for their support or seek to build relationships

**17. The Process Without Lobbyist Donations:**

The removal of lobbyist donations and their inordinate impact on the legislative process will help to reform the way in which Connecticut's public policy making process works. Removing the connection between legislative action and campaign donations will remove the present incentive to produce legislative results that help and reward lobbyists so that they in turn will be more likely to help raise campaign donations. This change will certainly help create an environment in which legislators can more easily weigh legislative decisions based on the actual merits of a given issue.

_____
Jonathan Pelto

STATE OF CONNECTICUT   )
                                            :        ss  HARTFORD
COUNTY OF HARTFORD    )

Sworn and subscribed before me on this _/8ᵗʰ_ day of March, 2008

_____
Notary Public/Commissioner of the Superior  Court

- 22 -