# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GREEN PARTY OF CONNECTICUT, S. MICHAEL DEROSA, LIBERTARIAN PARTY OF CONNECTICUT, ELIZABETH GALLO, JOANNE P. PHILLIPS, AMERICAN CIVIL LIBERTIES UNION OF CONNECTICUT, ROGER C. VANN, ASSOCIATION OF CONNECTICUT LOBBYISTS, BARRY WILLIAMS, and ANN C. ROBINSON, | CIVIL ACTION NO. 3:06cv1030 (SRU) |
|      Plaintiffs, | |
|     v. | |
| JEFFREY GARFIELD, in his official capacity as Executive Director and General Counsel of the State Elections Enforcement Commission; RICHARD BLUMENTHAL, in his official capacity as Attorney General of the State of Connecticut; PATRICIA HENDEL, ROBERT N. WORGAFTIK, JACLYN BERNSTEIN, REBECCA DOTY, ENID JOHNS ORESMAN, DENNIS RILEY, MICHAEL RION, SCOTT A. STORMS, SISTER SALLY J. TOLLES, in their official capacities as Officials and Members of the Office of State Ethics; and BENJAMIN BYCEL, in his official capacity as Executive Director of the Office of State Ethics, | |
|      Defendants, | |
| AUDREY BLONDIN, COMMON CAUSE OF CONNECTICUT, CONNECTICUT CITIZENS ACTION GROUP, KIM HYNES, and TOM SEVIGNY, | |
|      Intervenor-Defendants. | |

## RULING ON MOTION TO DISMISS and MOTION FOR JUDGMENT ON THE PLEADINGS

The Connecticut Legislature has enacted a campaign finance reform law that permits

certain qualified candidates to receive public funds to conduct their campaigns.  Plaintiffs filed a

five-count amended complaint alleging that various of the law's provisions violate the United

States Constitution.[1]  Defendants now move to dismiss and for judgment on the pleadings,

arguing that the plaintiffs lack standing to bring the challenges set forth in counts two and three,

and that counts one, two, and three fail to state a claim upon which relief can be granted.  For

reasons that follow, defendants' motions are granted in part and denied in part.

## I.    Background

On June 21, 2004, then Connecticut Governor John G. Rowland resigned after he was

accused of improperly accepting tens of thousands of dollars in gifts and services from state

contractors in exchange for the award of state contracts.  On December 7, 2005, Rowland pled

guilty to charges related to the scandal.  In response to those, and other recent events in the

state's history, the Connecticut General Assembly passed a new campaign finance reform law,

Public Act 05-5 (the "Act").

### A.    The Act

One of the Act's provisions created the Citizens' Election Program ("CEP"), a voluntary

public financing option for candidates seeking certain elective offices.  Before a candidate can

receive public funds under the CEP, however, the candidate must meet several requirements, and

the requirements depend upon the candidate's party affiliation.  A "major party" is "(A) a party

or organization whose candidate for Governor at the last-preceding election for Governor

received, under the designation of that political party or organization, at least twenty per cent of

the whole number of votes cast for all candidates for Governor, or (B) a political party having, at

---

[1] This case consists of two consolidated actions.

the last-preceding election for Governor, a number of enrolled members on the active registry list equal to at least twenty per cent of the total number of enrolled members of all political parties on the active registry list in the state."  Conn. Gen. Stat. § 9-372(5).

To qualify for CEP funds, all candidates, regardless of party affiliation, must raise a certain number of qualifying contributions in amounts of 100 dollars or less from individuals. Conn. Gen. Stat. §§ 9-102(b), 9-704.  The total amount of qualifying contributions that a candidate must raise depends upon the office for which the candidate is running.[2]  *Id*.  For major party candidates, there are no additional requirements to receive full public funding.[3]

Minor and petitioning party candidates (collectively "minor party candidates"), however, must satisfy at least one of two additional requirements to qualify for public funding.  First, a minor party candidate can qualify for public funding by gathering signatures of qualified voters ("petitioning requirements").  Conn. Gen. Stat. § 9-705(c)(2).  If a candidate gathers signatures equal to 20 percent or more of the total number of votes cast in the previous election, the candidate is entitled to receive the full public grant for the general election.  *Id*.  If the candidate gathers signatures equal to 15 to 20 percent of the total vote in the previous election, the candidate is entitled to receive two-thirds of the full public grant for the general election.  *Id*.  If the candidate gathers signatures equal to 10 to 15 percent of the total vote in the previous

---

[2] Gubernatorial candidates must raise 250,000 dollars in qualifying contributions; candidates for other state-wide offices such as Lieutenant Governor; Attorney General, State Comptroller, State Treasurer or Secretary of the State must raise 75,000 dollars; state senatorial candidates must raise 15,000 dollars; and state representative candidates must raise 5,000 dollars. *Id*. at § 9-704(a)(1)-(4).  The Act also places other restrictions on qualifying contributions.

[3] Except in the exceedingly rare circumstances set forth below, minor party candidates are entitled to only a fraction of the full public funds, or no public funds at all.

election, the candidate is entitled to receive one-third of the full public grant for the general election.[4]  *Id*.

Second, a minor party candidate can qualify for public funding if the candidate, or another member of her party, received a certain percentage of the vote in the previous general election for the same office ("prior success formula").  If the candidate, or a member of her party, garners 20 percent of the vote in the preceding general election, she is entitled to receive the full public grant for the general election.  Conn. Gen. Stat. §§ 9-705(c)(1), (g)(1).  If the candidate, or a member of her party, garners 15 to 20 percent of the vote in the preceding general election, she is entitled to receive two-thirds of the full public grant for the general election.  *Id*.  If the candidate, or a member of her party, garners 10 to 15 percent of the vote in the preceding general election, she is entitled to receive one-third of the full public grant for the general election.  *Id*.  Because it is necessary to show support in a preceding election, this provision, as a practical matter, does not apply to a minor party candidate whose party has not run a relatively successful campaign in the preceding year for the same office.  Again, the additional qualifying criteria apply only to minor party candidates; they do not apply to major party candidates.  Plaintiffs have alleged that these additional requirements are, as a practical matter, impossible for most, if not all, minor party candidates to satisfy.

Minor party candidates, in certain elections, also may be entitled to post-election reimbursements if they achieve a certain level of support.  Specifically, minor party candidates running for "Governor, Lieutenant Governor, Attorney General, State Comptroller, Secretary of

---

[4] Plaintiffs allege that fulfilling the signature requirement is either impossible, or at very least, impractical.  Because the motion-to-dismiss standard applies, I must assume the truth of that factual allegation.

the State or State Treasurer shall be eligible to receive a supplemental grant from the fund after

the general election if . . . such candidate received a greater per cent of the whole number of

votes cast for all candidates for said office at said election than the per cent of votes utilized by

such candidate to obtain a general election campaign grant. . . ."  Conn. Gen. Stat. § 9-705(c)(3).

The level of funding under the CEP depends upon the office sought, as well as party

status: qualifying gubernatorial candidates receive 1.25 million dollars for the major party

primary and 3 million dollars for the general election, Conn. Gen. Stat. § 705(a); qualifying

candidates for lieutenant governor, attorney general, state comptroller, secretary of the state, and

state treasurer receive 375,000 dollars for the major party primary and 750,000 dollars for the

general election, Conn. Gen. Stat. § 9-705(b); qualifying candidates for state senate receive either

35,000 dollars or 75,000 dollars for the major party primary,[5] and 85,000 dollars for the general

election, Conn. Gen. Stat. § 9-705(e); and qualifying candidates for state representative receive

either 10,000 dollars or 25,000 dollars for the major party primary,[6] and 25,000 dollars for the

general election, Conn. Gen. Stat. § 9-705(f).  Fully qualified minor party candidates receive the

same funds for the general election, but receive no funding for primaries.  Minor party candidates

who qualify and receive partial grants for the general election, however, may raise and spend

----

[5] Major party candidates receive 35,000 dollars for the party primary unless "the percentage of the electors in the district served by said office who are enrolled in said major party exceeds the percentage of the electors in said district who are enrolled in another major party by at least twenty percentage points," in which case the candidate receives 75,000 dollars.  Conn. Gen. Stat. § 9-705(e)(1)(A).

[6] Major party candidates receive 10,000 dollars for the party primary unless "the percentage of the electors in the district served by said office who are enrolled in said major party exceeds the percentage of the electors in said district who are enrolled in another major party by at least twenty percentage points," in which case the candidate receives 25,000 dollars.  Conn. Gen. Stat. § 9-705(f)(1)(A).

additional private funds in order to make up the difference between the partial grant and a full grant.  Conn. Gen. Stat. § 9-702(c).

Candidates who accept public funding may not accept any private contributions, other than the initial qualifying contributions, and, with a few exceptions, generally may not spend money in excess of the original full public grant.  Conn. Gen. Stat. § 9-702.

The CEP also contains provisions that provide for the release of additional public funds, in addition to the original full public grant, if the participating candidate is outspent by a non-participating candidate or by any other non-candidate or organization (collectively "triggering provisions").  One triggering provision is tied to expenditures made by an opposing candidate who does not accept public funding and is not bound by any expenditure limits.  If a non-participating candidate spends more than the amount of the full public grant, then the participating candidate is entitled to receive up to four additional grants in excess of the full public grant, each worth 25 percent of the original grant.  Conn. Gen. Stat. §§ 9-713(a)-(d) ("non-participating candidate trigger").  The participating candidate may not immediately spend any given 25 percent grant – instead, the grant is initially held in escrow and the candidate may only match her opponent's excess spending dollar for dollar.  *Id*.  The excess matching grants that participating candidates are entitled to receive through the non-participating candidate trigger, however, are capped at 100 percent of the original full public grant.  Conn. Gen. Stat. § 9-713(g).

The CEP also contains a triggering provision tied to independent expenditures made by non-candidates ("independent expenditure trigger").  An independent expenditure is "an expenditure that is made without the consent, knowing participation, or consultation of, a candidate or agent of the candidate committee and is not a coordinated expenditure," Conn. Gen.

Stat. § 9-601(18), that is made "with the intent to promote the defeat of a participating candidate.

. . ." Conn. Gen. Stat. § 9-714(a).  Matching funds are triggered when a non-candidate makes an

independent expenditure in support of an opposing candidate that, when combined with the

opposing candidate's other expenditures, exceeds the participating candidate's full public grant.

Conn. Gen. Stat. §§ 9-714(a)-(c).  Again, the additional grant may not exceed 100 percent of the

original full public grant.  Conn. Gen. Stat. § 9-714(c).

     B.     Claims Relevant to the Instant Motion

     Plaintiffs in this case, several minor political parties, several political organizations, and

several past and potential-future candidates for various state political offices, bring a facial

constitutional challenge to the Act.  They filed a five-count amended complaint against several

Connecticut officials[7] in which they seek to enjoin the officials from enforcing various of the

Act's provisions.[8]

     In count one, plaintiffs allege that the Act's qualifying criteria and distribution formulas

violate the First and Fourteenth Amendments to the United States Constitution because the CEP

disproportionately burdens the political opportunity of minor party candidates.  Am. Compl. at ¶

53.  In count two, plaintiffs allege that the non-participating candidate trigger, Conn. Gen. Stat.

§§ 9-713(a)-(d), violates non-participating candidates' First Amendment rights.  Am. Compl. at ¶

---

[7] Several parties also moved to intervene as defendants.  I granted their motion.  *Ass'n of Conn. Lobbyists LLC v. Garfield*, 241 F.R.D. 100 (D. Conn. 2007).

[8] In addition to the instant challenge, the Securities Industry and Financial Markets Association ("SIFMA") challenged a provision of the law that required the State Elections Enforcement Commission to publish the names of all state contractors, their principals, and the principals' household family members on the state's internet website.  *SIFMA v. Garfield*, 469 F. Supp. 2d 25 (D. Conn. 2007).

54. Similarly, in count three, plaintiffs allege that the independent expenditure trigger, Conn. Gen. Stat. § 9-714, violates the potential independent expenders' First Amendment rights. Am. Compl. at ¶ 55.

Defendants now move to dismiss counts two and three for lack of standing. Defendants also move to dismiss counts one, two and three for failure to state a claim, and, in the alternative, seek judgment on the pleadings.

## II.    Standard of Review

Defendants move to dismiss counts two and three for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. The party who seeks to exercise the jurisdiction of the court bears the burden of establishing the court's jurisdiction. *Thompson v. County of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994). To survive a Rule 12(b)(1) motion, a plaintiff must clearly allege facts demonstrating that the plaintiff is a proper party to invoke judicial resolution of the dispute. *Id*. Although the plaintiff bears the ultimate burden of establishing jurisdiction by a preponderance of the evidence, "until discovery takes place, a plaintiff is required only to make a prima facie showing by pleadings and affidavits that jurisdiction exists." *Koehler v. Bank of Bermuda*, 101 F.3d 863, 865 (2d Cir. 1996). "When considering a party's standing, we 'accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Thompson*, 15 F.3d at 249 (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). If a plaintiff has failed to allege facts supportive of standing, it is within the court's discretion to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of standing. *Id*.

Defendants also move to dismiss, and for judgment on the pleadings, with respect to counts one, two, and three pursuant to Rules 12(b)(6) and 12(c). "[A] motion to dismiss for failure to state a claim . . . that is styled as arising under Rule 12(b) but is filed after the close of pleadings, should be construed by the district court as a motion for judgment on the pleadings under Rule 12(c). This makes eminently good sense because a motion for judgment on the pleadings is the direct descendant of that ancient leper of the common law, the 'speaking demurrer.'" *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). I need not parse out the relatively complex filing history of this consolidated case to determine whether the instant motions, or particular portions of the motions, should be treated as motions to dismiss or motions for judgment on the pleadings because the standard of review here, as well as the analysis of the issues, are the same. *See id.* Thus, as a practical matter, I treat the two motions as one.

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Id.* Pursuant to that standard, the defendants' motions will be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. Spalding*, 467 U.S. 69, 73 (1984). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether the plaintiffs have pled a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007); *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007). Courts may also consider any documents attached as exhibits or incorporated by reference in the pleadings, and any other matters of which judicial notice may be taken. *Samuels*

*v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).  In addition, courts may "look to public records . . . in deciding a motion to dismiss."  *Blue Tree Hotels Investment (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004).

## III.    Standing

To satisfy Article III standing, a plaintiff must first establish that she has suffered an injury in fact that is both "concrete and particularized," and "actual or imminent, not 'conjectural' or 'hypothetical.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Second, a plaintiff must demonstrate a causal connection between the injury and the conduct of which she complains, specifically, that the injury is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court."  *Simon v. Eastern Ky. Welfare Rights Org*., 426 U.S. 26, 41-42 (1976). Finally, the injury must be redressable by a favorable decision.  *Lujan*, 504 U.S. at 561.

In addition, the injury-in-fact requirement "serves to distinguish a person with a direct stake in the outcome of a litigation – even though small – from a person with a mere interest in the problem."  *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 690 (1973).  Finally, where "plaintiffs allege an intention to engage in a course of conduct arguably affected with a constitutional interest which is clearly proscribed by statute, courts have found standing to challenge the statute, even absent a specific threat of enforcement."  *United Food & Commercial Workers Int'l Union v. IBP, Inc.*, 857 F.2d 422, 428 (8th Cir. 1988).

The crux of defendants' standing argument is that the plaintiffs have failed to plead a sufficient basis to establish that they will be injured by several of the CEP's challenged provisions.

A.    Do Plaintiffs Have Standing to Challenge the Qualifying Criteria for Petitioning
      Candidates?

Defendants argue that plaintiffs lack standing to challenge the qualifying criteria for

petitioning party candidates because the plaintiffs have not specifically alleged that any of them

will be a petitioning party candidate in the future, and thus, none of the plaintiffs will suffer an

injury from that provision.  Defendants' argument, however, misses the mark.

The CEP imposes two additional obstacles for *all* minor party candidates to obtain public

funds: the prior success formula and the petitioning requirements.  The prior success formula, by

definition, is inapplicable to candidates who either (a) have not previously run for the specific

office sought, or (b) whose party did not run for the specific office sought in the last election

cycle.  Thus, in many cases, satisfying the petitioning requirements is the only possible method to

obtain public funding for a minor party candidate.

In this case, at least one of the plaintiffs is a potential petitioning candidate.  Plaintiff S.

Michael DeRosa is a member of the Green Party, a minor political party.  Am. Compl. at ¶ 11.

He ran for Secretary of the State in the past election and received less than two percent of the

total vote.  *Id*.; Office of the Secretary of the State, Vote for the Secretary of the State (2006),

*available at* http://www.sots.ct.gov/RegisterManual/SectionVIII/SOV06Secretary.htm.  DeRosa

intends to run for a state political office in the future, and although he does not allege the specific

office he will seek, he does allege that he will not qualify for public funding under the CEP.  Am.

Compl. at ¶ 11.  Taking that allegation as true, and because DeRosa will not qualify for public

funding under the prior success formula, DeRosa will have to satisfy the petitioning requirements

to receive public funds.  DeRosa's current inability to qualify for public funds thus derives as

much, or greater, from his inability to satisfy the petitioning requirements as from the prior success formula.

Moreover, the fact that DeRosa has not alleged an intention to run as a petitioning party candidate may simply be a function of the fact that, as he alleges, the petitioning requirements, which require a petitioning candidate to gather signatures in the amount of 20 percent of the total votes cast for that office in the preceding year, Conn. Gen. Stat. §§ 9-705(c)(2), (g)(2), are impracticable or impossible to meet.  Still, the fact that DeRosa is not a declared petitioning party candidate does not render the petitioning requirements any less an obstacle to his receipt of public funds.  Thus, assuming the allegations of the Amended Complaint to be true, DeRosa will be imminently harmed by the petitioning requirements.

B.   Do Plaintiffs Have Standing to Challenge the Public Funding of Major Party Candidates in Primary Elections?

Defendants argue that plaintiffs have no standing to challenge the public funding of major party primaries because minor parties do not have primaries, and thus, minor party candidates suffer no harm from their exclusion from primary funding.  Plaintiffs counter that they do suffer harm.  Plaintiffs allege that, during primary elections, major party candidates gain exposure to the electorate and garner name recognition that helps the major party candidate in the general election.  By funding major party candidates in primary races at an excessively high level, the law is alleged to exacerbate major party candidates' comunications advantage.

Defendants may argue that funding major party candidates in their primary campaigns does not give them an advantage in the general election, and thus does not harm minor party candidates, but that goes to the ultimate issue on the merits, not to standing.  There is no question

that the plaintiffs have alleged a stake in the outcome of the public funding of their general

election opponents during their primary campaigns.

      C.     Do Plaintiffs Have Standing to Challenge the Independent Expenditure Trigger?

      Defendants argue that plaintiffs have no standing to challenge the independent

expenditure trigger because plaintiffs fail to allege they plan to make any independent

expenditures in the future.  The mere fact that a potential donor has not made, and would not

make under the current law, a donation sufficient to trigger additional public campaign funds

does not necessarily divest plaintiffs of standing, however, because the very fact that the trigger

would prevent a potential expender from expending in the first instance constitutes the injury that

gives rise to standing.  In that respect, the triggering provision is alleged to be somewhat akin to

the proverbial sword of Damocles; its impact is felt even when it merely hangs, it need not fall.

Again, the defendants' argument that the triggering provision does not chill speech goes to the

merits, not to standing.[9]

## IV.  Count One – Do the CEP's Qualifying Criteria and Distribution Formulas Violate The First and Fourteenth Amendments?[10]

---

[9] As set forth in greater detail below, plaintiffs' First Amendment claims in counts two and three that relate to the triggering provisions are without merit.  The triggers are nevertheless applicable to plaintiffs' other First and Fourteenth Amendment claims, namely, that the CEP crowds them out of races, especially in one-party-dominant districts, and that the CEP is effectively a subsidy to major party candidates, not a substitute for private campaign contributions.  Plaintiffs have standing to raise those First and Fourteenth Amendment claims.

[10] I understand plaintiffs' First Amendment challenge not to stand on its own, but to be part and parcel of their equal protection claim.  Specifically, the First Amendment is relevant to determining whether the CEP burdens the exercise of plaintiffs' fundamental constitutional rights.  *See Libertarian Party of Indiana v. Packard*, 741 F.2d 981, 984 n.2 (7th Cir. 1984) (discussing the interplay between the First and Fourteenth Amendments with respect to a similar claim); *see also Buckley v. Valeo*, 424 U.S. 1, 92-93 (1976) (initially rejecting plaintiff's First Amendment claim somewhat summarily before addressing plaintiffs' Equal Protection claim).

The Fourteenth Amendment to the United States Constitution prohibits States from depriving "any person of life, liberty, or property, without due process of law," or denying "any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV.  Courts perform similar analyses to evaluate claims pursuant to the Due Process and Equal Protection Clauses of the Fourteenth Amendment.[11]  Under both clauses, a court must first determine the appropriate level of scrutiny to apply when evaluating the challenge to the law.  A court must then apply the appropriate level of scrutiny to determine whether the law is appropriately tailored to meet its ends.

A broad overview of defendants' argument for dismissal of count one, and plaintiffs' responses to that argument, is useful before analyzing the nuances of the relevant issues in great detail.  Defendants argue that this case falls within the rubric of *Buckley* 424 U.S. 1 (1976), a case that upheld the constitutionality of the presidential public funding program set forth in Subtitle H of the Internal Revenue Code.  Plaintiffs argue that *Buckley* does not control here because the facts of this case are distinguishable from those presented in *Buckley*, and because the differences between the CEP and Subtitle H render the CEP unconstitutional under the Fourteenth Amendment.

---

[11] Indeed, the two constitutional theories often overlap.  *See Harrah Independent School Dist. v. Martin*, 440 U.S. 194, 197 (1979) (holding that the Supreme Court's "decisions construing the Equal Protection and Due Process Clauses of the Fourteenth Amendment do not form a checkerboard of bright lines between black squares and red squares"); *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 120 (1996) (holding that the Supreme Court's decisions regarding "access to judicial processes . . . reflect both equal protection and due process concerns" and that "A 'precise rationale' has not been composed" for analyzing those cases "because cases of this order cannot be resolved by resort to easy slogans or pigeonhole analysis") (internal citations and quotations omitted).

A.    Scrutiny

Plaintiffs allege in Count One that the CEP violates the First Amendment and the Equal

Protection clause of the Fourteenth Amendment.  Under "traditional equal protection principles,"

courts apply rational basis review to evaluate the constitutionality of a challenged statute, holding

the law constitutional if it is rationally related to a legitimate state interest.  *See Clements v.*

*Fashing*, 457 U.S. 957, 962-63 (1982) ("The Equal Protection Clause allows the States

considerable leeway to enact legislation that may appear to affect similarly situated people

differently.  Legislatures are ordinarily assumed to have acted constitutionally.  Under traditional

equal protection principles, distinctions need only be drawn in such a manner as to bear some

rational relationship to a legitimate state end.  Classifications are set aside only if they are based

solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be

conceived to justify them.").

Courts deviate from traditional equal protection principles, however, if the challenged

statute discriminates against a suspect class of persons or burdens the exercise of a fundamental

constitutional right in a discriminatory manner.  *Id*.  In this case, plaintiffs allege the latter.  If a

law burdens the exercise of a fundamental constitutional right in a discriminatory manner, it is

subject to strict scrutiny, and will be held constitutional only if the law is narrowly tailored to

achieve a compelling government interest.  *See, e.g., Police Dep't of Chicago v. Mosley*, 408

U.S. 92, 101 (1972) (applying strict scrutiny to strike down an ordinance that placed content-

based restriction upon certain types of picketing, holding that the "Equal Protection Clause

requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate

objectives"); *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) (applying strict scrutiny to strike

-15-

down an Oklahoma law that permitted the state to forcibly sterilize "habitual criminals," holding

that "strict scrutiny of the classification which a State makes in a sterilization law is essential,

lest unwittingly, or otherwise, invidious discriminations are made against groups or types of

individuals in violation of the constitutional guaranty of just and equal laws.  The guaranty of

equal protection of the laws is a pledge of the protection of equal laws.") (internal quotations

omitted).

        1.    *Framing the Right at Issue*

Central to this case is the question whether the CEP burdens minor party candidates'

exercise of a fundamental right.  It is axiomatic that, before determining whether a right is

fundamental, a court must frame and define the right at issue.  Plaintiffs allege that the CEP

burdens the exercise of their First Amendment rights.

In framing the particular First Amendment right at issue here, I do not write on a blank

slate.  Although a handful of other states have passed comprehensive public funding laws, *e.g.*,

Ariz. Rev. Stat. §§ 16-940, *et seq*.; Minn. Stat. §§ 10A.01, *et seq*.; Ky. Rev. Stat. §§ 121A.005, *et

seq*. (repealed); Me. Rev. Stat. tit. 21-A §§ 1121, *et seq*.; Mass. Gen. Laws ch. 55A, §§ 1, *et seq*.

(repealed); N.C. Gen. Stat. Ann. §§163-278.61, *et seq*.; Vt. Stat. Ann. tit. 17 §§ 2801, *et seq*.,

none of those laws is analogous to the CEP for reasons set forth below in greater detail.  Thus,

although most of those laws have been challenged, none of those cases provide much guidance.[12]

Instead, guidance in this case comes, almost exclusively, from Part III of the Supreme

_____

[12] As described in more detail in the tailoring section, those laws do provide a useful
contrast to the CEP.

Court's opinion in *Buckley*, 424 U.S. 1.[13]  In that case, plaintiffs brought a similar challenge to

Subtitle H, 26 U.S.C. §§ 9001, *et seq*. ("Subtitle H"), a provision of the Internal Revenue Code

that created a public funding system for presidential elections.[14]  Because of some rough

similarities between the CEP and Subtitle H, discussions of Subtitle H and *Buckley* provide a

useful starting point to analysis of the Act.

<blockquote>a.      Subtitle H</blockquote>

Section 9006 of Subtitle H established a Presidential Election Campaign Fund, from

which qualified candidates can receive public funding for presidential campaigns.  The fund is

financed under Section 6096(a), which authorizes individuals to earmark a small portion of their

income tax payments, one dollar originally, to the fund.  Subtitle H created three accounts, one

each for (1) presidential nominating conventions, 26 U.S.C. § 9008, (2) general election

campaigns, 26 U.S.C. § 9006, and (3) primary campaigns 26 U.S.C. § 9037.

Subtitle H makes distinctions among major, minor, and new parties.  A "major party" is

"a political party whose candidate for the office of President in the preceding presidential

election received, as the candidate of such party, 25 percent or more of the total number of

popular votes received by all candidates for such office."  26 U.S.C. § 9002(6).  A "minor party"

is "a political party whose candidate for the office of President in the preceding presidential

---

[13] The Supreme Court recently noted that "[o]ver the last 30 years, in considering the
constitutionality of a host of different campaign finance statutes, this Court has repeatedly
adhered to *Buckley*'s constraints."  *Randall v. Sorrell*, 126 S. Ct. 2479, 2488 (2006).

[14] Plaintiffs in *Buckley* also challenged the public funding provision set forth in Subtitle H
on at least two other grounds: (1) that it violated U.S. Const. Art. I, § 8 because it was "contrary
to the 'general welfare;'" and (2) that "any scheme of public financing of election campaigns is
inconsistent with the First Amendment."  *Buckley*, 424 U.S. at 90.

election received, as the candidate of such party, 5 percent or more but less than 25 percent of the total number of popular votes received by all candidates for such office."  26 U.S.C. § 9002(7). A "new party" is "a political party which is neither a major party nor a minor party."  26 U.S.C. § 9002(8).

The disbursement of funds under Subtitle H depends upon party status.  National committees of major parties are entitled to receive four million dollars for their nominating conventions, but the national committee may not use that money to benefit a particular candidate. 26 U.S.C. § 9008.  A minor party receives a fraction of the four million dollars equal to the ratio of "the number of popular votes received by the candidate for President of the minor party . . . in the preceding presidential election," and "the average number of popular votes received by the candidates for President of the United States of the major parties in the preceding presidential election."  26 U.S.C. § 9008(b)(2).  Major party candidates are entitled to receive 20 million dollars, adjusted for inflation, for the general election, 26 U.S.C. § 9004(a)(1); 2 U.S.C. § 441a(b)(1), provided the candidate agrees not to incur expenses in excess of the entitlement and does not accept private contributions "except to the extent necessary to make up any deficiency in payments received out of the fund on account of the application of section 9006(d)."  26 U.S.C. § 9003(b).  Minor party candidates are entitled to receive a fraction of the 20 million dollars equal to the ratio of "the number of popular votes received by the candidate for President of the minor party . . . in the preceding presidential election," and "the average number of popular votes received by the candidates for President of the United States of the major parties in the preceding presidential election."  26 U.S.C. § 9004(a)(2)(A).  To receive funds, minor party candidates must agree that they will not incur expenses "in excess of the aggregate payments to

-18-

which the eligible candidates of a major party are entitled," and that they will accept private contributions only to the extent necessary to make up the difference between the fraction of full public grant they receive and the total amount of the full public grant that major parties are entitled to receive.  26 U.S.C. § 9003(c).

If they do not qualify for public funding prior to an election, Subtitle H affords new party and minor party candidates an opportunity to obtain post-election funding to reimburse expenses under certain circumstances.  New party and minor party candidates who receive "5 percent or more of the total number of popular votes cast for the office of President in such election shall be entitled to payments under section 9006 equal in the aggregate to an amount which bears the same ratio to the amount allowed . . . for a major party as the number of popular votes received by such candidate in such election bears to the average number of popular votes received in such election by the candidates for President of the major parties."  26 U.S.C. § 9003(a)(3).

Finally, Subtitle H provides funding to use in presidential primary campaigns.  26 U.S.C. §§ 9031, *et seq*.  To be eligible for primary funds, a participating candidate must raise at least 5,000 dollars in each of 20 states in increments of 250 dollars or less per person, and must agree to abide by expenditure limitations.  Once eligible to receive funds, the participating candidate receives matching contributions up to 50 percent of the total expenditure limitation.  26 U.S.C. § 9034(b).

### b.    The First Amendment Right at Issue in *Buckley*

The *Buckley* Court, in Part III of the majority opinion, upheld the constitutionality of Subtitle H.  In identifying the fundamental right at issue in *Buckley*, the Court began its discussion by noting that "[i]n several situations concerning the electoral process, the principle

has been developed that restrictions on access to the electoral process must survive exacting

scrutiny." *Buckley*, 424 U.S. at 93-94.  The Court stated that ballot-access restrictions can be

sustained only if they further "a vital governmental interest that is achieved by a means that does

not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally

important interest in the continued availability of political opportunity." *Id*. at 94 (internal

quotations and citation omitted).

The Court, however, distinguished ballot-access restrictions from public funding

programs.  It noted that ballot-access restrictions were "direct burdens not only on the candidate's

ability to run for office but also on the voter's ability to voice preferences regarding

representative government and contemporary issues," whereas "the denial of public financing to

some Presidential candidates is not restrictive of voters' rights and less restrictive of

candidates'." *Id*.  The Court reasoned that "Subtitle H does not prevent any candidate from

getting on the ballot or any voter from casting a vote for the candidate of his choice; the inability,

if any, of minor-party candidates to wage effective campaigns will derive not from lack of public

funding but from their inability to raise private contributions." *Id*. at 94-95.  As such, "[a]ny

disadvantage suffered by operation of the eligibility formulae under Subtitle H is thus limited to

the claimed denial of the enhancement of opportunity to communicate with the electorate that the

formulae afford eligible candidates." *Id*. at 95.

In addition, Subtitle H is less restrictive than ballot-access measures because eligible

candidates must accept an expenditure ceiling.  The *Buckley* Court concluded that, although

public financing is less restrictive of access to the electoral process than are ballot-access

regulations, Congress nevertheless "enacted Subtitle H in furtherance of sufficiently important

governmental interests and has not unfairly or unnecessarily burdened the political opportunity of any party or candidate." *Id*. at 95. The Supreme Court thus identified the First Amendment right at issue as "political opportunity."

Unfortunately, the Supreme Court did not go far in defining the concept of "political opportunity," nor did it set forth, in meaningful detail, the nature and scope of that right. Instead, the Court focused the bulk of its analysis on explaining how and why Subtitle H did not impinge on the right to political opportunity.

One aspect of the decision, however, bears particular mention. Justice White, who joined Part III of the Court's opinion in *Buckley*, noted that, "money is not always equivalent to or used for speech, even in the context of political campaigns." *Id*. at 263. Although money is not speech *per se*, money facilitates a candidate's ability to communicate with the electorate. *See id*. ("I accept the reality that communicating with potential voters is the heart of an election campaign and that widespread communication has become very expensive."). Justice White also noted that campaigns have other substantial expenses that "are not themselves communicative or remotely related to speech," and that some campaigns that operate on lower budgets engage in significantly more traditional speech than some campaigns that operate on higher budgets. *Id*. Still, there can be no doubt that increasing a candidate's available funds enhances that candidate's ability to convey her message to the general voting public.

  2.  *Does the CEP Burden the Political Opportunity of Minor Party Candidates?*

    a.  Part III of the Majority Opinion in *Buckley*

I again begin my analysis with *Buckley*. The Court first articulated the general principle

that "the Constitution does not require Congress to treat all declared candidates the same for public financing purposes," essentially because different political parties have different "needs and potential." *Id.* at 97. The Court continued that "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike," *id.* at 97-98, and "since the presidential elections of 1856 and 1860, when the Whigs were replaced as a major party by the Republicans, no third party has posed a credible threat to the two major parties in presidential elections." *Id.* at 97-98. Because third parties have been traditionally unable to raise sufficient money to run effective presidential campaigns, Congress understandably provided major parties with full funding and minor parties with only a fraction of the full public grant. *Id.* at 98. "Identical treatment of all parties . . . would not only make it easy to raid the United States Treasury, it would also artificially foster the proliferation of splinter parties." *Id.* (internal quotation omitted).

The *Buckley* Court then reasoned that Subtitle H does not "disadvantage nonmajor parties by operating to reduce their strength below that attained without any public financing." *Id.* at 99. Minor party candidates are still "free to raise money from private sources." *Id.* In addition, participating candidates must comply with expenditure ceilings, whereas non-participating candidates are free to raise and spend unlimited sums of money. *Id.* Most significantly, the Court held that "*[p]ublic funding for candidates of major parties is intended as a substitute for private contributions*; but for minor-party candidates such assistance may be viewed as a supplement to private contributions since these candidates may continue to solicit private funds up to the applicable spending limit." *Id.* (emphasis added).

The *Buckley* plaintiffs had also argued, "relying on the ballot-access decisions of this

Court, that the absence of any alternative means of obtaining pre-election funding renders the

scheme unjustifiably restrictive of minority political interests." *Id*. at 100.  The Court disagreed

because the "need for an alternative means turn[s] on the nature and extent of the burden

imposed." *Id*.  Alternative means were held unnecessary in *Buckley* because Subtitle H did not

impose an unfair or unnecessary burden on minor party candidates.  *Id*. at 101.  The Court also

noted that "[t]he primary goal of all candidates is to carry on a successful campaign by

communicating to the voters persuasive reasons for electing them." *Id*.  Ballot-access is more

important to running a successful campaign than public financing because ballot-access is, with

rare exceptions, essential to a successful campaign, whereas "campaigns can be successfully

carried out by means other than public financing. . . . [A]fter all, the important achievements of

minority political groups in furthering the development of American democracy were

accomplished without the help of public funds." *Id*. at 101-02.

Finally, the *Buckley* plaintiffs challenged the five percent vote threshold that minor party

candidates must meet to receive public funds.  Plaintiffs argued that the threshold was too high

because it far exceeded previously-challenged ballot-access thresholds.  The Court rejected that

argument, again reasoning that a denial of public funds is less burdensome than a denial of access

to a position on a ballot.  *Id*. at 103.  In addition, Subtitle H's five percent threshold was actually

easier to meet than the five percent ballot-access threshold upheld in *Jenness v. Fortson*, 403

U.S. 431 (1971), because the ballot-access restriction in that case required a potential candidate

to acquire five percent of all eligible voters, but Subtitle H only required candidates to obtain five

percent of the actual vote.  *Id*.  Significantly, the Court held that "the choice of the percentage

requirement that best accommodates the competing interests involved was for Congress to make.

-23-

Without any doubt a range of formulations would sufficiently protect the public fisc and not foster factionalism, and would also recognize the public interest in the fluidity of our political affairs.  We cannot say that Congress' choice falls without the permissible range." *Id*. at 103-04 (internal citation omitted).[15]

The *Buckley* Court also noted that any harm to minor party interests was speculative because plaintiffs brought a facial challenge to Subtitle H, so no empirical data was available to corroborate the plaintiffs' claims. *Id*. ("Any risk of harm to minority interests is speculative due to our present lack of knowledge of the practical effects of public financing and cannot overcome the force of the governmental interests against use of public money to foster frivolous candidacies, create a system of splintered parties, and encourage unrestrained factionalism."). Although the *Buckley* Court rejected the petitioners' facial challenge to Subtitle H, the Court left open the possibility that a public financing scheme might have the practical effect of discriminating against minor parties:

> The allegations of individual discrimination are based on the claim that Subtitle H is facially invalid; since the public financing provisions have never been in operation, appellants are unable to offer factual proof that the scheme is discriminatory in its effect.  In rejecting appellants' arguments, we of course do not rule out the possibility of concluding in some future case, upon an appropriate factual demonstration, that the public financing system invidiously discriminates against nonmajor parties.

*Id*. at 97 n.131.

---

[15] In addition, plaintiffs in *Buckley* had argued that prior electoral success was not the best indicator of future electoral success, and that other methods would be more fair and accurate. The Court disagreed, holding that prior success in elections is a "proper measure of public support." *Id*.  (citing *Jenness v. Fortson*, 403 U.S. 431 (1971)).

b.      The Dissents in *Buckley*[16]

Chief Justice Burger and Justice Rhenquist dissented from Part III of the majority opinion

in *Buckley*.  In his dissent, Burger articulated two broad concerns.  Burger's first major concern

was "whether public financial assistance to the private political activity of individual citizens and

parties [was] a legitimate expenditure of public funds." *Id*. at 248.  Burger was particularly

concerned with the fact that Congress was "actual[ly] financing, out of general revenues, a

segment of the political debate itself." *Id*.  He cited Senator Howard Baker's remark from the

Congressional debate: "I think there is something politically incestuous about the Government

financing and, I believe, inevitably then regulating, the day-to-day procedures by which the

Government is selected. . . .  I think it is extraordinarily important that the Government not

control the machinery by which the public expresses the range of its desires, demands, and

dissent." *Id*.  Burger agreed with Baker, commenting that "the inappropriateness of subsidizing,

from general revenues, the actual political dialogue of the people – the process which begets the

Government itself – is as basic to our national tradition as the separation of church and state also

deriving from the First Amendment, or the separation of civilian and military authority, neither of

which is explicit in the Constitution but both of which have developed through case-by-case

adjudication of express provisions of the Constitution." *Id*. at 248-49 (citations omitted).  Burger

noted that recent history had shown the "dangerous examples of systems with a close,

'incestuous' relationship between 'government' and 'politics,'" and that those dangers could not

be dismissed summarily by the majority's position that "Subtitle H is a congressional effort, not

---

[16] The reasoning employed by the dissents in *Buckley* are obviously not controlling here.
I note, however, that the dissenters' concerns are particularly relevant in light of the differences
between the facts presented in that case and the facts alleged here.

to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people." *Id*. at 249.[17]

Burger's second major concern was that, even if it was constitutional to fund political candidates, Subtitle H "invidiously discriminates against minor parties." *Id*. at 251. He agreed with the majority that "there is a legitimate governmental interest in requiring a group to make a 'preliminary showing of a significant modicum of support,'" but noted that Subtitle H "could preclude or severely hamper access to funds before a given election by a group or an individual who might, at the time of the election, reflect the views of a major segment or even a majority of the electorate." *Id*. And perhaps most significantly, Burger reasoned that: "The fact that there have been few drastic realignments in our basic two-party structure in 200 years is no constitutional justification for freezing the status quo of the present major parties at the expense of such future political movements. . . . In short, [there are] grave risks in legislation, enacted by incumbents of the major political parties, which distinctly disadvantages minor parties or independent candidates. This Court has, until today, been particularly cautious when dealing with enactments that tend to perpetuate those who control legislative power." *Id*. (citation omitted). Finally, Burger noted that Subtitle H "will invite avoidance, if not evasion, of the intent of the Act, with 'independent' committees undertaking 'unauthorized' activities in order to

―――――――――――――――

[17] The CEP is even more "incestuous" than Subtitle H. Congress enacted Subtitle H to regulate the presidential election, not congressional elections. By contrast, the Connecticut state legislature enacted the CEP to fund elections for the Connecticut state legislature itself (as well as other state-wide executive positions). As such, the benefits the CEP provides to major parties are enjoyed directly by Connecticut state legislators, all of whom are members of the two major parties.

escape the limits on contributions." *Id*. at 253.

Justice Rhenquist also dissented from part III of the majority opinion in *Buckley*. Rhenquist first noted that he was not sure he agreed "with the Court's comment that 'public financing is generally less restrictive of access to the electoral process than the ballot-access regulations dealt with in prior cases.'" *Id*. at 292.  In comparing ballot-access laws with Subtitle H, Rhenquist noted that states must, "by definition," enact ballot-access laws to provide a republican form of government.  *Id*.  "The decision of the state legislature to enact legislation embodying such regulations is therefore not in any sense an optional one; there must be some standards, however few, which prescribe the contents of the official ballot if the popular will is to be translated into a choice among candidates." *Id*. at 292.  Rhenquist noted, however, that "Congress . . . while undoubtedly possessing the legislative authority to undertake the task if it wished, is not obliged to address the question of public financing of Presidential elections at all. When it chooses to legislate in this area, so much of its action as may arguably impair First Amendment rights lacks the same sort of mandate of necessity as does a State's regulation of ballot access." *Id*.

Rhenquist concluded that Subtitle H was an unconstitutional exercise of Congressional power to regulate elections.  He agreed that Congress "has an interest in not funding hopeless candidacies with large sums of public money, and may for that purpose legitimately require some preliminary showing of a significant modicum of support," *id*. at 293 (citations and internal quotations omitted), but concluded that, in Subtitle H, Congress had "done a good deal more than that.  It has enshrined the Republican and Democratic Parties in a permanently preferred position, and has established requirements for funding minor-party and independent candidates to which

the two major parties are not subject." *Id*. Rhenquist continued that "Congress would

undoubtedly be justified in treating the Presidential candidates of the two major parties

differently from minor-party or independent Presidential candidates, in view of the long

demonstrated public support of the former. But because of the First Amendment overtones of the

plaintiffs' Fifth Amendment equal protection claim, something more than a merely rational basis

for the difference in treatment must be shown, as the Court apparently recognizes." *Id*. He found

it "impossible to subscribe to the Court's reasoning that because no third party has posed a

credible threat to the two major parties in Presidential elections since 1860, Congress may by law

attempt to assure that this pattern will endure forever." *Id*. at 293-94.

> c.   Unlike Subtitle H, the CEP is Alleged to Burden the Political
> Opportunity of Minor Parties, Primarily in One-Party-Dominant
> Legislative Districts

It is immediately apparent from the face of the statute itself that the CEP's qualifying

criteria make it substantially more difficult for minor party candidates to receive public funds

than major party candidates. In fact, plaintiffs allege that the criteria, as a practical matter, all but

categorically exclude them from receiving public funds. As the Supreme Court held in *Buckley*,

however, an exclusion from public funds is not necessarily unconstitutional. *Id*. at 102 (holding

that the achievements of minor political parties "were accomplished without the help of public

funds," thus "the limited participation or non-participation of non-major parties or candidates in

public funding does not unconstitutionally disadvantage them"). The relevant question here is

thus not whether the CEP burdens minor party candidates' access to public funds, but rather,

whether the CEP, as a whole, burdens their political opportunity.[18]  For reasons set forth below, with respect to count one, I hold that plaintiffs have sufficiently pled that it does.

*Buckley*'s reasoning is not controlling here for two related reasons.  First, despite defendants' assertions to the contrary, *see* Def. Mem. at 16, the CEP is quite different than Subtitle H.  Most significantly, the CEP was created to fund literally hundreds of general elections across the state.  It determines major party status based upon the results of the preceding state-wide gubernatorial election and then uses that status as a proxy for virtually every potentially eligible candidate's chances of success in the current general election, regardless of whether the candidate is running for a state-wide or district-wide office and regardless of the composition, demographics, and voting history of any given district.  In short, the CEP applies a single state-wide proxy to numerous district-wide elections.  Subtitle H, by contrast, was designed to fund a single election.  Determination of major party status under Subtitle H is dictated by the preceding presidential election, and then applied only to candidates in the current presidential election.  Unlike the CEP, Subtitle H "measures support on a nation-wide basis for a national office," *Bang v. Chase*, 442 F. Supp. 758, 768 (D. Minn. 1977).[19]

Second, presidential elections are quite different than Connecticut state elections.

---

[18] The *Buckley* Court did not clearly delineate the boundaries of the right to political opportunity, and I need not do so when ruling on a motion to dismiss/motion for judgment on the pleadings.

[19] To further illustrate the difference between the CEP and Subtitle H, I note that a federal equivalent to the CEP would involve using the results of the preceding presidential election as a proxy to determine a given candidates' chances of success in a current election for United States Senate or House of Representatives, regardless of the composition of the state or district in which that federal candidate was running and regardless of the voting history of that district for the pertinent office.

Presidential elections are, with a few rare exceptions, always competitive, with both major party candidates enjoying significant popular support.[20]  A substantial percentage of Connecticut legislative elections are uncompetitive,[21] however, because many legislative districts are one-party dominant.[22]

---

[20] There certainly have been a few routs in the electoral college since 1856.  To name two of the biggest, Franklin D. Roosevelt defeated Alfred Landon in 1936 carrying 523 of the 531 electoral votes cast in that election, and Ronald Regan defeated Walter Mondale in 1984 carrying 525 of the 538 electoral votes cast in that election.  Dave Liep's Atlas of U.S. Presidential Elections, *available at* Databases and E-Resources at the Library of Congress, Federal Election System, http://www.loc.gov/rr/ElectronicResources/full_description.php?MainID=245 ("Liep Atlas").

But the popular vote in the vast majority of presidential elections, including those two contests, has been fairly evenly split between Republicans and Democrats.  *See id*.  With a few exceptions that involved extenuating circumstances, no Democratic or Republican candidate since 1856 received less than 34 percent of the popular vote, and in almost all of those elections, the Democratic and Republican candidate both received much closer to 50 percent of the vote.  *Id*.

The exceptions all involve three-way races.  *Id*.  In 1924, Republican Calvin Coolidge received 54.04 percent of the popular vote to defeat Democrat John Davis in the general election.  *Id*.  Davis received 28.82 percent of the vote, but Progressive Candidate Robert LaFollette also ran and received 16.61 percent.  *Id*.  In 1912, Democrat Woodrow Wilson received 41.84 percent of the popular vote to defeat Republican William Taft in the general election.  *Id*.  Taft received 23.17 percent of the vote, but Progressive Candidate Theodore Roosevelt also ran and received 27.40 percent.  *Id*.  In 1860, Republican Abraham Lincoln received 39.65 percent of the popular vote to defeat Democrat Steven Douglas in the general election.  *Id*.  Douglas received 29.52 percent of the popular vote, but Southern Democrat Candidate John Breckenridge and Constitutional Union Candidate John Bell also ran, collectively garnering 30.82 percent.  *Id*.

[21] The plaintiffs in this case submit that in 2006, 61 of the 151 races for state representative were virtually uncontested, and major party candidates faced only token opposition from the opposing major party candidate in an additional six races.  On the state senate side, nine of the 36 races were virtually uncontested, and major party candidates faced only token opposition from the opposing major party candidate in an additional five races.  In sum, 81 of 187 (43 percent) races for the Connecticut Generally Assembly in 2006 were uncompetitive.

[22] I use the term "one-party-dominant" district to mean a district in which either the voters registered to a particular major party materially exceed the number of voters registered to the other major party, or a district in which one party's candidate virtually always wins the general election.

-30-

Because races for the presidency are highly competitive between major party candidates, it follows that: (a) both major parties will always run a candidate for president, and those candidates will always present more than mere token opposition to the opposing party; (b) major party candidates will otherwise raise and spend a substantial amount of money on the election; and (c) major party candidates will gain no financial advantage by accepting public funds under Subtitle H because the public funds merely replace private funds, and because the candidate must accept meaningful expenditure limitations.

Plaintiffs contend, however, that in one-party-dominant districts, which constitute a large portion of Connecticut legislative districts, those circumstances do not apply because: (a) The non-dominant party often does not run a candidate, or runs only a token opponent; (b) Both the token candidate (if there is one) and the dominant candidate raise and spend substantially less on the general election than the limits set forth in the CEP, which are keyed to the most expensive races; and (c) The CEP does not merely substitute public funds for private funds – it subsidizes participating candidates with greater financial resources to conduct more communicative activities than they would otherwise conduct, and virtually compels a two-party race between major party candidates where there otherwise would have been only one major party candidate running.

Taking the allegations of the amended complaint as true, the CEP has a more pervasive effect on elections than did Subtitle H.  By conferring a communications benefit and compelling highly competitive two-party races in one-party-dominant districts, the CEP changes the dynamic of many state legislative races in a way that further marginalizes minor parties.  Before the CEP, minor parties had greater political opportunity, and made their biggest strides, in noncompetitive

districts.  In the absence of substantial competition between major party candidates, plaintiffs allege that those districts proved to be fertile ground on which to spread their message.  But the CEP has now created a perverse incentive for the non-dominant major party to run well-financed candidates, regardless of the party's prior success in the district, and regardless of the candidate's potential for electoral success.  It compels a competitive two-party race between major party candidates in which the government finances, at exceedingly generous levels, major party candidates' efforts to communicate their views and policies to the electorate.  Minor party candidates will be crowded out of those races, and the CEP will snuff out the gains that minor parties have made.  By perpetuating the two-party dominance of the Connecticut political landscape, the CEP is alleged to "disadvantage nonmajor parties by operating to reduce their strength below that attained without any public financing."  *Buckley*, 424 U.S. at 99.

The disadvantage is exacerbated not only by the fact that the CEP is alleged to be so generous that participating candidates have no meaningful spending limits, but by the ease with which participating major party candidates can circumvent those spending limits.  Take, for example, a three-way race between a publicly-funded Republican candidate, a Green Party candidate who has had some success in past elections but not enough to qualify for public funds, and a non-participating, independently-wealthy Democratic challenger.  Suppose the district is a Republican-dominant district.  Provided the Democratic challenger spends enough money on his own campaign, the publicly-funded Republican candidate could receive an additional public grant of up to the value of the entire original full public grant through the non-participating candidate trigger.  And provided that an independent source makes enough uncoordinated expenditures on behalf of the Democratic challenger, there appears to be no statutory mechanism

to prohibit the Republican candidate from receiving an additional public grant, again, up to the value of the entire original full public grant through the independent expenditure trigger.  The publicly-funded Republican has now received *three times* the original full public grant, which was, on its own, keyed to the most expensive races for that office state-wide.[23]

In addition, the publicly-funded candidate's party, or other individuals, can make virtually unlimited independent expenditures that directly advocate the election of the Republican or the defeat of the two challengers, as long as those expenditures are not coordinated by the Republican candidate or his campaign.  Because of the government-funded and government-induced major-party slugfest, the Green Party candidate's modest efforts to communicate with the electorate are alleged to be further marginalized.

With a few exceptions,[24] the Connecticut political landscape is, and has been, soundly

---

[23] Subtitle H has no similar triggers to increase public funding.

[24]  In Connecticut elections, some minor parties have not only posed credible threats to the major party candidates, but have won elections.  For example, in 2006, Senator Joseph I. Lieberman won election to the United States Senate as an independent candidate, running on the "Connecticut for Lieberman" ticket.  In addition, in 1990, Lowell P. Weicker, Jr. won the governorship as an independent candidate on the "A Connecticut Party" ticket.  Moreover, as of October 19, 2004, the number of unaffiliated registered voters in Connecticut (876,538 or 44 percent) substantially outnumbered the number of voters registered as Democrats (670,356 or 33.7 percent) and the number of voters registered as Republicans (438,554 or 22 percent).  Office of the Secretary of the State, Party Enrollment in Connecticut (2008) *available at* http://www.sots.ct.gov/ElectionsServices/election_results/statistics/enrolhst.pdf.  In fact, the percentage of unaffiliated registered voters increased in every year between 1993 and 2004, and in 2004, the last year of available statistics, the percentage of unaffiliated registered voters was higher than at any point since the state began compiling those numbers in 1958.  *Id.*

The electoral successes of independent party candidates, however, are admittedly limited and can be qualified.  Although Lieberman ran as an independent candidate in the 2006 general election, he is at least closely associated with the Democratic Party; he had twice previously been elected to the United States Senate as a Democrat, and only ran as an independent candidate after losing in the Democratic Party primary election.  Moreover, he had gained national attention in 2000 running as a vice-presidential candidate on the Democratic ticket.  (The CEP does not apply

dominated by the major political parties.  According to a March 2006 report compiled by the

Connecticut Office of Legislative Research, of the 46 candidates who ran for state-wide offices

in the last three general elections (i.e., 1994, 1998, and 2002), 15 were minor or petitioning party

candidates.  Pl. Mem., ex. B, doc. # 70-3 at 1.  Of the 15 minor or petitioning party candidates,

13 received less than three percent of the total votes cast for those offices, one candidate received

approximately 11 percent, and one received 19 percent.[25]  *Id*.  The report also indicates that of the

1,115 candidates who ran for state legislative offices in the last three general elections, 166 were

petitioning or minor party candidates.[26]  *Id*.  Of the 166 minor party candidates, 105 received less

than five percent of the total votes cast for those offices, 39 candidates received between five

percent and 10 percent, 18 received between 10 percent and 20 percent, and four received over

20 percent.  *Id*. at 1-2.  No current member of the Connecticut legislature is registered to a minor

party.  *See* State of Connecticut House of Representatives, House Members Listed

Alphabetically, *available at* http://www.cga.ct.gov/asp/menu/hlist.asp, and Senate Members

Listed Alphabetically, *available at* http://www.cga.ct.gov/asp/menu/slist.asp (last visited August

---

to candidates for United States Senate.)

     Similarly, although Weicker won the 1990 gubernatorial election as an independent candidate, he was closely associated with the Republican Party; he had once previously won election to the United States House of Representatives as a Republican, and three times previously won election to the United States Senate as a Republican.  Moreover, Weicker is the only minor party candidate to win the Connecticut governorship in well over 100 years.

     [25] Eunice Groark, who served as Lieutenant Governor under Weicker and who ran to succeed him, received 18.88 percent of the popular vote as the candidate for A Connecticut Party.

     [26] The OLR report, and the plaintiffs' memorandum in opposition to the instant motion, indicate that 168 independent candidates ran for political office during those elections.  The table, however, indicates that only 166 independent candidates ran for political office during those elections.

7, 2007).  The numbers indicate that candidates of major parties wield a tremendous competitive

advantage over candidates of minor parties.  The Connecticut General Assembly had no

obligation to pass a law that levels the playing field, but the legislature is not free to pass a law

that further slants the playing field.  And the fact that minor party candidates have not achieved

substantial success in past elections does not mean the CEP cannot, as a matter of law, burden

their political opportunity in future elections.

It is also well established that individuals generally do not have a First Amendment right

to government-subsidized speech.  *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S.

819, 834 (1995) ("the Government is not required to subsidize the exercise of fundamental

rights"); *see also Regan v. Taxation with Representation*, 461 U.S. 540, 546, 549-50 (1983)

("We again reject the notion that First Amendment rights are somehow not fully realized unless

they are subsidized by the State. . . . 'although government may not place obstacles in the path of

a [person's] exercise of . . . freedom of [speech], it need not remove those not of its own

creation.'") (quoting *Harris v. McRae*, 448 U.S. 297, 316 (1980)).  But when the government

endeavors to enter that fray and, as alleged in this case, subsidize the expression of one set of

political parties' views to the exclusion of other political parties, it must do so in a way that does

not alter the status quo to unfairly and unnecessarily burden the political opportunity of

disfavored minor parties.

The Supreme Court's holding in *Buckley* is not controlling here, in sum, because the CEP

is so fundamentally different than Subtitle H, and because Connecticut state elections are so

fundamentally different than presidential elections.  Unlike presidential elections, many

Connecticut state elections are one-party dominant, and unlike Subtitle H, the CEP applies a

state-wide proxy to hundreds of district-wide races, and is alleged to change the very dynamic of many of those races.  In this case, the plaintiffs have alleged that the CEP substantially increases the ability of participating major party candidates to communicate with the electorate and compels the highest level of competition between two major party candidates.  The result, plaintiffs allege, is that the CEP makes it much more difficult for minor party candidates to communicate their message to the electorate in those legislative districts.  Thus, the CEP allegedly burdens their political opportunity.

Because the CEP is alleged to burden a fundamental constitutional right, specifically, minor-party political opportunity, I will apply strict scrutiny to the law.  Thus, the present motions can be granted only if, based on the allegations of the complaint, the CEP is narrowly tailored to further a compelling government interest.

B.     Government Interests

The *Buckley* Court held that "public financing as a means of eliminating the improper influence of large private contributions furthers a significant governmental interest."  *Id.* at 96. In this case, the CEP, as a whole, is also designed to serve the interest of eliminating the appearance of corruption by encouraging candidates for state office to forgo private donations, the traditional source of political contributions, in exchange for public funding.

The specific provision that the plaintiffs allege violates the Fourteenth Amendment, namely, the qualifying and distribution formulas, also serves an important government interest. The *Buckley* Court held that Congress had an interest "in not funding hopeless candidacies with large sums of public money."  *Id.*  That interest "necessarily justifies the withholding of public assistance from candidates without significant public support."  *Id.*  The Court concluded that

"Congress may legitimately require 'some preliminary showing of a significant modicum of support' as an eligibility requirement for public funds." *Id.*  Similarly, the CEP's qualifying and distribution formulas at issue are designed to protect the public fisc and prevent a raid on state funds by noncompetitive candidates.[27]  I will next consider whether the CEP is narrowly tailored to achieve the interests used to justify it.

C.    Narrow Tailoring

"The narrow tailoring inquiry examines the 'fit' between means and ends. . . .  In order to satisfy the 'narrow tailoring' standard, the government must also prove that the mechanism chosen is the least restrictive means of advancing that interest." *Landell v. Sorrell*, 382 F.3d 91, 125 (2d Cir. 2002), *rev'd on other grounds*, 548 U.S. 230 (2006); *see also California Democratic Party v. Jones*, 530 U.S. 567, 585-86 (2000) (observing, in dicta, that California's "blanket" partisan primary system was not narrowly tailored to further the asserted state interests because "a nonpartisan blanket primary" would advance the same interests "without severely burdening a political party's First Amendment right of association").  In this case, the CEP makes distinctions between major party candidates and minor party candidates purportedly to protect the public fisc.

1.    *The Size of the Threshold*

Plaintiffs argue that the CEP is not narrowly tailored because the ten-fifteen-twenty percent stepped thresholds the legislature has chosen to apply to minor party candidates are too high.  In *Buckley*, the Court upheld a significantly lower threshold, five percent, noting that "a

---

[27] The *Buckley* Court also noted that minor parties, and society as a whole, have a countervailing interest, namely, the "present opportunity of minority parties to become major political entities if they obtain widespread support" and the "potential fluidity of American political life." *Id.*

range of formulations would sufficiently protect the public fisc and not foster factionalism, and would also recognize the public interest in the fluidity of our political affairs." *Id.* at 103-04. The Court concluded that "the choice of the percentage requirement that best accommodates the competing interests involved" is for the legislature to make. *Id.* I need not yet decide whether, as a matter of law, the higher thresholds that the Connecticut legislature has chosen fall within the constitutionally permissible range.

I do hold, however, that because the percentages the legislature has chosen are significantly higher than the threshold upheld in *Buckley*, they are entitled to less deference. This is especially true given the fact that, if the thresholds the CEP imposes only upon the minor party candidates also applied to major party candidates in the next election cycle, major party candidates would have failed to qualify for the full complement of public funds in 43 percent of all races for the Connecticut General Assembly.[28] The same is not true under Subtitle H; in all but one election since 1856,[29] both Democratic and Republican presidential candidates would have met the twenty-five percent threshold Subtitle H imposes, and would thus have qualified to receive full public funding.

2.     *The Application of the Threshold Only to Minor Party Candidates*

_____

[28] Most of those candidates would not have qualified to receive any public funds.

[29] The only election in which one of the major party candidates would not have met the prior success threshold to receive public funds under Subtitle H involved extenuating circumstances not wholly related to a lack of public support. In 1916, Republican candidate Charles Hughes would not have qualified for public funding because the Republican candidate in 1912, William Taft, received only 23.17 percent of the popular vote, just shy of the 25 percent threshold. Leip Atlas. Again, however, the 1912 election was a three-way race between Woodrow Wilson, William Taft, and Progressive Candidate Theodore Roosevelt. *Id.* Taft split the vote with Progressive Candidate Theodore Roosevelt, who also ran and garnered 27.40 percent. *Id.*

The size of the ten-fifteen-twenty percent stepped thresholds is not as problematic as the fact that the thresholds apply only to minor party candidates in the first instance.  Plaintiffs argue that it is unfair to impose additional qualifying requirements only on minor party candidates because, in one-party-dominant districts, the minor party candidate's chances to win the general election are as good as, or better than, the token (or nonexistent) major party candidate, yet the token major party candidate is presumptively entitled to the full complement of public funds, whereas the minor party candidate must show additional "modicums of support."  That argument is persuasive.  Indeed, in those districts, major party candidates have proven to be just as capable of running hopeless candidacies, or no candidacies at all, as minor party candidates.  Defendants have suggested no good reason why the legislature sought to protect the public fisc from hopeless minor party candidacies, on the one hand, while spending significant sums of money on hopeless major party candidacies, on the other.  In short, the CEP treats things that are exactly alike, namely, hopeless candidacies, as though they were different.  Thus, *Buckley* does not protect the CEP from constitutional challenge.

3.    *Comparisons With Other States' Laws*

Connecticut is not the first state to enact a public funding law.  In determining the validity of imposing the discriminatory qualifying criteria that the Connecticut legislature has chosen, an examination of other states' laws is useful.[30]  I begin with Maine and Arizona – the two states that have enacted public funding laws that the defendants argue are similar to the CEP.

---

[30] For a fuller discussion of some state public financing laws, *see* Jason B. Frasco, *Full Public Funding: An Effective and Legally Viable Model for Campaign Finance Reform in the States*, 92 CORNELL L. REV. 733 (2007) ("Frasco Public Funding Article"); *see also* Brennan Center for Justice, Campaign Finance Reform, *available at* http://www.brennancenter.org/content/section/category/campaign_finance_reform/.

a.  Maine

In 1996, Maine voters approved the Maine Clean Elections Act, Me. Rev. Stat. tit. 21-A

§§ 1121, *et seq*. ("Maine Act"), which created a voluntary system of public funding in which

candidates for governor, state senate, and state house of representatives may elect to participate.

Me. Rev. Stat. tit. 21-A § 1122.  To qualify for public funds under the Maine Act, all candidates,

regardless of party affiliation, must raise a certain amount of "qualifying contributions."  Me.

Rev. Stat. tit. 21-A § 1124(3).[31]  Once the candidate raises the required qualifying contributions,[32]

which vary depending upon the office sought,[33] the candidate is qualified to receive public funds,

as long as the candidate has complied, and continues to comply, with the Act's other provisions.

Me. Rev. Stat. tit. 21-A § 1125(5).  The Maine Act is party-neutral; it has no prior success

formula, and imposes no other qualifying criteria only on minor party candidates.

The amount of public funds that a participating candidate will receive depends upon

whether the election is contested or uncontested:

---

[31] Before raising qualifying contributions, candidates who wish to participate must declare their intent, Me. Rev. Stat. tit. 21-A § 1125(1), and may first raise "seed money contributions," not to exceed 100 dollars per contributor, to defray campaign costs incurred only before the candidate is certified.  Me. Rev. Stat. tit. 21-A §§ 1122(9), 1125(2-A).

[32] A "qualifying contribution" is a donation "A. Of $5 in the form of a check or a money order payable to the [Maine Clean Election Fund], signed by the contributor and made in support of a candidate; B. Made by a registered voter within the electoral division for the office a candidate is seeking and whose voter registration has been verified by the municipal registrar; C. Made during the designated qualifying period; and D. That the contributor acknowledges was made with the contributor's personal funds and in support of the candidate and was not given in exchange for anything of value . . . ."  Me. Rev. Stat. tit. 21-A § 1122(7).

[33] Candidates for governor must obtain at least 3,250 qualifying contributions, candidates for state senate must obtain at least 150 qualifying contributions, and candidates for state house of representatives must obtain 50 qualifying contributions.  Me. Rev. Stat. tit. 21-A § 1125(3).

> For contested legislative general elections, the amount of revenues distributed is the average amount of campaign expenditures made by each candidate during all contested general election races for the immediately preceding 2 general elections, as reported in the initial filing period subsequent to the general election, for the respective offices of State Senate and State House of Representatives.  For uncontested legislative general elections, the amount of revenues to be distributed from the fund is 40% of the amount distributed to a participating candidate in a contested general election.

Me. Rev. Stat. tit. 21-A §§ 1125(8)(C), (8)(D).  Participating candidates for the gubernatorial general election receive 600,000 dollars.  Me. Rev. Stat. tit. 21-A § 1125(8)(F).[34]

Noticeably, the Maine Act differs from the CEP in at least two respects.  First, the Maine Act contains no distinctions between major party candidates and minor party candidates; all candidates are treated equally regardless of party affiliation.  Second, the amount of public funds available to participating candidates is not one-size-fits-all.  Instead, the amount of public funding depends upon whether a given race is contested.  Moreover, "[t]he amount of the initial distribution is the average amount of campaign expenditures in the prior two election cycles for the particular office," *Daggett v. Commission on Governmental Ethics & Election Practices*, 205 F.3d 445, 451 (1st Cir. 2000), whereas the plaintiffs here allege the CEP is keyed to the most competitive and expensive races in the state.

The First Circuit Court of Appeals considered the constitutionality of the Maine Act in *Daggett*.[35]  Relying on the proposition that limits on expenditures are generally otherwise

---

[34] Under the CEP, participating candidates for the gubernatorial general election receive 3,000,000 dollars.  Conn. Gen. Stat. § 9-705(a)(2).

[35] The *Daggett* Court also considered the constitutionality of other provisions of the Maine Act, including the triggering provisions and the contribution limits.  In addition, several lobbying organizations had earlier challenged a provision of the law that imposed a registration fee on lobbyists.  *See National Right to Life PAC State Fund v. Devine*, 1997 U.S. Dist. LEXIS 12637 (D. Me. 1997).

unconstitutional, *see Buckley*, 424 U.S. at 44, plaintiffs argued, in that case, that the Maine Act

"is unconstitutional because it is impermissibly coercive – that is, it provides so many incentives

to participate and so many detriments to foregoing participation that it leaves a candidate with no

reasonable alternative but to seek qualification as a publicly-funded candidate." *Daggett*, 205

F.3d at 466.  Because the candidate is "coerced" to accept the funds, they are also "coerced" to

accept the expenditure ceilings and an allegedly inadequate level of funding to run a successful

campaign.[36]  The *Daggett* Court held that "the appropriate benchmark of whether candidates'

First Amendment rights are burdened by a public funding system is whether the system allows

candidates to make a 'voluntary' choice about whether to pursue public funding."  *Id*. at 467.

"[T]he government may create incentives for candidates to participate in a public funding system

in exchange for their agreement not to rely on private contributions."  *Id*.  The Court ultimately

rejected the plaintiffs' coercion argument as internally inconsistent – "if the sums are

unreasonably low, they will not attract, much less coerce, participation."  *Id*. at 467-68.

 But the *Daggett* opinion is not relevant here because the plaintiffs make the opposite

---

[36] Central to many cases challenging campaign finance reform laws is the expenditure-donation dichotomy.  The general principle set forth in *Buckley* is that expenditure caps are generally unconstitutional (unless voluntarily accepted by a candidate as a part of a public funding program), whereas caps on donations to candidates are, with a few exceptions, usually held to be constitutional.  *But see Randall v. Sorrell*, 548 U.S. 230 (2006).

In *Randall v. Sorrell*, the Supreme Court recently considered the constitutionality of a Vermont law that reduced both contribution limits and expenditure limits.  The district court had held that some of the contribution limits were unconstitutionally low, and that the expenditure limits were *per se* unconstitutional under *Buckley*.  In *Landell v. Sorrell*, 382 F.3d 91, the Second Circuit Court of Appeals reversed the district court, holding that all of the contribution limits were unconstitutional, and that the expenditure limitations might be constitutional if they survived strict scrutiny.  *Id*.

The Supreme Court then reversed the Second Circuit Court of Appeals.  The Court held that the expenditure limits were *per se* unconstitutional.  *See Randall*, 126 S. Ct. at 2488.  The Court also held the contribution limits were unconstitutionally low.  *Id*. at 2500.

argument.  The plaintiffs in *Daggett* argued that the Maine Act, in effect, coerced participation, whereas the plaintiffs here argue that they are categorically prohibited from participating. Moreover, the plaintiffs in *Daggett* alleged that the public funds under the Maine Act were woefully inadequate, whereas the plaintiffs here allege that the public funds are excessive.  And most significantly, the plaintiffs in *Daggett* did not challenge the law based upon its disparate treatment of minor party candidates because the Maine Act makes no distinctions in its qualifying criteria based solely upon party affiliation.

> b.    Arizona

In 1998, Arizona voters adopted, as an initiative, the Citizens Clean Elections Act, Ariz. Rev. Stat. §§ 16-901, *et seq*. ("Arizona Act"), which created a voluntary system of public funding in which candidates for governor, secretary of state, attorney general, treasurer, superintendent of public instruction, corporation commission, mine inspector, and state legislature may elect to participate.  *See* Ariz. Rev. Stat. § 16-950(D).  To qualify for public funds, all candidates, regardless of party affiliation, must raise a certain amount of "qualifying contributions."  Ariz. Rev. Stat. § 16-950.[37]  Once the candidate raises the required qualifying contributions,[38] which

---

[37] Before raising qualifying contributions, candidates who wish to participate must apply through the secretary of state, Ariz. Rev. Stat. § 16-947, create a single campaign account, Ariz. Rev. Stat. § 16-948, and may first collect "early contributions," not to exceed 100 dollars per contributor, to defray campaign costs incurred only before the end of the qualifying period.  Ariz. Rev. Stat. § 16-945.

[38] A "qualifying contribution" is a donation of exactly five dollars made payable to the candidate's campaign committee, or, if cash, deposited in the candidate's campaign account, and "[a]ccompanied by a three-part reporting slip."  Ariz. Rev. Stat. § 16-946.

vary depending upon the office sought,[39] the candidate is qualified to receive public funds as long

as the candidate has complied, and continues to comply, with the Act's other provisions.  Ariz.

Rev. Stat. § 16-950.  The Arizona Act is substantially party-neutral; it has no prior success

formula, and imposes no other qualifying criteria only on minor party candidates.

Although the Arizona Act's qualifying criteria are similar to those of the Maine Act, the

distribution formulas differ slightly.  Instead of averaging the amounts spent in prior elections

and setting a specific value for the gubernatorial race, the Arizona Act sets specific values for

each election and adjusts those values to account for inflation.  Ariz. Rev. Stat. § 16-959.[40]  Like

the Maine Act, the Arizona Act adjusts for uncompetitive districts.  Ariz. Rev. Stat. § 16-952.

Unlike the Maine Act, however, the Arizona Act does not reduce a participating candidate's

---

[39] Candidates for governor must obtain 4,000 qualifying contributions, candidates for
secretary of state and attorney general must obtain 2,000 qualifying contribution, candidates for
treasurer, superintendent of public instruction and corporation commission must obtain 1,500
qualifying contributions, candidates for mine inspector must obtain 500 qualifying contributions,
and candidates for the legislature must obtain 200 qualifying contributions.  Ariz. Rev. Stat. §
16-950(D).

[40] The specific grants for the primary and general elections are set forth in a table
compiled by the secretary of state.  Ariz. Rev. Stat. §§ 16-959, 16-961(H).
        I note that plaintiffs in this case argue that their disadvantage is exacerbated, in part, by
the fact that the funding levels under the CEP are excessively high.  Although the specific
funding levels are, to a large extent, within the legislature's discretion, plaintiffs derive factual
support from their argument in the disparity between the CEP's limits and the Arizona Act's
limits.  The spending limits for the 2008 elections under the Arizona Act are as follows: 736,410
dollars for the governor; 155,042 dollars for Secretary of State; 155,042 dollars for Attorney
General; 77,513 dollars for Treasurer; and 19,382 dollars for legislature.  Ariz. Rev. Stat. §§ 16-
959, 16-961(H).  The limits under the CEP are: 3,000,000 dollars for governor; 750,000 dollars
for secretary of state, attorney general, and state treasurer; 85,000 dollars for state senator; and
25,000 dollars for state representative.  Conn. Gen. Stat. § 9-705(a)(2), (b)(2), (e)(2), (f)(2).
        The disparity between Connecticut's limits and Arizona's limits is particularly stark given
the fact that Arizona (approximately 6.3 million people) has almost twice the population as
Connecticut (approximately 3.5 million people), and that Arizona (113,998 square miles) is more
than 20 times the geographic area of Connecticut (5,543 square miles).

general election grant in a "one-party-dominant"[41] race, but rather, gives the candidate the option

to reallocate a portion of the candidate's general election funds to the primary election.  Ariz.

Rev. Stat. § 16-952(D).  Finally, the Arizona Act also makes some distinctions in distributions

based upon party status.  It provides that qualifying independent candidates receive "an amount

equal to seventy percent of the sum of the original primary election spending limit and the

original general election spending limit."  Ariz. Rev. Stat. § 16-951.

The Arizona Act has been challenged on several occasions.  The plaintiffs in those cases

generally raised issues not relevant to the issues here.[42]  In *Ass'n of Am. Physicians & Surgs v.*

*Brewer*, 363 F. Supp. 2d 1197 (D. Ariz. 2005), however, the plaintiffs argued that the equal

funding provision violates the First Amendment by "coercing involuntary participation in public

campaign financing," because it "punishes" candidates who choose not to participate.[43]  *Id.* at

1199.  The equal funding provision provided triggering mechanisms similar to the CEP, *see* Ariz.

---

[41] The Arizona Act defines "a one-party-dominant legislative district" as "a district in which the number of registered voters exceeds the number of registered voters registered to each of the other parties by an amount at least as high as ten percent of the total number of voters registered in the district."  Ariz. Rev. Stat. § 16-952(D).

[42] In *Citizens Clean Elections Comm'n v. Myers*, 196 Ariz. 516 (2000), several parties challenged the provision of the Arizona Act that created the Citizens Clean Elections Commission, the Commission charged with administering the Arizona Act.  The parties alleged that the manner in which members were appointed to the Commission violated the Arizona state constitution.

In *Lavis v. Bayless*, 233 F. Supp. 2d 1217 (D. Ariz. 2001), several parties challenged a provision of the Arizona Act that imposed several assessments on civil and criminal fines, and a surcharge on lobbyists, to finance the pubic funding program.  The parties alleged that the assessments violated the First and Fourteenth Amendments to the United States Constitution.  In *May v. McNally*, 203 Ariz. 425 (2002), the plaintiff brought a similar challenge.

[43] Plaintiffs in *Brewer* also challenged the triggering provisions in Ariz. Rev. Stat. § 16-952.  Those issues are discussed below.

Rev. Stat. §§ 16-952(A), (B), and allowed participating candidates in one-party-dominant

districts to reallocate some of their general election funds to the primary election, Ariz. Rev. Stat.

§ 16-952(D).  Again, like the challenge to the Maine Act in *Daggett*, the alleged injury in *Brewer*

derived from the fact that the candidates were coerced to accept public funds and the

accompanying expenditure limitations, whereas the alleged injury in this case is that the

candidates are effectively prohibited from participating.  The *Brewer* Court ultimately ruled for

the defendants and dismissed the plaintiffs' claims.

c.    North Carolina

In 2002, the North Carolina legislature passed the North Carolina Judicial Campaign

Reform Act, N.C. Gen. Stat. Ann. §§ 163-278.61, *et seq.* ("North Carolina Act"), which created a

voluntary system of public funding in which candidates for Supreme Court justice and Court of

Appeals judge may elect to participate.  N.C. Gen. Stat. Ann. § 163-278.61.  Aside from the fact

that the public funding program applies only to certain judges and justices of the judiciary, the

North Carolina Act is similar to the Arizona and Maine Acts in most other critical respects.  To

qualify for public funds under the North Carolina Act, all candidates, regardless of party

affiliation, must raise a certain amount of "qualifying contributions."  N.C. Gen. Stat. Ann. §

163-278.64(b).[44]  Once the candidate raises the required 350 qualifying contributions,[45] the

---

[44] Before raising qualifying contributions, candidates who wish to participate must declare
their intent to participate, N.C. Gen. Stat. Ann. § 163-278.64(a), and may collect donations
beginning January 1 of the year before the election and before the filing of a declaration of intent
to defray campaign costs incurred before the end of the qualifying period.  N.C. Gen. Stat. Ann. §
163-278.64(d).

[45] A "qualifying contribution" is a donation of not less than 10 dollars and not more than
500 dollars in the form of a check or money order to the candidate or the candidate's committee .
. . ."  N.C. Gen. Stat. Ann. § 163-278.62(15).  Each candidate must raise at least 30 times the

-46-

candidate is qualified to receive public funds as long as the candidate has complied, and continues to comply, with the Act's other provisions.  *See* N.C. Gen. Stat. Ann. § 163-278.64. The North Carolina Act is party-neutral; it has no prior success formula, and imposes no other qualifying criteria only on minor party candidates.

The amount of public funds that a participating candidate will receive under the North Carolina Act is based upon whether the election is contested or uncontested.[46]  For uncontested primaries, no funds are distributed.  N.C. Gen. Stat. Ann. § 163-278.65(b)(1).  For contested primaries, only "rescue funds"[47] are distributed.  N.C. Gen. Stat. Ann. § 163-278.65(b)(2).  For uncontested general elections, no funds are distributed.  N.C. Gen. Stat. Ann. § 163-278.65(b)(3). For contested general elections, full funds are distributed.  N.C. Gen. Stat. Ann. N.C. Gen. Stat. Ann. § 163-278.65(b)(4).

In *Jackson v. Leake*, 2006 U.S. Dist. LEXIS 55017 (M.D.N.C. 2006), several judicial candidates challenged the law as unconstitutional.  Specifically, the candidates challenged the provisions: (1) requiring "nonparticipating candidates to report campaign contributions or expenditures that exceed certain specified trigger amounts to the Board within 24 hours," along with "any independent entities making expenditures in support of a nonparticipating candidate to

---

candidacy filing fee, but no more than 60 times the filing fee.  N.C. Gen. Stat. Ann. §§ 163-278.62(9), (10).

[46] A "contested" election means any election "in which there are more candidates than the number to be elected."  N.C. Gen. Stat. Ann. § 163-278.62(4).

[47] Rescue funds are, essentially, funds distributed to a participating candidate when the candidate is outspent.  *See* N.C. Gen. Stat. Ann. § 163-278.67.  In the case of primary elections, rescue funds are triggered when a participating candidate's opponent spends an amount that exceeds the maximum qualifying contributions for participating candidates.  N.C. Gen. Stat. Ann. § 163-278.62(18).

make similar reports to the Board;" (2) providing for "rescue funds" for "participating candidates

in the event the expenditures of a nonparticipating candidate . . . exceed certain specified trigger

amounts;" (3) prohibiting "contributions to the campaign of any candidate during the period

beginning 21 days before the general election and ending the day after the general election;" and

(4) requiring "every active member of the North Carolina State Bar to pay a $50 fee for the

support of the North Carolina Public Financing Fund."  *Id*. at *5-6.

The parties argued, among other things, whether the North Carolina Act "places

nonparticipating candidates at a distinct disadvantage relative to participating candidates."

*Jackson v. Leake*, 476 F. Supp. 2d 515, 529 (E.D.N.C. 2006).[48]  Contrary to the argument raised

here, however, the plaintiffs in *Jackson* argued, in essence, that the public funding program

coerces participation, and thus, coerces acceptance of an unconstitutional expenditure limit.  The

*Jackson* Court rejected those arguments, holding that it "simply disagrees with plaintiffs'

argument that the scheme's reporting provision, trigger, and 21 day provision unfairly or

unnecessarily burden nonparticipating candidates' political opportunities, given the important

interests advanced by the public financing scheme."  *Id*. at 530.

d.      Minnesota

Originally enacted in the 1970s and reformed on multiple subsequent occasions, the

Ethics in Government Act, Minn. Stat. §§ 10A.01, *et seq*. ("Minnesota Act"), created a voluntary

system of public funding in which candidates for governor, lieutenant governor, attorney general,

secretary of state, state auditor, state senate and state house of representatives may elect to

---

[48] The parties in *Leake* advanced several other claims.  Only their last claim, which relates
to the public funding system as a whole, is relevant.

participate. *See* Minn. Stat. § 10A.323. To qualify for public funds under the Minnesota Act, all candidates, regardless of party affiliation, must raise a certain amount of contributions. Minn. Stat. § 10A.323.[49] Once the candidate raises the required contributions,[50] which vary depending upon the office sought,[51] the candidate is qualified to receive public funds as long as the candidate has complied, and continues to comply, with the Act's other provisions. Minn. Stat. §§ 10A.322, 10A.323. The Minnesota Act, like the North Carolina, Maine, and Arizona Acts, is party-neutral; it has no prior success formula, and imposes no other qualifying criteria only on minor party candidates.

The funding of Minnesota Act and the distribution formula, however, are more complex. Although it has evolved through the years, the Minnesota Act is currently funded, in large part, by a tax-check-off system. The system allows taxpayers to allocate five dollars of their income tax liability to the general election account, or to the election account of a specific political party. Minn. Stat. § 10A.31 (subd. 1). The money is allocated within the respective accounts on a percentage basis according to the particular office sought.[52] Minn. Stat. § 10A.31 (subd. 5). The

---

[49] Before raising qualifying contributions, candidates who wish to participate must declare their intent to participate. Minn. Stat. § 10A.14 (Subd. 1).

[50] A contribution is a donation from persons eligible to vote in the state up to the limits of the Act, but only the first 50 dollars from each contributor counts towards satisfying the contribution minimums. Minn. Stat. § 10A.323.

[51] Candidates for governor and lieutenant governor running together must collectively obtain 35,000 dollars in contributions, candidates for attorney general must obtain 15,000 dollars, candidates for secretary of state and state auditor must obtain 6,000 dollars, candidates for state senate must raise 3,000 dollars, and candidates for state house of representatives must raise 1,500 dollars. Minn. Stat. § 10A.323.

[52] For example, within the general account, 21 percent of the funds are allocated to the gubernatorial race, and, depending upon the election cycle, 23 and 1/3 percent are allocated to

funds are then distributed to the candidates using the given percentages, but limited to 50 percent of the designated total spending limit for the particular office.

Significantly, under the Minnesota Act as originally enacted in 1974, "winners of the primary election of each party for the state senate and house of representatives share[d] equally in the funds allocated to their respective offices from their party account.  Thus the funding for the specific party accounts is determined by taxpayer preference on a state-wide basis while the party accounts are required to be distributed at the legislative district level." *Bang*, 442 F. Supp. at 768.  In other words, regardless of whether taxpayers in a given legislative district contributed substantially more to a party's general account, the funds in the account were nevertheless evenly distributed throughout all legislative districts.

Several parties challenged the distribution formula, along with other provisions of the Minnesota Act, in *Bang v. Chase*, 442 F. Supp. 758.[53]  The *Bang* Court held the distribution formula unconstitutional, reasoning that "the aggregate political party preferences expressed by

---

races for the state senate, and 46 and 2/3 percent are allocated to races for the state house of representatives.  Minn. Stat. § 10A.31 (subd. 5(a)).  Within the party-specific accounts, 14 percent of the funds are allocated to the gubernatorial race, and, depending upon the election cycle, 23 and 1/3 percent are allocated to races for the state senate, and 46 and 2/3 percent are allocated to races for the state house of representatives.  Minn. Stat. § 10A.31 (subd. 5(b)).

[53] Since its enactment, the Minnesota Act has been challenged on multiple occasions. *E.g., Day v. Holahan*, 34 F.3d 1356 (8th Cir. 1994); *Rosenstiel v. Rodriguez*, 101 F.3d 1544 (8th Cir. 1996); *Weber v. Heany*, 793 F. Supp. 1438 (D. Minn. 1992).  I note that the plaintiffs in *Rosenstiel* raised claims similar to those made in *Daggett, Jackson* and *Brewer*, namely, that the public funding option set forth in the Minnesota Act is "so attractive" that the Act "effectively compel[s] candidates to enroll in the State's financing plan," and thus, the candidates are effectively compelled to accept the expenditure limits. *Rosenstiel*, 101 F.3d at 1549.  The Eighth Circuit disagreed, reasoning that participation in the public funding system is "truly voluntary." *Id*. at 1550-51.  The *Rosenstiel* Court concluded that the statute achieves "the rough proportionality necessary to entice, but not coerce, candidate participation." *Id*. at 1551.

all the state taxpayers in Minnesota have no rational relation to the support for particular parties

or for particular candidates within legislative districts.  Under this distribution scheme, a party

with state-wide plurality can unfairly disadvantage its opponents in those districts where it enjoys

little district support." *Id*. at 768.  The *Bang* Court thus concluded that "the method of

distribution of public campaign funds . . . invidiously discriminates between candidates of

different political parties and abridges the First Amendment right of political association." *Id*.

Although not identical, *Bang* appears to be the closest analog to the plaintiffs' claims in this case.

> e.     Massachusetts

In 1998, Massachusetts voters approved the Massachusetts Clean Elections Law, Mass.

Gen. Laws ch. 55A §§ 1, *et seq*. (repealed) ("Massachusetts Act"), which created a voluntary

system of public funding in which candidates for governor, lieutenant governor, attorney general,

treasurer and receiver general, state secretary, auditor, councillor, state senator, and state

representative may elect to participate.  Mass. Gen. Laws. ch. 55A § 7 (repealed).  To qualify for

public funds under the Massachusetts Act, all candidates, regardless of party affiliation, must

raise a certain amount of "qualifying contributions."  Mass. Gen. Laws. ch. 55A § 4 (repealed).[54]

Once the candidate raises the required qualifying contributions,[55] which vary depending upon the

office sought,[56] the candidate is qualified to receive public funds as long as the candidate has

---

[54] Candidates who wish to participate must declare their intent.  Mass. Gen. Laws. ch. 55A § 3 (repealed).

[55] A "qualifying contribution" is a contribution of at least five dollars to a participant made during the qualifying period.  Mass. Gen. Laws. ch. 55A § 1 (repealed).

[56] Candidates for governor must obtain 6,000 qualifying contributions, lieutenant governor, attorney general, and treasurer and receiver general must obtain 3,000 qualifying contributions, candidates for state secretary and auditor must obtain 2,000 qualifying

complied, and continues to comply, with the Act's other provisions.  Mass. Gen. Laws. ch. 55A §

5 (repealed).  The Massachusetts Act was also neutral; it had no prior success formula, and

imposed no other qualifying criteria only on minor party candidates.

      The Massachusetts Act, however, was never put into effect because, in 2002, the

legislature refused to release the funds to the public funding system.  Proponents of the

Massachusetts Act brought suit "against the director of the office of campaign and political

finance . . . and the Secretary of the Commonwealth . . . .  They sought a declaration that any

Massachusetts State or State-wide election held without access to the funds mandated by the

clean elections law would violate both art. 48 [of the Massachusetts Constitution] and the clean

elections law.  They also sought permanent injunctive relief ordering the director to provide

public campaign funds to all candidates entitled to such funds, and barring the Secretary from

holding any elections unless and until such funds had been made available to all eligible

candidates."  *Bates v. Dir. of the Office of Campaign & Political Fin.*, 436 Mass. 144, 147

(2002).  The Court did not order the relief sought, but the Massachusetts legislature nevertheless

repealed the Massachusetts Act, 2003 Mass. Legis. Serv. 26, 43 (LexisNexis), and the law never

became effective.[57]

      f.     Vermont

      In 1997, Vermont enacted the Vermont Campaign Finance Reform Act, Vt. Stat. Ann. tit.

---

contributions, candidates for councillor must obtain 400 qualifying contributions, candidates for
state senator must obtain 450 qualifying contributions, and candidates for state representative
must obtain 200 qualifying contributions.  Mass. Gen. Laws. ch. 55A § 4 (repealed)

   [57] The Massachusetts legislature did enact a much less comprehensive public funding law
that awards matching funds to certain qualifying candidates who agree to expenditure limits and
otherwise comply with the new Act.  Mass. Gen. Laws. ch. 55C §§ 1, *et seq.*

17 §§ 2801, *et seq*. ("Vermont Act"),  which created a voluntary system of public funding in

which candidates for governor and lieutenant governor may elect to participate.  Vt. Stat. Ann.

tit. 17 § 2855.  To qualify for public funds under the Vermont Act, all candidates, regardless of

party affiliation, must raise a certain amount of "qualifying contributions."  Vt. Stat. Ann. tit. 17

§ 2854.[58]  Once the candidate raises the required qualifying contributions,[59] which vary

depending upon the office sought,[60] the candidate is qualified to receive public funds, as long as

the candidate has complied, and continues to comply, with the Act's other provisions.  Vt. Stat.

Ann. tit. 17 § 2853.  The Vermont Act is also party-neutral; it has no prior success formula, and

imposes no other qualifying criteria only on minor party candidates.  Certain provisions of the

Vermont Act have been challenged,[61] but the public funding provision remains intact.

g.      Other States

A number of other states have passed either full or partial public funding laws.  *See* Fla.

Stat. §§ 106.030-35 (matching funds for qualifying gubernatorial and state cabinet candidates);

Haw. Rev. Stat. §§ 11-217-225 (partial funds for qualifying gubernatorial, state legislative, and

other candidates); Md. Code Ann. §§ 15-101-11 (matching funds for qualifying gubernatorial and

lieutenant gubernatorial candidates); Mich. Comp. Laws §§ 169.201-282 (matching funds for the

---

[58] Any candidate who wishes to participate must file a campaign finance affidavit.  Vt. Stat. Ann. tit. 17 § 2852.

[59] A "qualifying contribution" is a donation of a maximum of 50 dollars. Vt. Stat. Ann. tit. 17 § 2854.

[60] Candidates for governor must obtain at least 35,000 dollars from no fewer than 1,500 qualified individuals, and candidates for lieutenant governor must raise at least 17,500 dollars from no fewer than 750 qualified individuals.  Vt. Stat. Ann. tit. 17 § 2854.

[61] *E.g.*, *Randall v. Sorrell*, 548 U.S. 230; *Landell v. Sorrell*, 382 F.3d 91.

primary election and partial funds for the general election to qualifying gubernatorial

candidates);[62] Neb. Rev. Stat. §§ 32-1601-1613 (partial funds for qualifying gubernatorial and

other candidates for state-wide office who are outspent by their opponents); R.I. Gen. Laws §§

17-25-18-30.1 (matching funds for qualifying gubernatorial and other candidates for state-wide

office);[63] N.M. Stat. §§ 1-19A-1-17 (full funding for qualifying judicial candidates and

candidates running for a seat on the Public Regulation Commission).[64]  Of those states, none

impose qualifying criteria analogous to the CEP, and more specifically, none of those states use

---

[62] The Michigan Act, like the CEP, imposes a prior success requirement on minor party candidates.  Mich. Comp. Laws § 169.265.  The statute is easily distinguishable from the CEP, however, because (a) the threshold for major party status under the Michigan Act (five percent of the gubernatorial vote) is much lower than the threshold for major party status under the CEP (20 percent), *id.*; (b) the Michigan Act does not use a state-wide measure of support as a proxy for district-wide elections because public funds under the Michigan Act are only available for the state-wide gubernatorial race and not to district-wide legislative races, *id.*, and (c) only partial funding is available under the Michigan Act, *id.*

[63] The Rhode Island Act requires independent candidates to raise additional private funds, R.I. Gen. Laws § 17-25-20(6), but again, the statute is also easily distinguishable from the CEP for essentially the same reasons that the Michigan Act is distinguishable: (a) the threshold for "political party" status is 5 percent of either the gubernatorial vote or the presidential vote, and the threshold can also be satisfied through a 5 percent petitioning requirement, *see* R.I. Gen. Laws §§ 17-1-2(4), (9), 17-25-20(6); (b) the Rhode Island Act does not use a state-wide measure of support as a proxy for district-wide elections; (c) and only matching funds are available under the Rhode Island Act.  R.I. Gen. Laws. § 17-25-20.  In addition, if the Rhode Island Act did not impose the requirements on independent candidates, "any independent candidate who met the very modest nomination paper signature requirement would be eligible for State funds.  This would place a significant burden on a limited supply of funds."  *Gill v. Rhode Island*, 933 F. Supp. 151, 160 (D.R.I. 1996).  The CEP, however, has substantial requirements in addition to the qualifying criteria to safeguard the public fisc.

[64] In addition to those states, New York City also offers matching funds for qualifying candidates for mayor, public advocate, comptroller, borough president, or member of the city council city offices.  N.Y.C., N.Y., Admin. Code §§ 3-701, *et seq*.  Like most of the above-cited state laws, New York City's public funding program, and specifically, the qualifying criteria, are also party-neutral, and the amount of matching funds depends, in part, on the extent to which a participating candidate is opposed.  *See id.*

the results of a single state-wide election as a proxy for a given candidate's level of support in a

district-wide election.

### D.    Conclusion Regarding Count One

Almost all other state public funding laws, except for the CEP, are party-neutral, and the

few that are not do not impose qualifying criteria that are even remotely similar to the CEP's

qualifying criteria.  It thus appears more than possible to weed out hopeless candidacies and

avoid a doomsday raid on the public fisc through party-neutral qualifying criteria, or at least

without the proxy that the Connecticut legislature has chosen.[65]  I thus hold that plaintiffs are

entitled to present evidence to prove that the CEP is not narrowly tailored to meet its stated

objective of protecting the public fisc.[66]

Plaintiffs have alleged that the CEP burdens their political opportunity, and that the law is

not sufficiently tailored to meet the state's compelling interests.  As such, plaintiffs have pled a

---

[65] For example, at the motion to dismiss/judgment on the pleadings stage there is no record evidence to show whether or not the discriminatory qualifying criteria would save the CEP from being prohibitively expensive.  *See* Suzanne Novak and Seema Shah, Reform New York Series, Paper Thin:  The Flimsy Facade of Campaign Finance Laws in New York State, p. 16 *available at* http://brennan.3cdn.net/20b4bbcfae6a61b5bc_kfm6b5l2q.pdf (stating that "[w]hile public financing systems cost money, even full public financing can be relatively inexpensive per voter.  A few dollars per taxpayer per year can cover the costs of a full public financing system for all state offices.  For instance, an analysis of the cost of the public financing systems in Maine, Arizona, and New York City reveals that those systems have cost a mere $1.61-$6.96 per person of voting age").  The parties are free to develop that evidence through discovery.

[66] I note that, although it would be a much closer case, I would have also denied the defendants' motions even upon rational basis review.  *See Bang v. Chase*, 442 F. Supp. at 768 ("the aggregate political party preferences expressed by all the state taxpayers in Minnesota have no rational relation to the support for particular parties or for particular candidates within legislative districts.  Under this distribution scheme, a party with state-wide plurality can unfairly disadvantage its opponents in those districts where it enjoys little district support.").

viable equal protection claim in count one, and defendant's motion to dismiss/motion for

judgment on the pleadings is DENIED with respect to that count.

**V.      Counts Two and Three – Do the Non-Participating Candidate and Independent
          Expenditure Triggers Violate the First Amendment?**

Plaintiffs argue that the non-participating candidate trigger and the independent

expenditure triggers violate the First Amendment rights of non-participating candidates.  To

determine whether a campaign finance law unconstitutionally infringes upon an individual's right

to free speech, the Court must "decide whether the provision in question actually burdens the

exercise of political speech and, if it does, whether it is narrowly tailored to serve a compelling

state interest." *Rosenstiel v. Rodriguez*, 101 F.3d at 1549.

Plaintiffs argue that the triggers burden the exercise of free speech because they cause

additional funds to be released if either an independent party or a non-participating candidate

engages in political speech in excess of the expenditure limits, thus discouraging the potential

speaker from making the expenditure.  In short, plaintiffs argue that their speech is chilled by the

threat of responsive speech.

The only source of support for plaintiffs' argument is *Day v. Holahan*, 34 F.3d 1356 (8th

Cir. 1994).  In that case, the Eighth Circuit Court of Appeals considered whether an independent

expenditure trigger violated the First Amendment.  The *Day* Court held that "[t]he knowledge

that a candidate who one does not want to be elected will have her spending limits increased and

will receive a public subsidy equal to half the amount of the independent expenditure, as a direct

result of that independent expenditure, chills the free exercise of that protected speech." *Id*. at

1360.  In short, the Eighth Circuit equated responsive speech with an impairment to the initial

speaker.

All other courts to consider the issue have either questioned *Day*'s logic outright, or have distinguished *Day* on its facts.  *See Daggett v. Commission on Governmental Ethics & Election Practices*, 205 F.3d at 465, 465 n.25 (holding that it could not "adopt the logic of *Day*, which equates responsive speech with an impairment to the initial speaker. . . . the continuing vitality of *Day* is open to question."); *Jackson v. Leake*, 476 F. Supp. 2d at 529 (quoting *Daggett* at length for the same proposition); *Ass'n of Am. Physicians & Surgs v. Brewer*, 363 F. Supp. 2d at 1200 (also quoting *Daggett* for the same proposition); *Wilkinson v. Jones*, 876 F. Supp. 916, 927-28 (W.D. Ky. 1995) (distinguishing *Day* on its facts and holding that a non-participating candidate trigger did not chill speech "simply because it enables the speakers' adversaries to respond."  In fact, "the trigger provision promotes more speech, not less.").

I agree with the courts that have rejected *Day*'s logic.  The release of additional funds to a given candidate whom an individual opposes does not prevent the individual from speaking, nor does the release of additional funds to a candidate's opponent prevent the candidate from speaking.  An individual or candidate may decide, as a strategic matter, not to speak as a result of the campaign financing system, but he is in no way prohibited from exercising his right to free speech.  I also note that most of the comprehensive campaign financing statutes cited in the previous section contain triggering provisions that have either not been challenged, or have survived similar challenges.  *E.g.*, Me. Rev. Stat. tit. 21-A § 1125(9); Ariz. Rev. Stat. § 16-952; N.C. Gen. Stat. § 163-278.67; Minn. Stat. § 10A.25 (Subd. 10); Mass. Gen. Laws ch. 55A § 11

(repealed); *see also* Ky. Rev. Stat. Ann. § 121A.030(5)(a) (repealed).[67]

I hold that the triggers do not actually burden the exercise of political speech, and I thus need not consider whether the provisions are narrowly tailored.  As such, defendants' motions are GRANTED with respect to counts two and three.

## VI.    Conclusion

Because plaintiffs have alleged a sufficient injury in this case, defendants' motion to dismiss counts two and three for lack of standing pursuant to Rule 12(b)(1) is **DENIED**.

In addition, treating defendants' motion to dismiss pursuant to Rule 12(b)(6) and their motion for judgment on the pleadings pursuant to Rule 12(c) as a single dispositive motion and applying the standard of review for Rule 12(b)(6), defendants' motions are **DENIED** with respect to count one, essentially because plaintiffs have adequately alleged that the CEP unfairly and unnecessarily burdens their political opportunity, especially in one-party-dominant districts, and because the CEP is not narrowly tailored to achieve the compelling government interests at issue.

Finally, defendants' motions are **GRANTED**, however, with respect to counts two and three because the triggering provisions do not burden the exercise of any candidate's or any other individual's First Amendment rights.  Those counts are hereby dismissed.

Collectively, defendants' motions **(docs. ## 68, 77)** are **GRANTED** in part and **DENIED**

_____

[67] As defendants point out, the absence of triggers may have serious consequences for the participation rate.  For example, the Vermont Act has no triggers.  Howard Dean, then Democratic candidate for governor, initially accepted public funds under the Vermont Act for the 2000 gubernatorial race but withdrew from the program and returned the public funds after "citing concerns that his Republican opponent was receiving enormous amounts of money, much of it from out-of-state groups, and that the recent court ruling . . . left him no way to keep up." Frasco Public Funding Article, 92 CORNELL L. REV. at 787.

in part.

It is so ordered.

Dated at Bridgeport, Connecticut, this 20th day of March 2008.

_____/s/_____
Stefan R. Underhill
United States District Judge