# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

GREEN PARTY OF CONNECTICUT, S.
MICHAEL DEROSA, LIBERTARIAN
PARTY OF CONNECTICUT, ELIZABETH
GALLO, JOANNE P. PHILLIPS,
AMERICAN CIVIL LIBERTIES UNION OF
CONNECTICUT, ROGER C. VANN,
ASSOCIATION OF CONNECTICUT
LOBBYISTS, BARRY WILLIAMS, and
ANN C. ROBINSON,
     Plaintiffs,

     v.

JEFFREY GARFIELD, in his official
capacity as Executive Director and General
Counsel of the State Elections Enforcement
Commission; RICHARD BLUMENTHAL,
in his official capacity as Attorney General of
the State of Connecticut; PATRICIA
HENDEL, ROBERT N. WORGAFTIK,
JACLYN BERNSTEIN, REBECCA DOTY,
ENID JOHNS ORESMAN, DENNIS
RILEY, MICHAEL RION, SCOTT A.
STORMS, SISTER SALLY J. TOLLES, in
their official capacities as Officials and
Members of the Office of State Ethics; and
BENJAMIN BYCEL, in his official capacity
as Executive Director of the Office of State
Ethics,
     Defendants,

AUDREY BLONDIN, COMMON CAUSE
OF CONNECTICUT, CONNECTICUT
CITIZENS ACTION GROUP, KIM HYNES,
and TOM SEVIGNY,
     Intervenor-Defendants.

CIVIL ACTION NO.
3:06cv1030 (SRU)

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

The instant motions for summary judgment present another chapter in the litigation over

Connecticut's recently-enacted campaign finance reform law.  In those motions, the government

and intervenor-defendants (collectively "the government" or "the state") seek summary judgment

on the plaintiffs' claims that the campaign contribution and solicitation bans for certain lobbyists,

state contractors, and their immediate family members violate their First Amendment rights of

speech and association.[1]  The plaintiffs have filed two cross-motions for summary judgment,

arguing that those contribution and solicitation prohibitions depart from clearly established

Supreme Court precedent and have no support in fact or law.

Although the challenged law imposes an outright prohibition on plaintiffs' ability to make

and solicit campaign contributions for candidates seeking state elected office, because the burden

of the statute falls on marginal speech and associational rights lying closer to the edge than the

core of First Amendment protections, I conclude that the Act's contribution and solicitation bans

are subject to less exacting "closely drawn" scrutiny.  In light of Connecticut's recent history of

corruption scandals involving high-ranking state politicians, I conclude that the legislature had a

---

[1] The government is not questioning the plaintiffs' standing to challenge the contribution and solicitation ban provisions of the CFRA.  Plaintiff Elizabeth Gallo is a lobbyist who alleges she has made and solicited contributions to political candidates in the past, and that she intends to do so in the future.  Green Party Amended Complaint (doc. #17) ¶ 13.  Plaintiff Joanne Philips is the spouse of a "communicator lobbyist" who alleges that she has made contributions to, and solicitations on behalf of, candidates and that she plans to continue to do so in the future.  *Id.* at ¶ 15.  Plaintiff Ann Robinson is the Executive Director of the Community Capital Fund, a non-profit corporation that is considered a state contractor because it has received two grants from the State Department of Economic and Community Development.  She alleges that she has made contributions to state candidates and intends to do so in the future.  *Id.* at ¶ 16.  Plaintiff Barry Williams is a "communicator lobbyist" who has made contributions to, and solicited contributions on behalf of, candidates for statewide and state legislative offices.  Association of Connecticut Lobbyists, LLC Second Amended Complaint (doc. #64), ¶ 24.  Finally, members of the plaintiff Association of Connecticut Lobbyists, LLC also allege that they have made contributions to and sought contributions on behalf of such candidates, and that they face severe criminal penalties if they attempt to do so in the future.  *Id.* at ¶¶ 24-26.

constitutional, sufficiently important interest in combating actual and perceived corruption by eliminating contributions from individuals with the means and motive to exercise undue influence over elected officials.  Because the law does not materially undermine the plaintiffs' core First Amendment rights to engage in meaningful expressions of political belief and support or to freely associate with candidates and political parties, the bans are narrowly tailored to pass constitutional muster.  Therefore, because the challenged provisions are closely drawn to the state's sufficiently important state interest of preventing actual and perceived corruption, the government's motion for summary judgment is granted and the plaintiffs' cross-motions for summary judgment are denied.

## I.    **Background**[2]

As noted in previous decisions in this case, several Connecticut politicians have been implicated in major corruption scandals, or pled guilty to criminal charges related to public corruption.  It cannot be seriously disputed that the scandals have substantially undermined public confidence in Connecticut state government.  Partly in response to those scandals, the Connecticut General Assembly passed the Campaign Finance Reform Act ("CFRA" or the "Act").

### A.    The Bans

To restore the public's confidence in Connecticut's elected officials, the General Assembly included two provisions in the CFRA that are the subject of the instant motions.  First,

---

[2] I assume familiarity with the facts, procedural background, and holdings in the several previous rulings related to the same law.  *Green Party of Conn. v. Garfield*, 537 F. Supp. 2d 359 (D. Conn. 2008), *SIFMA v. Garfield*, 469 F. Supp. 2d 25 (D. Conn. 2007), and *Ass'n of Conn. Lobbyists LLC v. Garfield*, 241 F.R.D. 100 (D. Conn. 2007).

the Act principally bans communicator lobbyists[3] (hereinafter, "lobbyists"), and their immediate

family members,[4] from contributing to, and soliciting donations on behalf of, candidates for state

office.[5]   Conn. Gen. Stat. § 9-610(g)-(h).   Second, the Act bans principals of contractors[6] or

---

[3] Under the statutory scheme, "communicator lobbyists" are a subset of "lobbyists." *Compare* Conn. Gen. Stat. § 1-91(l) *with* Conn. Gen. Stat. § 1-91(v).   Specifically, a "communicator lobbyist" is "a lobbyist who communicates directly or solicits others to communicate with an official or his staff in the legislative or executive branch of government or in a quasi-public agency for the purpose of influencing legislative or administrative action." Conn. Gen. Stat. § 1-91(v).   In addition, "[a] communicator lobbyist is someone compensated for lobbying over the threshold amount of $2,000 in any calendar year."   SEEC Declaratory Ruling 2006-1, Lobbyist Contribution and Solicitation Ban, Garfield Decl., Ex. 1 at 2.

[4] The Act defines "immediate family member" as "the spouse or a dependent child of an individual."   Conn. Gen. Stat. § 9-601(24).   All children under the age of 18, even those not subject to the ban, are limited to contributing $30 pursuant to Conn. Gen. Stat. § 9-611(e).

[5] It is important to note at the outset that section 9-610 (formerly section 9-333l) has been amended twice since the parties filed their motions for summary judgment in July 2007.   Those amendments have led to some discrepancies in the language of section 9-610 between the official version published by the state and the versions available through the two major commercial legal databases, Westlaw and LexisNexis.   The original language of section 9-610 was amended by Public Act 06-137, with those amendments taking effect as of October 1, 2007.   In April 2008, however, the General Assembly amended the language of 9-610 once again, by passing Public Act 08-02, with those changes taking effect *immediately*.   The official version of section 9-610 published by the state, http://www.cga.ct.gov/2007/pub/Chap155.htm#Sec9-610.htm (last visited December 18, 2008), and the version available on Lexis, however, only reflect changes through January 1, 2008 and therefore, do not present the version of section 9-610 that is legally in effect. Although the state's official website includes access to the official 2008 supplement, that supplement is not up-to-date with the language added by Public Act 08-02.   Westlaw's version of 9-610 appears to present the most up-to-date version, having incorporated the changes made by Public Act 08-02.   Having consulted all available resources, I have set forth in this decision what I understand to be the actual current version of the CFRA's provisions, recognizing that in some respects those provisions may differ from the "official" version available from the state website.

The statutory text provides that:

> No communicator lobbyist, member of the immediate family of a
> communicator lobbyist, or political committee established or controlled by a
> communicator lobbyist or a member of the immediate family of a
> communicator lobbyist shall make a contribution or contributions to, or for

the benefit of (1) an exploratory committee or a candidate committee established by a candidate for nomination or election to the office of Governor, Lieutenant Governor, Attorney General, State Comptroller, State Treasurer, Secretary of the State, state senator or state representative, (2) a political committee established or controlled by any such candidate, (3) a legislative caucus committee or a legislative leadership committee, or (4) a party committee.

Conn. Gen. Stat. § 9-610(g).

No communicator lobbyist, immediate family member of a communicator lobbyist, agent of a communicator lobbyist, or political committee established or controlled by a communicator lobbyist or any such immediate family member or agent shall solicit (1) a contribution on behalf of a candidate committee or an exploratory committee established by a candidate for the office of Governor, Lieutenant Governor, Attorney General, State Comptroller, State Treasurer, Secretary of the State, state senator or state representative, a political committee established or controlled by any such candidate, a legislative caucus committee, a legislative leadership committee or a party committee, or (2) the purchase of advertising space in a program for a fund-raising affair sponsored by a town committee, as described in subparagraph (B) of subdivision (10) of section 9-601a.

Conn. Gen. Stat. § 9-610(h).

[6] "State contractor" is defined as "a person, business entity or nonprofit organization that enters into a state contract."  The designation as a state contractor lasts until December 31 of the year of the contract's termination.

Conn. Gen. Stat. § 9-612(g)(1)(D).

A "principal" of a state contractor or prospective state contractor is defined as:

(i) any individual who is a member of the board of directors of, or has an ownership interest of five per cent or more in, a state contractor or prospective state contractor, which is a business entity, except for an individual who is a member of the board of directors of a nonprofit organization, (ii) an individual who is employed by a state contractor or prospective state contractor, which is a business entity, as president, treasurer or executive vice president, (iii) an individual who is the chief executive officer of a state contractor or prospective state contractor, which is not a business entity, or if a state contractor or prospective state contractor has no such officer, then the officer who duly possesses comparable powers and duties, (iv) an officer or an

-5-

prospective contractors[7] with state contracts[8] (hereinafter, "state contractors") from contributing to, or soliciting contributions on behalf of, candidates for state office.[9]  Conn. Gen. Stat. § 9-

---

employee of any state contractor or prospective state contractor who has managerial or discretionary responsibilities with respect to a state contract, (v) the spouse or a dependent child who is eighteen years of age or older of an individual described in this subparagraph, or (vi) a political committee established or controlled by an individual described in this subparagraph or the business entity or nonprofit organization that is the state contractor or prospective state contractor.

Conn. Gen. Stat. § 9-612(g)(1)(F).

[7] "Prospective state contractor" is defined as:

[A] person, business entity or nonprofit organization that (i) submits a response to a state contract solicitation by the state, a state agency or a quasi-public agency, or a proposal in response to a request for proposals by the state, a state agency or a quasi-public agency, until the contract has been entered into, or (ii) holds a valid prequalification certificate issued by the Commissioner of Administrative Services under section 4a-100.

Conn. Gen. Stat. § 9-612(g)(1)(E).

[8] "State contract" is defined as:

[A]n agreement or contract with the state or any state agency or any quasi-public agency, let through a procurement process or otherwise, having a value of fifty thousand dollars or more, or a combination or series of such agreements or contracts having a value of one hundred thousand dollars or more in a calendar year, for (i) the rendition of services, (ii) the furnishing of any goods, material, supplies, equipment or any items of any kind, (iii) the construction, alteration or repair of any public building or public work, (iv) the acquisition, sale or lease of any land or building, (v) a licensing arrangement, or (vi) a grant, loan or loan guarantee. "State contract" does not include any agreement or contract with the state, any state agency or any quasi-public agency that is exclusively federally funded, an education loan or a loan to an individual for other than commercial purposes.

Conn. Gen. Stat. § 9-612(g)(1)(C).

[9] The statutory text provides that:

(A) No state contractor, prospective state contractor, principal of a state

-6-

612(g)(2).

The definition of "solicitation" is central to the issues presented here.  The Act defines

"solicit" as:

> (A) requesting that a contribution be made, (B) participating in any
> fund-raising activities for a candidate committee, exploratory committee,
> political committee or party committee, including, but not limited to,
> forwarding tickets to potential contributors, receiving contributions for
> transmission to any such committee or bundling contributions, (C) serving as
> chairperson, treasurer or deputy treasurer of any such committee, or (D)
> establishing a political committee for the sole purpose of soliciting or
> receiving contributions for any committee.

Conn. Gen. Stat. § 9-601(26).  Notably, "solicit" does not include: "(i) making a contribution that

is otherwise permitted under this chapter, (ii) informing any person of a position taken by a

candidate for public office or a public official, (iii) notifying the person of any activities of, or

---

> contractor or principal of a prospective state contractor, with regard to a state
> contract or a state contract solicitation with or from a state agency in the
> executive branch or a quasi-public agency or a holder, or principal of a holder
> of a valid prequalification certificate, shall make a contribution to, or solicit
> contributions on behalf of (i) an exploratory committee or candidate
> committee established by a candidate for nomination or election to the office
> of Governor, Lieutenant Governor, Attorney General, State Comptroller,
> Secretary of the State or State Treasurer, (ii) a political committee authorized
> to make contributions or expenditures to or for the benefit of such candidates,
> or (iii) a party committee;
>
> (B) No state contractor, prospective state contractor, principal of a state
> contractor or principal of a prospective state contractor, with regard to a state
> contract or a state contract solicitation with or from the General Assembly or
> a holder, or principal of a holder, of a valid prequalification certificate, shall
> make a contribution to, or solicit contributions on behalf of (i) an exploratory
> committee or candidate committee established by a candidate for nomination
> or election to the office of state senator or state representative, (ii) a political
> committee authorized to make contributions or expenditures to or for the
> benefit of such candidates, or (iii) a party committee[.]

Conn. Gen. Stat. § 9-612(g)(2).

-7-

contact information for, any candidate for public office, or (iv) serving as a member in any party committee or as an officer of such committee that is not otherwise prohibited in this subdivision."  *Id.*

On November 15, 2006, the State Elections Enforcement Commission ("SEEC") – the state agency charged with administering and enforcing the CFRA – issued a declaratory ruling interpreting the scope and terms of the contribution and solicitation bans.[10]  SEEC Declaratory Ruling 2006-1, Lobbyist Contribution and Solicitation Ban, Garfield Decl. Ex. 1 at 1 ("SEEC Ruling 2006-1").  In that ruling, the SEEC interpreted the phrase "requesting that a contribution be made" require that either:  "(1) an express request that a contribution be made; or 2) a request is made such that a reasonably prudent person would not construe it as anything other than a request that a contribution be made, to a covered candidate or committee . . . ."  *Id.* at 3. Communicator lobbyists may also not participate in any fundraising activities, which include attending fundraisers, forwarding tickets for fundraisers, receiving contributions, or bundling contributions.[11]  *Id.* at 4.  "Bundling" is "the practice of collecting several contributions for forwarding or delivery to a campaign, generally so as to receive credit or good will for their collection."  *Id.*  In addition, communicator lobbyists may not hold certain positions within a

---

[10] The Connecticut Supreme Court has held that "[a]lthough the interpretation of statutes is ultimately a question of law it is the well established practice of this court to accord great deference to the construction given a statute by the agency charged with its enforcement."  *Conn. Alcohol & Drug Abuse Comm'n v. Freedom of Info. Comm'n*, 233 Conn. 28, 39 (1995) (internal quotation omitted).

[11] Providing copies of fundraising announcements falls within the definition of "forwarding tickets."  SEEC Ruling 2006-1 at 9.  On the other hand, orally informing someone of a fundraising event is not a solicitation, so long as that information is not accompanied by a suggestion, express or implied, that the person should attend the event or contribute.  *Id.* at 5, 9.

campaign, such as chairperson, campaign treasurer, deputy treasurer, or other committee officer. *Id*.

The solicitation ban, however, is as notable for the conduct it does not prohibit as for the conduct it does. SEEC Ruling 2006-1 explains that communicator lobbyists may still "inform their clients (or anyone else, for that matter) that a certain legislator or public official has been helpful, or not, on an issue that they are concerned about." *Id*. at 5. Moreover, "[a] lobbyist subject to the ban can provide anyone with a candidate's website, phone number or other contact information," and "could even inform someone that the candidate was having a fundraising event, but would have to avoid suggesting that they should attend or contribute." *Id*. The ruling provides further that the SEEC "believes it is clearly permissible conduct for a communicator lobbyist to orally inform a person of a fundraising event being held on behalf of a candidate's campaign. An express request that the person should attend or contribute, or an implicit request capable of no other construction by an ordinarily reasonably prudent person, would constitute a prohibited solicitation under the ban." *Id*.

SEEC Ruling 2006-1 listed the following examples of activities that are unaffected by the contribution and solicitation bans:

> 1) Volunteer for a covered candidate's political campaign (except as chairperson, treasurer, deputy treasurer or other officer, or in any fundraising capacity);
>
> 2) Put a sign on his or her lawn;
>
> 3) Make get out the vote calls;
>
> 4) Express support for a candidate or his or her views;
>
> 5) Advise someone whether a candidate is likely to be elected;

6) Communicate his or her evaluations of a legislator or candidate to his or her clients or anyone else;

7) Contribute to a political committee that is not established or controlled by one of the covered candidates (but could not contribute to one committee with the direction to pass through to another, otherwise known as laundering, earmarking or giving in the name of another);

8) Contribute to candidate committees for candidates for Judge of Probate, municipal office and referenda committees;

9) Make independent expenditures on behalf of a covered candidate (no coordination, as defined in Conn. Gen. Stat. § 9-333a(19) [replaced by Conn. Gen. Stat. § 9-601(19)]);

10) Provide advice to a candidate for public office;

11) Run for office;

12) Be the spouse or dependent child of someone running for office;

13) Attend campaign events for covered candidates that do not involve fundraising, such as debates or meet and greet events where fundraising is not involved;

14) Host an event for a candidate that was not a fundraising event;

15) Serve as chairperson, treasurer, deputy treasurer or other officer for a candidate committee of a candidate for municipal office.

*Id*. at 5-6.  The ruling described, in detail, a multitude of ways in which communicator lobbyists can still participate in the political process short of donating to, or soliciting contributions on behalf of, candidates for state office.

SEEC Ruling 2006-1 further explained that the actions of third-parties cannot convert permissible activities into prohibited activities for lobbyists or other affected individuals.  *Id.* at 9.  For example, if a lobbyist held a non-fundraiser meet and greet event for a candidate, he or she would not be penalized if an attendee unilaterally asked the candidate how to make a

campaign contribution.  *Id.*

  With regard to enforcement of the CFRA, SEEC Ruling 2006-1 stated that, "[a]ny implicit request that a contribution be made by a lobbyist in violation of [the solicitation ban] would have to be established by clear and convincing evidence."  *Id*. at 3-4.  Moreover, "[a]ny determination of whether a solicitation was made would be based upon the facts and circumstances surrounding the alleged solicitation, and not solely on the subjective belief of the individual" with whom the individual communicates.  *Id*. at 6.  The SEEC thus employs "an objective test . . . to determine whether a reasonably prudent person would believe that they were being solicited to make a contribution."  *Id*.

  The same definition of solicitation, and the same analysis of prohibited and permissible conduct set forth in the Act, and in SEEC Ruling 2006-1, with respect to communicator lobbyists also applies to state contractors.  *Id*. at 8.

  B. <u>The Pending Motions</u>

  The parties have filed three summary judgment motions.  First, the Association of Connecticut Lobbyists, LLC and Barry Williams (collectively, the "ACL plaintiffs") have moved for summary judgment on counts one and two of their second amended complaint (doc. #64), which allege that the solicitation and contribution bans on communicator lobbyists violate the First and Fourteenth Amendments to the United States Constitution (count one) and sections Four and Five of the Connecticut Constitution (count two).  Second, the Green Party plaintiffs, including Elizabeth Gallo, Roger Vann, Ann Robinson, and Joanne Phillips have moved for summary judgment on count four of their amended complaint (doc. #17), which alleges that the contribution and solicitation bans violate the First Amendment.  Finally, the government and the

intervenor-defendants (collectively, "the government" or "the state") have moved for summary judgment on the ACL plaintiffs' claims in their entirety, and on count four of the Green Party plaintiffs' amended complaint.

## II.    Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"), *cert*. *denied*, 506 U.S. 965 (1992). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991), *cert*. *denied*,

502 U.S. 849 (1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d

Cir. 1992).  If the nonmoving party submits evidence that is "merely colorable," or is not

"significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will
> not defeat an otherwise properly supported motion for summary judgment;
> the requirement is that there be no genuine issue of material fact.  As to
> materiality, the substantive law will identify which facts are material.  Only
> disputes over facts that might affect the outcome of the suit under the
> governing law will properly preclude the entry of summary judgment.
> Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48.  To present a "genuine" issue of material fact, there must be contradictory evidence

"such that a reasonable jury could return a verdict for the non-moving party."  *Id.* at 248.

　　　　If the nonmoving party has failed to make a sufficient showing on an essential element of

his case with respect to which he has the burden of proof at trial, then summary judgment is

appropriate.  *Celotex*, 477 U.S. at 322.  In such a situation, "there can be 'no genuine issue as to

any material fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322-23; *accord

Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's

burden satisfied if he can point to an absence of evidence to support an essential element of

nonmoving party's claim).  In short, if there is no genuine issue of material fact, summary

judgment may enter.  *Celotex*, 477 U.S. at 323.

　　　　When cross-motions for summary judgment are presented to the court, the standard is the

same as that applied to individual motions for summary judgment.  *Morales v. Quintel

Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  "Each party's motion must be examined

on its own merits, and in each case all reasonable inferences must be drawn against the party

whose motion is under consideration." *Id.* Summary judgment should not be granted "unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely in dispute." *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975). In this case, the task of deciding cross-motions for summary judgment is easier than in most cases because the record, with rare exceptions, is not in serious dispute.

## III. First Amendment Claims

The plaintiffs argue that the contribution and solicitation bans impermissibly burden their First Amendment rights of free political expression and association. The state defends the CFRA as a constitutional restriction on speech because it burdens only marginal speech and associational rights, while still permitting the affected individuals to participate in the political process and express their political views in myriad and substantive alternative ways. For each contested provision, the parties dispute what level of scrutiny should be applied to determine whether the law runs afoul of the First Amendment.

### 1. Contribution Bans

The plaintiffs argue that strict scrutiny applies because the law imposes an outright ban on contributions by lobbyists, state contractors, and their immediate family members rather than imposing a limit that will permit at least a nominal level of political expression. The state maintains that, although the CFRA bans contributions rather than imposing a contribution limit, it does not change the level of scrutiny typically applied to contribution limits and that the "closely drawn" level of intermediate scrutiny should apply.

#### A. Scrutiny

Since its decision in *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court has

-14-

routinely upheld limits on campaign contributions.  *See McConnell v. FEC*, 540 U.S. 93 (2003)*;

FEC v. Beaumont*, 539 U.S. 146 (2003); *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377

(2000).  In those cases, the Supreme Court drew a clear line between campaign contributions and

campaign expenditures, subjecting the latter to more exacting "strict scrutiny," while subjecting

contribution limitations to the "closely drawn" standard primarily because contribution limits,

unlike expenditure limits, involve an indirect form of speech.  As the *Buckley* Court explained,

"[w]hile contributions may result in political expression if spent by a candidate or an association

. . ., the transformation of contributions into political debate involves speech by someone other

than the contributor."  424 U.S. at 21.  The *Nixon* Court echoed:

> A limitation upon the amount that any one person or group may contribute to
> a candidate or political committee entails only a marginal restriction upon the
> contributor's ability to engage in free communication.  A contribution serves
> as a general expression of support for the candidate and his views, but does
> not communicate the underlying basis for the support.  The quantity of
> communication by the contributor does not increase perceptibly with the size
> of his contribution, since the expression rests solely on the undifferentiated
> symbolic act of contributing.  At most, the size of the contribution provides a
> very rough index of the intensity of the contributor's support for the
> candidate.  A limitation on the amount of money a person may give to a
> candidate or campaign organization thus involves little direct restraint on his
> political communication, for it permits the symbolic expression of support
> evidenced by a contribution but does not in any way infringe the contributor's
> freedom to discuss candidates and issues.

528 U.S. at 386-87 (quoting *Buckley*, 424 U.S. at 20-21).  The *Nixon* Court concluded that "in

effect, . . . limiting contributions [leaves] communication significantly unimpaired. . . .

[R]estrictions on contributions require less compelling justification than restrictions on

independent spending.  It has, in any event, been plain ever since *Buckley* that contribution limits

would more readily clear the hurdles before them."  *Id*. at 387 (internal quotations omitted).

Contribution limitations are considered "merely 'marginal' speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than the core of political expression." *Beaumont*, 539 U.S. at 161. As such, even those contribution limits that significantly interfere with First Amendment rights can pass muster under the less exacting, "closely drawn" level of scrutiny. *Id.* at 162 (citing *Nixon*, 528 U.S. at 387-88).

Although contribution limits do impose restrictions on the free exercise of political expression and association, they also provide value to the electoral process by protecting the integrity of the system, which in turn, encourages greater political participation. As the *McConnell* Court explained:

> Because the electoral process is the very "means through which a free society democratically translates political speech into concrete governmental action," contribution limits, like other measures aimed at protecting the integrity of the process, tangibly benefit public participation in political debate. For that reason, when reviewing Congress' decision to enact contribution limits, "there is no place for a strong presumption against constitutionality, of the sort often thought to accompany the words 'strict scrutiny.'" The less rigorous standard of review we have applied to contribution limits (*Buckley*'s "closely drawn" scrutiny) shows proper deference to Congress' ability to weigh competing constitutional interests in an area in which it enjoys particular expertise. It also provides Congress with sufficient room to anticipate and respond to concerns about circumvention of regulations designed to protect the integrity of the political process.

540 U.S. at 137 (quoting *Nixon*, 528 U.S. at 400-01 (Breyer, J., concurring)) (internal citations omitted).

The state argues that similar deference, in the form of intermediate "closely drawn" scrutiny, must be shown to the General Assembly's particular expertise in the area of state elections when considering the constitutionality of the contribution bans.

The plaintiffs rest their argument that the contribution bans should be subject to strict

scrutiny on the fact that they are *bans* rather than *limits*.  By preventing lobbyists and state contractors from making even a small donation, the plaintiffs argue, the CFRA deprives them of the ability to make even a symbolic expression of support.  The Supreme Court in *Beaumont*, however, considered and squarely rejected that argument.  The plaintiffs in that case argued that 2 U.S.C. § 441b(a), which banned campaign contributions from nonprofit advocacy corporations, "should be subject to a strict level of scrutiny, on the ground that [it] does not merely limit contributions, but bans them on the basis of their source."  539 U.S. at 161.  The *Beaumont* Court rejected that argument, concluding that it ignored the "basic premise" it has followed when "setting First Amendment standards for reviewing political financial restrictions: the level of scrutiny is based on the importance of the political activity at issue to effective speech or political association."  *Id.* (internal quotation omitted).

In concluding that the closely drawn standard would apply to contribution bans, the Court reiterated that, unlike political expenditures, contributions generally "lie closer to the edges than to the core of political expression."  *Id.*  Thus, a contribution ban was still a "marginal" speech restriction "subject to relatively complaisant review under the First Amendment."  *Id.*  When considering the statute's ban on contributions from nonprofit advocacy corporations, the *Beaumont* Court reaffirmed *Buckley*'s rationale for differentiating the speech value of expenditures and contributions.  *Id.* at 161-62 ("While contributions may result in political expression if spent by a candidate or an association, the transformation of contributions into political debate involves speech by someone other than the contributor.") (quoting *Buckley*, 424 U.S. at 20-21).  Significantly, however, the Court did not distinguish between a contribution limit and a contribution ban.  In holding that the "closely drawn" standard applied, the *Beaumont*

Court noted that "[i]t is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when *applying* scrutiny at the level selected, not in *selecting* the standard of review itself." *Id*. at 162 (emphasis added).  Therefore, the Court concluded that, because the contribution bans were marginal speech restrictions not involving direct political expression, the statute's contribution bans were still subject to the less exacting "closely drawn" scrutiny.  *Id.* at 162.

Similarly, the closely drawn standard applies here.  The solicitation and contribution bans will be upheld provided the state can demonstrate that the CFRA has been "closely drawn to match a sufficiently important interest."  *Id.* (internal quotation omitted).

B.    Sufficiently Important Interest

The legislature enacted the contribution and solicitation bans in the wake of several widely publicized corruption scandals involving high-ranking public officials.  The state asserts it did so in order to limit the potential for actual corruption and, even more significantly, to combat the public's perception that there was widespread corruption among elected state officials.  The state argues that a strong response, i.e., an outright ban on contributions from lobbyists, state contractors, and their immediate family members, was necessary to restore the public's confidence in state government.

The plaintiffs primarily contest the state's assertion that it has successfully demonstrated that the General Assembly had a sufficiently important interest for passing the CFRA.  First, as a threshold issue, the plaintiffs contend that Connecticut's recent corruption scandals, discussed in more detail below, have little temporal or material relation to the contribution and solicitation bans and therefore, do not provide sufficient justification for those measures.  Next, the plaintiffs

note that lobbyists and state contractors contribute only a small percentage of overall donations to statewide and General Assembly campaigns and that there is not enough evidence in the record demonstrating how those personal contributions or efforts to solicit and bundle contributions lead to undue influence.  Third, they dispute that lobbyists make or solicit contributions primarily to further the interests of their clients, arguing that lobbyists have a right to contribute, in their personal capacities, to those candidates that reflect their individual political beliefs.  Finally, the plaintiffs contend that the competitive bid process for state contracts successfully defeats the state's argument that contributions from or solicited by state contractors have an undue influence on public officials.

The problem with the plaintiffs' position is that it ignores the Supreme Court's consistent rulings that preventing the *perception* of corruption, not just actual corruption, is a sufficiently important state interest to support contribution limits.  It is well-established that attempts to prevent both actual and perceived corruption provide a "constitutionally sufficient justification" for contribution limitations.  *Buckley*, 424 U.S. at 26.  The *Buckley* Court explained that it not only undermines "the integrity of our system of representative democracy" when large contributions are made to candidates in order to "secure a political quid pro quo," but "[o]f almost equal concern," is the "*appearance* of corruption."  *Id.* at 26-27 (emphasis added).  With regard to the contribution limits at issue in *Buckley*, the Court held that "Congress could legitimately conclude that the avoidance of the appearance of improper influence 'is also critical . . . if confidence in the system of representative Government is not to be eroded to a disastrous extent.'" *Id.* (quoting *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 565 (1973)).

Since *Buckley*, the Supreme Court has reiterated the sufficiency of that interest, stating that "[o]ur cases have made clear that the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits." *McConnell*, 540 U.S. at 143. *See also FEC v. Wis. Right to Life, Inc.*, ___ U.S. ___, 127 S. Ct. 2652, 2672 (2007) (noting that in contribution limit cases, the "Court has long recognized the governmental interest in preventing corruption and the appearance of corruption in election campaigns") (internal quotations omitted); *Nixon*, 528 U.S. at 389 (citing cases). The need to address the perception of corruption stems not just from actual and documented corruption, but also arises out of "the broader threat from politicians too compliant with the wishes of large contributors." *Nixon*, 528 U.S. at 389. "Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance." *Id.* at 390. The Court reasoned further that, "[d]emocracy works 'only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption." *Id.* (quoting *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 562 (1961)). It is within the state's interest to prevent not just "cash-for-votes corruption," but also to prevent "undue influence on an officeholder's judgment, and the appearance of such influence." *McConnell*, 540 U.S. at 150 (internal quotation omitted). Therefore, where the state can demonstrate that there is a *perception* of corruption among public officials, particularly when presented in conjunction with highly-publicized episodes of actual corruption, it can successfully meet its burden of proving it had a sufficiently important interest in enacting contribution limits.

To meet its burden of demonstrating a sufficiently important interest, the state is not

-20-

required to prove that many elected officials are on the take or that elected officials uniformly act only in accordance with the interests of their largest contributors.  Actual corruption is only one factor the state is permitted to consider; the public's perception of corruption is another important factor.  As discussed below, the undisputed facts in the record demonstrate that there was both actual corruption at the highest levels of state government in Connecticut and a declining level of public trust in elected officials as a result of corruption scandals that gave rise to a sufficiently important interest to support enactment of the CFRA.

        *1.*    *Recent Corruption Scandals in the State of Connecticut*

On June 21, 2004, Governor John Rowland announced his resignation after being accused of improperly accepting tens of thousands of dollars in gifts and services from state contractors in return for facilitating the award of several state contracts.  Feinberg Decl. Ex. 3.  Rowland subsequently pled guilty to federal criminal charges, including conspiracy to defraud the state and its citizens of the honest services of its Governor and federal tax evasion.  Feinberg Decl. Exs. 2 & 4.  In March 2005, Rowland was sentenced to a term of imprisonment of one year and a day and ordered to pay $82,000 in fines.  Feinberg Decl. Ex. 4.  As part of his plea agreement, Rowland acknowledged that he conspired with other public officials and state contractors to award and/or facilitate the award of state contracts in return for free or greatly reduced vacation stays in Florida and Vermont, free construction work on his Connecticut lake cottage, and free private jet flights to Las Vegas and Philadelphia – the value of which totaled in excess of $100,000.  Feinberg Decl. Ex. 3.  Peter Ellef, Rowland's chief of staff, Lawrence Alibozek, his deputy chief of staff, and several state contractors, including William Tomasso and the Tunxis Management Company, also pled guilty to federal charges stemming from their roles in that

corruption scandal.  Feinberg Decl. Exs. 5-10.

The Rowland episode was neither the first, nor the last, of Connecticut's string of corruption scandals involving state officials.  In 1999, State Treasurer Paul Silvester pled guilty to federal racketeering and money laundering charges stemming from a kick-back scheme involving state pension investments.  Feinberg Decl. Ex. 11.  In return for investing over $500 million of the state's pension funds with certain financial institutions, Silvester directed millions of dollars in "finder's fees" to be paid to various friends and associates, who then funneled part of the money back to his campaign fund.  Feinberg Decl. Exs. 11-17.  Silvester eventually pled guilty to two counts of racketeering and conspiracy to launder money and was sentenced in federal court to a term of imprisonment of fifty-one months.  In addition he paid a forfeiture sum of $230,000.  Many of Silvester's co-conspirators either pled guilty or were convicted on counts arising out of the public official bribery scheme and received terms of imprisonment.[12]  One of

---

[12] In September 2002, after pleading guilty to conspiracy to launder money, Peter Hirschl was sentenced to a term of imprisonment of five months, to be followed by five months of home confinement, and was ordered to pay a $15,000 fine.  In 2003, Frederick McCarthy, Chairman of Triumph Capital, pled guilty to corruptly rewarding a public official and was sentenced to a prison term of a year and a day.  Lisa Thiesfield, one of Silvester's friends, pled guilty to corruptly aiding and abetting a public official in accepting a reward; her sentence included a six-month term of imprisonment.  Two other co-conspirators were convicted after a jury trial.  Ben Andrews was convicted of nine counts, including bribery, mail and wire fraud, and money laundering and was sentenced to a 30-month term of imprisonment for his role in funneling the pension funds to private equity firm Landmark Partners.  In addition, former assistant state treasurer George Gomes was sentenced to two years' probation and fined $1,500 after pleading guilty to mail fraud for his role in the scheme.  Silvester's brother, Mark Silverster, pled guilty to conspiracy to solicit and accept corrupt payments and was sentenced to a 21-month term of imprisonment and fined $40,000.  In exchange for his cooperation with federal prosecutors, Christopher Stack was never charged.  Charles Spadoni, Triumph Capital's General Counsel, was convicted on eight counts, including racketeering, racketeering conspiracy, bribery, and wire fraud and sentenced to 36 months' imprisonment.  Spadoni's case remains ongoing, however.  In September 2008, the Second Circuit reversed and remanded for a new trial on several of those counts, determining that the government had suppressed material and exculpatory evidence.

the financial firms involved in the conspiracy, Triumph Capital, was fined $4,000,000.

In an additional episode of public corruption, in September 2005, State Senator Ernest Newton II pled guilty to federal bribery charges in connection with a kick-back scheme involving a non-profit organization in Bridgeport. Feinberg Decl. Ex.19. In return for a $5,000 bribe, Newton agreed to assist the non-profit group, Progressive Training Associates, Inc., in its quest to secure a $100,000 grant from the state. *Id.* Newton also pled guilty to federal mail fraud and tax evasion charges for diverting $40,000 in campaign contributions to his personal use. *Id.* Newton was ultimately sentenced to 60 months in federal prison and ordered to pay over $13,000 in restitution. Feinberg Decl. Ex. 21.

Although candidates for municipal office are not subject to the CFRA, the corruption scandal involving the mayor of Bridgeport, Joseph Ganim, is also relevant because it contributed to the atmosphere of public distrust and perception of corruption of public officials in Connecticut. In March 2003, a jury convicted Ganim of sixteen counts of federal racketeering, extortion, bribery, mail fraud, and tax evasion arising from a scheme to award city contracts in exchange for illegal kickbacks from contractors. *United States v. Ganim*, Case No. 3:01cr263 (JBA), 2006 WL 1210984, at *1 (D. Conn. 2006). At least three contractors also pled guilty to their role in that scheme. *United States v. Lenoci*, 377 F.3d 246, 248 (2d Cir. 2004) (noting that "Lenoci also agreed to raise funds for the mayor's anticipated campaign for governor, in return for Ganim's support for the [development project]"); *Bridgeport Harbour Place I, LLC v. Ganim*, 269 F. Supp. 2d 6, 7 (D. Conn. 2002) (noting that the three contractors "acknowledged that they corruptly provided bribes, kickbacks, and other things of value . . . in return for preferential

_____

*United States v. Triumph Capital, Inc.*, 544 F.3d 149, 152 (2d Cir. 2008).

-23-

treatment from Mayor Ganim in connection with the awarding of city contracts.").  Ganim's

criminal case continues to make headlines; he recently filed a motion seeking a new trial on the

basis of alleged prosecutorial misconduct.  *See* Bill Cummings, *Ganim Wants New Trial, Cites

Deal*, Conn. Post, Nov. 20, 2008.

   The above scandals have received widespread press coverage, leading some in the media

to dub the state "Corrupticut."  *See, e.g.,* Paul von Zielbauer, *The Nutmeg State Battles the

Stigma of Corrupticut*, N.Y. Times, Mar. 28, 2003 ("Nowadays, from Storrs to Stamford, there

are jokes about living in Corrupticut, Connection-icut or, the new favorite, Criminalicut").[13]

   The plaintiffs do not dispute that, in the past decade, several elected state officials have

pled guilty to federal charges arising out of widely publicized corruption scandals.  They

primarily dispute the state's characterization of those episodes as demonstrating a "long series"

of scandals involving corruption of public officials, arguing that there is not enough evidence of

widespread corruption of elected officials to support the contribution and solicitation bans for

---

   [13] *See also* Feinberg Decl. Ex. 22:  Marc Santora, *Political Memo; The Whiff of
Corruption Persists in Connecticut*, N.Y. Times, Sept. 21, 2003 (referring to the brewing
Rowland scandal, "[w]hile the investigation continues, each new development chips away at the
layer of trust between Connecticut's residents and their elected officials"); Stan Simpson, *Plain
Talk About Corruption*, Hartford Courant, Oct. 8, 2003, ("For its size, little Connecticut –
proportionately – just may be the most corrupt state in the union. . . .  No longer is it a far-fetched
notion to link public officials here with jail time – or potential time."); Richard Lezin Jones, *Our
Towns; Move Over, New Jersey.  New Trend Puts the Con in Connecticut*, N.Y. Times, Nov. 30,
2003 (noting that the state's mounting corruption scandals "may be helping to give otherwise
refined Connecticut an unexpected and unwanted mark of distinction in the region: the state with
the most dysfunctional politicians"); Avi Salzman, *He's Leaving.  Now the State Has to Restore
its Reputation*, N.Y. Times, June 27, 2004 ("A half-decade of mounting political scandals have
turned Connecticut into a punchline of political backwardness."); David A. Fahrenthold, *Political
Scandals Refuse to Go Away in 'Corrupticut'; Officials' Wrongdoing Persists After Governor's
2005 Conviction*, Wash. Post, July 3, 2006 ("The past few years have revealed so many tales of
graft, malfeasance and all-purpose criminality by public servants in Connecticut that it's hard to
choose the most brazen.").

lobbyists, state contractors, and their immediate family members.

First, as a threshold matter, that argument goes more to the issue whether the contribution and solicitation ban is "closely drawn" enough to survive constitutional scrutiny, not whether the state had a sufficiently important interest in enacting the ban in the first place. Second, and more significantly, the plaintiffs' focus on whether or not the state has presented enough evidence of *actual* corruption ignores the long line of cases that accept that combating the *perception* of corruption is also a sufficiently important interest, particularly when it coincides with evidence of actual corruption. It is certainly true that there is no evidence in the record to suggest that a majority, or even more than a handful, of state elected officials engage in quid pro quo arrangements with their top contributors. However, as discussed below, the actual episodes of corruption have contributed to the public's belief that corruption among state elected officials is commonplace.

### 2. *Public Perception of Elected State Officials in Connecticut*

A 2004 poll of likely Connecticut voters, the results of which the plaintiffs do not dispute, reveals public perception of Connecticut's elected officials during the relevant time frame. According that poll, 78% of likely Connecticut voters agreed that the way political campaigns are financed in Connecticut encourages candidates to grant special favors and preferential treatment to their contributors. Meadow Decl. ¶ 20, Ex. A at 4.[14] Of those polled, 49% strongly agreed that was true. *Id.* According to that same 2004 poll, 44% of likely Connecticut voters believed that state lawmakers voted the way that campaign contributors wanted them to vote in exchange

---

[14] The plaintiffs previously moved to strike this expert report. I have not relied on any of the opinion evidence that was subject to that motion, but rather have drawn on the uncontroverted facts contained therein.

for contributions "a lot" of the time; another 44% believed that happens "sometimes."  *Id.* at ¶

29(second), Ex. A at 9.  Only 9% stated they believed that happened "rarely" or "never."  *Id.*  In a

2005 poll of likely Connecticut voters, 62% stated that elected officials in Connecticut are more

concerned with the needs of those who pay for their campaigns than the needs of everyone.  *Id.* at

¶ 28, Ex. A at 8.  In that same poll, 82% of Connecticut voters agreed that it was necessary to

limit the influence of money on politics.  *Id.*

The plaintiffs are correct to note that that polling data is not specific to contributions from

lobbyists and state contractors, but those results certainly shed light on widespread public

sentiment regarding the strong influence that campaign contributions have on candidates for

public office, which speaks directly to the issue of perceived corruption.  *See also* Brocchini

Decl. Ex. 8, Smith Dep. at 12 (stating his constituents were bothered by special interest money

"because they do think that folks get up for sale").

The *Nixon* plaintiffs sought to "take the State to task . . . for failing to justify the

invocation of those interests with empirical evidence of actually corrupt practices or of a

perception among Missouri voters that unrestricted contributions must have been exerting a

covertly corrosive influence."  *Nixon*, 528 U.S. at 390-91.  The *Nixon* Court rejected that

argument, holding that "[t]he quantum of empirical evidence needed to satisfy heightened

judicial scrutiny of legislative judgments will vary up and down with the novelty and plausibility

of the justification raised."  *Id.* at 391.  Because "the dangers of large, corrupt contributions and

the suspicion that large contributions are corrupt are neither novel nor implausible,"[15] the Court

---

[15] In *Nixon*, the statute at issue limited the amount of individual contributions to
candidates for state office, capping the maximum donation at $1,000.  *Id.* at 382.

concluded that the evidence submitted by the state, which included affidavits of state legislators who believed large contributions had the potential to buy votes and newspaper accounts detailing "large contributions supporting inferences of impropriety," was sufficient to demonstrate "why voters would tend to identify a big donation with a corrupt purpose." *Id.* at 391, 393.

Like the plaintiffs in *Nixon*, the plaintiffs here attempt to undermine the state's justification for the contribution and solicitation bans on the ground that the state has failed to demonstrate sufficient evidence: (1) of "a culture of corruption" in Connecticut, particularly one stemming directly from contributions by lobbyists and state contractors to purchase influence, (2) that lobbyists and state contractors contribute enough to enable them to exercise undue influence over the legislative process, or (3) that the public's mistrust of their elected officials stems from a perception of corruption specific to the contributions from and solicited by Connecticut lobbyists and state contractors.

The idea that lobbyists and state contractors – whose livelihood depends in large part on successfully influencing state legislators and executive officials or from winning state contracts controlled by those officials – might seek to influence elected officials by contributing to and/or soliciting contributions on behalf of candidates for public office, however, is neither novel nor implausible.  A lobbyist's primary job description is to influence policymakers on behalf of the lobbyist's clients who stand to benefit from the success or failure of a particular piece of legislation.  There is no dispute that lobbyists have "constant interaction" with lawmakers when the General Assembly is in session and that lobbyists play an "integral role" in the legislative process and do work at the behest of legislators, such as drafting bills and amendments.  Pl. L.R. 56(a)(1) Statement at ¶¶ 75-78; Sen. Roraback Aff. ¶ 9.  Similarly, a contractor can derive a

-27-

significant source of income from state contracting jobs.  It is not implausible for the public to surmise that candidates might look more favorably upon those lobbyists and state contractors who contribute to their election campaigns, even if that view does not necessarily bear out in practice. When candidates collect significant amounts of money – or as the state argues in this case, *any* amount of money – from the very people whose livelihood depends on currying favor with policymakers and elected officials, the public trust in the system begins to erode, as demonstrated by the public opinion polls discussed above.  Because this is neither novel nor implausible, the "quantum of empirical evidence" that the state must produce that bears out its justification for the contribution and solicitation bans is not high.

The real question presented here is not whether the State of Connecticut lacked a sufficiently important interest when it enacted the contribution and solicitation bans.  The undisputed evidence in the record supports the state's contention that there was not only a history of corruption among public officials in Connecticut, but also that public sentiment towards elected officials had ebbed low enough to justify the legislature's belief that some measures were necessary to shore up public confidence in state government.  The truly contested issue is whether the legislature's measures are adequately "closely drawn" to that important state interest to pass constitutional muster.

C.    Closely Drawn

There is no question that contribution limits "operate in an area of the most fundamental First Amendment" rights of political expression and political association. *Buckley*, 424 U.S. at 14.  However, the right to associate and the right to participate in political activities are not absolutely protected under the First Amendment.  *Id.* at 25.  "Even a significant interference with

protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Id.* (internal quotation omitted). A contribution limit meets the closely drawn standard if it "do[es] not undermine to any material degree the potential for robust and effective discussion of candidates and campaign issues by individual citizens, associations, the institutional press, candidates, and political parties." *Id.* at 29.

To be sure, contribution limits can go too far by "work[ing] more harm to protected First Amendment interests than their anti-corruption objectives could justify." *Randall v. Sorrell*, 548 U.S. 230, 247-48 (2006). To violate the First Amendment under the closely drawn standard, however, the contribution limit must effectively "drive the sound of the candidate's voice below the level of notice." *Nixon*, 528 U.S. at 397. It is not simply a quantitative determination. *Id.* Rather than focusing on the dollar amount at issue, a court must consider whether the contribution limit adversely affects a candidate's "power to mount a campaign." *Id.* The pertinent inquiry for the closely drawn prong of the intermediate scrutiny standard is whether the contribution limit is "so low as to impede the ability of candidates to amass the resources necessary for effective advocacy." *Id.* (internal quotation omitted). *See also McConnell*, 540 U.S. at 135 ("Contribution limits impose serious burdens on free speech only if they are so low as to prevent candidates and political committees from amassing the resources necessary for effective advocacy.") (internal quotation omitted). With regard to the CFRA's effect on lobbyist and state contractors' right to "symbolic expression of support," it is necessary to balance that restriction against the rights not infringed upon, namely, "the contributor's freedom to discuss candidates and issues." *Buckley*, 424 U.S. at 21. *See also McConnell*, 540 U.S. at 135-36;

*Nixon*, 528 U.S. at 387-88.

As the most recent Supreme Court decision to address the constitutionality of contribution limits, *Randall* provides a helpful demonstration of the closely drawn standard in practice. In a plurality decision striking down Vermont's contribution limits as unconstitutional, the Court applied the closely drawn level of scrutiny to the contribution limits at issue in that case. *Id.* at 247-49. Reaffirming *Buckley* and *Nixon*'s guidance that a contribution limit may be "too low" to pass constitutional muster if it "prevent[s] candidates from 'amassing the resources necessary for effective campaign advocacy,'" *id.* at 248 (quoting *Buckley*, 424 U.S. at 21), the plurality decision also highlighted a second inquiry: "whether [the contribution limits] magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage." *Id.*

Acknowledging it had "no scalpel to probe" the varying contribution limits, but that the amount of a contribution limit could "make a difference," the Court reiterated that "[i]n practice, the legislature is better equipped to make such empirical judgments, as legislators have 'particular expertise' in matters related to the costs and nature of running for office." *Id.* at 247-48 (quoting *Buckley*, 424 U.S. at 30; *McConnell*, 540 U.S. at 137). Defending its decision to strike down the contribution limits as unconstitutional, the *Randall* plurality stated that "[a]t some point the constitutional risks to the democratic electoral process become too great." *Id.* at 248. Recognizing that the integrity of the political process depends on the eradication of actual and perceived corruption, the Court nevertheless expressed concern that a statute designed to enhance those interests could yet "prove an obstacle to the very electoral fairness it seeks to promote." *Id.* at 249. According to the *Randall* plurality, a key question for a court to probe is

whether the contribution limits are so low that they "prevent[] challengers from mounting

effective campaigns against incumbent officeholders." *Id.* at 248-49.  A reviewing court should

"review the record independently and carefully with an eye toward assessing the statute's

'tailoring,' that is, toward assessing the proportionality of the restrictions." *Id.* at 249.

        1.    *Ban v. Limit*

In support of their motions for summary judgment, the plaintiffs first contend that the

CFRA is not closely drawn because it is not merely a "limit" on contributions from lobbyists and

state contractors, but is rather an outright ban.  The plaintiffs argue that, although the legislature

is entitled to some deference when it comes to setting the amount of a contribution *limit*, the

legislature is not entitled to the same level of deference when it chooses to enact an outright ban

on contributions.  Because, as discussed above, contribution bans are subject to the same level of

scrutiny as any other form of contribution limit, I will consider plaintiffs' alternative argument

that the CFRA is not closely enough drawn to pass constitutional muster because it suppresses

even the symbolic expression of support evidenced by even nominal contributions.

Undoubtedly, banning individual contributions is more constitutionally problematic than

imposing a nominal contribution limit would be; the latter would at least preserve the value of

the symbolic expression of support that political contributions represent.  *See Randall*, 548 U.S.

at 246-47 (noting that, although contribution limits restrict the contributor's ability to support a

preferred candidate, "they nonetheless permit the symbolic expression of support evidenced by a

contribution") (internal quotation omitted).  Courts that have had the opportunity to examine

bans on contributions from selected groups, including lobbyists, however, have rejected the

argument that bans are per se unconstitutional simply because they are "bans" and not merely

"limits" on contributions.  For instance, in *Institute of Governmental Associates v. Fair Political Practices Commission*, 164 F. Supp. 2d 1183, 1191 (E.D. Cal. 2001), the Court noted that the statute at issue was "not unconstitutional simply because it *bans*, rather than limits, contributions by certain lobbyists."  Relying on *Nixon*, the Court held that "the test for determining the validity of the amount of a limitation (here a complete ban) is whether the limit is 'so low as to impede the ability of candidates to amass the resources necessary for effective advocacy.'"  *Id.* (quoting *Nixon*, 528 U.S. at 397).

Addressing a constitutional challenge to North Carolina's in-session ban on lobbyist contributions, the Fourth Circuit in *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 716 (4th Cir. 1999), similarly rejected the plaintiffs' challenge that the ban was per se unconstitutional, concluding that the appearance of corruption arising from lobbyists' political contributions was "corrosive" enough to support reasonable measures aimed at preserving "public confidence in the integrity of representative democracy."   Because "lobbyists are paid to effectuate particular political outcomes," the in-session ban on lobbyist contributions was a constitutional, "narrowly tailored" restriction on lobbyists' First Amendment rights of speech and association. *Id.* at 715-16, 718.  The Court thus concluded that "North Carolina law does nothing more than recognize that lobbyists are paid to persuade legislators, not to purchase them."  *Id.* at 718.

Similarly, in *Casino Ass'n of Louisiana v. Louisiana ex. rel. Foster*, 820 So. 2d 494 (2002), the Louisiana Supreme Court addressed a ban on political contributions by individuals associated with the casino and gaming industry to candidates seeking elected office in Louisiana. The Court refused to hold that the statute's contribution ban was per se unconstitutional by virtue

-32-

of being a ban rather than a limit.  *Id.* at 504.  Concluding that "there is no indication in *Buckley*

that a contribution limit of *zero*, as a opposed to a contribution limit of $1,000.00, would be

unconstitutional," the Court reasoned that even a contribution ban could withstand constitutional

scrutiny under the closely drawn standard.  *Id.* at 502, 509 (emphasis added).  Of significance to

the Court was evidence in the record suggesting that the public believed the gaming industry to

be associated with political corruption, which was bolstered by evidence that governmental

officials in nine states (including Louisiana) had been prosecuted for corrupt activity involving

the gaming industry.  *Id.* at 509.  Noting that the ban would have a minimal effect on a

candidate's "ability 'to amass the resources necessary for effective advocacy,'" the Court

concluded that the contribution bans did not violate the First Amendment.  *Id.* at 503, 509

(quoting *Buckley*, 424 U.S. at 21).

     In *Soto v. New Jersey (In re Soto)*, 565 A.2d 1088 (N.J. Super. Ct. App. Div. 1989), a

New Jersey appellate court considered the constitutional implications of a contribution *ban*

versus a contribution *limit* for casino industry workers.  The Court rejected the plaintiff's

argument that a blanket prohibition on contributions was per se unconstitutional, accepting the

state's argument that the legislature had the expertise and discretion to determine that even a low

limit on contributions from casino employees would not be sufficient to maintain the public's

trust in state government.  *Id.* at 1098.  Adopting the reasoning of an Illinois Supreme Court

decision upholding a ban on campaign contributions from liquor licensees, the *Soto* Court stated

that it was reasonable for the state legislature to believe that its efforts to prevent actual and

perceived corruption "'would have been much less effective if only contributions above a certain

amount were prohibited.'"  *Id.* (quoting *Schiller Park Colonial Inn, Inc. v. Berz*, 349 N.E.2d 61,

66 (Ill. 1976)).

Plaintiffs rely heavily on the California Supreme Court's decision in *Fair Political Practices Commission v. Superior Court of Los Angeles County*, 599 P.2d 46 (Cal. 1979), to support their argument that comprehensive bans on political contributions by lobbyists are not closely drawn to further the state's interest in combating actual and perceived corruption. Applying *Buckley*'s closely drawn standard, the California Supreme Court concluded that, "[w]hile either apparent or actual political corruption might warrant some restriction of lobbyist associational freedom, it does not warrant total prohibition of all contributions by all lobbyists to all candidates." *Id.* at 52-53. The court pointed to three aspects of the law that rendered it unconstitutional: the ban applied to contributions to all candidates, not merely ones the lobbyist would necessarily be lobbying; the definition of lobbyist was overbroad and included those persons who appear before administrative agencies seeking to influence administrative determinations in their clients' favor; and the law prohibited all contributions, not merely large ones. *Id.* The plaintiffs argue that Connecticut's ban on contributions by lobbyists is similarly "a total prohibition" and therefore, is not closely drawn to the state's sufficiently important interest in ridding the system of actual or perceived corruption.

*Fair Political Practices Commission* is unpersuasive for several reasons. First, the California Supreme Court decided that case shortly after *Buckley* and many years before the United States Supreme Court had occasion to consider the appropriate application of the "closely drawn" standard in campaign contribution limit cases. As discussed above, the more recent cases read *Buckley* as suggesting that an outright ban is not per se unconstitutional. Furthermore, the California Supreme Court did not explain *why* it believed the ban on lobbyist contributions was

not closely drawn, other than identifying that some aspects of the law could have been more narrowly tailored.  As more recent cases have discussed, "closely drawn" does not necessarily require the legislature to adopt the least restrictive means for addressing the state's sufficiently important interest, nor does the legislature have to address all sources of corruption at once.  The Court's decision appears to accept the questionable premise that *any* ban is not closely drawn, rendering the holding of that case less persuasive.

Furthermore, the relevancy of *Fair Political Practices Commission* has been diminished by a more recent case on California's political contribution law:  *Institute of Governmental Associates*, 164 F. Supp. 2d at 1194, which upheld a ban on contributions from lobbyists.  The Court first distinguished the present version of the law from the previous version struck down in *Fair Political Practices Commission*, noting that the current law defined "lobbyist" more narrowly and "omit[ted] from its scope certain activities and individuals covered by the previous definition," including those individuals who offer testimony before an administrative agency or who spend less than one-third of their compensated time in direct communication with qualifying officials.  *Id.* at 1190.  Next, the Court rejected the premise that a ban on contributions from lobbyists was per se unconstitutional.  *Id.* at 1191.  Using the test set forth in *Nixon* – that "the test for determining the validity of the amount of a limitation (here a complete ban) is whether the limit is 'so low as to impede the ability of candidates to amass the resources necessary for effective advocacy'"– the Court determined that there was no evidence to suggest that candidates would be unable to seek office without lobbyist contributions.  *Id.* (quoting *Nixon*, 528 U.S. at 397).  The Court noted that the appearance of corruption naturally arises when lobbyists make personal contributions to "the very persons whose decisions they hope to influence."  *Id.* at 1194.

The Court thus concluded that, by prohibiting contributions from those individuals "whose continued employment depends on their success in influencing legislative action," the state had successfully demonstrated that the law was narrowly tailored to achieving the state's sufficiently important interest of avoiding actual and perceived corruption. *Id.* at 1193-94.

Finally, the plaintiffs argue that *Randall*, which struck down Vermont's contribution limits as unconstitutional, demonstrates the Supreme Court's disavowal of contribution bans. That argument is similarly unavailing. Although the Court rejected the premise that the "lower the limit, the better" was best for combating corruption, it did not eliminate the possibility that banning contributions from specific groups having greater access to lawmakers than the average member of the public and a well-documented history of exercising undue influence over public officials would necessarily be unconstitutionally "too low." *Randall*, 548 U.S. at 248-49.

The contribution limits at issue in *Randall*, and their accompanying constitutional infirmities, are distinguishable on several grounds from the CFRA's contribution bans for lobbyists, state contractors, and their immediate family members. Most significantly, Vermont's contribution limits applied across-the-board to all individual contributors, all political committees, and all political parties; the statute even held local, state, and national party committees to a single contribution limit per candidate.[16] *Id.* at 238. Those limits were not indexed for inflation and applied to an entire two-year election cycle, which included a candidate's primary and general election campaigns. *Id.* The statute also defined "contribution" broadly to mean that any expenditure made on a candidate's behalf counted against an

---

[16] The contribution limits per candidate were as follows: $400 per candidate for governor, lieutenant governor, and other statewide office; $300 per candidate for state senate; and $200 per candidate for state representative. *Id.* at 238.

individual's contribution limit, so long as it was "intentionally facilitated by, solicited by, or approved by" the candidate. *Id.* at 239. In practice, that provision had the effect of counting all a campaign volunteer's expenses towards his or her contribution limit for that particular candidate. *Id.* at 239, 259. Therefore, not only did the contribution limits have a critical impact on the total amount of money that would be available to candidates, but the statute severely restricted an individual's ability to volunteer for a candidate.

The *Randall* plurality identified five concerns that prompted its conclusion that the contribution limits were not adequately narrowly tailored to pass constitutional muster. *Id.* at 261. First, on the issue of overall funding, the *Randall* plurality noted that the record suggested, though not conclusively, that the "contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns," because it would prevent political parties from targeting candidates in competitive races by providing greater than average monetary support. *Id.* at 253-54. The expert reports indicated that, in those competitive races, party contributions account for a "significant amount" of a candidate's total funding, and that the contribution limits would cut party contributions by 85% for legislative office candidates and 99% for gubernatorial candidates.[17] *Id.* at 254. Those studies, "taken together with low *average* Vermont campaign expenditures and the typically higher costs that a challenger must bear to overcome the name-recognition advantage enjoyed by an incumbent, raise a reasonable inference that the contribution limits are so low that they may pose a significant obstacle to candidates in competitive elections." *Id.* at 256.

---

[17] The Court pointed to the example that, in the 1998 election, the Republican party contributed $40,600 to its gubernatorial candidate. It thus calculated that limiting its contribution to $400 represented a 99% reduction. *Id.* at 254.

The Court next objected to the statute's "insistence that political parties abide by *exactly* the same low contribution limits that apply to other contributors" because it "threaten[ed] harm to a particularly important political right, the right to associate in a political party." *Id.* Limiting the local, state, and national arms of a party to a single contribution, which included the cost of in-kind expenditures such as "stamps, stationary, coffee, doughnuts, gasoline, campaign buttons," etc., threatened to "severely limit" a party's ability to assist with its candidate's campaign. *Id.* at 257. By preventing a party from providing any meaningful assistance, the statute "severely inhibit[ed] collective political activity," thus reducing "the voice of political parties in Vermont to a whisper." *Id.* at 258-59 (internal quotations omitted).

Third, the *Randall* Court objected to the statute's treatment of volunteer activities. Although it excluded the value of a volunteer's *services* from his or her contribution limit to that candidate, the statute did not exclude the volunteer's *expenses*, such as the cost of gas or coffee and doughnuts for an informal candidate meet and greet event. *Id.* at 259-60. The combination of low contribution limits and a broad definition of contribution "imped[ed] a campaign's ability effectively to use volunteers," thereby threatening the volunteers' right of association. *Id.* at 260.

Next, the *Randall* Court held that the statute's failure to adjust for inflation contributed to its constitutional inadequacy because the overall pool of money available to candidates declined in real value over time and the statute "impos[ed] the burden of preventing the decline upon incumbent legislators who may not diligently police the need for changes in limit levels to ensure the adequate financing of electoral challenges." *Id.* at 261. Thus the limits would inevitably become "too low over time," and would likely enhance the advantages of incumbency. *Id.*

Finally, and quite significantly for purposes of the present case, the Court found the

record to be devoid of any "special justification that might warrant a contribution limit so low or so restrictive."  *Id.*  Other than advancing the basic state interest of preventing actual and perceived corruption, the state had not offered any specific evidence of why corruption was a "significantly more serious matter" in Vermont than in other states.  *Id.*

Taking those five considerations together, the *Randall* plurality concluded that the contribution limits "disproportionately" burdened First Amendment interests and therefore, struck down the statute as unconstitutional.  *Id.* at 262.

It is difficult to find any similarities between the Vermont contribution limits at issue in *Randall* and Connecticut's ban on contributions from lobbyists and state contractors.  First and foremost, the plaintiffs here, unlike the plaintiffs in *Randall*, are not challenging the contribution limits that apply to the general populace at large, political committees, and party committees, which are much more generous than the Vermont ceilings.[18]  Rather, they are

_____

[18] The CFRA does contain contribution limits for individuals, political committees, and party committees, specifically:

> No individual shall make a contribution or contributions to, for the benefit of, or pursuant to the authorization or request of, a candidate or a committee supporting or opposing any candidate's campaign for nomination at a primary, or any candidate's campaign for election, to the office of (1) Governor, in excess of three thousand five hundred dollars; (2) Lieutenant Governor, Secretary of the State, Treasurer, Comptroller or Attorney General, in excess of two thousand dollars; (3) chief executive officer of a town, city or borough, in excess of one thousand dollars; (4) state senator or probate judge, in excess of one thousand dollars; or (5) state representative or any other office of a municipality not previously included in this subsection, in excess of two hundred fifty dollars. The limits imposed by this subsection shall be applied separately to primaries and elections.

Conn. Gen. Stat. § 9-611(a).  However, even individuals subject to the ban may make unlimited independent, uncoordinated expenditures on behalf of a candidate.  Conn. Gen. Stat. § 9-612(e)(1).

The statute sets the following limits for political committees established by organizations:

_____

(a) No political committee established by an organization shall make a contribution or contributions to, or for the benefit of, any candidate's campaign for nomination at a primary or for election to the office of: (1) Governor, in excess of five thousand dollars; (2) Lieutenant Governor, Secretary of the State, Treasurer, Comptroller or Attorney General, in excess of three thousand dollars; (3) chief executive officer of a town, city or borough, in excess of one thousand five hundred dollars; (4) state senator or probate judge, in excess of one thousand five hundred dollars; (5) state representative, in excess of seven hundred fifty dollars; or (6) any other office of a municipality not previously included in this subsection, in excess of three hundred seventy-five dollars.

Conn. Gen. Stat. § 9-615(a).

The statute sets the following limits for political committees organized for ongoing political activities:

(b) No political committee organized for ongoing political purposes, except a legislative caucus committee or legislative leadership committee, shall make a contribution or contributions to, for the benefit of, or pursuant to the authorization or request of, a candidate or a committee supporting or opposing any candidate's campaign for nomination at a primary, or any candidate's campaign for election, to the office of: (1) Governor, in excess of five thousand dollars; (2) Lieutenant Governor, Secretary of the State, Treasurer, Comptroller or Attorney General, in excess of three thousand dollars; (3) chief executive officer of a town, city or borough, in excess of one thousand five hundred dollars; (4) state senator or probate judge, in excess of one thousand five hundred dollars; (5) state representative, in excess of seven hundred fifty dollars; or (6) any other office of a municipality not previously included in this subsection, in excess of three hundred seventy-five dollars. The limits imposed by this subsection shall apply separately to primaries and elections.

Conn. Gen. Stat. § 9-618(b).

The statute sets the following limits for political committees established for a single primary or election:

No political committee established for a single primary or election, except a legislative caucus committee or legislative leadership committee, shall make a contribution or contributions to, for the benefit of, or pursuant to the authorization or request of, a candidate or a committee supporting or opposing any candidate's campaign for nomination at a primary, or any candidate's campaign for election, to the office of: (1) Governor, in excess of five thousand dollars; (2) Lieutenant Governor, Secretary of the State, Treasurer, Comptroller or Attorney General, in excess of three thousand dollars; (3) chief executive officer of a town, city or borough, in excess of one thousand five hundred

-40-

challenging the contribution bans that are applicable only to a small segment of the electorate,

which immediately eliminates most of the concerns identified by the *Randall* Court as reasons

---

> dollars; (4) state senator or probate judge, in excess of one thousand five hundred dollars;
> (5) state representative, in excess of seven hundred fifty dollars; or (6) any other office of
> a municipality not previously included in this subsection, in excess of three hundred
> seventy-five dollars. The limits imposed by this subsection shall apply separately to
> primaries and elections.

Conn. Gen. Stat. § 9-619(b).

The statute sets the following limits for state party committees:

> No state central committee shall make a contribution or contributions to, for the benefit
> of, or pursuant to the authorization or request of, a candidate or a committee supporting
> or opposing any candidate's campaign for nomination at a primary, or any candidate's
> campaign for election, to the office of: (A) Governor, in excess of fifty thousand dollars;
> (B) Lieutenant Governor, Secretary of the State, Treasurer, Comptroller or Attorney
> General, in excess of thirty-five thousand dollars; (C) state senator, probate judge or chief
> executive officer of a town, city or borough, in excess of ten thousand dollars; (D) state
> representative, in excess of five thousand dollars; or (E) any other office of a municipality
> not previously included in this subsection, in excess of five thousand dollars. The limits
> imposed by this subdivision shall apply separately to primaries and elections.

Conn. Gen. Stat. § 9-617(b)(1).

The statute sets the following limits for town party committees:

> No town committee shall make a contribution or contributions to, for the benefit of, or
> pursuant to the authorization or request of, a candidate or a committee supporting or
> opposing any candidate's campaign for nomination at a primary, or any candidate's
> campaign for election, to the office of: (A) Governor, in excess of seven thousand five
> hundred dollars; (B) Lieutenant Governor, Secretary of the State, Treasurer, Comptroller
> or Attorney General, in excess of five thousand dollars; (C) state senator, in excess of five
> thousand dollars; (D) state representative, probate judge or chief executive officer of a
> town, city or borough, in excess of three thousand dollars; or (E) any other office of a
> municipality not previously included in this subsection, in excess of one thousand five
> hundred dollars. The limits imposed by this subdivision shall apply separately to
> primaries and elections.

Conn. Gen. Stat. § 9-617(c)(1).

for striking down Vermont's contribution limits.  Specifically, concerns about the size of the

universe of available funding, discussed in more detail below, are not present, which also

eliminates the *Randall* plurality's fourth (and related) concern about failure to index the

limitations for inflation.  Also, the CFRA does not raise the same concerns about contribution

limits for political parties.  Not only does the Act not hold national, state, and local party

committees to a single limit, but the applicable limits are much higher than individual

contribution limits and apply separately to a candidate's primary and general election campaign.

Not surprisingly, the plaintiffs are not contesting those provisions of the CFRA.

Critically, the loss of contributions from lobbyists and state contractors (and their

immediate family members) will not significantly impact a candidate's ability to amass the

necessary resources to mount a successful campaign.  Contributions from registered

communicator lobbyists and state contractors in Connecticut has never been historically

substantial.  Therefore, the loss of those contributions would not significantly diminish the

universe of funds available to a candidate to a non-viable level.  By the plaintiffs' own

admission, supported by evidence in the record, lobbyists, state contractors, and their immediate

family members contribute only a small percentage of a candidate's overall campaign funds.  *See*

Section III.1.C.2.a, *infra*.

Furthermore, there is testimony included in the record that suggests that lobbyists tend not

to contribute to challengers, that they focus on the campaigns of incumbents when making

contributions.  *See, e.g.,* Pl. Ex. 6, Sen. DeFronzo Dep. at 16 (noting that lobbyist contributions

are "a source of funding not available to challengers"); Garfield Decl. Ex. 16, Transcript of June

7, 2005 Senate Debate, at 360 (statement of Sen. Defronzo: "It is sort of an unwritten rule around

here that lobbyists don't give to challengers."); Pl. Ex. 27, Schepker Dep. at 87 (noting that she

typically makes contributions to incumbents only).  Therefore, a ban on contributions from

lobbyists actually addresses *Randall*'s concern about magnifying the advantages of incumbency

by removing one of those benefits.  In fact, excluding lobbyists, state contractors, and their

immediate family members from the pool of potential campaign contributors requires a candidate

to seek out contributions from *more* funding sources, which, as the *Buckley* Court noted, could

enhance greater participation in the electoral process.  *See Buckley*, 424 U.S. at 21-22 ("The

overall effect of the Act's contribution ceilings is merely to require candidates and political

committees to raise funds from a greater number of persons and to compel people who would

otherwise contribute amounts greater than the statutory limits to expend such funds on direct

political expression, rather than to reduce the total amount of money potentially available to

promote political expression.").

Significantly for purposes of considering the nature and extent of the CFRA's burden on

their First Amendment rights to expression and association, the contribution bans do not impede

the right of lobbyists, state contractors, and their immediate family members to engage in direct

political expressions of support.  The CFRA explicitly excludes from the definition of

"contribution:" uncompensated volunteer services and unreimbursed travel expenses and the cost

of hosting home meet-and-greets, including the cost of food, beverages, and invitations (so long

as the event is not a fundraiser).  Conn. Gen. Stat. § 9-601a(b)(4)-(5), (7).   In addition, the SEEC

identified a long list of activities that lobbyists, state contractors, and their immediate families

can undertake without running afoul of the CFRA.  *See* SEEC Ruling 2006-1 at 5-6.

The preceding discussion does not suggest that the CFRA's effect on the plaintiffs' right

to "the symbolic expression of support evidenced by a contribution" should be taken lightly.

*Buckley*, 424 U.S. at 21.  "Making a contribution, like joining a political party, serves to affiliate

a person with a candidate."  *Id.* at 22.  The CFRA undoubtedly infringes on that First

Amendment interest.  The right to participate in political activities and the right to associate,

however, are not absolute rights.  *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413

U.S. 548, 567 (1973).  For example, restricting a person's ability to affiliate with a candidate by

way of a contribution is not enough to render a statute unconstitutional because limiting that right

"involves little direct restraint on [a contributor's] political communication."  *Buckley*, 424 U.S.

at 21.  Notwithstanding the contribution ban, a lobbyist, state contractor, or immediate family

member remains free to associate with that candidate by volunteering, writing letters to the

editor, encouraging others to vote for the candidate, publicly endorsing the candidate, and the

like.

 The critical issue in contribution limitation cases has been whether the significant First

Amendment rights of political expression and association remain intact, i.e., "the contributor's

freedom to discuss candidates and issues."  *Id.*  On balance, while acknowledging that

contribution limits restrict "one important means of associating with a candidate or committee,"

if the limits nevertheless "leave the contributor free to become a member of any political

association and to assist personally in the association's efforts on behalf of candidates," those

contribution limits are constitutional.  *Id.* at 22.  The contribution limits in *Buckley* were

considered to be closely drawn because they "focus[d] precisely" on the sufficiently important

interest – actual and perceived corruption stemming from large contributions – "while leaving

persons free to engage in independent political expression, to associate actively through

-44-

volunteering their services . . . .   Significantly, the Act's contribution limits in themselves do not undermine to any material degree the potential for robust and effective discussion of candidates and campaign issues." *Id.* at 28-29.

Because the ban eliminates the right of lobbyists, state contractors, and their immediate family members to engage in the symbolic expression that even a nominal contribution would permit, such as appearing on a candidate's list of donors, it is necessary to balance that deprivation against the rights that remain unaffected in order to determine whether the ban is unconstitutionally severe.  As noted in SEEC Ruling 2006-1, it is clear that the CFRA does not restrict the plaintiffs' right to engage in robust and effective discussion of candidates and campaign issues or to associate with a political party or candidate.  For instance, lobbyists, state contractors, and their immediate family members are free volunteer for a candidate and incur travel and other incidental expenses on behalf of a campaign; they may host meet-and-greets that are not fundraising events; they may broadcast their support for a particular candidate to their neighbors and other motorists by placing a campaign sign on their lawn or bumper sticker on their car; they may make get-out-the-vote calls; they may contribute to political committees not established or controlled by a covered candidate or to political advocacy groups such as Greenpeace, the Federalist Society, Planned Parenthood, the NRA, etc.; they can freely contribute to campaigns not covered by the CFRA, including mayoral and other municipal campaigns; they may serve as an advisor to a candidate; they may run for office themselves and contribute freely to their own campaigns; and they may attend events, such as political rallies, that are not fundraising events.  The rights of political expression and freedom of association remain robust, notwithstanding the marginal restriction on those rights represented by the

contribution bans.

Furthermore, the CFRA does not have a deleterious impact on a lobbyist's ability to do his or her job.  Lobbyists provide their clients with a variety of services, including discussing clients' positions with legislators, arranging for meetings between legislators and clients, preparing clients for testimony before the legislature, assisting clients with media and grassroots outreach efforts, and monitoring pertinent legislation.  Pl. Ex. 9, Amended Gallo Decl. ¶ 7.  According to plaintiff Barry Williams, he often provides his clients "with information about the effectiveness of legislators and insights and advice concerning a candidate's position on a particular issue."  Pl. Ex. 53, Williams Decl. ¶ 9.  In addition, lobbyists frequently assist understaffed legislators by: (1) providing information about legislation and the position of other legislators, *id.* at ¶ 21; (2) drafting legislation, Pl. Ex. 24, Williams Dep. at 66; and (3) informing legislators of the unintended consequences that a particular bill may have.  Pl. Ex. 55, Schepker Aff. ¶ 7n.  Although they are prohibited from accepting and bundling contributions from clients on behalf of a candidate and advising clients about which candidates they should contribute to, lobbyists are still able to engage in robust and effective discussions about candidates and campaign issues with their clients and they may continue to provide legislators with key information and assistance.  Furthermore, the CFRA does not prevent lobbyists from communicating their opinion of a particular legislator or executive official to their clients and explaining whether that person supports the clients' interests and whether that person is likely to be elected.  The CFRA does not stop a client from then making his or her own independent contribution to that candidate on the basis of his or her own conclusions about the candidate's particular positions.

-46-

Finally, unlike Vermont, Connecticut has a well-documented and strongly supported "special justification" for the contribution and solicitation bans at issue here.  Prior to the passage of the CFRA, Connecticut was racked by corruption scandals that included the prosecution and conviction of a number of high-ranking public officials, including then-Governor John Rowland, as discussed more thoroughly above.  *See* Feinberg Decl. Ex. 22.  Those scandals continue to reverberate, as evidenced by the recent Second Circuit decision to reverse and remand for new trial in the case of Charles Spadoni, one of Paul Silvester's co-defendants, on several counts, including bribery and racketeering.  *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 152 (2d Cir. 2008).

The record demonstrates that lawmakers undertook a comprehensive effort to pass expansive campaign finance reforms, instigated in large part by the fall-out from the corruption scandals that culminated in the resignation of Governor Rowland and his subsequent indictment and conviction on federal corruption charges.   In her first State of the State Address in January 2005, Governor Rell observed that the people of Connecticut "had been sorely tested over the last 12 months" and that the state had "witnessed countless revelations of corruption and breach of the public trust."  Garfield Decl. Ex. 2.  She went on to pledge to work with the state legislature to "reform our ethics and elections systems," noting that "[t]he people of Connecticut expect much from us."  *Id.*  Shortly thereafter, Rell submitted her own campaign finance reform proposal, Bill 943, to the General Assembly.  Garfield Decl. Ex. 3.  Rell's bill focused on banning contributions by state contractors and contributions and solicitations by lobbyists and political action committees by or on behalf of lobbyists.  *Id.*  The legislature responded with its own campaign finance reform proposals, Senate Bill 61 and House Bill 6670.  Garfield Decl.

-47-

Exs. 4 & 5.  Those bills focused on a plan for public financing of election campaigns, and also

included a ban on some contributions from state contractors and limits on contributions from

lobbyists and their immediate family members.  *Id.*

Those three bills were referred to the General Assembly's joint Government

Administration and Elections ("GAE") Committee.  Garfield Decl. ¶ 4.  The GAE Committee

held five public hearings across the state in January and February 2005, hearing testimony from

Governor Rell, state election officials, interested organizations, and members of the public.

Garfield Decl. ¶ 5, Exs. 6-10.  The Governor and the legislature worked right through the end of

the legislative session in June 2005 on compromise comprehensive campaign reform legislation

that included both the contribution and solicitation bans and the public financing scheme.

Garfield Decl. ¶ 10.  Although both the Senate and the House passed their own campaign finance

reform bills, the legislative session expired before either chamber could consider the other's bill.

Garfield Decl. ¶ 11.

After the General Assembly failed to pass a single campaign finance reform bill before

the session expired, Governor Rell called upon both chambers of the legislature to establish a

Campaign Finance Reform Working Group (the "Working Group") to attempt to reconcile the

two bills.  Garfield Decl. ¶ 12.  After three months of meetings, reviewing materials, taking

testimony, and receiving expert advice, the Working Group presented a framework for a new bill

to Governor Rell in late September 2005.  Garfield Decl. ¶ 14.  The Working Group's Summary

Report concluded that "due to the appearance of undue influence," contributions from and

contributions solicited by lobbyists should be banned.  Garfield Decl. Ex. 26 at 3-4.  It

additionally concluded that contractors doing business with state agencies should be banned from

making contributions.  *Id.*

Governor Rell convened a Special General Assembly Session for the sole purpose of enacting comprehensive campaign finance reform, stating that "[t]he very legitimacy of [the people's] government is called into question when – rightly or wrongly – the perception exists that a moneyed few play a special role or have a special influence over elections and policy." Garfield Decl. ¶ 15 and Ex. 27.  In calling the special session, her proclamation noted that, in the past decade the people of Connecticut had "endured . . . indictments, convictions and corruption investigations concerning their own state and local public officials" and that "the General Assembly can help to restore faith and trust in state government and further renew citizens' confidence in their leaders by enacting meaningful and comprehensive campaign finance reform."  Garfield Decl. Ex. 27.

The General Assembly met in a special legislative assembly on November 30, 2005 to debate the proposed campaign finance reform bill.  Garfield Decl. ¶ 16.  Although no formal findings accompanied passage of the law, lawmakers' testimony from that session reveals a widespread determination to undertake stiff measures aimed at combating the public's perception of corruption among state officials.[19]  In summing up before the Senate's vote, Working Group

---

[19] *See, e.g.,* Transcript of the November 30, 2005 Senate Debate, Garfield Decl. Ex. 28, at 55 (statement of Sen. DeFronzo: "I think . . . the impetus of the scandals over the last couple of years and the clear nexus between contractor contributions, selling of influence, conviction of a Governor, obviously is compelling with respect to this piece of legislation."); *id.* at 93 (statement of Sen. Herlihy: "[W]hen I realize that one of my priorities and commitments when I ran for reelection was to restore trust and confidence in government, then I realize I have no choice but to support this legislation."); *id.* at 108-09 (statement of Sen. DeFronzo on the impetus for the CFRA, "there's a consensus formed around the perception, if not the reality, that campaign contributions open the door to inappropriate levels of influence and access in government"); *id.* at 238 (statement of Sen. McKinney, noting that although he has no personal knowledge of actual corruption, "I think the public believes [there is corruption] because we've had instances where a

Chairman Senator Donald DeFronzo stated that the rationale behind the bans was that

"contributions and campaigns lead to access, lead to favoritism, lead to corruption as it's borne

out in the recent events of the Rowland Administration and subsequent events. . . .  We probably

wouldn't be here today passing this landmark legislation if we weren't led to this by the Rowland

corruption scandals."  Garfield Decl. Ex. 28 at 352.[20]  After reviewing the Working Group's

recommendations and reaching an agreement on a single campaign finance reform bill, Senate

colleague of ours or a governor has engaged in wrongdoing.  And one bad apple has in many
ways spoiled a bunch of very good, hardworking Legislators"); *id.* at 284-85 (statement of Sen.
Gaffey: "My gut feeling is that we have gotten to the point . . where there . . . is the appearance of
undue influence by our friends who happen to work the halls out there, lobbying for whatever
interest they may lobby for."); *id.* at 290 (statement of Sen. Gaffey, noting "[t]he appearance of
corruption that could occur, if lobbyists whose continued employment depends on their success
in influencing legislative action are allowed to make campaign contributions to the very persons
whose decisions they hope to influence"); *id.* at 294 (statement of Sen. Roraback, noting that
lobbyist contributions "most greatly undermine the public confidence"); *id.* at 364 (statement of
Sen. DeLuca, "[T]he perception is that people out there think that the money from lobbyists and
other special interest groups is influencing how we vote . . . .  So we're coming up with a bill to
deal with a perception that we all disagree is actually real.").

       Transcript of the November 30, 2005 House of Representatives Debate, Garfield Decl.
Ex. 29, at 95-96 (statement of Rep. McCluskey, noting that the purpose of the bans is to
"eliminate corruption or the appearance or the perception of potential corruption"); *id.* at 271
(statement of Rep. Doyle, remarking on the purpose of the bill, "I think that the respective
proponents of this Bill are seeking to address the recent history of our State of Connecticut. . . .
[O]ver the last ten years . . . we've had a lot of scandals and problems with our officials,
municipal officials and State officials"); *id.* at 282 (statement of Rep. Caruso: "[T]here is the
perception that influence by lobbyists, by contractors, by people . . . that are doing business with
the State of Connecticut is corrupting our system. . . . [The public's] confidence is shaken.  And
that's the reason we look to correct the system.").  *But see id.* at 289-90 (statement of Rep.
Cafero: "[W]hen we talk about corruption, let us not pretend that by the passage of this Bill
we're going to take those who are predisposed to do illegal and corrupt things and change the
world for the better, ain't going to happen.").

       [20] Senator DeFronzo stated during his deposition that "[w]ith respect to the appearance of
corruption or appearance of undue influence, I think that's in large part the motivation for the ban
on lobbyist activities."  Brocchini Decl. Ex. 4, Sen. DeFronzo Dep. at 56.

Bill 2103, both the Senate and the House voted to pass the bill on November 30 and December 1, 2005.  Garfield Decl. ¶¶ 16-17.  Governor Rell signed the bill into law on December 7, 2005. Garfield Decl. ¶ 18.  Several amendments were later passed in May 2006 and signed into law in June 2006.  *Id.* at ¶ 19.

Even though lobbyists had not been directly linked to the pay-to-play scandals, which primarily involved state contractors offering bribes in exchange for preferential treatment, the legislature was nevertheless uniquely positioned to assess the influence that lobbyist contributions have on the legislative decision-making process.  The legislature concluded that eliminating the fundraising connection between both state contractors and lawmakers, and lobbyists and lawmakers, was of paramount importance if the public was to be convinced that its state government was not up for sale.  Senator DeFronzo stated during the special session that, during the Working Group meetings, although nobody "could point definitively to a specific scandal involving a specific lobbyist, . . . what was said and referred to quite openly and freely was the fact that the perception, the public perception is such that lobbyists wheeled a huge amount of influence up here and that is something that needed to be regulated." Garfield Decl. Ex. 28, Transcript of Nov. 30, 2005 Senate Debate, at 56-57.[21]  Therefore, because eliminating actual corruption and the appearance of undue influence over elected officials was one of the primary goals of the campaign finance reform measures, it was reasonable for the legislature to focus its efforts on lobbyists, who by their very job description seek to influence state legislators to adopt the positions most favorable for their clients.  Unlike Vermont, which could not reasonably justify reducing the contribution limits for all individuals, political committees, and

---

[21] *See also* footnote 19 and accompanying text.

party committees as a narrowly tailored effort to combat corruption, Connecticut's bans squarely address the sources of actual and perceived corruption in the state.

Determining the qualitative value of the contribution limit for those select groups is squarely within the discretion of the legislature, which has "better expertise" in matters related to the costs and nature of running for office. *Randall*, 548 U.S. at 248 (quoting *McConnell*, 540 U.S. at 137). Although Connecticut's decision that lobbyists, state contractors, and their immediate family members should be banned outright from making contributions or soliciting contributions on behalf of candidates is more extreme than permitting them to contribute a nominal amount, I am not in a position "to determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives." *Id.* Other courts have similarly declined to second-guess the legislature's determination of what would be the necessary measures for addressing actual and perceived corruption. *See Bartlett*, 168 F.3d at 717-18 (upholding the ban on lobbyist contributions, noting "this effort on the part of a state legislature to protect itself from the damaging effects of corruption should not lightly be thwarted by the courts"); *Instit. of Governmental Advocates*, 164 F. Supp. 2d at 1191 (citing *Bartlett* in upholding the legislature's determination to ban lobbyist contributions). The General Assembly was entitled to consider that a contribution ban carries a stronger message of reform than a low or nominal contribution limit, and therefore, would be more effective at combating the perception of corruption among Connecticut lawmakers. *See, e.g.,* Brocchini Decl. Ex. 4, Sen. DeFronzo Dep. at 56 (explaining that the lobbyist contribution ban was a "very, very aggressive" reform effort that was needed to mitigate the appearance of corruption and undue influence arising out of the convergence of lobbyists' contributions and their privileged access to lawmakers).

2.    *Narrow Tailoring*

Before turning to the particular provisions at issue in this case, namely the contribution

and solicitation bans as applied to lobbyists, state contractors, and their immediate family

members, it is worth noting that, pursuant to the "closely drawn" intermediate level of scrutiny at

issue here, a law need not address every possible reform in order to pass constitutional muster.

As the *Buckley* Court observed, "[i]n deciding the constitutional propriety of the limitations in

such a reform measure we are guided by the familiar principles that a statute is not invalid under

the Constitution because it might have gone farther than it did, that a legislature need not strike at

all evils at the same time, and that reform may take one step at a time, addressing itself to the

phase of the problem which seems most acute to the legislative mind."  424 U.S. at 105 (internal

quotations and citations omitted).  Furthermore, unlike strict scrutiny, which requires a law's

measures be *necessary* to achieving a compelling government interest, closely drawn scrutiny

merely requires that the law's provisions further the state's sufficiently important interest.  *See,

e.g.*, *Inst. of Governmental Advocates*, 164 F. Supp. 2d at 1193 (noting that "the court can only

consider whether the acknowledged state interest is advanced by a rational and sufficiently

narrow restriction on plaintiffs' First Amendment rights").  Therefore, the measures at issue in

the instant case will be deemed to be closely drawn so long as they are reasonably calculated to

prevent actual and/or perceived corruption among Connecticut's elected officials.

The government contends that the contribution and solicitation bans are closely drawn

because the bans apply only to those specific groups that are best-positioned to exercise undue

influence over state government officeholders and that have the economic incentive to do so.  It

further contends that the bans on contributions and solicitations by lobbyists' and state

contractors' immediate family members and contributions from political action committees ("PACs") controlled by state contractors and lobbyists are necessary anti-circumvention measures to ensure the efficacy of the CFRA's basic provisions aimed at improving public confidence in state government.

a.    Ban on Lobbyist Contributions

The plaintiffs oppose the lobbyist contribution ban on the ground that the government has failed to demonstrate adequate justification for enacting a complete ban in lieu of the restrictions on lobbyist contributions that were in place before passage of the CFRA.  The plaintiffs note that, as a practical matter, because lobbyists' contributions make up a small and insubstantial percentage of most candidates' total contributions, such contributions are incapable of unduly influencing lawmakers.  The plaintiffs maintain that, even though lobbyists have greater access to and influence with state lawmakers than ordinary citizens, because their contributions are so low, their influence cannot be the direct result of political contributions.  The plaintiffs further argue that the defendants cannot demonstrate how contributions from lobbyists have any more influence on lawmakers than contributions from other individuals, and that the defendants have not cited a single episode of actual corruption or undue influence that arose from a lobbyist contribution.  The plaintiffs assert that, given the absence of corruption scandals involving lobbyists and given lobbyists' low contribution rates, the legislature's decision to enact a ban on lobbyist contributions was unnecessary and not narrowly tailored to the government's important interest.

In response, the defendants dispute that lobbyists play an insignificant role in campaign contributions, noting that contributions from lobbyist-controlled PACs, lobbyist contributions to

leadership committees, and lobbyist bundling efforts all play a significant role in campaign contributions.  More significantly, the defendants contend that the plaintiffs have defined the permissible scope of the legislature's efforts too narrowly.  In addition to targeting actual corruption, the defendants maintain that the General Assembly was permitted, pursuant to well-established case law beginning with *Buckley*, to take on the sources of *perceived* corruption even in the absence of actual scandals.  In that vein, the government defends the law on the ground that, given lobbyists' high level of access to lawmakers and their pecuniary interest in influencing legislative outcomes on behalf of their clients, it was legitimate for the legislature to conclude that those factors gave rise to an impermissible potential for corruption and that the prior restrictions did not go far enough to eliminate the perception that lobbyists exercise undue influence over state lawmakers due to their ability to make and solicit contributions for political campaigns.

The following statistics are not disputed.  According to the National Institute on Money in State Politics, lobbyists contributed 1.04% ($262,788 out of $25.2 million) in total receipts for state candidates and committees in the 2006 election cycle and 1.97% ($209,805 out of $10.6 million) in total receipts raised by state candidates and committees in 2004.  Pl. Exs. 15-16. According to reports by the Office of Legislative Research, in 2002, contributions from lobbyists and lobbyist PACs contributed in the following amounts to victorious statewide candidates: 3.99% of the amount raised by Governor John Rowland; 2.01% of the amount raised by Secretary of State Susan Bysiewicz; 3.53% of the amount raised by State Treasurer Denise Nappier; 6.24% of the amount raised by State Comptroller Nancy Wyman; and 0.01% of the amount raised by Attorney General Richard Blumenthal.  Pl. Ex. 21 at 3.

In 2004, lobbyists contributed 2.22% of the $4.36 million raised by candidates for the House of Representatives.  *Id.* at 7-18.  Adding the contributions from lobbyist PACs increases the percentage to 7.75% of the total amount raised.  *Id.*  Seven candidates for the House raised more than $2,000 from individual lobbyists and 40 candidates received more than $2,000 from lobbyist PACs.  *Id.*  On the Senate side in 2004, lobbyists contributed 1.90% of the $4.37 million raised by all candidates.  *Id.* at 4-6.  Adding the contributions from lobbyist PACs increases the amount contributed by lobbyists and lobbyist PACs to 7.06% of the total raised.  *Id.*  Eight candidates received more than $3,000 from individual lobbyists and 29 candidates received more than $3,000 from lobbyist-controlled PACs.  *Id.*

In 2006, individual lobbyists and their spouses contributed 2.04% of the $3.51 million raised by all candidates for seats in the Senate.  Pl. Ex. 18 at 3.  Nine Senate candidates received more than $3,000 from individual lobbyists.  *Id.* at 1-3.  Focusing on the 30 candidates who raised the most money in the 2006 House races, individual lobbyists and their spouses contributed 2.26% of the $917,185 raised by all candidates in those races.  *Id.* at 6.  Of those candidates, four candidates received more than $2,000 from individual lobbyists.  *Id.* at 5-6.

Before the CFRA took effect, lobbyists who, in combination with their immediate families, contributed more than $1,000 to political committees (including candidate committees, party committees, and PACs) during any reporting year were required to file itemized disclosures with the Secretary of State.  In 2003, 109 of 584 reporting lobbyists (18.7%) submitted itemized disclosure forms, indicating they had contributed above the statutory amount.  Pl. Ex. 19 at 54.  In 2005, 97 out of 721 reporting lobbyists (13.5%) submitted itemized disclosures.  Pl. Ex. 20 at 73.

The plaintiffs contend those statistics prove that few lobbyists actually make campaign contributions, and that those lobbyists who do contribute nonetheless play an insignificant role to political campaigns.  The defendants argue that the statistics must be viewed in the full context of lobbyists' pre-CRFA fundraising role, which included not just personal contributions to candidates, but also soliciting contributions for candidates from clients and family members and making contributions to leadership PACs formed by legislative leaders.  To that end, the defendants note that lobbyists and lobbying firms contributed an additional $115,928 in the 2002 election cycle, $93,322 in the 2004 election cycle, and $68,905 in the 2006 election cycle to the 14 leadership PACs.  A. Sauer Supp. Decl. ¶ 8.  The defendants further contend that, because lobbyists were not required to disclose any information regarding the contributions they solicited or collected from their clients or other sources, the total impact of lobbyist involvement in campaign fundraising is unknown.

Although the cited statistics shed significant light on the actual role that contributions by lobbyist and lobbyist-controlled PACs play in overall fundraising efforts for political campaigns, whether or not those contributions actually give rise to undue influence over the legislative process is not particularly material to the pending motions, considering that perceived corruption is itself a sufficiently important interest for the legislature to address.  On that issue, the evidence suggests that, mistakenly or not, the public overwhelmingly believes that state lawmakers vote the way that campaign contributors want them to vote in exchange for contributions at least some of the time, that elected officials in Connecticut are more concerned with the needs of those who pay for their campaigns than the needs of everyone else, and that Connecticut voters believe that it was necessary to limit the influence of money on politics.  Although those polls do not reflect

Connecticut voters' specific feelings about lobbyist contributions, they do reflect a belief that campaign contributors exercise undue influence over lawmakers' decisions.

Although no individual lawmaker has admitted that he or she has been unduly influenced by lobbyist contributions, lawmakers are certainly cognizant that the potential for such undue influence exists. In legislative floor statements, declarations prepared for this lawsuit, and in deposition testimony, lawmakers have cited the unique position that lobbyists hold and their ability to influence the legislative process. For example, in a statement during debate on the campaign finance initiatives on the House floor in June 2005, Representative Vickie Nardello stated that, in her eleven years as a representative, she had "seen the rapid growth of lobbyists and their influence in this building." Garfield Decl. Ex. 17, Transcript of June 5, 2005 Debate in House of Representatives, at 564.[22] Therefore, it is not significant whether those contributions were *actually* made to influence a lawmaker's decision or not. The parties agree that some

_____

[22] Further examples of lawmakers' comments on the role that lobbyists play include: Garfield Decl. Ex. 17, Transcript of June 5, 2005 Debate in House of Representatives, at 484-85 (statement of Rep. Caruso, noting that lobbyists have often prevented bills from coming up for debate in the House); *id.* at 487 (statement of Rep. Caruso: "I also know that when support is given, it is expected that support be returned, and many times do we look clearly at an issue or do we solely look at it as who supported us and should we return that favor?"); *id.* at 564-65 (statement of Rep. Nardello: "And the reason the Bill will never become law, because it was our understanding that our lobbyists that were in the room did not like the final product, even though all the agencies agreed. And thereby, that Bill was never going to become law."); *id.* at 573-74 (statement of Rep. Caruso: "[S]pecial interests have a tremendous influence on the legislative process."). Brocchini Decl. Ex. 2, Sen. Roraback Dep. at 22 ("I've never been able to tell my constituents with a straight face that campaign contributions mean nothing, that I disregard a campaign contribution; that it doesn't enter into my thinking."); Brocchini Decl. Ex. 7, Rep. Dyson Dep. at 68 (agreeing that interest groups influence legislation through campaign contributions). *Compare* Brocchini Decl. Ex. 5, Gallo Dep. at 114 (stating she does not consider fundraising a form of lobbying or that political contributions have an effect on the voting of legislators) *with* Brocchini Decl. Ex. 6, Sept. 27, 2006 Gallo email ("I have spent a not so small fortune on fundraiser [sic] in the last two weeks. It is part of the job I guess. I can only hope ACLU loses their case.").

lobbyists make contributions for reasons other than influencing the legislative process, such as supporting personal political beliefs and that lobbyist contributions are relatively insignificant. *See* Pl. Ex. 9, Amended Gallo Decl. at ¶¶ 48-49 (noting that she made contributions in order to further her personal political beliefs, not to influence legislators on behalf of her lobbying clients); Pl. Ex. 55, Schepker Aff. at ¶ 8s (stating her belief that her contributions as a lobbyist did not further her clients' legislative agendas because the contribution amounts were so small). It is also undisputed that no lobbyist was charged with a crime in connection with the recent scandals involving public officials in Connecticut.

The significant point, however, is that state lawmakers reasonably believe that lobbyists make contributions in the hopes of influencing votes and that those contributions create an appearance of undue influence, and passed the CFRA to diminish the appearance of corruption in state elections. Actual corruption involving lobbyists and state lawmakers would certainly bolster the government's case for banning contributions, however, the CFRA's constitutionality does not rise or fall with the determination whether lobbyists actually participate in corruption. The contribution ban is aimed at preventing the appearance of corruption, which arises when there is a consistent stream of contributions in combination with lobbyists' unique level of access to lawmakers.

Combining the public's perception that corruption exists at the state level with the fact that members of the General Assembly are the best-positioned to determine the role that campaign contributions play on their personal decision-making process, along with the undisputed fact that lobbyists have greater access to and influence with legislators than ordinary citizens, lawmakers legitimately concluded that banning lobbyist contributions was one way to

combat the perception of corruption.  Furthermore, because removing lobbyist contributions from

candidates' coffers will not prevent them from amassing the resources necessary to mount

effective political campaigns, and because the contribution ban does not severely diminish

lobbyists' ability to participate in non-fundraising aspects of the political process, the

contribution ban does not violate the plaintiffs' First Amendment rights of speech and

association.

Plaintiffs next point out specific ways that the law could achieve the same important state

interest, but in a less restrictive way, thus contending that the law is not narrowly tailored to pass

constitutional muster.  The plaintiffs claim that the CFRA presents a sharp departure from other

cases upholding contribution bans.  The plaintiffs argue that the contribution ban is not closely

drawn because the ban: (1) is not limited to the legislative session, but is instead expanded to a

year-round ban; (2) prohibits contributions not just to candidates, but also to legislative and party

committees; (3) prohibits contributions by lobbyist-controlled PACs; (4) defines "communicator

lobbyist" too broadly; (5) bans contributions from lobbyists' immediate family members; and (6)

does not go far enough.  I will address each concern in turn.

(1) Year-Round Ban

Plaintiffs argue that the year-round ban is not necessary because Connecticut has a part-

time legislature and already bans in-session contributions from lobbyists.  *See* Conn. Gen. Stat. §

9-610(e).  According to the plaintiffs, when the legislature is not in session, lobbyists have no

reason or opportunity to interact with legislators and, therefore, any contributions made when the

General Assembly is not in session cannot be reasonably calculated to influence a legislator's

decision on a particular piece of legislation.  They point to *Bartlett*, 168 F.3d at 716, and *Kimbell*

*v. Hooper*, 665 A.2d 44, 51 (Vt. 1995), which upheld bans on in-session contributions by

lobbyists, as support for their position that the CFRA's year-round ban goes too far and,

therefore, is not narrowly tailored.   The defendants counter that the legislature is best-positioned

to determine whether the in-session ban was working sufficiently or not, and having concluded

that the prior ban was too easy to circumvent, it had not only the authority, but also well-founded

reasons for extending the ban.

It is undisputed that it was customary for lobbyists to attend legislators' pre- and post-

legislative session fundraising events.  Brocchini Decl. Ex. 5, Gallo Dep. at 106-07, 111 (noting

that at one eve-of-the-legislature event, lobbyists comprised 75% of non-lawmaker attendees); Pl.

Ex. 27, Schepker Dep. at 125.  The plaintiffs dispute that the sole purpose of those fundraising

sessions was to coordinate lobbyist contributions, arguing that other industry and advocacy

organizations also attended those events to make contributions and that it was the best time for

lawmakers, many of whom reside elsewhere in the state, to connect with supporters before

returning home.  The parties also dispute whether there is significant state business conducted

when the legislature is not in session.  The government states that it is not uncommon for

lawmakers and lobbyists to work on issues year round, not just when the legislature is in session,

while the plaintiffs' claim that there is no significant business conducted when the General

Assembly is out of session.  *Compare* Brocchini Decl. Ex. 4, Sen. DeFronzo Dep. at 44-45;

Brocchini Decl. Ex. 10, Schepker Dep. at 30 (stating she has a year-round retainer with her client

PhRMA) *with* Pl. Ex. 9, Amended Gallo Decl. ¶ 12.  Those two statements are not mutually

exclusive – even Gallo admits that she "occasionally" meets with lawmakers on issues important

to her clients when the legislature is not in session.  Pl. Ex. 9, Amended Gallo Decl. ¶ 12.

The dispute over the true purpose of the pre- and post-session events and the type of work the legislature conducts when it is out-of-session is immaterial.  Whenever lawmakers and lobbyists gather together and money is exchanged, it is reasonable for the legislature to conclude that, given the potential for undue influence, it gives rise to an appearance of corruption.  In upholding California's year-round ban on lobbyist contributions, the *Institute of Governmental Advocates* Court similarly concluded that the danger of corruption was ever-present, noting that "a promised contribution delivered the day after the session ends provides the same financial benefit and *potentially a greater appearance of corruption* as one delivered on the first day of the session."  164 F. Supp. 2d at 1192 (emphasis added).  Prohibiting only in-session lobbyist contributions "draws a temporal distinction with limited practical effect," particularly given the legislature's year-round activities.  *Id.*  Even if only an insignificant amount of business is conducted between lawmakers and lobbyists when the General Assembly is not in session, the ability to hold fundraising events during those periods nevertheless gives rise to an appearance of corruption that the legislature was permitted to address with a year-round contribution ban.  Furthermore, the executive branch is always "in session," and the contribution ban does not discriminate between contributions to executive branch and legislative branch officials and/or candidates.

(2) Prohibition on Contributions to Legislative and Party Committees

The plaintiffs next take issue with the CFRA's ban on lobbyist contributions to all legislative leadership[23] and caucus committees[24] and party committees.[25]  Conn. Gen. Stat. § 9-

---

[23] "Legislative leadership committee" is defined as a committee established "by a leader of the General Assembly."  Conn. Gen. Stat. § 9-601(23).  Each of the following is permitted to form a leadership committee: the speaker of the House of Representatives, the majority leader of

610(g).  Again, the plaintiffs argue that the prohibition is an unnecessary departure from

approaches adopted in other states to curb the potential for corruption and that there is no special

danger of corruption associated with contributions to those committees that can justify the

measure.  The government argues that the ban on contributions to legislative and party

committees was a necessary anti-circumvention measure, noting that contributions to legislative

and party committees are just one more way that lobbyists seek to curry favor with legislators.

By cutting off that source of funding, the government argues, the measure is narrowly tailored to

the interest of diminishing the perception that corruption exists in the General Assembly.

    Although contributions to legislative and party committees are not spent directly by a

specific candidate's campaign, those committees direct contributions to particular candidates to

shore up support for a particular party or a legislator's quest to become or remain in a leadership

position in the General Assembly.  Contributors do not know for what or to whom their

contributions will be directed; however, those contributions provide committee members with

the power and ability to make those decisions.  The more money the committees have to

distribute to candidates, the more effective those committees can be.  Because individual

legislators directly control those committees, the inference still arises that contributions to the

---

the House of Representatives, the president pro tempore of the Senate, the majority leader of the
Senate.  Conn. Gen. Stat. § 9-605(e)(3).  The minority leaders of the House and Senate may each
form two leadership committees, for a total of eight leadership committees.  *Id.*

    [24] "Legislative caucus committee" is defined as a committee established "by the majority
of the members of a political party who are also state representatives or state senators."  Conn.
Gen. Stat. § 9-601(22).  Each party may form one such committee per legislative body in the
General Assembly, making a total of four committees.  *See* Conn. Gen. Stat. § 9-605(e)(2).

    [25] "Party committee" is defined as "a state central committee or a town committee."
Conn. Gen. Stat. § 9-601(2).

committees are meant to influence the legislative process by currying favor with committee members.

In testimony before the Working Group, SEEC Executive Director Jeffrey Garfield urged the adoption of the ban as a necessary anti-circumvention measure, even in the face of concerns from legislators that prohibiting such contributions would lead to a "proliferation of independent PACs and expenditures" that are inherently more difficult to regulate. *See* Garfield Decl. 23A, Transcript of Sept. 6, 2005 Working Group Meeting at 1 (stating that "the rationale for limiting or trying to restrict contributions from lobbyists and contractors to the party committee is based on the anti-evasion principle, that you don't want to see the basic restriction . . . being evaded by just giving it to the political party, that will then turn around and give it back to the candidates"); Garfield Decl. Ex. 26 at 3.

The Supreme Court has recognized that, in regulating the appearance of corruption, lawmakers may employ anti-circumvention measures. The interest of combating the appearance of corruption is "sufficient to justify not only contribution limits themselves, but laws preventing the circumvention of such limits." *McConnell*, 540 U.S. at 144 (quoting *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 456 (2001)). The General Assembly need not wait to see whether such efforts at circumventing the direct ban on lobbyist contributions in fact materialize before enacting common sense anti-circumvention measures such as the prohibition on lobbyist contributions to legislative and party committees. As the *McConnell* Court stated, "the First Amendment does not require Congress to ignore the fact that candidates, donors, and parties test the limits of the current law." *Id.* (internal quotation omitted). Noting that the concept that contributions to parties create an appearance of corruption was "neither novel nor

implausible," the *McConnell* Court reasoned that "contributions to a federal candidate's party in aid of that candidate's campaign threaten to create – no less than would a direct contribution to the candidate – a sense of obligation."  *Id.*

Similarly, it was neither novel nor implausible for the General Assembly to conclude that permitting lobbyists to make contributions to politically active legislative and party committees would undermine the contribution ban's goal of preventing the appearance of corruption. Therefore, like the year-round aspect of the ban, the ban on contributions to legislative and party committees is a common sense anti-circumvention measure that is closely drawn to the sufficiently important interest of preventing an appearance of corruption that arises when lobbyists contribute money to lawmakers' favored committees.

(3)      Prohibition on Contributions from Lobbyist-Controlled PACs

The plaintiffs next argue that contributions by PACs established or controlled by lobbyists do not pose a threat of circumvention and therefore, banning such contributions is not a closely drawn measure.  The plaintiffs first note that lobbyist-controlled PACs do not make significant contributions to political campaigns.  They further contend that the definition of "lobbyist-controlled" is too broad and eliminates the right of some client-run PACs to contribute where the lobbyist merely provides advice about legislative action, candidate voting records, and the competitiveness of elections.  The government justifies the ban on the ground that banning contributions from PACs established and controlled by lobbyists is a necessary anti-circumvention measure.  Without such a ban, the government contends that lobbyists would be able to easily funnel their individual contributions through PACs to political campaigns, thus undermining the state's interest in preventing the appearance of corruption.

-65-

The plaintiffs are correct that lobbyist-controlled PACs do not make significant contributions to political campaigns.  *See* Office of Legislative Research report, Pl. Ex. 21 (showing contribution rates from individual lobbyists and lobbyist-controlled PACs in 2002 statewide campaigns and 2004 legislative campaigns).  However, lobbyist-controlled PACs tend to make contributions at higher rates than individual lobbyists.  *Id.*  Therefore, regardless whether or not there is evidence proving that lobbyists use the PACs to make contributions *in lieu of* individual contributions, because lobbyist-controlled PACs are a consistent source of financial support for candidates in their own right, it was not implausible for the legislature to conclude that contributions from lobbyist-controlled PACs would remain a steady source of campaign financing for candidates in the absence of individual lobbyist contributions, which would undermine the purpose of the ban.  As explained above, such anti-circumvention measures aimed at preventing the appearance of corruption are permissible.

Regarding the plaintiffs' complaints about the broad definition of "control" and "establish," the SEEC's Declaratory Ruling 2006-2, issued on December 20, 2006 ("SEEC Ruling 2006-2"), clarifies which PACs are subject to the CFRA's contribution ban.  The SEEC first incorporated a "present day component" to the CFRA's definition of "established," ruling that only where the lobbyist that established the PAC remains in control of the PAC would it be considered "established" by a lobbyist.  SEEC Ruling 2006-2 at 4.  Specifically, the ruling states that "if the political committee was established by a communicator lobbyist when originally formed and the communicator lobbyist *remains* a registered communicator lobbyist as of December 31, 2006, the committee will be deemed to be 'established' by a communicator lobbyist for purposes of the ban."  *Id.*  Therefore, PACs established by former lobbyists and not

presently controlled by a lobbyist are not covered by the contribution ban. *Id.* at 3-4. The ruling

further clarified that a PAC is considered "controlled" by a lobbyist where such person:

> (1)     Has substantial involvement or influence in the decision-making concerning how
> the committee solicits or makes contributions or expenditures, or in the day-to-day
> activities of the committee;
>
> (2)     Directs or participates in the appointment or selection of the committee's officers;
> and/or
>
> (3)     Serves as a committee chairperson, treasurer, deputy treasurer or other officer.

*Id.* at 4. Finally, because the definition of "communicator lobbyist" was not created until 1995,

the SEEC ruled that all PACs formed prior to June 28, 1995 are exempt from the contribution

ban. *Id.* Therefore, because the CFRA's prohibition on contributions from lobbyist-established

PACs is applicable only to those PACs formed by lobbyists after 1995 and still under the control

of a lobbyist, the measure is not unconstitutionally over-inclusive.

(4) CFRA Definition of "Communicator Lobbyist"

The plaintiffs also contend that the CFRA defines communicator lobbyist too broadly,

sweeping in many people who are not regularly involved in influencing legislative activities.

According to the plaintiffs, the CFRA's definition of communicator lobbyist covers

approximately 622 individuals, but only 50 of those individuals are regularly involved in

legislative activities. *See* Pl. Ex. 9, Amended Gallo Decl. ¶ 11. The plaintiffs argue that the

CFRA is not closely drawn because the contribution ban applies to all communicator lobbyists,

not merely the most active lobbyists. The plaintiffs further contend that the contribution ban is

not narrowly tailored because it applies to all candidates, rather than banning contributions only

to those candidates who are running for office in the branch of government that the lobbyist is

registered to lobby. Finally, the plaintiffs contend there is no justification for applying the

-67-

contribution ban to lobbyists who lobby on behalf of non-profit organizations.

The government cites feasibility and administrative efficiency as the primary reasons for applying the CFRA's contribution ban to "communicator lobbyists." First, the defendants note that the definition of communicator lobbyist was well-established prior to the passage of the CFRA and excludes from its reach those individuals who have only infrequent or casual contacts with legislators and executive officials, i.e., those individuals who do not present the same risk of undue influence as those lobbyists having more regular contact with lawmakers. Specifically, a "communicator lobbyist" is an individual who, in addition to earning more than $2,000 a year from lobbying activities, Conn. Gen. Stat. § 1-91(l), is someone "who communicates directly or solicits others to communicate with an official or his staff in the legislative or executive branch of government or in a quasi-public agency *for the purpose of* influencing legislative or administrative action." Conn. Gen. Stat. § 1-91(v) (emphasis added). As it currently stands, the contribution ban applies to a smaller subset of the category of "lobbyists" and targets only those "lobbyists" who directly communicate with lawmakers on behalf of paying clients expressly for the purpose of influencing the legislative or administrative process.

Plaintiffs' mistakenly rely on *Institute of Governmental Advocates* to support their argument that the lobbyist contribution ban is not closely drawn because it is not limited to candidates running for the branch of government that the lobbyist is registered to lobby. Although it is true that the California law permitted registered lobbyists to make contributions to those candidates or officeholders whom they were not registered to lobby, *Institute of Governmental Advocates*, 164 F. Supp. 2d at 1192-93, the Connecticut General Assembly has the discretion to determine which provisions would work best at combating the perception of

corruption, based on its expertise and knowledge of the Connecticut electoral and legislative process. *See, e.g., McConnell*, 540 U.S. at 137 (stating that the reason intermediate scrutiny applies to contribution limit cases is because it "shows proper deference" to the legislature's "particular expertise" in the area of protecting "the integrity of the electoral process").

The government argues that the decision to enact a blanket contribution ban for lobbyists was reasonable because, not only do communicator lobbyists often lobby both the executive and legislative branches, *see, e.g.*, Brocchini Decl. Ex. 5, Gallo Dep. at 31 ("I lobby the Connecticut General Assembly.  To some extent we lobby the governor's office."), but also because Connecticut's lobbyist registration requirement does not require the lobbyists to firmly commit to lobbying one or both branches.  *See* Conn. Gen. Stat. § 1-95(a)(5) (requiring lobbyists to register every two years and to identify "with reasonable particularity" those legislative or administrative branches they expect to lobby).  Therefore, it was reasonable for the legislature to conclude that a blanket ban was administratively more efficient, the most effective way of preventing the perception of corruption that arises when lobbyists contribute money to political campaigns, and a means to ensure that lobbyists would not be able to circumvent the ban.

Similarly, the fact that the law does not exempt lobbyists with non-profit clients does not render it unconstitutionally overbroad.  In *Beaumont*, which upheld a ban on direct contributions by non-profit corporations, the Court rejected a similar claim that the ban was per se unconstitutional merely because it was applicable to non-profit corporations.  539 U.S. at 163. ("[The non-profit corporation] cannot prevail, then, simply by arguing that a ban on an advocacy corporation's direct contributions is bad tailoring.").  It is not the nature of the *client's* business that is significant, but rather the nature of the *lobbyists'* role, which is the same for both non-

-69-

profit and for-profit clients.  Regardless why a client is seeking a beneficial legislative outcome, the role of the lobbyist is still to seek to influence legislative outcomes on behalf of his or her clients.  When combating the perception of corruption, it makes no difference whether the lobbyist's contribution has been made on behalf of a client that is a non-profit hospital or a for-profit corporation – it still gives rise to an inference that the contribution was made with the intent to unduly influence the legislative process.

(5)   Ban on Contributions by Lobbyists' Immediate Family Members

Plaintiffs next argue that the ban on contributions by the immediate family members of lobbyists violates those individuals' First Amendment rights and is not closely drawn to the state's sufficiently important interest of preventing corruption because the government has presented no evidence that it is a necessary anti-circumvention measure.  The plaintiffs contend that the circumvention threat must be real and evident to support such an extensive restriction, arguing that there is no evidence that spouses or dependent children of lobbyists have historically made significant contributions to political campaigns and noting that all dependents under the age of 18 are already prohibited from making contributions in excess of $30.  *See* Conn. Gen. Stat. § 9-611(e).  Furthermore, the plaintiffs point out that all of the defendants' witnesses admitted that they did not know of any instance where an immediate family member made a donation in lieu of his or her lobbyist family member.  Therefore, the plaintiffs contend that the current law prohibiting all persons from making contributions on behalf of others is a sufficient anti-circumvention measure.  *See* Conn. Gen. Stat. § 9-622(7).  The defendants counter that the ban on contributions by immediate family members was a reasonable anti-circumvention measure that the legislature was entitled to enact in order to ensure the efficacy of the underlying

-70-

ban on lobbyist contributions.

Again, the factual "dispute" at issue is not whether lobbyists' immediate family members make contributions to political candidates that mirror their spouses' and parents' contributions. The undisputed evidence in the record shows those individuals do make campaign contributions. The plaintiffs primarily dispute that they do so in "significant" amounts or with great frequency. In 2006, only two candidates for the Senate reported receiving any contribution from a lobbyist's spouse. Pl. Ex. 18 at 1-3. In 2003, out of the 109 lobbyists submitting itemized disclosures, only 30 lobbyists reported family member contributions. Pl. Ex. 19 at 54. Family member contributions accounted for 11.65% of the total amount lobbyists and their family members contributed to political candidates in 2003.[26]  *Id.*  In 2005, that percentage dropped by almost half, with family member "transactions" accounting for 6.5% of the total amount contributed to political campaigns by lobbyists and their family members.[27]  Pl. Ex. 20 at 73. The evidence in the record indicates that, although family members do contribute to political candidates, they do not do so at such a precipitous rate that eliminating that source of campaign funding would render the candidate unable to amass the necessary resources to mount a campaign.

The issue, however, is not whether lobbyists' immediate family members make contributions at all, but whether the legislature is entitled to consider that source of campaign funding a feasible way to evade the contribution ban. According to Senator DeFronzo, the

---

[26] According to the Report on Itemized Disclosure and Exemption Forms for Lobbyists in 2003, lobbyists contributed a total of $334,136.83 and purchased items worth $17,529.67. "Transactions" by immediate family members totaled $46,356.73. Pl. Ex. 19 at 54.

[27] According to the Report on Itemized Disclosure and Exemption Forms for Lobbyists in 2005, lobbyists contributed a total of $240,361.36 and purchased items worth $11,201.66. "Transactions" by immediate family members totaled $17,492.00. Pl. Ex. 20 at 73.

primary purpose for the ban on immediate family contributions was to close a potential loophole.

Sen. DeFronzo Aff. ¶ 23.  *See also* Brocchini Decl. Ex. 2, Dep. of Sen. Roraback, at 11-12

(noting that the Working Group considered the immediate family member ban as a way to "guard

against the system being gamed").  At least as it relates to the ban on contributions from

lobbyists' spouses, the measure is a reasonable prophylactic measure aimed at avoiding a

potential source for actual and perceived corruption.  *See, e.g., Nixon*, 528 U.S. at 391 n.5 ("Nor

will we second-guess a legislative determination as to the need for prophylactic measures where

corruption is the evil feared.") (quoting *FEC v. National Right to Work Comm.*, 459 U.S. 197,

210 (1982)); *McConnell*, 540 U.S. at 165-66 (concluding that Congress had leeway to enact

common sense anti-circumvention measures because it was "neither novel nor implausible" that

contributors would test the contribution limit's loopholes).

       The ban on contributions from lobbyists' dependent children is a closer question.  As the

plaintiffs correctly point out, the *McConnell* Court concluded that a ban on contributions from

minors swept too broadly and violated their First Amendment rights.  540 U.S. at 231-32.  The

federal campaign finance law at issue in *McConnell* banned all political contributions from

minors to candidates and political parties.  *Id.* at 231.  Like the defendants here, the government

in *McConnell* claimed the ban was necessary to prevent "corruption by conduit," i.e., that parents

would make donations through their minor children in order to circumvent the contribution

limits.  *Id.* at 232.  Employing the familiar "closely drawn" level of scrutiny, the Court

determined that the government had provided "scant evidence" of such attempts to evade the

contribution limits and determined the provision was "overinclusive."  *Id.*  "Absent a more

convincing case of the claimed evil, this interest is simply too attenuated for [the act] to

withstand heightened scrutiny." *Id.*

The ban on contributions by minors in *McConnell* differs in several significant respects from the ban at issue in the present case. First, the *McConnell* ban applied to all minors, not just the children of a distinct category of individuals who have a high level of access to lawmakers and whose job it is to influence legislative outcomes. Second, although Connecticut has already enacted one of the "more tailored approaches" identified by the Court – a lower cap on contributions by minors – not all dependent children of lobbyists are under 18 years of age, and thus are not subject to the $30 contribution limit for minors in Connecticut. An across-the-board limit on all political contributions by minors does not address the corruption by conduit concern presented by dependent children who are not subject to that limit in the same way as an outright ban. Perhaps a nominal limit on this subcategory of individuals would prove to be equally effective at limiting the potential for corruption by conduit, however, it is not the court's role to act as a divining rod to determine the "right" contribution limit the legislature could have enacted to achieve the same stated goal. Accordingly, like the ban on spousal contributions, the measure is a reasonable prophylactic measure aimed at preventing a source of corruption by conduit.

(6)    CFRA Does Not Go Far Enough

Finally, the plaintiffs argue that the CFRA is not closely drawn because it does not address the ability of all special interest groups to make political contributions, nor does it affect lobbyists' high level of working access to lawmakers. The fact that a law does not address every possible source for corruption does not, however, render it constitutionally invalid. *Buckley,* 424 U.S. at 105 ("[A] statute is not invalid under the Constitution because it might have gone farther than it did.") (internal quotation omitted). The *Buckley* Court explicitly recognized that the

legislature "need not strike at all evils at the same time" and that "reform may take one step at a time." *Id.* (internal quotations omitted).  The fact that lobbyists still enjoy ready access to legislators to lobby on behalf of their clients or that special interests may continue to contribute to political campaigns is not a basis for challenging the constitutionality of the CFRA.

    With this and all the other objections raised by the plaintiffs, the bottom line is that determining whether the law would work equally well with different or less restrictive provisions is not the task of the court.  "[A] court has no scalpel to probe" whether certain distinctions in the law would serve the state's interest as well as others. *Buckley*, 424 U.S. at 30.  Only where the contribution limit's provisions "work more harm to protected First Amendment interests than their anticorruption objectives could justify" should a court consider striking down a particular provision or an entire contribution limit law. *Randall*, 548 U.S. at 247-48.  Courts are not well equipped to improve upon legislative judgments of this type.  Accordingly, unless the contribution limit or ban "prevent[s] candidates from amassing the necessary resources for effective campaign advocacy," "magnif[ies] the advantages of incumbency," or "infringe[s] the contributor's freedom to discuss candidates and issues," a court should leave the fine-tuning of contribution limit provisions to the expertise of the legislature. *Randall*, 548 U.S. at 247-48 (internal quotations omitted).

### c.    Ban on State Contractor Contributions

    The plaintiffs additionally challenge whether the ban on contributions by state contractors is narrowly tailored to meet the state's sufficient state interest of combating perceived and actual corruption.  The constitutional legitimacy of the ban on contributions by state contractors is an even easier case than the lobbyist ban for several reasons.  First, state contractors, unlike

-74-

lobbyists, were featured actors in the recent "pay to play" public corruption scandals in Connecticut.  Given the evidence of multiple corruption scandals arising from state contractors attempting to court favor with lawmakers through contributions, gifts, and kick-backs in return for assistance in winning lucrative state contracts, the state's argument that an outright ban on contributions was the most effective means for overcoming the public's perception that the state government was up for sale carries significant weight.  Second, the ban on state contractors applies more narrowly than the ban on lobbyists.  Unlike lobbyists, who are prohibited from making contributions to candidates for any state office, state contractors are only prohibited from making contributions to those candidates or office holders in the particular branch of government with which the contractor does business.

Plaintiffs raise virtually identical challenges to the state contractor ban that they raise to the lobbyist ban.  For instance, the plaintiffs argue that the ban is not closely drawn because it bans contributions by state contractors' immediate family members and because it applies equally to non-profit companies seeking state contracts.  With respect to the issue of banning contributions by immediate family members, the concerns raised about corruption by conduit are identical to the concerns arising out of contributions from lobbyists' immediate family members, as explained more fully above.  With regard to the applicability of the ban to principals of non-profit companies seeking state contracts, again, as explained above, it is the relationship between the company and the state government that is significant, not the identity of the person making the contribution or the substance of the ultimate state contract.  There is still a danger of corruption or the appearance of corruption that arises out of contributions by a principal of a non-profit organization to elected officials with authority or discretion over the contract bidding

process.  Because non-profit organizations must compete to obtain state contracts in the same

manner as for-profit companies, any campaign contributions from the principals of a successful

non-profit contractor gives rise to a similar inference that the contributions were made in

exchange for favorable treatment during the bid process.  Finally, as demonstrated by the bribery

scandal involving State Senator Newton and a non-profit agency, non-profits are not immune

from engaging in corrupt activities.  The appearance of corruption that arises from contributions

by principals of non-profit companies seeking state contracts justifies the inclusion of non-profit

companies in the ban on contributions from state contractors.

Notably, the plaintiffs contend that the state contractor ban sweeps in too many

individuals and fails to account for the competitive bidding process.  First, addressing the breadth

and scope of the ban, the statute does not sweep quite as broadly as the plaintiffs contend.  The

ban does not apply to every state contract nor to every contractor or employee of a contractor in

the state of Connecticut.  Rather, to trigger the contribution ban, the state contract must be worth

in excess of $50,000 and the ban only applies to those persons with some threshold level of

authority over the contracting entity, including board members, owners,[28] senior executives, and

those employees with managerial or discretionary responsibilities with respect to the state

contract.  Conn. Gen. Stat. § 9-612(g)(1)(C) and (F).  Furthermore, the ban only applies to

candidates for the particular branch of government that awarded the contract; if the contract is

with the General Assembly, the state contractor can still contribute to candidates for statewide

---

[28] Board members of non-profit organizations and individuals who own less than 5% of
the shares of a publicly traded state contractor are exempt from the ban.  Conn. Gen. Stat. § 9-
612(g)(1)(F).

executive office and vice-versa.[29]  Conn. Gen. Stat. § 9-612(g)(2)(A) and (B).

Next, although most state contracts are competitively bid, state officials have enough opportunity to exercise some discretion in awarding contracts to support the government's claim that a reasonably comprehensive ban was necessary in order to eliminate the potential for abuse and to combat the perception that contracts are awarded on the basis of corrupt practices.  First, even competitively bid contracts are not determined on the basis of completely objective criteria.  According to Connecticut's law on awarding state contracts, all competitively bid contracts must be awarded to the lowest bidder of those bidders possessing the necessary "skill, ability and integrity" based on "past performance and financial responsibility."  Conn. Gen. Stat. § 4a-59(a).  In evaluating the "past performance" of a bidder, the bidder's fulfillment of past contractual obligations and past experience or lack of experience in the area of the specific project is to be considered.  Conn. Gen. Stat. § 4a-59(c).  Such statutory language indicates that some bidders may be excluded on the basis of what a public official deems to be a lack of experience or failure to meet the threshold showing of "skill, ability and integrity."  *See also* Pl. Ex. 47, State of Connecticut Department of Transportation Construction Contract Bidding and Award Manual, at 29 ("The Commissioner reserves the right to do any of the following without liability: a) waive technical defects in bid proposals as he or she may deem best for the interests of the State; b) reject any or all bids; c) cancel the award or execution of any contract prior to the issuance of the 'Notice to Proceed;' and d) advertise for new bids."); at 38-39 (noting at least eight ways in which the Commissioner can lawfully reject an apparent low bidder on the basis of his or her

---

[29] Contractors with a prequalification certificate issued by the Commissioner of Administrative Services and their principals are subject to both the legislative and executive branch bans.  Conn. Gen. Stat. § 9-612(g)(2)(A) and (B).

subjective opinion about that contractor; for instance, a bid may be rejected when, "in the opinion

of the Commissioner, the contractor lacks managers with the experience, knowledge, and good

judgment in financial, business, and construction matters which the Commissioner deems

necessary to ensure the satisfactory and timely completion of the project.").

Second, even the plaintiffs concede that not all state contracts are awarded through the

competitive bid process.[30]  For instance, in the case of an "emergency," which is determined by

the presence of "extraordinary conditions or contingencies that could not reasonably be foreseen

and guarded against, or because of unusual trade or market conditions," the state may waive the

competitive bid requirements.  Conn. Gen. Stat. § 4a-58.  The state agency may also elect to

conduct a competitive negotiation.  In those circumstances, the state agency makes a request for

proposals, which must specify the method for evaluating the proposals that are submitted.  Conn.

Agencies Regs. § 4a-52-18(b).  Agency staff then select the three top-scoring proposals, which

are then referred to the agency head who has the discretion to choose among those three

proposals, provided he or she selects the contractor that is "best qualified."  Conn. Agencies

Regs. § 4a-52-16.  *See also* Pl. Ex. 48, State of Connecticut Office of Policy and Management

Personal Service Agreements Standards and Procedures, at 57 ("An Agency Head has the

prerogative to reject any or all of the three top ranking Proposers.").  Because there is perceptible

room for discretion built into the process for awarding state contracts, there is at least the

potential that a decisionmaker would look more favorably on his or her contributors, which

---

[30] The plaintiffs note that state contracts are awarded competitively "[w]ith some limited exceptions;" that the contracting process is "by and large" centralized, standardized, and transparent; and that the selection process is "largely" objective.  Green Party Pl. Memorandum in Support of Summary Judgment (doc. #120-3), at 69.

supports the legislature's stated purpose for the ban.

Connecticut is not alone in banning or severely limiting contributions by state contractors. For example, Hawaii similarly bans state contractors from making contributions to, or soliciting contributions on behalf of, any political party, committee, or candidate, or to any person for any political purpose or use, for the duration of the contract, beginning from its execution to completion of performance.[31]  Haw. Rev. Stat. § 11-205.5.  West Virginia also prohibits political contributions from and solicited by state contractors, beginning from the contract's negotiation period through its completion of performance.  W. Va. Code § 3-8-12(d).[32]  Notably, both states' contribution bans apply to competitively bid contracts and do not limit contributions only with respect to candidates for the agencies or branch of government which awarded the contract.

New Jersey also imposes a stringent contribution limit on state contractors, prohibiting the state from awarding contracts worth in excess of $17,500 to any "business entity" that has contributed or solicited more than $300 to a candidate for governor or any state or county

---

[31] Hawaii's contribution ban only applies to the contracting entity's ability to make contributions out of its treasury funds and does not apply to individuals associated with the contracting entity, such as its owner.  *See* Advisory Opinion No. 07-04, Campaign Spending Commission of the State of Hawaii, at 1, http://hawaii.gov/campaign/Opinions/AdvisoryOpinions/2007/ao07-04.htm.  As a general matter, Hawaii permits corporate campaign contributions.  *See* Haw. Rev. Stat. § 11-205.5(b).

[32] Kentucky, Ohio, and South Carolina also limit contributions from state contractors, albeit in a less restrictive manner.  *See* Ky. Rev. Stat. § 121.056 (limiting the amount a state contractor can contribute to candidates for Governor and Lieutenant Governor in order to remain eligible for certain non-competitively bid state contracts); Ohio Rev. Code § 3517.13 (limiting eligibility for most non-competitively bid state contracts to those contractors that have not exceeded contribution limits, over a period of two years, to the holder of the public office having ultimate responsibility for the award of the contract); S.C. Code Ann. § 8-13-1342 (prohibiting post-award contributions by state contractors to those officials having authority to act on the contract's award).

political party committee within the eighteen months preceding the contract's negotiation.  N.J. Stat. Ann. § 19:44A-20.14; *In re Earle Asphalt Co.*, 950 A.2d 918, 925 (N.J. Super. Ct. App. Div. 2008), *cert. granted*, 196 N.J. 465, 957 A.2d 1173 (2008).  The contribution and solicitation prohibition applies to all individuals who own or control more than 10% of the business entity. N.J. Stat. Ann. § 19:44A-20.17.  Where the affected business entity is a natural person, that individual's spouse, and any children residing at home, are also covered by the contribution limit. *Id.*

A New Jersey highway contractor challenged the law after it lost a state highway construction project because its president had recently contributed in excess of $300 to a county party committee.  *Earle Asphalt*, 950 A.2d at 920-21.  Applying the now-familiar closely drawn standard of scrutiny, the New Jersey appellate court held that "the State's interest in 'insulat[ing] the negotiation and award of State contracts from political contributions that pose the risk of improper influence, purchase of access, or the appearance thereof[,]' is a 'sufficiently important interest' to justify a limitation upon political contributions."  *Id.* at 927 (quoting N.J. Stat. Ann. § 19:44A-20.13 and *Buckley*, 424 U.S. at 25).

Significantly, in challenging the law as an unconstitutional restriction on his First Amendment rights to free speech and association, the plaintiff-contractor raised many of the same points put forward by the plaintiffs in this case.  He argued that the contribution limit was overbroad and unnecessary because: (1) current restrictions and rules governing the public bidding process were adequate to prevent misconduct in government contract bid process, (2) highway contracts are competitively bid, and (3) the low contribution limit threatened to "inhibit effective advocacy" by candidates and political parties.  *Id.* at 925-26.

The Court rejected each argument in turn.  First, noting that *Buckley* had rejected a similar argument, the Court reiterated that criminalizing bribery prevented only "'the most blatant and specific attempts'" to influence public officials and that successfully "'safeguarding against the appearance of impropriety'" also required eliminating the *opportunity* for abuse.  *Id.* (quoting *Buckley*, 424 U.S. at 27-28, 30).  Second, the Court held that, because even competitively bid contracts permit state officials to "exercise substantial discretion," the opportunity for undue influence and abuse was still present.  *Id.* at 926 (noting that the Commissioner of Transportation had the authority to determine whether a contractor was "responsible," whether the bid conformed to the "specifications" of the contract, and whether to reject all bids because they were "excessively above the estimated cost, or for any other cause") (quoting N.J. Stat. Ann. § 27:7-30).  Finally, noting that restricting contributions from a specific group of individuals was inherently different than the universally-applied contribution limits at issue in *Randall*, the Court determined that New Jersey's limitations would not prevent candidates "from amassing the resources necessary for effective campaign advocacy." *Id.* at 927 (quoting *Randall*, 548 U.S. at 248) (internal quotation omitted).

Looking beyond the state contractor context specifically, several courts have upheld contribution bans for other groups of individuals who derive significant income from business dealings with the state.  Those decisions recognize that, whenever motive, money, and access coincide, there is an obvious potential for corruption.  For example, in *Blount v. SEC*, 61 F.3d 938, 939-40 (D.C. Cir. 1995), the D.C. Circuit considered the constitutionality of an SEC rule prohibiting contributions by municipal securities professionals to those public officials from whom they obtained business.  Dismissing the lack of evidence demonstrating that "pay to play"

practices were actually prevalent in the municipal bond business, the Court stated that

contributions by municipal securities professionals nevertheless "self-evidently create a conflict

of interest in state and local officials who have power over municipal securities contracts and a

risk that they will award the contracts on the basis of benefit to their campaign chests rather than

to the governmental entity." *Id.* at 944-45.  It further concluded that "[a]lthough the record

contains only allegations, no smoking gun is needed where . . . the conflict of interest is apparent,

the likelihood of stealth great, and the legislative purpose prophylactic." *Id.* at 945.

      In *Casino Ass'n of Louisiana*, 820 So.2d at 497, the Louisiana Supreme Court considered

a ban on contributions to political candidates by gaming industry owners, senior executives, and

their spouses.  Considering the heavily regulated nature of the casino industry in the state,

combined with evidence demonstrating that the public perceived the industry to be associated

with public corruption, the Court concluded that it was "plausible, and not at all novel, for the

Louisiana legislature to have concluded that it was necessary to distance gaming interests from

the ability to contribute to candidates." *Id.* at 508.  The Court held that the ban was "closely

drawn" because it was focused on the "narrow aspect of political association where the actuality

and potential for corruption have been identified," while leaving those individuals "free to

engage in independent political expression, to associate actively through volunteering their

services," and to make independent expenditures.  *Id.* at 509.  *See also Schiller Park*, 349 N.E.2d

at 65-66 (upholding Illinois' contribution ban for liquor licensees); *Soto*, 565 A.2d at 1098

(upholding New Jersey's contribution ban for "key employees" of the casino industry); *Gwinn v.

State Ethics Comm'n*, 426 S.E.2d 890, 892 (Ga. 1993) (upholding Georgia's ban on contributions

from insurers to candidates seeking election to the office of insurance commissioner, the state's

insurance regulator).  *Cf. FEC v. Weinstein*, 462 F. Supp. 243, 249 (S.D.N.Y. 1978) (upholding 2

U.S.C. § 441c's prohibition on political contributions by federal government contractors).

The fact that Connecticut's ban on contributions from state contractors is more far-

reaching than the bans enacted by other states does not render it less constitutionally valid.

Given the strong incentive for lobbyists and state contractors to gain the favor of state officials

and lawmakers through contributions, and given the wide range of political activities that the

bans do not impact, I conclude that the CFRA's prohibition on campaign contributions by

lobbyists, state contractors, and their immediate family members is closely drawn to the

sufficiently important state interest in preventing actual and perceived corruption.

### 2.    Solicitation Bans

#### A.    <u>Standard of Review</u>

As with the contribution ban, the parties seriously dispute the level of scrutiny that the

court should apply in considering the constitutionality of the CFRA's solicitation ban.  The

plaintiffs insist that strict scrutiny must apply, regardless of the standard used to analyze the

constitutionality of the contribution ban, because the solicitation ban is a direct restraint on

speech and thus raises even more significant First Amendment issues.  The state argues that the

plaintiffs are exaggerating the solicitation ban's scope and burden on speech, and that the more

deferential "closely drawn" standard should apply because the solicitation ban imposes only a

minimal burden on speech and, as a necessary anti-circumvention measure to support the efficacy

of the contribution ban, is itself an important way to combat actual and perceived corruption.

From the parties' respective perspectives, the solicitation ban is at once *more* troubling than the

contribution ban because it is a direct restraint on speech in that it prohibits an affected individual

from requesting contributions on behalf of a candidate and, at the same time, *less* troubling than the contribution ban because it is one step removed from even that indirect and symbolic act of expressing support for a candidate.

Unfortunately, there is no case law directly on point that would definitively support either side's claim on the issue of scrutiny. For instance, the state correctly points out that the *McConnell* Court rejected the invitation to apply strict scrutiny to the solicitation prohibitions at issue in that case, most notably because the solicitation bans did not burden speech any differently than the provision restricting the contribution itself. 540 U.S. at 138-39. However, the state also concedes that the solicitation provisions at issue in *McConnell* are different than the solicitation bans at issue in the present case. The *McConnell* solicitation provisions only barred the solicitation of contributions that the potential donor would have been prohibited from making in the first place, i.e., the provision merely "regulate[d] contributions on demand side rather than the supply side." *Id.* at 138. The CFRA's solicitation bans, on the other hand, prohibits lobbyists, state contractors, and their immediate family members from soliciting contributions that would otherwise be legal if made independently of the solicitation. Conversely, although the D.C. Circuit in *Blount* applied strict scrutiny to a solicitation ban similar to the CFRA's provision, it did so only because the Court determined that the solicitation ban could survive even strict scrutiny, thus skirting the issue of scrutiny. *Id.* at 943, 947-48.

In the absence of direct authority on the appropriate scrutiny level to apply to the CFRA's solicitation ban, an examination of the ban's scope and weight of its burden on protected speech provides a useful starting point. The plaintiffs are correct that the CFRA's solicitation ban is technically a direct restraint on speech, however, in pressing their case for strict scrutiny they

-84-

have overvalued the significance of that fact.  Merely because a campaign finance provision

directly restricts speech does not necessarily dictate that strict scrutiny must apply.  As the

*McConnell* Court noted, in determining the appropriate level of scrutiny in the campaign finance

context, a court should consider whether the impact of the burden on protected speech was

"weighty" enough to overcome the state's interest in "protecting the integrity of the political

process."  540 U.S. at 140 n.42 (internal quotation omitted).  Thus, not all burdens on speech

"necessitate strict scrutiny review."  *Id.*  Rather, the appropriate level of scrutiny is "based on the

importance of the political activity at issue to effective speech or political association."

*Beaumont*, 539 U.S. at 161 (internal quotation omitted).  Consequently, those restrictions

affecting "marginal" forms of speech or expression lying "closer to the edges than the core" of

the rights protected by the First Amendment are "subject to relatively complaisant review."  *Id.*

Put simply, the "degree of scrutiny turns on the nature of the activity regulated," *id.* at 162,

keeping in mind that the significance of soliciting comes not with the act of asking for money,

but because it "is characteristically intertwined with informative and perhaps persuasive speech"

in support of specific causes and issues.  *Village of Schaumberg v. Citizens for a Better

Environment*, 444 U.S. 620, 632 (1980).

  The CFRA's solicitation ban places a direct restraint on speech by prohibiting lobbyists,

state contractors, and their immediate family members from requesting campaign contributions

on behalf of a candidate.  As clarified by the SEEC, that means affected individuals may not (1)

make "an express request that a contribution be made;" or (2) make a request "that a reasonably

prudent person" could not construe as anything other than "a request that a contribution be

made."  SEEC Ruling 2006-1 at 3.  The ban also places a direct restraint on association by

prohibiting lobbyists, state contractors, and their immediate family members from participating

in fundraising activities for covered candidates.  *Id.* at 4.  Prohibited activities include attending a

fundraiser, forwarding tickets to a fundraiser, receiving contributions, and bundling

contributions.  *Id.*  The CFRA's solicitation ban also prohibits lobbyists, state contractors, and

their immediate family members from serving as the chairperson, campaign treasurer, deputy

treasurer or other committee officer of a covered committee or candidate's campaign committee.

*Id.*

Perhaps more significant than what the solicitation ban prohibits, are the rights that

remain untouched.  The CFRA expressly excludes from the definition of "solicit" the act of

"informing any person of a position taken by a candidate for public office or a public official."

Conn. Gen. Stat. § 9-601(24).  Thus, lobbyists, state contractors, and their immediate family

members are not prohibited from informing their clients or anyone else that "a certain legislator

or public official has been helpful, or not, on an issue that they are concerned about."  SEEC

Ruling 2006-1 at 5.  The ban does not prohibit the affected individuals from providing anyone

with a candidate's website, phone number or any other contact information.  *Id.*  Furthermore,

even though they may not encourage anyone to attend a fundraising event, they may still inform

others about fundraising events.  *Id.*  The solicitation ban does not prohibit affected individuals

from "freely discuss[ing] political affairs, candidates, or elected officials," nor does it prevent

such individuals from volunteering for a campaign in a non-fundraising capacity, placing a sign

on their lawn, making get-out-the-vote calls, expressing support for a candidate or his or her

views, advising whether a candidate is likely to be elected, communicating his or her evaluations

of a candidate or public official, making independent expenditures on behalf of candidates,

providing advice to candidates, running for office, being the spouse or child of a candidate,

attending or hosting non-fundraising events for covered candidates, or soliciting contributions on

behalf of municipal candidates or serving on municipal candidates' campaign committees.  *Id.* at

5-6.

Furthermore, the solicitation ban also has a marginal impact on lobbyists' ability to

provide their clients with advice regarding "helpful" legislators.  As the plaintiff-lobbyists have

explained, the act of soliciting campaign contributions from clients is frequently done in

conjunction with advice and information about legislators' voting records and positions on

relevant issues.  According to Barry Williams, he would "regularly provide [his] clients with

information about the effectiveness of legislators and insights and advice concerning a

candidate's position on a particular issue.  During an election year, [he would] advise clients

about which candidates to support based both on their voting records and their election

prospects."  Pl. Ex. 53, Williams Decl. ¶ 9.  Lobbyist Anita Schepker stated that, when providing

contribution advice to clients, she would consider the following factors:

> [T]he legislator's overall perception of [her] client, whether the legislator is a
> ranking member or committee chair, whether the legislator introduced
> legislation adverse to or in favor of [her] client, whether or not the actions
> taken by a legislator were truly helpful, or merely an artifice, whether the
> legislator supported procedural acts which caused problems for legislation,
> and how influential a legislator was in his or her caucus.

Pl. Ex. 55, Schepker Aff. ¶ 8r.  She would often recommend not making contributions on the

basis of those considerations.  *Id.  See also* Pl. Ex. 9, Amended Gallo Decl. ¶ 41 (noting that she

often advised her clients "to contribute to candidates who have demonstrated support for or who

are likely to support the issues that are important to [them]").

Significantly, apart from recommending or suggesting that a client make a campaign contribution, the solicitation ban would not prohibit the plaintiff-lobbyists from continuing to provide the same information and advice to their clients regarding particular legislators, whether they take client-friendly positions on issues, and what their electoral prospects might be.  For instance, at their monthly breakfast meeting, a lobbyist could relate to his major Connecticut-based light manufacturing client that Senator Smith had taken a particularly helpful, pro-business stance on several key pieces of legislation involving environmental and labor issues.  The lobbyist could freely explain how those bills would have affected the client's business operations and why it mattered to the client that Senator Smith be reelected in the upcoming General Assembly election.  The lobbyist could advise his client that Senator Smith was engaged in closely contested reelection campaign against a candidate with particularly problematic positions for the client.  Finally, he could even inform his client that Senator Smith was holding a fundraiser the following Friday night at a local restaurant.  The only thing the lobbyist could not do at that point would be to tell, suggest, or request that his client attend that fundraiser or give his client a copy of the fundraiser announcement.  Although the lobbyist could not advise his client to make a campaign contribution to Senator Smith, the lobbyist's essential job functions and First Amendment rights to freely communicate remain fundamentally intact.

Considering the nature of the restricted activities, it is clear that the rights implicated by the solicitation ban are closer in terms of substantive worth and importance to the symbolic right of expression that is restricted by a contribution ban than the rights at the core of political expression that are implicated by an expenditure limit.  Like a contribution ban, which essentially eliminates the marginal value of the symbolic expression of support derived from appearing on a

candidate's list of donors, the solicitation ban eliminates the value of the expression of support that is derived from asking others for campaign contributions on behalf of the candidate.  The number of contributions that a person successfully solicits on behalf of the candidate is, like the size of a personal contribution, nothing more than a "very rough index" of the intensity of support for that candidate.  *Buckley*, 424 U.S. at 21.  The fact that a person is soliciting on behalf of a candidate, like making a contribution, demonstrates a "general expression of support for a candidate and his views, but does not communicate the underlying basis for the support."  *Id.*

In both cases, there is no restriction on an individual's right to engage in direct and substantive expressions of support for a candidate such as knocking on doors, writing letters to the editor, hosting non-fundraising meet-and-greets, and otherwise broadcasting his or her support and generating enthusiasm for the candidate.  In other words, aside from participating in fundraising activities, the individual remains "free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates" and to engage in a "robust and effective discussion of candidates and campaign issues."  *Id.* at 22, 29.  Unlike the form of solicitation ban at issue in *Schaumburg*, the CFRA's ban effectively divorces the act of requesting money from "the communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes."  444 U.S. at 632.

Plaintiffs rely on the Eighth Circuit decision in *Republican Party of Minnesota v. White*, 416 F.3d 738, 763 (8th Cir. 2005), to support their claim that strict scrutiny should apply to the CFRA's solicitation ban.  The solicitation ban at issue in *White*, however, applied to the candidates themselves, not their supporters.  *Id.*  Specifically, the law prohibited judicial candidates from personally soliciting campaign contributions from individuals or groups.  *Id.*

The Eighth Circuit concluded that strict scrutiny applied because the law prohibited candidates from requesting contributions to be used in promoting their political message, and thus the solicitation ban in that case was more akin to an expenditure limit.  *Id.* at 764 ("Insofar as the solicitation clause restricts the amount of funds a judicial candidate is able to expend on his or her political message, the regulation is of the same caliber as that struck down in *Buckley*."). Because the CFRA's solicitation ban does not prohibit candidates themselves from soliciting campaign contributions from eligible donors, *White*'s application of strict scrutiny is unpersuasive.

Given the relatively marginal value of the speech restricted by the solicitation ban, I conclude that the closely drawn level of scrutiny is appropriate for determining whether the ban passes constitutional muster.  Therefore, so long as the ban is closely drawn to match a sufficiently important interest, it will be constitutionally valid.

B.    Sufficiently Important Interest

The state identifies two purposes for the solicitation bans, which it contends satisfy the sufficiently important interest prong: (1) it is an anti-circumvention measure necessary to ensure the efficacy of the contribution bans, and (2) it helps prevent actual and perceived corruption of public officials in its own right.  As discussed in more detail above in relation to the contribution bans, both purposes are well-recognized sufficiently important interests in the campaign finance context.  *See, e.g., McConnell*, 540 U.S. at 144 ("[B]ecause the First Amendment does not require Congress to ignore the fact that 'candidates, donors, and parties test the limits of the current law,' these [anti-corruption] interests have been sufficient to justify not only contribution limits themselves, but laws preventing the circumvention of such limits.") (quoting *Colo.*

-90-

*Republican Fed. Campaign Comm.*, 533 U.S. at 457) (internal citation omitted)); *id.* at 143 ("Our cases have made clear that the prevention of corruption or its appearance constitutes a sufficiently important interest" in campaign finance cases).

          C.    <u>Closely Drawn</u>

Having determined that the stated purposes of the solicitation ban are sufficiently important, the pertinent question is whether the solicitation bans are appropriately tailored to satisfy the closely drawn standard.

Arguably the solicitation ban is a more effective anti-corruption measure than the contribution ban itself because an individual contributor can only contribute so much money to a candidate, which necessarily limits the extent of influence that an individual can wield through delivering a personal contribution. The key to lobbyists' influence with lawmakers, however, is not necessarily their own personal wealth, but their access to deep-pocketed clients and an ability to act as conduits to those funds by soliciting and bundling campaign contributions. *See* Corrected Pelto Decl. ¶ 9; Rapaport Decl. ¶¶ 6-7.[33]  Similarly, state contractors with many

---

[33] *See also* Garfield Decl. Ex. 17, Transcript of June 5, 2005 House of Representatives Debate, at 486 (statement of Rep. Caruso: "We go through a campaign, and we want to run for office and we say to one of the lobbyists, we're running, can you help us out, and they go out and they get 5 or 6 checks from their clients, and they give to our campaigns. All legal, all proper by our current law, but again, to gain influence in this system."); *id.* at 574 (statement of Rep. Caruso: "We feel that [the solicitation ban] would have a very positive impact because . . . lobbyists could simply communicate information advocacy but would not be expected in return to gather checks on behalf of a candidate from their clients."); Garfield Decl. Ex. 19, Transcript of the Aug. 4, 2005 Working Group Hearing, at 127 (statement of lobbyist Brian Anderson: "I think the real problem is the bundling. So I don't think just stopping immediate lobbyists from giving might really do enough."); Brocchini Decl. Ex. 2, Sen. Roraback Dep. at 11 (stating that removing lobbyists from the fundraising process was meant to "disabuse" the public of the perception that lobbyists won influence by raising money for campaigns); A. Sauer Decl. ¶¶ 36-43, Exs. 25-30 (compilation of campaign contribution reporting data for several candidates, demonstrating that employees of clients of the lobbying firm Gaffney Bennett made multiple

employees and subcontractors can marshal their subordinates' campaign contributions for delivery to favored candidates. *See* A. Sauer Decl. ¶¶ 14-16, Ex. 1 (detailing contractor Tomasso's success at bundling and/or coordinating contributions from employees, family members, and subcontractors). The appearance of even greater undue influence arises when lobbyists and state contractors can leverage their position with lawmakers by funneling campaign contributions from their broad and established base of clients and subordinates.

The plaintiffs primarily contend that the solicitation ban must be struck down because it chills protected speech and is an unconstitutional impediment to robust political discussion and advocacy. However, as explained above, the plaintiffs' argument ignores SEEC Ruling 2006-1, which clarified that affected individuals still have the ability to engage in a wide variety of political activities that lie at the core of the rights to free political expression and association that are protected by the First Amendment. The key fact for the *McConnell* Court when considering the solicitation restrictions at issue in that case was that they did not "alter[] or impair[] the political message 'intertwined' with the solicitation." 540 U.S. at 139-40.

Furthermore, the solicitation bans will not prevent candidates from amassing the necessary resources to mount an effective campaign because candidates may still seek and accept contributions from persons formerly solicited by lobbyists. If anything, the solicitation ban will force lawmakers to expand the range of their political message to reach that base of potential contributors. As the *McConnell* Court noted, when candidates must seek financial support from a broader array of donors it provides the additional benefit of strengthening the political process. *Id.* at 140 ("[T]he restriction here tends to increase the dissemination of information by forcing

---

contributions on the same day, suggesting bundling by Gaffney Bennett lobbyists).

parties, candidates, and officeholders to solicit from a wider array of potential donors.").

      The plaintiffs also contend that an anti-bundling measure or more in-depth disclosure requirements would be a less restrictive means of achieving the legislature's stated goals.  The legislature, however, must be accorded a fair amount of deference when it comes to crafting anti-circumvention measures aimed at obvious and suspected loopholes in campaign finance regulations.  *See, e.g., McConnell*, 540 U.S. at 170-71; *Beaumont*, 539 U.S. at 155.  In *Blount*, the D.C. Circuit upheld a solicitation ban that applied to the same individuals subject to the accompanying contribution ban, reasoning that the contribution ban would otherwise be "easily circumvent[ed]."  61 F.3d at 947.  The Court concluded that nothing short of a ban on solicitations would have as effectively protected the contribution ban's purpose in shoring up the integrity of the municipal bond market.  *Id.*  Similarly, the General Assembly was well within its authority to reject measures that fell short of the efficacy represented by a solicitation ban.

      Finally, as SEEC Ruling 2006-1 makes clear, the solicitation ban proscribes a narrow range of conduct while still permitting lobbyists to effectively carry out their jobs of informing clients about the legislative process, the policy positions of individual legislators, and whether those positions are favorable or unfavorable to the client.  Furthermore, lobbyists and other affected individuals[34] are not prohibited from publicly declaring their support for particular candidates or volunteering on behalf of a candidate.  Because the solicitation bans have an impact on only marginal speech and are sufficiently severed from the delivery of any "intertwined" political message, the bans are adequately tailored to meet the closely drawn

---

      [34] Banning lobbyists and state contractors' immediate family members from soliciting contributions on behalf of covered candidates is a reasonable anti-circumvention measure aimed at bolstering the efficacy of the underlying bans.

standard of scrutiny.  *See, e.g., McConnell*, 540 U.S. at 139-40; *Blount*, 61 F.3d at 948.

### IV.   Equal Protection and/or Due Process Claims

In addition, the ACL Plaintiffs seek summary judgment on their claim that the

contribution and solicitation bans violate their rights to equal protection and due process of law

as protected by the Fourteenth Amendment.  In their complaint, the ACL Plaintiffs identify four

reasons why the CFRA's contribution and solicitation bans violate their rights to equal protection

and/or due process.  First, they allege that the Act's application to lobbyists earning over $2,000

per year in income from lobbying is an arbitrary and capricious distinction.  ACL Plaintiffs'

Second Amended Complaint ¶ 29.  Second, they contend that the law unfairly discriminates

against those who enter into marriage or civil unions with communicator lobbyists, but not those

individuals "who live as a family without the benefit of either marriage or civil union."  *Id.*

Third, they contest the law's application only to lobbyists registered to lobby in the State of

Connecticut, rather than all lobbyists.  *Id.*  Finally, they argue that the law unfairly singles out

communicator lobbyists from "other similarly situated advocates."  *Id.*

In support of their equal protection claims, the ACL Plaintiffs ostensibly hold themselves

out as a minority that is owed the same level of deference accorded well-recognized suspect

classes, such as those based on race or national origin.  ACL Plaintiffs' Memorandum in

Opposition to Defendants' Motion for Summary Judgment (Doc. #138) at 2-3, 29-31.  The

plaintiffs' argument in that respect is untenable.  Persons who choose to make a living by

lobbying are not comparable in any meaningful sense to members of minority groups who have

faced a history of discrimination on the basis of hereditary distinctions such as race, national

origin, gender, and the like.

Because the plaintiffs cannot reasonably claim recognition as a suspect class, I will consider their equal protection claims using rational basis scrutiny.  For such non-suspect class equal protection claims, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439-40 (1985).  *See also Inst. of Governmental Advocates,* 164 F. Supp. 2d at 1194-95 (rejecting lobbyist-plaintiffs' equal protection claims under rational basis scrutiny after concluding that, because lobbyists' are paid to influence government officials, a ban on their campaign contributions was reasonably related to the legislature's objective of preventing actual or perceived corruption).

Each of the CFRA's distinctions singled out by the plaintiffs is rationally related to a legitimate state interest of preventing actual and perceived corruption among public officials.  First, not only is the $2,000 threshold a long-recognized distinction in Connecticut's regulation of lobbyists, *see* DeFronzo Aff. at ¶ 17, but it narrows the application of the CFRA's provisions to those lobbyists who present the greatest threat of actual or perceived corruption, i.e., those who are paid substantial amounts to influence lawmakers on behalf of their clients.  Along those same lines, it is unclear how "similarly situated advocates," who are not classified by law as "communicator lobbyists," present any similar danger of actual or perceived corruption, as they do not, by definition, earn more than $2,000 per year from communicating directly with lawmakers or their staff for the purpose of influencing legislative or administrative action.

Next, there is no basis to argue that the General Assembly's decision to limit the CFRA's application to lobbyists registered to lobby in Connecticut was not rational.  The purpose of the law is to prevent actual and perceived corruption among Connecticut's lawmakers and it does not

purport to address corruption elsewhere.  Because only Connecticut-registered lobbyists have

occasion, by law, to lobby Connecticut lawmakers, that distinction is rationally related to the

state's legitimate interest.

Finally, reasons of administrative efficiency are sufficient to justify the CFRA's ban on

contributions from and solicited by only those individuals in legally recognized relationships

with lobbyists, such as marriage or civil unions, rather than all domestic partners.  Because there

is no way for the state to track non-legally sanctioned domestic relationships, it would have been

nearly impossible to apply the contribution and solicitation bans to those individuals.  The

legislature was entitled to reasonably calculate that applying the contribution and solicitation

bans to lobbyists' immediate family members was the most effective way of preventing

circumvention of the underlying bans.  Accordingly, the plaintiffs' equal protection claims must

fail.

To the extent that the ACL Plaintiffs are alleging a due process claim under the

Fourteenth Amendment, those claims also fail.  The Due Process Clause "provides heightened

protection against government interference with certain fundamental rights and liberty interests."

*Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997).  Unless a challenged state action

implicates a fundamental right, the state need only demonstrate "a reasonable relation to a

legitimate state interest to justify the action."  *Id.* at 722.  The plaintiffs have not identified how

or why the right to make or solicit campaign contributions is a fundamental right and therefore,

rational basis scrutiny applies.  Because the state has identified a legitimate purpose for setting

the CFRA's threshold of applicability at $2,000 or more in income per year to lobby, it cannot

reasonably be considered an arbitrary or capricious standard.

## V.        Connecticut Constitutional Claims

Finally, the ACL Plaintiffs move for summary judgment on count two of their second

amended complaint, which alleges that the contribution and solicitation bans violate their rights

under Sections Four and Five of the Connecticut Constitution.  The plaintiffs argue that because

the Connecticut Constitution may afford greater protection for First Amendment rights than the

U.S. Constitution, their state constitutional claims survive without regard to the fate of their

federal constitutional claims.

It is true that the Connecticut Constitutional *may* afford greater First Amendment

protection than the United States Constitution.  *State v. Linares*, 232 Conn. 345, 379-80 (1995).

Except when Connecticut law actually provides greater protection than federal law, however,

Connecticut courts generally adhere to the guidance of the United States Supreme Court on First

Amendment issues.  *Horton v. Meskill*, 172 Conn. 615, 641-42 (1977) ("[D]ecisions of the

United States Supreme Court defining fundamental rights are persuasive authority to be afforded

respectful consideration, but they are to be followed by Connecticut courts only when they

provide no less individual protection than is guaranteed by Connecticut law.").  *See e.g., Caldor,*

*Inc. v. Heslin*, 215 Conn. 590, 600, 600 n.6 (1990) (adopting the United States Supreme Court's

analysis for determining the constitutionality of restrictions on commercial speech).

Although the Connecticut Constitution may provide broader protection to the rights at

issue here, there is no indication that it would do so in this case.  Specifically, the ACL plaintiffs

have not cited any case law for the proposition that Connecticut would employ a standard other

than *Buckley v. Valeo* in the campaign finance context.  In the absence of any basis to suggest

that Connecticut law applies a more expansive test for restrictions on making or soliciting

campaign contributions, I decline to speculate whether and how Connecticut would afford greater

protection to the rights of plaintiffs in this case.  I conclude that the Connecticut Supreme Court

would follow the United States Supreme Court decisions relied upon in this decision when

evaluating plaintiffs' claims under the Connecticut Constitution.  Accordingly, the plaintiffs'

claims pursuant to the Connecticut Constitution fail for the same reasons as their federal claims.

### VI.    Conclusion

For the foregoing reasons, the defendants' motion for summary judgment (**doc. #122**) is

**GRANTED**, and, the plaintiffs' motions for summary judgment (**docs. #117 and #120**) are

**DENIED**.  Judgment shall enter for defendants on the ACL Plaintiffs' claims in their entirety

and on the claims raised in count four of the Green Party Plaintiffs' amended complaint.

It is so ordered.

Dated at Bridgeport, Connecticut, this 19th day of December 2008.

　　　　　　　　　　　　　　　　　　　/s/ Stefan R. Underhill
　　　　　　　　　　　　　　　　　　Stefan R. Underhill
　　　　　　　　　　　　　　　　　　United States District Judge