## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GREEN PARTY OF CONNECTICUT, ET AL.,<br>        Plaintiffs,<br><br>        v.<br><br>JEFFREY GARFIELD, ET AL.,<br>        Defendants. | CIVIL ACTION NO.<br>3:06cv1030 (SRU) |

### MEMORANDUM OF DECISION and ORDER

In 2005, Connecticut enacted the Campaign Finance Reform Act ("CFRA") in response to public outcry over several high-profile corruption scandals involving state elected officials, including former Governor John Rowland. One aspect of the CFRA is the Citizens' Election Program ("CEP"), a voluntary public financing scheme for candidates seeking election to the offices of Governor, Lieutenant Governor, Attorney General, State Comptroller, Secretary of the State, State Treasurer, and candidates for state senate and the state house of representative.

The plaintiffs, a group of self-described "minor" parties and minor party candidates for statewide and state legislative office, challenge the CEP on the ground that its minor party candidate qualifying criteria and distribution formulae place an unconstitutional, discriminatory burden on their fundamental, First Amendment-protected right to political opportunity by enhancing the relative strength of major party candidates who can more easily qualify for public funding. The defendants are the state officials responsible for operating and enforcing the CEP and a group of intervenor-defendants who support the principles underlying the CEP (collectively, "the state"). The state defends the CEP on the ground that it does not reduce minor party candidates' absolute political strength below what they would have otherwise been able to achieve in the absence of the CEP. The state further contends that any burden the CEP may

impose is justified by compelling state interests in protecting the public fisc against funding hopeless candidacies, minimizing incentives that would promote factionalism and splintered parties, and encouraging high participation rates in the CEP by viable candidates.

On December 9-10, 2008 and March 11-12, 2009, the parties tried this case to the court. After considering all of the evidence and the parties' arguments, I make the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

Good motives underlie the enactment of the CEP, namely, to combat actual and perceived corruption arising out of large contributions from private sources and to encourage candidates to spend more time engaged with voters and each other on the pertinent issues, rather than spending time fundraising.  Indeed, the state should be praised for its groundbreaking efforts to increase the public's confidence in state lawmakers and to promote the integrity of the electoral system as a whole.  Spurred on by a regrettable legacy of corruption that has pervaded all levels of elected office in recent decades, Connecticut is now commendably at the forefront of a nationwide movement to increase transparency in the political process.

In pursuing its campaign finance reforms efforts, however, the state must remain mindful that it is operating in the arena of core, fundamental constitutional rights that demand narrow and carefully tailored regulations.  For the reasons explained below, therefore, I conclude that the CEP imposes an unconstitutional, discriminatory burden on minor party candidates' First Amendment-protected right to political opportunity by enhancing participating major party candidates' relative strength beyond their past ability to raise contributions and campaign, without imposing any countervailing disadvantage to participating in the public funding scheme.

First, the CEP provides public funding to participating candidates at windfall levels, well

beyond historic expenditure levels in most races, thus creating merely illusory expenditure "limits" for participating candidates.  The CEP grant levels are also well beyond what most candidates have previously been able to raise from private fundraising sources.  Accordingly, the CEP acts as an impermissible subsidy for major party candidates, rather than a permissible substitute for those traditional sources of funding.

Second, the use of a statewide proxy artificially enhances the political strength of many major party General Assembly candidates by disregarding the level of public support for those candidates within their actual legislative district; in the past three election cycles, in nearly half of the legislative districts, one of the major parties has either abandoned the district or its candidate has won less than 20% of the vote, in other words, losing in landslide fashion.  By using a statewide proxy, the CEP permits any major party candidate to become eligible for full public financing without first requiring those candidates to demonstrate the same significant modicum of public support that minor candidates must establish before becoming similarly eligible for full funding.  In this way, the CEP distorts the strength of many major party candidates who have otherwise failed to establish any degree of success in a particular district by removing the inhibiting factors that previously deterred candidates from running in that district, such as lack of public support or inability to raise the necessary campaign funding to be competitive.

Third, the CEP's additional qualifying criteria for minor party candidates are so difficult to achieve that the vast majority of minor party candidates will never become eligible to receive public funding at even reduced levels.  For instance, the legislature chose to set the necessary thresholds for the prior success requirement at vote levels that very few minor party candidates have historically attained, thus ensuring most minor party candidates would need to qualify for

the CEP under the petitioning requirement.  In turn, the evidence in the record establishes the

CEP's petitioning requirement thresholds are nearly impossible to achieve given the minor

parties' general lack of organizational structure, the great expense that a petition drive requires in

the absence of a sufficient volunteer network, the CEP's prohibition on hiring professional

canvassing services "on spec," and the general difficulties faced by unknown minor party

candidates who cannot benefit from either name recognition or party identification when seeking

the signatures of registered voters of that district.

Finally, the CEP's distribution formulae discourage minor party candidates from

participating, or even attempting to participate in the CEP, by releasing significant additional

funding to the participating major party opponent once the minor party candidate reaches a

minimal level of fundraising and by hamstringing the minor party candidate's ability to collect

additional contributions at levels that would permit him or her to close the fundraising gap.

Given those difficulties imposed by the statute, minor party candidates face great incentives to

forgo public financing, along with its associated transformative benefits, and seek funding from

private sources only.

Having determined that the CEP burdens the political opportunity of minor party

candidates, I further conclude that the CEP is not narrowly tailored to achieving the state's

compelling interests because the state has failed to demonstrate how the public fisc is actually

protected by imposing stringent qualifying criteria on minor party candidates, while permitting

equally hopeless major party candidates to qualify under significantly less onerous qualifying

criteria, in vastly greater numbers and at windfall funding levels.  Furthermore, there is

significant evidence in the record to suggest that much lower thresholds for the additional

qualifying criteria – or indeed, a party-neutral scheme – would serve the state's compelling interests equally well without imposing an unconstitutional burden on minor party candidates.

I further conclude that the CEP's excess expenditure and independent expenditure provisions also unconstitutionally burden the plaintiffs' exercise of their First Amendment rights. In a manner analogous to the law struck down by the Supreme Court in *Davis v. FEC*, __ U.S. __, 128 S. Ct. 2759 (2008), the expenditure triggers in the CEP require non-participating minor party candidates and minor parties considering making independent expenditures to choose between limiting their political speech and providing bonus public funding grants to candidates they oppose. Again, the state has failed to show that these trigger provisions are supported by interests sufficiently compelling to withstand strict scrutiny.

As explained in more detail below, I conclude that the CEP represents an unconstitutional, discriminatory burden on the plaintiffs' First Amendment-protected right to political opportunity, in violation of the Fourteenth Amendment's Equal Protection Clause, because the state has not established how the CEP is narrowly tailored to further compelling state interests, particularly when there were less restrictive alternatives for achieving those interests available to the state at the time the CFRA was passed and subsequently amended. Accordingly, I conclude that the operation and enforcement of the CEP must be permanently enjoined.

## I.      Factual Background

### A.      The Parties

#### 1.      *The Plaintiffs*

a.      The Green Party of Connecticut

The Green Party of Connecticut ("Green Party") was founded in 1996 and has since

fielded candidates for federal, state, and local office.  Pl. Ex. A-1, DeRosa Decl. ¶11.  The Green

party is considered a "non-major" party or "minor" party in the State of Connecticut; in 2002,

there were 2,142 voters registered in the Green Party, with 100-150 people actively involved in

party operations at the state and local levels.  Sevigny Aff. ¶ 23.  According to the most recent

voter registration data submitted to the court, there are 1,872 registered members of the Green

Party statewide, comprising less than 1% of registered voters in Connecticut.  March 26, 2009

Notice of Intervenor-Defs.' and Defs.' Submission of Supp. Data Ex. 2, Party Registration, Table

3.

Since 2000, the Green Party has fielded a handful of candidates for state representative

and state senator in each election cycle.[1]  Pl. Ex. A-1, DeRosa Decl. ¶ 11.  Several of those

candidates received between 10% and 20% of the vote, with two candidates receiving in excess

of 20% of the vote.  Specifically, in 2000, Mike DeRosa received 10.7% of the vote in the 1st

Senate District; Thomas Ethier received 11.8% of the vote in the 65th House District; and Paul

Bassler received 10.8% of the vote in the 142nd House District.  Pl. Ex. 30, OLR Research

Report, Past Performance of Petitioning and Minor Party Candidates in Connecticut, at 6.  In

2002, John Battista received 30.9% of the vote in the 67th House District and Simone Mason

---

[1] In 2000, the Green Party fielded two candidates for state senate and four candidates for
state house.  DeRosa Decl. ¶ 11.  In 2002, it fielded three candidates each for the state house and
state senate.  *Id.*  In 2004, the Green Party ran four candidates for state senate and two candidates
for state house.  Appendices A & B.  In 2006, the Party had three candidates for state senate and
one candidate for state house.  Appendices C & D.  In the most recent election held November 4,
2008, the Green Party ran three candidates for state senate and two candidates for state
representative.  Appendices E & F.

-6-

received 18.4% of the vote in the 91st House District.  *Id.* at 8.  In 2004, Mike DeRosa received

11.4% of the vote in the 1st Senate District; Joyce Chen received 27.28% of the vote in the 93rd

House District; and Nancy Burton received 17.9% of the vote in the 135th House District.

Appendices A & B.  In 2006, Nancy Burton won 11.7% of the vote in the 135th House District.[2]

Appendix D.  In 2008, Remy Chevalier received 18% of the vote in the 135th House District.[3]

Appendix F.

In 2006, the Green Party qualified its first full slate of candidates for statewide office,

including Cliff Thornton for Governor, Jean de Smet for Lieutenant Governor, Nancy Burton for

Attorney General, Mike DeRosa for Secretary of the State, David Bue for State Treasurer, and

Colin Bennett for State Comptroller.  Pl. Ex. A-1, DeRosa Decl. ¶ 11.  The Green Party has not

yet fielded a successful candidate for any statewide office or the General Assembly.  It intends to

run a full slate of candidates for statewide election in 2010.  *Id.* ¶ 12.

According to former and current Green Party leaders, the Party does not have a strong or

comprehensive internal organization.  For instance, the party does not have any paid staff

members or a headquarters.  Youn Decl. Ex. 3, Ferrucci Dep. at 22-23.  In 2006, it hired one paid

campaign manager for its gubernatorial campaign, who also managed the party's collection of

---

[2] The other Green Party General Assembly candidates in 2006 won less than 10% of the vote in their respective districts.  Specifically, Robert Pandolfo won 5.9% of the vote in the 1st Senate District, Colin Bennett won 2% of the vote in the 33rd Senate District, and David Bedell won 1.2% of the vote in the 36th Senate District.  Appendix C.

[3] The other Green Party General Assembly candidates in 2008 won less than 10% of the vote in their respective districts.  Specifically, Mike DeRosa won 4.6% of the vote in the 1st Senate District, Colin Bennet won 3.4% of the vote in the 33rd Senate District, Zachary Chaves won 2.2% in the 36th Senate District, and Kenric Hanson won 8.5% of the vote in the 39th House District.  Appendices E & F.

part-time volunteers.  Youn Decl. Ex. 18, Thornton Dep. at 51-54; Youn Decl. Ex. 5, Krayeske

Dep. at 58; Migally Decl. Ex. 1, DeRosa Dep. at 45.  During his tenure as Co-Chairman of the

Green Party, Tom Sevigny stated that it was often difficult to reach the necessary quorum for the

monthly statewide meetings because local chapters would not send representatives with the

necessary frequency.  Sevigny Aff. ¶ 25.  Sevigny also explained that, although the Green Party's

practice is to formally approve any candidate who runs for state office on its platform, the vote to

endorse a candidate has often been "perfunctory" and that any party member who volunteered to

run is likely to be approved; the Green Party has never held a primary for state office.  *Id.* ¶ 35.

*See also* Youn Decl. Ex. 18, Thornton Dep. at 104; Migally Decl. Ex. 1, DeRosa Dep. at 44-45.

Finally, the Green Party has historically not had sufficient funds to supply a steady stream

of monetary support to its candidates.  Youn Decl. Ex. 3, Ferrucci Dep. at 58.  Individual Green

Party candidates for the General Assembly have typically run as "exempt," meaning they have

not raised or spent in excess of $1,000 in support of their campaigns.[4]  According to the website,

www.followthemoney.org, which both parties have relied on to report campaign receipts, eight

Green Party candidates have raised over $1,000 since 2002.  In 2002, Mike DeRosa (1st Senate

District) raised $4,998, Tom Sevigny (8th Senate District) raised $2,598, Penny Teal (18th

Senate District) raised $3,211, John Tattista (67th House District) raised $36,935, Peter Magistri

(60th House District) raised $3,273, and Simone Mason (91st House District) raised $8,187.  In

2004, Nancy Burton raised $6,325 in the 135th House District and Joyce Chen raised $10,886 in

---

[4] Candidates who certify with the State Elections Enforcement Commission ("SEEC")
that they will not receive or expend funds in excess of $1,000 are not required to form a
candidate committee and are, therefore, exempt from submitting the otherwise obligatory
financial disclosure forms.

the 93rd House District.  In 2006, all Green party candidates ran as exempt.  In 2008, only two

candidates ran as non-exempt and those candidates failed to raise over $1,000.

    b.  S. Michael DeRosa

  S. Michael "Mike" DeRosa joined the Green Party in 1996 and is presently serving as one

of the Party's three Connecticut co-chairmen.  Pl. Ex. A-1, DeRosa Decl. at ¶¶ 3-4.  DeRosa has

run for state senate in the 1st District on the Green Party platform four times (2000, 2002, 2004,

and 2008) and was the Green Party's candidate for Secretary of the State in 2006.  *Id.* at 13-14.

He received over 10% of the vote in the 2000 and 2004 elections; in 2008 he won 4.6% of the

vote.  In his campaign for Secretary of the State in 2006, DeRosa received 1.7% of the vote.

Connecticut Secretary of the State, 2006 Election Results, *available at*

http://www.ct.gov/sots/cwp/view.asp?a=3188&q=392584 (last visited August 26, 2009).

  In the 2008 election, because the 2006 Green Party candidate in the 1st Senate District did

not receive over 10% of the vote, DeRosa was not eligible to qualify for partial CEP funding

under the prior-success provision.  Pl. Ex. A-9, DeRosa Supp. Decl. ¶ 2.  He also missed the

deadline for submitting signatures to qualify for CEP funding under the petitioning provision,

and therefore, he received no CEP funding in 2008.  *Id.*

  In the 2008 election for state senate in the 1st District, DeRosa faced competition from

both major parties and ultimately received 4.6% of the vote, or 1,109 of the 24,034 votes cast.

*Id.* ¶ 7.  DeRosa's Democratic competitor, incumbent John Fonfara, received 78.6% of the vote[5]

and his Republican competitor, Barbara Ruhe received 16.8% of the vote.  *Id.*  As a Democrat,

---

[5] Fonfara was cross-endorsed by the Working Family Parties.  Pl. Ex. A-1, DeRosa Supp.
Decl. ¶ 7.

Fonfara qualified to receive CEP funding.  Because he drew a primary challenger, Fonfara received an initial grant of $75,000 for the primary.  *Id.* ¶ 5.  He received an additional $85,000 grant because he drew a Republican challenger in the general election.  *Id.* ¶ 6.  Ruhe, the Republican candidate, was unable to collect enough qualifying contributions and thus failed to qualify for CEP funding.  *Id.* ¶ 10.

DeRosa intends to run as the Green Party candidate for Secretary of the State in 2010. DeRosa Decl. ¶ 14.  He intends to attempt to qualify for public financing under the CEP.  *Id.* ¶ 15.  Because he only received 1.7% of the vote in 2006, he must do so by collecting signatures as a petitioning candidate.  *Id.* ¶ 19.

c.      The Libertarian Party of Connecticut

The Libertarian Party of Connecticut (the "Libertarian Party") is another minor party with a statewide presence, consistently running candidates for federal, statewide, and state legislative office since 2000.  Pl. Ex. A-5, Rule Decl. ¶¶ 4-6.  As of March 2009, there were 998 registered Libertarians, representing less than 1% of registered Connecticut voters.  March 26, 2009 Notice of Intervenor-Defs.' and Defs.' Submission of Supp. Data Ex. 2, Party Registration, Table 3. According to the Libertarian Party's treasurer, Andrew Rule, the Party has approximately 45 to 50 dues-paying members.  Youn Decl. Ex. 12, Rule Dep. at 90.  The Libertarian Party is ideologically opposed to any public financing of campaigns and believes that elections should be left to the marketplace.  Pl. Ex. A-5, Rule Decl. ¶ 8.

In 2000, the Libertarian Party ran three candidates for state senate and twelve candidates for state house.  Pl. Ex. 30, OLR Research Report, Past Performance of Petitioning and Minor Party Candidates in Connecticut, at 6.  In 2002, the Libertarian Party ran several candidates for

statewide office, including Darlene Nicholas for Secretary of the State, Ken Mosher for State

Treasurer, and Leonard Rasch for State Comptroller.  Pl. Ex. A-5, Rule Decl. ¶ 4.  That year the

Party also ran two candidates for state house.  *Id.*  In 2004, the Libertarian Party had one

candidate for state senate and four candidates for state house.  Appendices A & B.  In 2006, the

party fielded several candidates for statewide office:  Ken Mosher for Secretary of the State,

Steven Edelman for State Treasurer, and Richard Connelly, Jr. for State Comptroller, plus two

candidates for state house.  Pl. Ex. A-5, Rule Decl. ¶ 4.  In 2008, the Libertarian Party ran one

candidate for state senate.  Appendix E.  In 2010, the Libertarian Party plans to run a full slate of

candidates for statewide office for the first time.  Pl. Ex. A-5, Rule Decl. ¶ 7.  To qualify its slate

for the statewide ballot, the Libertarian Party will have to meet the state's ballot access

petitioning requirement by collecting 7,500 valid signatures.  *Id.*

The Libertarian Party has had candidates for the General Assembly receive over 10% of

the vote.  In 2000, Michael Costanza received 26.1% of the vote in the 43rd House District and

William Rood received 15.9% of the vote in the 49th House District.  Pl. Ex. 30, OLR Research

Report, Past Performance of Petitioning and Minor Party Candidates in Connecticut, at 6.  Also

in 2000, one Libertarian Party candidate for state senate and three more candidates for state

house received over 5% of the vote.[6]  *Id.*  In 2004, one Libertarian candidate for state house

received over 5% of the vote.[7]  Appendix B.  In 2006, Arlene Dunlop in the 82nd House District

---

[6] Richard Antico received 7.2% of the vote in the 32nd Senate District.  Pl. Ex. 30, OLR Research Report, Past Performance of Petitioning and Minor Party Candidates in Connecticut, at 6.  Vincent Marotta received 5.9% of the vote in the 33rd House District, Donald Allen Nicholas received 8.7% of the vote in the 39th House District, and Sandra Cote received 6.4% of the vote in the 44th House District.  *Id.*

[7] Arline Dunlop received 6.8% of the vote in the 82nd House District. Appendix B.

won 7.4% of the vote; there were no Libertarian candidates for state senate.  Appendix D.  In

2008, the only Libertarian candidate for General Assembly – Marc Guttman – won 1.6% of the

vote in the 20th Senate District.  Appendix E.

In 2008, Guttman claimed exempt status, meaning no Libertarian attempted to qualify for

the CEP during 2008 election cycle.  Since 2002, all but one Libertarian candidate for the

General Assembly has claimed exempt status.  In 2002, Abelardo Arias, the Libertarian candidate

for the 91st House District, raised $568.

http://www.followthemoney.org/database/StateGlance/state_candidates.phtml?s=CT&y=2002&f

=H&so=P&p=3#sorttable (last visited August 26, 2009).

The Libertarian Party has no paid staff members and does not maintain an office.  Youn

Decl. Ex. 12, Rule Dep. at 113.  It no longer has a telephone number, but the Party does maintain

a website and a Post Office box.  *Id.*  Historically, the Party has not provided monetary support

for its statewide or state legislative candidates and, according to its by-laws, intends for

candidates to provide their own campaign financing.  Youn Decl. Ex. 12, Rule Dep. at 114-16;

Youn Decl. Ex. 13, Libertarian Party By-laws, Art. 3, § 8.  The Libertarian Party does not

generally cross-endorse candidates.  Youn Decl. Ex. 12, Rule Dep. at 101-05.

2.      *The Defendants*

a.      Jeffrey Garfield

Jeffrey Garfield is the Executive Director and General Counsel of the State Elections

Enforcement Commission ("SEEC") and is sued solely in his official capacity.[8]  The SEEC is the

---

[8] In June 2009, Garfield announced his retirement as SEEC Executive Director and General Counsel, a position he has held since 1979.  SEEC Press Release, State Elections Enforcement Commission Long Time Executive Director to Retire, *available*

state agency charged with the administration and enforcement of the CEP and has the authority to

levy civil penalties for violations of the Act.  *See* Conn. Gen. Stat. §§ 9-7b, 9-601, 9-701, 9-713,

9-714.

### b.      Richard Blumenthal

Richard Blumenthal is the Attorney General of the State of Connecticut and is sued solely

in his official capacity.  As Attorney General, Blumenthal has the statutory authority to enforce

the orders of the SEEC.  Conn. Gen. Stat. § 9-7b.

### 3.      *Intervenor-Defendants*

Audrey Blondin, Kim Hynes, and Tom Sevigny, (collectively, the "Candidate-

Intervenors"), Connecticut Common Cause ("Common Cause"), and Connecticut Citizens

Action Group ("CCAG") successfully intervened in this action as defendants on February 28,

2007 in support of the CEP.

### a.      Candidate-Intervenors

The Candidate-Intervenors are former candidates for state office who plan to run again in

the future.  Blondin was a Democratic candidate who ran for Secretary of the State in 2004 and

who states she will likely run for Secretary of the State or Governor in 2010.  Hynes was a

Democratic candidate who ran for State Representative for the 149th District in 2004 and who, at

the time she intervened in this case, stated she would likely run for the same office again in 2008.

Sevigny was a Green Party candidate who ran for State Representative for the 8th District in

---

*at* http://www.ct.gov/seec/cwp/view.asp?a=3556&Q=441884 (last visited August 26, 2009).
Garfield has not yet stepped down, however, stating he will remain with the SEEC for at least 90
days to assist in its search for his successor.  *Id.*  For purposes of this decision, therefore, he
remains a properly named defendant.

2004 and who, at the time he intervened in this case, stated he would likely run for the same office again in 2008.  The Candidate-Intervenors support the CEP as a means for increasing access to public office.

> b.      Common Cause & CCAG

Common Cause is a non-profit citizens' lobbying organization committed to promoting and maintaining democracy in Connecticut and has approximately 7,000 members in the state. CCAG is a non-profit organization dedicated to social, economic, and environmental justice with approximately 30,000 members in Connecticut.  These groups support the CEP because they believe it reduces the influence of special interest money on elections and creates opportunities for individuals who lack independent wealth to run for office.

> B.      Events Leading to the Passage of the CFRA

Over the past decade, Connecticut has been rocked by several widely publicized corruption scandals involving high-ranking state and local officials, including, *inter alia*, the resignation and conviction of Governor John Rowland for improperly accepting valuable gifts and services in exchange for lucrative state contracts.  As a result of those scandals, in an effort to restore citizens' faith in state government, the General Assembly passed the CFRA in late 2005.  The CFRA is comprised of two principal components: (1) the CEP, the focus of the present decision, which creates a voluntary scheme for the public financing of campaigns for statewide and state legislative office, and (2) a ban on campaign contributions from, and solicited by, certain lobbyists, state contractors, and their immediate family members.  I recently decided the constitutional challenge to the latter component in *Green Party of Connecticut v. Garfield ("Green Party II")*, 590 F. Supp. 2d 288, 294 (D. Conn. 2008) (appeal pending), holding that the

bans – as amended through December 19, 2008 – did not violate the plaintiffs' rights protected under the First Amendment.

### 1.    *Connecticut's Corruption Scandals*

On June 21, 2004, John Rowland resigned as Governor following accusations that he had improperly accepted over $100,000 dollars worth of gifts and services from state contractors, including free or reduced vacations in Florida and Vermont, construction work on his Connecticut lake cottage, and free private jet flights to Las Vegas and Philadelphia, in exchange for facilitating the award of several state contracts.  Feinberg Decl. Ex. 3.  Rowland subsequently pled guilty to federal criminal charges, including federal income tax evasion and conspiracy to defraud the state and its citizens of the honest services of its Governor.  Feinberg Decl. Exs. 2 & 4.  In March 2005, Rowland was sentenced to a term of imprisonment of one year and a day and ordered to pay $82,000 in fines.  Feinberg Decl. Ex. 4.  Rowland's chief of staff, Peter Ellef, his deputy chief of staff, Lawrence Alibozek, and several state contractors, including William Tomasso and the Tunxis Management Company, also pled guilty to federal charges stemming from their roles in that corruption scandal.  Feinberg Decl. Exs. 5-10.

The Rowland scandal was but one of the many corruption scandals involving elected officials in state and local government that helped earn the state the nickname "Corrupticut." *See, e.g.,* Paul von Zielbauer, *The Nutmeg State Battles the Stigma of Corrupticut*, N.Y. Times, Mar. 28, 2003 ("Nowadays, from Storrs to Stamford, there are jokes about living in Corrupticut, Connection-icut or, the new favorite, Criminalicut.").[9]

_____

[9] *See also* Feinberg Decl. Ex. 22:  Marc Santora, *Political Memo; The Whiff of Corruption Persists in Connecticut*, N.Y. Times, Sept. 21, 2003 (referring to the brewing Rowland scandal, "[w]hile the investigation continues, each new development chips away at the

For example, in 1999 State Treasurer Paul Silvester pled guilty to federal racketeering and money laundering charges stemming from a kick-back scheme involving state pension investments.  Feinberg Decl. Ex. 11.  In return for investing over $500 million of the state's pension funds with certain financial institutions, Silvester directed millions of dollars in "finder's fees" to be paid to various friends and associates, who then funneled part of the money back to his campaign fund.  Feinberg Decl. Exs. 11-17.  Silvester's various schemes resulted in the convictions of many individuals and companies.[10]

_____

layer of trust between Connecticut's residents and their elected officials"); Stan Simpson, *Plain Talk About Corruption*, Hartford Courant, Oct. 8, 2003, ("For its size, little Connecticut – proportionately – just may be the most corrupt state in the union. . . .  No longer is it a far-fetched notion to link public officials here with jail time – or potential time."); Richard Lezin Jones, *Our Towns; Move Over, New Jersey.  New Trend Puts the Con in Connecticut*, N.Y. Times, Nov. 30, 2003 (noting that the state's mounting corruption scandals "may be helping to give otherwise refined Connecticut an unexpected and unwanted mark of distinction in the region: the state with the most dysfunctional politicians"); Avi Salzman, *He's Leaving.  Now the State Has to Restore its Reputation*, N.Y. Times, June 27, 2004 ("A half-decade of mounting political scandals have turned Connecticut into a punchline of political backwardness."); David A. Fahrenthold, *Political Scandals Refuse to Go Away in 'Corrupticut'; Officials' Wrongdoing Persists After Governor's 2005 Conviction*, Wash. Post, July 3, 2006 ("The past few years have revealed so many tales of graft, malfeasance and all-purpose criminality by public servants in Connecticut that it's hard to choose the most brazen.").

[10] In September 2002, after pleading guilty to conspiracy to launder money, Peter Hirschl was sentenced to a term of imprisonment of five months, to be followed by five months of home confinement, and was ordered to pay a $15,000 fine.  In 2003, Frederick McCarthy, Chairman of Triumph Capital, pled guilty to corruptly rewarding a public official and was sentenced to a prison term of a year and a day.  Lisa Thiesfield, one of Silvester's friends, pled guilty to corruptly aiding and abetting a public official in accepting a reward; her sentence included a six-month term of imprisonment.  Two other co-conspirators were convicted after a jury trial.  Ben Andrews was convicted of nine counts, including bribery, mail and wire fraud, and money laundering and was sentenced to a 30-month term of imprisonment for his role in funneling the pension funds to private equity firm Landmark Partners.  In addition, former assistant State Treasurer George Gomes was sentenced to two years' probation and fined $1,500 after pleading guilty to mail fraud for his role in the scheme.  Silvester's brother, Mark Silverster, pled guilty to conspiracy to solicit and accept corrupt payments and was sentenced to a 21-month term of imprisonment and fined $40,000.  In exchange for his cooperation with federal prosecutors,

In September 2005, State Senator Ernest Newton II pled guilty to federal bribery charges in connection with a kick-back scheme involving a non-profit organization in Bridgeport. Feinberg Decl. Ex. 19.  In return for a $5,000 bribe, Newton agreed to assist the non-profit group, Progressive Training Associates, Inc., in its quest to secure a $100,000 grant from the state.  *Id.* Newton also pled guilty to federal mail fraud and income tax evasion charges for diverting $40,000 in campaign contributions to his personal use.  *Id.*  Newton was ultimately sentenced to 60 months in federal prison and ordered to pay over $13,000 in restitution.  Feinberg Decl. Ex. 21.  *See also United States v. Newton*, Case No. 3:05cr233 (AHN), 2007 WL 1098479 (D. Conn.) (denying resentencing), *aff'd*, 226 Fed. Appx. 80 (2d Cir. 2007).

Although municipal officials are not eligible to receive CEP funding, nor are they subject to the CFRA's bans on contributions and solicitations from lobbyists and contractors, corruption cases involving local officials are nevertheless still relevant to the extent that they have contributed to the atmosphere of public distrust and perceived corruption of elected officials in the state.  For example, in 2003, the mayor of Bridgeport, Joseph Ganim, was convicted of federal racketeering, extortion, bribery, mail fraud, and income tax evasion arising from a scheme to award city contracts in exchange for illegal kickbacks from contractors.  *United States v. Ganim*, Case No. 3:01cr263 (JBA), 2006 WL 1210984, at *1 (D. Conn. 2006).  At least three contractors also pled guilty to their role in that scheme.  *United States v. Lenoci*, 377 F.3d 246,

---

Christopher Stack was never charged.  Charles Spadoni, Triumph Capital's General Counsel, was convicted on eight counts, including racketeering, racketeering conspiracy, bribery, and wire fraud and sentenced to 36 months' imprisonment.  Spadoni's case remains ongoing, however.  In September 2008, the Second Circuit reversed and remanded for a new trial on several of those counts, determining that the government had suppressed material, exculpatory evidence.  *United States v. Triumph Capital, Inc.*, 544 F.3d 149, 152 (2d Cir. 2008).

248 (2d Cir. 2004) (noting that "Lenoci also agreed to raise funds for the mayor's anticipated

campaign for governor, in return for Ganim's support for the [development project]");

*Bridgeport Harbour Place I, LLC v. Ganim*, 269 F. Supp. 2d 6, 7 (D. Conn. 2002) (noting that

the three contractors "acknowledged that they corruptly provided bribes, kickbacks, and other

things of value . . . in return for preferential treatment from Mayor Ganim in connection with the

awarding of city contracts").[11]

> 2. *Corruption Scandals Spur Legislature to Consider Campaign Finance Reform*

Spurred in large part by the fall-out from the corruption scandals that culminated in the

resignation of Governor Rowland and his subsequent indictment and conviction on federal

corruption charges, Connecticut lawmakers undertook a comprehensive effort to pass expansive

campaign finance reforms.  Following a failed legislative effort to pass campaign finance reform

in June 2005, Governor M. Jodi Rell called upon the General Assembly to establish a Campaign

Finance Reform Working Group (the "Working Group") to craft a bill while the legislature was

out of session.  July 11, 2007 Declaration of Jeffrey B. Garfield ("Garfield Decl. I") ¶ 12.

Comprised of twelve state legislators, six from the House and six from the Senate, the

---

[11] In addition, though not relevant to the events leading to the passage of the CFRA, it is worth noting that corruption scandals involving municipal officials continue to roil the state.  For instance, the mayor of Hartford, Eddie Perez, was recently arrested on state bribery charges stemming from allegations that he accepted $40,000 worth of home renovations in exchange for facilitating the receipt and oversight of city contracts.  *See, e.g.*, Jeffrey B. Cohen and Matthew Kauffman, *Hartford Mayor Arrested on Bribery Charges*, Hartford Courant, Jan. 28, 2009.  Additionally, Shelton developer James Botti is scheduled to stand trial in October 2009 on federal bribery charges stemming from allegations that he bribed an unnamed Shelton politician, described in the indictment as "Public Official #1," in exchange for help pushing through development projects in the town.  *See United States v. Botti*, Case No. 3:08cr230(CSH) (D. Conn.).

Working Group held eleven publicly televised meetings throughout the summer and fall of 2005.

In August 2005, for instance, the Working Group heard testimony from the administrators of the

clean election programs in Maine and Arizona.  Garfield Decl. I, Ex. 19 at 26-28; 88-89.  July 10,

2008 Declaration of Jeffrey B. Garfield ("Garfield Decl. II") Ex. 1, Tr. of Aug. 4, 2005 Working

Group meeting.  The Working Group also heard testimony from representatives of the

intervenor-defendants, Common Cause and CCAG, along with representatives from the Brennan

Center for Justice, which serves as defense counsel for the intervenor-defendants, and other

national experts in the area of public financing and campaign finance reform.  After three months

of holding meetings, reviewing materials, taking testimony, and receiving expert advice, the

Working Group presented a framework for a new bill to Governor Rell in late September 2005.

Garfield Decl. I ¶ 14 and Ex. 25.

In its Summary Report to the Governor, the Working Group made several

recommendations related to campaign finance reform, including a proposed public financing

scheme, contribution and solicitation bans for lobbyists and state contractors,

limitations/prohibitions on political action committee ("PAC") contributions, the number and

amount of qualifying contributions to become eligible for public financing, public grant levels for

all races, and rules for one-party-dominant districts.  Garfield Decl. I Ex. 25.  On the issue of

qualifying contributions, the Working Group recommended that candidates be required to collect,

in no more than $100 increments: (1) for the House, $5,000 from at least 150 individuals within

their district; (2) for the Senate, $15,000 from at least 300 individuals within their district; (3) for

state office (not Governor), $75,000, with at least 90% in-state contributions; and (4) for

Governor, $250,000, with at least 90% in-state contributions.  *Id.* at 7.  The Working Group

further recommended that participating candidates receive: (1) for the House, $8,000 for the primary and $25,000 for the general election; (2) for the Senate, $50,000 for the primary and $150,000 for the general election; (3) for statewide offices, $375,000 for the primary and $750,000 for the general election; and (4) for Governor, $1.25 million for the primary and $3 million for the general election.  *Id.*  For those participating candidates in "one-party-dominant" districts, meaning one major party holds a 20% or more registration advantage over the other major party, the recommended primary grants would be raised to $25,000 for the House and $80,000 for the Senate.  *Id.* at 8.  Participating candidates running unopposed would be limited to 30% of the general election grant for that office.  *Id.* at 9.  Participating candidates opposed by a nonparticipating minor party who raised less than 30% of the applicable grant amount, would be eligible for public funding equal to 60% of the grant for that office.  *Id.*  Notably, the Working Group proposal did not contain a recommendation that non-major party candidates, i.e., minor party candidates and independent/petitioning candidates (collectively, "minor party candidates"),[12] should have to comply with additional qualifying criteria beyond collecting the requisite number and amount of qualifying contributions.  *Id.* at 1-9.  Ultimately, Governor Rell's proposed campaign finance reform bill did not contain additional qualifying criteria for minor party candidates seeking to qualify for public funding.  Pl. Ex. 87, OLR Research Report, Summary of Governor's Proposed Campaign Finance Bill (October 4, 2005).

---

[12] There are two categories of non-major parties – minor party candidates and petitioning/independent candidates who are unaffiliated with any party.  Although I recognize that independent candidates are substantively distinguishable from minor party candidates, for ease of discussion, I will refer to both collectively as minor party candidates.

3.     *The CEP is Enacted*

In the fall of 2005, Governor Rell convened a Special Session of the General Assembly for the sole purpose of enacting comprehensive campaign finance reform, stating that "[t]he very legitimacy of [the people's] government is called into question when – rightly or wrongly – the perception exists that a moneyed few play a special role or have a special influence over elections and policy." Garfield Decl. I ¶ 15 and Ex. 27. In calling the special session, her proclamation noted that, in the past decade the people of Connecticut had "endured . . . indictments, convictions and corruption investigations concerning their own state and local public officials" and that "the General Assembly can help to restore faith and trust in state government and further renew citizens' confidence in their leaders by enacting meaningful and comprehensive campaign finance reform." Garfield Decl. I Ex. 27.

The General Assembly convened for the special session on October 11, 2005 to debate and discuss the campaign finance reform proposals. *Id.* After caucusing for one month, the General Assembly leaders reached an agreement on a single campaign finance reform bill, Senate Bill 2103. Garfield Decl. I ¶ 16. Senate Bill 2103 modified the Working Group's proposed grant levels as follows: participating candidates seeking election to the Senate would receive $35,000 for the primary (down from $50,000) and $85,000 (down from $150,000) for the general election and those seeking election to the House would receive $10,000 for the primary (up from $8,000). Significantly, the bill added additional qualifying criteria for minor party candidates seeking to participate in the CEP, as detailed more fully below.

The full General Assembly met in a special legislative assembly on November 30, 2005 to debate the proposed campaign finance reform bill. Garfield Decl. I ¶ 16. Although no formal

findings accompanied passage of the law, the bill's sponsors described the general purpose

behind the bill, i.e., to combat actual and perceived corruption in state government, stating that

the bill would "take out sources of financing which have been considered to be corrosive" and

"eliminat[e] the influence of money overall, and shift[] back to a greater reliance on grassroots."

Garfield Decl. I Ex. 28,  Tr. of Nov. 30, 2005 Senate Debate at 54 (statement of Sen. DeFronzo,

Chairman of the Working Group).

During the Senate and House debates on Senate Bill 2103, legislators argued that the bill

was necessary to redress the perception that special interests had undue influence, particularly in

light of the recent political scandals.  *Id.* at 29-30, 55-57, 61-62, 108-09, 238, 284-85, and 352-

53; Garfield Decl. I Ex. 29, Tr. of Nov. 30, 2005 House Debate, at 55-56, 95-97, and 281-82.

Senate Bill 2013 passed in the Senate on November 30, 2005 by a vote of 27-8, and

passed in the House of Representatives on December 1, 2005 by a vote of 82-65.  Garfield Decl. I

¶ 17.  Governor Rell signed the bill into law on December 7, 2005, Public Act 05-5, and it

became effective on January 1, 2006.  Garfield Decl. I ¶ 18.  The Act was substantively amended

in May 2006 (Public Act 06-137) and May 2008 (Public Act 08-02).

C.     Provisions and Requirements of the CEP, as Amended, and as Construed and
        Applied by the SEEC

        1.     *Qualifying Criteria*

The CEP provides public campaign financing grants to qualifying candidates for

statewide and state legislative office.  In order to become eligible for CEP funding, candidates

must first satisfy one or more qualifying criteria, depending on their party affiliation, i.e., major

or minor party.  A "major party" is defined as:

> (A) a political party or organization whose candidate for Governor at the last-preceding election for Governor received, under the designation of that political party or organization, at least twenty per cent of the whole number of votes cast for all candidates for Governor, or (B) a political party having, at the last-preceding election for Governor, a number of enrolled members on the active registry list equal to at least twenty per cent of the total number of enrolled members of all political parties on the active registry list in the state.

Conn. Gen. Stat. § 9-372(5).  There are currently only two major parties in Connecticut: the Democratic Party and the Republican Party (collectively, the "major parties").

To qualify for CEP funds, all candidates, regardless of party affiliation, must raise a certain number of qualifying contributions in amounts of $100 or less (hereinafter, "qualifying contributions").  Conn. Gen. Stat. § 9-704.  The total amount of qualifying contributions that a candidate must raise depends upon the office for which the candidate is running.  Gubernatorial candidates must raise $250,000 in qualifying contributions, $225,000 of which must come from state residents.[13]  *Id.* § 9-704(a)(1).  Candidates for other statewide offices, such as Lieutenant Governor, Attorney General, State Comptroller, State Treasurer, or Secretary of the State, must raise $75,000 in qualifying contributions, $67,500 of which must come from state residents.  *Id.* § 9-704(a)(2).  Candidates for state senate must raise $15,000 in qualifying contributions, which must include contributions from at least 300 individuals residing in that senate district.  *Id.* § 9-704(a)(3).  Candidates for state house must collect $5,000 in qualifying contributions from at least 150 residents of that house district.  *Id.* § 9-704(a)(4).  Once they have raised the requisite

---

[13] Although a person may be registered to vote in only one location, an individual may be "resident" of multiple locations for purposes of calculating CEP qualifying contributions.  According to the SEEC, "[a]n individual who genuinely and actually resides at multiple locations may make qualifying contributions, which satisfy the 'in-state' or 'in-district' requirement, from the individual's residence at each of the locations."  Garfield Decl. II Ex. 13, SEEC Declaratory Ruling 2007-4, at 2-3.

number and amount of qualifying contributions, major party candidates do not need to satisfy any additional criteria in order to become eligible for a full CEP grant.[14]

In addition to collecting the requisite number of qualifying contributions, minor party candidates, however, must satisfy at least one of two additional requirements in order to qualify for public funding.  First, a minor party candidate is eligible to receive public funding if that candidate, or another member of his or her party, received a certain percentage of the vote in the previous general election for the same office (the "prior success requirement").  To receive a one-third grant, the candidate, or a member of her party, must have received at least 10% of the vote in the preceding general election.  *Id.* §§ 9-705(c)(1), (g)(1).  To be eligible for a two-thirds grant, the candidate, or a member of his or her party, must have received at least 15% of the vote in the preceding election.  *Id.*  To obtain a full CEP grant, the prior vote requirement increases to 20%.  *Id.*

Second, a minor party candidate can qualify for public funding by gathering signatures of qualified voters (the "petitioning requirement").[15]  *Id.* § 9-705(c)(2), (g)(2).  If a minor party candidate gathers signatures equal to 10% of the votes cast in the previous election for that

---

[14] A major party candidate's total grant amount may be increased or reduced depending on whether he or she faces a primary opponent, he or she is running unopposed in the general election, his or her opponent's party affiliation, and whether the opponent is participating in the CEP or not.  Conn. Gen. Stat. § 9-705(j).

[15] Minor party candidates who received less than 10% of the vote, but more than 1% of the vote, in the preceding election are eligible to qualify for CEP funding using the petitioning option.  Garfield Decl. II Ex. 14, SEEC Declaratory Ruling 2008-01, at 4-6.  Plaintiffs urge me not to accept this interpretation of the provision because it is not explicit on the face of the statute.  Because the SEEC appears to have enforced the Act consistently with its declaratory ruling, however, I conclude that minor party candidates who received between 1% and 9.99% of the vote in the previous election may still attempt to qualify for the CEP under the petitioning provision.

office, the candidate is entitled to receive one-third of the full CEP grant for the general election. *Id.* To obtain a two-thirds grant, that candidate must collect signatures equal to 15% of the votes cast in the prior election. *Id.* To be eligible for full CEP funding, the signature requirement increases to 20%. *Id.*

        2.    *CEP Funding Levels*

            a.    Primary Funding

Participating major party candidates running in contested primary elections are eligible to receive primary funding under the CEP.[16] *Id.* § 9-705. The CEP provides the following grants for primary contests: $1.25 million for gubernatorial candidates; $375,000 for all other statewide candidates; $35,000 for state senate candidates; and $10,000 for state representative candidates. *Id.* §§ 9-705(a)(1), (b)(1), (e)(1), (f)(1). The CEP increases the amount of primary grants for major candidates in one-party dominant districts. A district is considered "one-party dominant" if the percentage of registered voters for one major party exceeds the number of registered voters in the other major party by at least 20%.[17] *Id.* §§ 9-705(e)(1)(A), (f)(1)(A). In those instances,

---

[16] The statutory text explicitly grants primary funding only to major party candidates. The state contends this is because only major parties are required to hold primary elections under certain mandatory procedures and candidates may only participate in a primary if they make the necessary showing of support as required under Connecticut law. Conn. Gen. Stat. §§ 9-400, 9-415. According to the state, if a minor party opted to select its candidates through a primary, which they currently do not do, a participating minor party candidate could be eligible for a CEP primary grant. Garfield Decl. II ¶ 13.

[17] Specifically, the statute states that "if the percentage of the electors in the district served by said office who are enrolled in said major party exceeds the percentage of the electors in said district who are enrolled in another major party by at least twenty percentage points, the amount of said grant shall be seventy-five thousand dollars." Conn. Gen. Stat. § 9-705(e)(1)(A). For candidates for state representative, "if the percentage of the electors in the district served by said office who are enrolled in said major party exceeds the percentage of the electors in said district who are enrolled in another major party by at least twenty percentage points, the amount of said

the primary grants for participating "dominant party" candidates for state senate increases to $75,000 and for participating "dominant party" candidates for state representative increases to $25,000.  *Id.*

Any amount of a primary grant that is not expended will be reduced from the participating candidate's general election grant.  *Id.* § 9-705(j)(2).

> b.      General Election Funding

The CEP sets the following grant levels for the general election: $3 million for gubernatorial candidates; $750,000 for other statewide offices;[18] $85,000 for senate candidates; and $25,000 for candidates for state representative.  *Id.* §§ 9-705(a)(2), (b)(2), (e)(2), (f)(2).  The CEP provides for an adjustment for inflation for primary and general election grants, beginning in 2010 for General Assembly candidates, and in 2014 for statewide candidates.  *Id.* § 9-705(d) and (h).  Grants for statewide candidates will be adjusted for inflation beginning with the 2014 election cycle.  *Id.* § 9-705(d).  Candidates who accept public funding may not accept any private contributions, other than the initial qualifying contributions, and, with a few exceptions detailed below, generally may not spend money in excess of the original full public grant.  *Id.* § 9-702(c).

_____

grant shall be twenty-five thousand dollars."  *Id.* § 9-705(f)(1)(A).

An "elector" is essentially a registered voter.  As defined by the Connecticut Constitution: "Every citizen of the United States who has attained the age of eighteen years, who is a bona fide resident of the town in which he seeks to be admitted as an elector and who takes such oath, if any, as may be prescribed by law, shall be qualified to be an elector."  Conn. Const. Art. 6, § 1.

[18] Candidates for Lieutenant Governor do not receive general election funding because they run on the same slate as the gubernatorial candidate for their party.  Thus, the general election funding for gubernatorial candidates covers both candidates for Governor and Lieutenant Governor.

c.      Expenditure Limits

Candidates seeking to participate in the CEP must abide by statutory expenditure limits. The CEP establishes three distinct periods, with differing expenditure limits.  In the first period, which I will refer to as the "pre-primary, pre-general election period," the candidate's expenditure limit is the amount of qualifying contributions for that office and any personal funds provided by the candidate, as permitted by section 9-710(c).  *Id.* § 9-702(c)(A).  If the candidate is running in a primary election, the expenditure limit for the "primary period" is the sum of the amount of qualifying contributions and permitted personal funds not spent during the pre-primary, pre-general election period, plus the CEP primary grant and any supplemental grants released pursuant to the trigger provisions.  *Id.* § 9-702(c)(B).  Finally, for the "general election period," the candidate's expenditure limit is the sum of the amount of qualifying contributions and personal funds not spent during the pre-primary, pre-general election and primary periods, any unexpended funds from CEP grants released for the primary period, and the general election grant plus any supplemental grants released pursuant to the trigger provisions.  *Id.* § 9-702(c)(C).

The plaintiffs contend that the pre-primary, pre-general election expenditure limit applies to a candidate who is seeking to qualify for CEP funding until that candidate actually qualifies for a CEP grant; according to the plaintiffs, this is known as the "qualifying" period.  The plaintiffs, for example, believe that a minor party candidate for state house seeking to qualify for a CEP grant under the petitioning requirement is limited to spending $5,000 until that candidate actually qualifies for the CEP, which might not occur until mid-October, just weeks before the general election.  Beth Rotman, the SEEC Director of Public Financing, disputes the plaintiffs' interpretation of the CEP's expenditure limits, stating that there is no so-called "qualifying

period" expenditure limit in the CEP.  March 10, 2009 Rotman Decl. ¶ 4.  According to Rotman, the key event for determining which expenditure limit is applicable is the date the candidate becomes the official nominee of his or her party.  *Id.* ¶¶ 6-7.  Once the candidate becomes the nominee for his or her party, the general election expenditure limit applies, regardless whether the candidate has yet qualified for a CEP grant.  *Id.*  Therefore, even though a candidate has not yet received his or her CEP grant, so long as he or she has been formally nominated by his or her party, he or she may incur obligations for services or goods up to the amount of the applicable expenditure limit for that office, provided those goods and services are not being provided on spec (i.e., that the payment will be made whether or not the candidate actually receives a grant). *Id.* ¶ 8.  Therefore, taking the example of Deborah Noble, the Working Families Party nominee for the 16th House District, because she was nominated to be the Working Families candidate on July 10, 2008, she was subject to the general election expenditure limit from July 11, 2008 onward, even though she did not submit her application for a CEP grant until October 10, 2008.[19] *Id.* ¶ 7.

Assuming no primary election, the expenditure limit for participating gubernatorial candidates is $3.25 million (plus an additional $1.25 million in the event of a primary).  For other participating statewide candidates, the effective expenditure limit is $825,000 (plus an additional $375,000 for candidates in a primary election).  In the General Assembly races, the expenditure limit is $100,000 for candidates for state senate and $30,000 for candidates for state

---

[19] Although this interpretation of the statute is not explicit on its face, because the SEEC attests it has enforced the CEP's expenditure limits consistently with this interpretation, and will continue to do so in the future, I accept the SEEC's statement that there is no "qualifying period" expenditure limit.

representative.  Depending on the type of district, i.e., party-dominant or not, the amount of a

primary grant would increase the expenditure limit by $35,000 or $75,000 for state senate

candidates and by $10,000 or $25,000 for state house candidates.  As explained more fully

below, there are additional grants and expenditures that are not subject to those limits.

d.      Reduced CEP Grants

Participating candidates may receive a reduced grant depending on whether they are

running unopposed or against a minor party candidate.  CEP general election grants for

unopposed major party candidates are reduced to 30% of the full grant amount for that office,

resulting in the following grant amounts:  $900,000 for gubernatorial candidates; $225,000 for

other statewide candidates; $25,500 for senate candidates; and $7,500 for house candidates.

Conn. Gen. Stat. § 9-705(j)(3).  A minor party candidate's entrance into a race will bring those

grant totals for the participating major party candidate up to 60% of the full grant amount,

provided the minor party candidate has not raised an amount equal to the qualifying contribution

threshold level for that office or qualified for a partial or full CEP grant.  *Id.* § 9-705(j)(4).  For

example, a participating major party candidate for state senate with only a non-participating

minor party opponent, whose contributions total less than $15,000, will receive a $51,000 CEP

general election grant.  A participating major party candidate for state representative with a non-

participating minor party opponent who has raised less than $5,000 will receive a grant of

$15,000.

If the minor party candidate becomes eligible for even a partial CEP grant or raises

private contributions that exceed the amount equal to the qualifying contribution amount for that

office, then the participating major party candidate receives a full CEP grant.  Conn. Gen. Stat. §

9-705(j)(4).  Minor party candidates who qualify for a partial CEP grant may raise private

contributions, in increments of $100 or less, up to the full grant amount.  *Id.* § 9-702(c).  In

certain instances, participating minor party candidates may be eligible for post-election

reimbursements if they achieve a certain level of success in the election.  Participating minor

party candidates are eligible to receive a post-election supplemental grant so long as that

candidate:  (1) qualified for at least a partial CEP grant prior to the election; (2) received a

percentage of the vote that corresponds to a higher grant level; and (3) reports a deficit

immediately following the election.  *Id.* §§ 9-705(c)(3), (g)(3).

 Finally, a participating major party candidate will receive a full CEP grant if his or her

opponent is a major party candidate, regardless whether that opponent has qualified for CEP

funding.

3. *CEP Trigger Provisions*

 In addition to the primary and general election grants, participating candidates are eligible

to receive additional public funds, in the form of supplemental grants, in the event they are

outspent by a nonparticipating candidate or by any other non-candidate individual or group

(collectively, the "trigger provisions").  *See* Conn. Gen. Stat. §§ 9-713 ("excess expenditures");

9-714 ("independent expenditures").  Each supplemental grant is capped at a maximum 100% of

the full grant for any given office; participating candidates are thus eligible to receive an

additional 200% of the full grant in supplemental funding.  *Id.*  Any participating candidate is

eligible to receive supplemental grants under the trigger provisions.  *See id.*

-30-

a.      Excess Expenditure Trigger

The CEP provides matching funds for participating candidates who are outspent by a non-participating opponent – who is not bound by any expenditure limit – in the primary or the general election ("excess expenditure trigger").  Conn. Gen. Stat. § 9-713.  If a non-participating candidate receives contributions or spends more than an amount equal to the participating candidate's expenditure limit, then the participating candidate is eligible to receive up to four additional grants, each worth 25% of the full grant.  *Id.*  The excess expenditure grants are distributed whenever the non-participating candidate receives contributions or makes expenditures exceeding 100%, 125%, 150%, and 175% of the expenditure limit for that particular office.  *Id.*; *see also* Pl. Ex. 61, SEEC, Understanding Connecticut Campaign Finance Laws: A Guide for 2008 General Assembly Candidates Participating in the Citizens' Election Program ("2008 SEEC CEP Guide"), at 65-66.

Recent amendments to the CEP permit the participating candidate to access the full 25% supplemental grant immediately.  Conn. Gen. Stat. § 9-713; *see also* Public Act 08-02, § 19.  Under an earlier version of the CEP, if a non-participating candidate received contributions or spent in excess of the participating candidate's expenditure limit, the participating candidate's 25% supplemental grant would be held in escrow by the SEEC and distributed on a dollar-per-dollar basis.  *Green Party I*, 537 F. Supp. 2d at 363.  As amended, rather than holding each grant in escrow, the participating candidate receives the full value of the supplemental grant immediately, meaning that even if a non-participating candidate spends only $1 over the expenditure limit, the participating candidate opponent receives an immediate 25% supplemental grant.  Conn. Gen. Stat. § 9-713; Pl. Ex. 61, 2008 SEEC CEP Guide, at 65-66.

-31-

b.      Independent Expenditure Trigger

The CEP also contains a trigger provision tied to independent expenditures made by non-candidate individuals and political advocacy groups ("independent expenditure trigger").  Conn. Gen. Stat. § 9-714.  A qualifying independent expenditure is "an expenditure that is made without the consent, knowing participation, or consultation of, a candidate or agent of the candidate committee and is not a coordinated expenditure," *id.* § 9-601(18), and that is made "with the intent to promote the defeat of a participating candidate." *Id.* § 9-714(a).  Matching funds under this provision are triggered when non-candidate individuals or groups make independent expenditures advocating the defeat of a participating candidate, that in the aggregate, and when combined with the spending of the opposing non-participating candidates in that race, exceed the CEP grant amount. *Id.* § 9-714(c)(2).  Funds are distributed to the participating candidate on a dollar-per-dollar basis to match the amount of the independent expenditure(s) in excess of the full grant amount. *Id.* § 9-714(a).

Notably, independent expenditures made in *support* of a candidate (without expressly advocating the defeat of an opponent) do not count towards the independent expenditure trigger, meaning individuals and groups are entitled to make unlimited independent expenditures in support of a candidate without triggering CEP matching funds for that candidate's opponents. *See generally id.* § 9-714; *see also* Pl. Ex. 61 at 57 (noting that a targeted candidate is eligible for a supplemental grant under the independent expenditure trigger provision if the expenditure "expressly advocates the defeat of a participating candidate").  SEEC regulations define expressly advocating the defeat of a candidate to mean:

1. Conveying a public communication containing a phrase including, but not

-32-

limited to, "vote against," "defeat," "reject," or a campaign slogan or words that in context and with limited reference to external events, such as the proximity to the primary or election, can have no reasonable meaning other than to advocate the defeat of one or more clearly identified candidates; or

2. Making a public communication which names or depicts one or more clearly identified candidates, which, when taken as a whole and with limited reference to external events, contains a portion that can have no reasonable meaning other than to urge the defeat of the candidate(s), as evidenced by factors such as the presentation of the candidate(s) in a unfavorable light, the targeting, placement, or timing of the communication, or the inclusion of statements by or about the candidate.

Conn. Agencies. Regs. § 9-714-1; Pl. Ex. 36. Furthermore, because they are considered uncoordinated expenditures, independent expenditures made in support of a candidate do not count towards an excess expenditure trigger. *Id.* §§ 9-713, 9-714; *see also* Pl. Ex. 61, 2008 SEEC CEP Guide, at 54.

Independent expenditures in excess of $1,000 that are made in support of a participating candidate or to promote the defeat of a participating candidate must be reported to the SEEC, even if they would not trigger matching funds for the participating candidate. Conn. Gen. Stat. § 9-612(e)(2). If such an expenditure is made more than 20 days before the day of an election, it must be reported within 48 hours of the expenditure. *Id.* If such an expenditure is made 20 days or less before the day of an election, it must be reported within 24 hours. *Id.*

4.    *Organization Expenditures*

The CEP exempts from the definition of "contribution" or "expenditure" certain expenditures made on behalf of participating candidates by party and legislative committees, known as "organization expenditures." An organization expenditure is defined as "an expenditure by a party committee, legislative caucus committee or legislative leadership

-33-

committee for the benefit of a candidate or candidate committee."[20]  Conn. Gen. Stat. § 9-

601(25).  There are four legislative caucus committees: one for each major party in the House

and one for each major party in the Senate.  *Id.* § 9-605(e)(2).  There are eight legislative

leadership committees.  *Id.* § 9-605(e)(3).  There are 366 state and town party committees.

March 4, 2009 Decl. of Jeffrey Garfield ("Garfield Decl. III") Ex. A.  Because there are no minor

party members of the General Assembly, there are no minor party legislative leadership or

legislative caucus committees, although minor parties can and do have state and town party

committees.

 The CEP permits party and legislative committees to make organization expenditures for

the following purposes:

> (A) The preparation, display or mailing or other distribution of a party
> candidate listing. As used in this subparagraph, "party candidate listing"
> means any communication that meets the following criteria: (i) The
> communication lists the name or names of candidates for election to public
> office, (ii) the communication is distributed through public advertising such
> as broadcast stations, cable television, newspapers or similar media, or
> through direct mail, telephone, electronic mail, publicly accessible sites on
> the Internet or personal delivery, (iii) the treatment of all candidates in the
> communication is substantially similar, and (iv) the content of the

---

[20] A "party committee" is defined as "a state central committee or a town committee." Conn. Gen. Stat. § 9-601(2).

 A "legislative caucus committee" is defined as "a committee established under subdivision (2) of subsection (e) of section 9-605 by the majority of the members of a political party who are also state representatives or state senators."  *Id.* § 9-601(22).

 A "legislative leadership committee" is defined as "a committee established under subdivision (3) of subsection (e) of section 9-605 by a leader of the General Assembly."  *Id.* § 9-601(23).  The speaker of the House of Representatives, the majority leader of the House, president pro tempore of the Senate, and majority leader of the Senate may each establish one legislative leadership committee.  *Id.* § 9-605(e)(3).  The minority leaders of the House and Senate may each establish two legislative leadership committees.  *Id.*

communication is limited to (I) for each such candidate, identifying
information, including photographs, the office sought, the office currently
held by the candidate, if any, the party enrollment of the candidate, a brief
statement concerning the candidate's positions, philosophy, goals,
accomplishments or biography and the positions, philosophy, goals or
accomplishments of the candidate's party, (II) encouragement to vote for each
such candidate, and (III) information concerning voting, including voting
hours and locations;

(B) A document in printed or electronic form, including a party platform, a
copy of an issue paper, information pertaining to the requirements of this title,
a list of registered voters and voter identification information, which
document is created or maintained by a party committee, legislative caucus
committee or legislative leadership committee for the general purposes of
party or caucus building and is provided (i) to a candidate who is a member
of the party that has established such party committee, or (ii) to a candidate
who is a member of the party of the caucus or leader who has established
such legislative caucus committee or legislative leadership committee,
whichever is applicable;

(C) A campaign event at which a candidate or candidates are present;

(D) The retention of the services of an advisor to provide assistance relating
to campaign organization, financing, accounting, strategy, law or media; or

(E) The use of offices, telephones, computers and similar equipment which
does not result in additional cost to the party committee, legislative caucus
committee or legislative leadership committee.

*Id.*

The CEP limits organization expenditures made on behalf of participating candidates for

the General Assembly, but not for statewide office.  Conn. Gen. Stat. § 9-718.  Specifically,

under the CEP, each committee is limited to making $10,000 in organization expenditures on

behalf of candidates running for state senator and $3,500 in organization expenditures on behalf

of candidates running for state representative.  *Id.*  The CEP further prohibits any primary

election organization expenditures made on behalf of candidates running for state senator or state

-35-

representative.  *Id.*  Committees are required to report all organization expenditures made on behalf of participating candidates.  Conn. Gen. Stat. § 9-608(c)(5).

The present organization expenditure provisions were revised in 2006 in an effort to close the perceived organization expenditure "loophole" that existed.  Previously, party and legislative committees were permitted to make unlimited expenditures for the advertising, campaign staff, and consultant and fundraising costs for *all* participating candidates, statewide and General Assembly alike.  The General Assembly passed some amendments to the CEP in May 2006, narrowing the organization expenditure provision to its present construction by limiting the amount of organization expenditures that can be made on behalf of candidates running for General Assembly.

5.    *Exploratory Committees*

Before declaring their official intent to seek public office, individuals are permitted to set up exploratory committees to "test the waters" for a potential campaign.[21]  SEEC Declaratory Ruling 2007-02 at 1 ("SEEC Ruling 2007-02").  Once a candidate declares his or her official intent to seek a party's nomination for or election to a specific office, the candidate has 15 days to dissolve the exploratory committee and set up a candidate committee.[22]  Conn. Gen. Stat. §§ 9-

---

[21] The CFRA defines an exploratory committee as "a committee established by a candidate for a single primary or election (A) to determine whether to seek nomination or election to (i) the General Assembly, (ii) a state office, as defined in subsection (e) of section 9-610, or (iii) any other public office, and (B) if applicable, to aid or promote said candidate's candidacy for nomination to the General Assembly or any such state office."  Conn. Gen. Stat. § 9-601(5).

[22] A candidate committee is defined as "any committee designated by a single candidate, or established with the consent, authorization or cooperation of a candidate, for the purpose of a single primary or election and to aid or promote such candidate's candidacy alone for a particular public office or the position of town committee member, but does not mean a political committee

608(f), 9-604(c).  A candidate who intends to participate in the CEP may use his or her

exploratory committee to begin collecting the necessary qualifying contributions.  SEEC Ruling

2007-2 at 2.  Once a candidate officially declares his or her candidacy and establishes a candidate

committee, the candidate committee assumes the exploratory committee's surplus or deficit.

Conn. Gen. Stat. § 9-608(f).  For those candidates who intend to participate in the CEP, any

surplus that exceeds the total amount of qualifying contributions must be given to the Citizens'

Election Fund.  *Id.*

      Exploratory committees, unlike official candidate committees, are not subject to the CEP

fundraising restrictions and expenditure limits.  *See id.* § 9-702.  Therefore, it is possible for a

candidate to raise and spend campaign contributions outside the limits set by the CEP until that

candidate forms a candidate committee and agrees to abide by the CEP expenditure limits.  The

CEP does not require that a potential candidate declare his or her intent to participate in the

public financing program, and thus abide by the CEP expenditure limits, until 25 days prior to

the primary or 40 days prior to a general election.  *Id.* § 9-703(a).

      6.    *2006 Amendments*

      After signing the CFRA into law, Governor Rell asked Garfield to study the CFRA in

order to make suggestions for its improvement.  On March 13, 2006, Garfield appeared before

the Joint Committee on Government Administration and Elections (the "GAE Committee") to

testify about the SEEC's recommended changes to the CFRA.  Garfield first suggested narrowing

the organization expenditure "loophole."  Pl. Ex. 5, Garfield March 13, 2006 Written Statement

to the GAE Committtee, at 1-2.  Garfield next recommended lowering the 20% qualifying

---

or a party committee."  Conn. Gen. Stat. § 9-601(4).

threshold for minor party candidates to become eligible for full CEP financing, stating that the

"standards for [minor party candidate] participation . . . are so high that it is very unlikely that

these candidates would qualify for any public grants." *Id.* at 2. Garfield suggested that a 5%

standard – 5% of prior vote total or 5% signature requirement (in addition to the qualifying

contributions requirement) – was a sufficient safe harbor to protect the state's interests. *Id.*

Garfield further recommended that those minor party candidates who qualified for a partial CEP

grant should be permitted to raise contributions up to the amount of the full grant to make up the

difference in funding with his or her major party opponents. *Id.* Garfield also recommended that

qualifying contributions come from registered *voters* in the state or district, rather than from mere

*residents* of the state or district. *Id.* at 3. Garfield testified in favor of House Bill 5610, which

would have relaxed the prior success and petitioning requirement thresholds from 10/15/20% to

3/4/5%. Garfield Decl. II Ex. 4, Tr. 03/13/06 GAE Committee Hearing at 122 (testimony of

SEEC Director Jeffrey Garfield). In addition, Secretary of the State Susan Bysiewicz testified in

favor of reforms that would permit more minor party and petitioning candidates to receive public

funding. *Id.* at 108 (testimony of Sec. of the State Susan Bysiewicz).

The General Assembly took up those issues during its regular 2006 session, passing

several substantive and technical amendments to the CEP in May 2006. Public Act 06-137,

which was signed into law by Governor Rell on June 6, 2006, addressed some, but not all, of

Garfield's concerns regarding the CEP's treatment of party and legislative leadership

committees' organization expenditures and the qualifying criteria for minor party candidates.

Specifically, the General Assembly narrowed the organization expenditure loophole by

prohibiting legislative leadership committees from making organization expenditures on behalf

of primary candidates and by limiting such expenditures for the general election to $10,000 for

Senate races and $3,500 for House races.  Public Act 06-137, § 16.  The CEP was further

amended to permit those candidates who qualified for a partial CEP grant to raise contributions,

in $100 increments, up to the full amount of the grant.  *Id.* at § 20(c).  The amendments did not

lower, or otherwise adjust in any way, the CEP's qualifying criteria for minor party candidates.

      D.    <u>Statewide and General Assembly Elections in Connecticut Pre-2008</u>

          1.   *Legislative Elections*

There are 36 state senate districts and 151 state house districts in Connecticut.

Historically, most legislative districts in Connecticut have been one-party-dominant, meaning

that candidates from one of the two major parties have often run unopposed or without

competition from the other major party.  Elections are considered "non-competitive" when a

major party candidate: runs unopposed, runs against only a minor party candidate, or wins by

more than 20% over the other major party candidate.  According to the defendants' expert

Donald Green, political scientists typically dub any legislative district where a major party

candidate wins over 60% of the vote to be a "safe" district for that major party.  Pl. Ex. 21,

Supplemental Expert Report of Donald Green, at 1.  In other words, a candidate that wins by

more than 20% – using Green's 60/40 vote split as the baseline – is in a "safe," party-dominant

district.  *Id.*  As explained more fully below, given the overwhelming dominance of one of the

two major parties in many districts, prior to the first CEP-funded elections in 2008, a majority of

the General Assembly districts in Connecticut were considered "safe."

a.      General Assembly Elections: 2006, 2004, and 2002

The 2006 election results demonstrate just how few state legislative elections in Connecticut involve "competitive" races.[23]  On the state senate side, nine out of 36 races had only one major party candidate; of those nine races, six major party candidates ran unopposed and three had only minor party competition.  In the 27 senate districts in which both major parties ran candidates, a major party candidate won by more than 20% of the vote in 17 races, meaning the winning major party candidate won by a landslide in 63% of the races with two major party candidates.  Out of 36 state senate races, therefore, only 10 races were considered "competitive" between the major party candidates, meaning the major party candidates' vote totals were within 20% of one another.  Put differently, 72% of the state senate races were not competitive in 2006.

The picture is not any different on the state house side.[24]  Out of 151 races for state representative, 61 had only one major party candidate; of those 61 races, 40 major party candidates ran unopposed and 21 had only minor party competition.  Of the 90 races that had candidates from both major parties, a major party candidate won by more than 20% of the vote in 64 races, meaning the winning major party candidate won by a landslide in 71% of the races with two major party candidates.  Out of 151 races, therefore, only 26 were considered "competitive" between the major party candidates.  In other words, 83% of the state house races were not

---

[23] Election results are drawn from the Connecticut Secretary of the State website.  The 2006 election results for state senate may be found at: http://www.sots.ct.gov/sots/cwp/view.asp?a=3188&q=392586 (last visited August 26, 2009).  I have included those election results in Appendix C.

[24] The 2006 results for state representative may be found at the Connecticut Secretary of the State's website: http://www.sots.ct.gov/sots/cwp/view.asp?a=3188&q=392566 (last visited August 26, 2009).  I have included those election results in Appendix D.

competitive in 2006.

Looking at all the General Assembly races in 2006, 70 of 187 races were uncontested by one of the major parties.  In addition, in three state senate races and nine state house races, a major party candidate received less than 20% of the vote.  Thus, in 2006, 82 of 187 (44%) General Assembly races were either uncontested by one of the major parties, or resulted in one of the major party candidates receiving less than 20% of the vote.

The state legislative races in 2004 and 2002 demonstrate that the trend of uncontested and weak major party candidates in a high percentage of General Assembly races has been consistent over the past decade.[25]  In 2004, out of 36 state senate races, five major party candidates ran unopposed and eight had only minor party competition.  Looking at the 23 races where both major parties ran candidates, a major party candidate won by more than 20% of the vote (i.e., by a landslide) in 15 of those races.  Thus, out 36 state senate races, only eight were truly competitive in 2004.  In other words, 78% of state senate races were not competitive in 2004.

On the state representative side in 2004, out of 151 state house races, 34 major party candidates ran unopposed and 28 had only minor party competition.  Focusing on the 89 races where both major parties ran candidates, a major party candidate won by more than 20% of the vote in 58 races, meaning only 31 were competitive races between the major parties, or put differently, 79% of state house races were not competitive in 2004.  In addition, in those races with candidates from both major parties, seven major party candidates for state representative

---

[25] The results for those elections may be found at the Connecticut Secretary of the State's website, http://www.sots.ct.gov/sots/cwp/view.asp?a=3179&Q=392194&SOTSNav_GID=1846 (last visited August 26, 2009).  I have included the 2004 election results in Appendices A & B.

received less than 20% of the vote.  Thus, looking at all the state legislative races in 2004, 82 of 187 (44%) General Assembly districts were either uncontested by one of the major parties, or resulted in one of the major party candidates receiving less than 20% of the vote.

In 2002, out of 36 state senate races, six major party candidates ran unopposed and two faced only minor party competition.  Of the 28 races that were contested by both major parties, one major party candidate won by a landslide (more than 20% of the vote) in 22 races.  Thus, only six state senate races were truly competitive in 2002.  In other words, 83% of state senate races were not competitive.

Turning to the elections for state representative in 2002, once again, the election results show that a substantial majority of Connecticut's legislative districts are one-party-dominant. Out of 151 districts, 37 major party candidates ran unopposed and 13 had only minor party competition.  Focusing on the 101 districts that were contested by both major parties, a major party candidate won by more than 20% of the vote in 60 races; only 41 state house races were considered competitive in 2002. Thus, in 2002, 73% of the races for state representative were not competitive.  In addition, in nine state house races, a major party candidate failed to garner more than 20% of the vote.  Looking at the state legislative elections as a whole, in 2002, 67 of 187 (36%) General Assembly districts were either uncontested by one of the major parties, or resulted in one of the major party candidates receiving less than 20% of the vote.

In the 2002, 2004, and 2006 elections, there were a total of 179 minor party candidates on the ballot, not including cross-endorsed major party candidates.[26]  *See* Pl. Ex. 30, OLR Research

---

[26] The OLR Past Performance Report summarizes how many petitioning and minor party legislative candidates were on the ballot in 2000, 2002, and 2004.  On page 4 of that report, it reports that there were 14 minor party candidates for state senate in 2002.  According to Table 7

Report, Past Performance of Petitioning and Minor Party Candidates in Connecticut ("OLR Past

Performance Report"), at 4-12; Connecticut Secretary of the State, 2006 Election Results,

*available at*

http://www.sots.ct.gov/sots/cwp/view.asp?a=3179&Q=392194&SOTSNav_GID=1846 (last

visited August 26, 2009).  Although no minor party candidate won election to office, several

garnered a statistically significant percentage of the vote.  Between 2002 and 2006, 78 minor

party candidates received less than 3% of the vote; 16 received between 3% and 3.99%; 11

received between 4% and 4.99%; 47 received between 5% and 9.99%; 17 received between 10%

and 14.99%; 4 received between 15% and 19.99%; and 4 received 20% or more of the vote.  Of

the 25 candidates who received more than 10% of the vote, 23, or 92% of minor party candidates,

ran against only one major party candidate.

Turning to 2006 specifically, out of 45 minor party candidates (excluding cross-endorsed

major party candidates): 16 received less than 3% of the vote; three received between 3% and

3.99%; two received between 4% and 4.99%; 13 received between 5% and 9.99%; 10 received

between 10% and 14.99%; none received between 15% and 19.99%; and one candidate, Michael

---

of that report, however, there were only 10 minor party candidates for state senate in 2002.  A
comparison to the Connecticut Secretary of the State election results website reveals that there
were 10 minor party state senate candidates in 2002:
http://www.ct.gov/sots/cwp/view.asp?a=3188&q=392542 (last visited August 26, 2009).
Therefore, my calculations reflect that 10 minor party candidates ran for state senator in 2002.  In
addition, the chart dividing those candidates into percentage of the vote won should be changed
as follows: in 2002, three state senate candidates (not six) in the 1% to 1.99% range and zero
candidates (not one) in the 10% to 14.99% range.

In calculating the 2002 to 2006 minor party candidate record, I relied on the data, with the
above described adjustments, contained in the OLR report for the 2002 and 2004 elections, and
on the vote totals retrieved from the Connecticut Secretary of the State website for the 2006
election.

E. Royston, received over 20% of the vote.  Appendices C & D.  Therefore, based on prior vote totals, only eleven minor party candidates were eligible to receive partial or full CEP funding for the 2008 elections.  All but one of the eleven minor party candidates who garnered 10% or more of the vote in 2006 were competing against only one major party candidate.  The 21 minor party candidates facing two major party candidates received, on average, 2.93% of the vote.  The 24 minor party candidates who competed against only one major party candidate received, on average, 8.9% of the vote.

   b.   General Assembly Elections: 2008[27]

---

[27] Although the 2008 election results are certainly relevant to the issues presented by plaintiffs' challenge to the CEP, I hesitate to draw significant conclusions about the CEP's future impact on the basis of the 2008 election because there is no way to determine what effect the pendency of this litigation had on the election strategies and decisions of major and minor parties.  For instance, the state urges me to find that the "net contestedness" of General Assembly districts did not vary widely from 2006 to 2008 – the number of contested state senate districts remained flat and the number of contested house districts dropped by two.  *See* Appendices C-F. The state therefore argues that the CEP must not encourage increased "contestedness" of General Assembly elections by major parties who formerly abandoned districts historically dominated by the other major party.  After just one year of operation, and considering the pendency of this litigation, however, it would not be wise to draw the conclusion that the CEP will *never* encourage increased contestedness in historically abandoned districts.  Indeed, as explained more fully below, the major parties have no incentive to keep the status quo of one-party-dominant districts, particularly when the prospect of easily qualifying for CEP funding will encourage major parties to challenge entrenched incumbents and slowly break down the dominant party's advantage over time.  Indeed, when various legislators spoke with regard to the CEP's impact during the late 2005 Special Session, many touted (or denounced) its potential to encourage major party competition.  Garfield Decl. I Ex. 28, Tr. of Nov. 30, 2005 Senate Debate, at 83-84 (statement of Sen. Meyer, noting that the public interest in the bill "goes to the health of a two-party system" and encouraging more competitive races); *id.* at 170 (statement of Sen. Murphy, agreeing with Senator Meyer's statement that having more competitive elections is "a great thing for democracy"); *id.* at 343 (statement of Sen. McKinney, expressing concern about the CEP because, in enacting the CEP, the legislature has "completely stacked the deck against third-party candidates"); *id.* at 361 (statement of Sen. DeLuca, noting that the CEP will increase contestedness because it will "help to ensure those that couldn't raise money and now would be able to get into the process").  Garfield Decl. I Ex. 29, Tr. of Nov. 5, 2005 House Debate, at 37-39 (statement of Rep. Cafero, describing the CEP as promoting an "even playing field" between

In 2008, on the state senate side, 27 out 36 districts were contested by both major parties, the same as in 2006;[28] in seven districts, a major party candidate ran unopposed, and in two districts, a major party candidate faced only minor party competition.[29]  Of the 27 districts with contested races, a major party candidate won by more than 20% of the vote in 16 races.  In three of those contested races, a major party candidate received less than 20% of the vote and, in one of those races, the major party candidate received less than 10% of the vote.  Out of 36 state senate races, therefore, only 11 races were considered "competitive" between the major party candidates, i.e., their vote totals were within 20% of one another.  Put differently, 70% of the state senate races in 2008 were not competitive.

---

the major party candidates, and that the public financing will create a "different game" for minority parties in party-dominant districts by giving the non-dominant major party candidate "some serious cash to play with"); *id.* at 55 (statement of Rep. Caruso, noting that "[t]he intent of campaign finance reform, coupled with public financing, is to encourage participation in our democratic system, to allow individuals that traditionally cannot because they cannot amass the necessary funds to wage an effective campaign" and that the CEP "would provide [those candidates] the opportunity" to participate).  To adopt the state's interpretation that the CEP will not encourage increased major party competition in party-dominant districts is to be wilfully blind to its readily apparent mechanics.

[28] The state's figures about "net competitiveness" contained in paragraph 14 of the Foster Declaration are wholly inaccurate.  For example, Foster states that the 35th Senate District was "newly competitive" in 2008, when in fact the Republican candidate ran uncontested.  On the house side, Foster states that the 29th, 73rd, and 108th House Districts were "newly competitive," when in fact, there was only one major party candidate in each district.  Foster states that the 13th, 44th, and 65th House Districts were "newly uncompetitive" when they actually had candidates from both major parties.  It is because of those types of inaccuracies that I did not rely on the parties' representations regarding "net competitiveness," number of minor party candidates, and the like, and instead created my own charts using election results data directly from the Connecticut Secretary of the State website.  *See* Appendices A-G.

[29] All the 2008 General Election results were taken from the Connecticut Secretary of the State website *available at* http://www.ct.gov/sots/cwp/view.asp?a=3179&Q=392194&SOTSNav_GID=1846 (last visited August 26, 2009).  I have included those election results in Appendices E & F.

-45-

On the state house side in 2008, 88 out 151 districts were contested by both major parties, two less than in 2006; in 47 districts, a major party candidate ran unopposed, and in 16 districts, a major party candidate faced only minor party competition.  Of those 88 districts with contested races, a major party candidate won by more than 20% of the vote in 55 races.  In 11 of the contested races, a major party candidate received less than 20% of the vote; in four of those 11 races, the major party candidate received less than 10% of the vote.  Out of 151 state house races, therefore, only 33 races were considered "competitive" between the major party candidates, i.e., their vote totals were within 20% of one another.  Put differently, 78% of the state house races in 2008 were not competitive.

Looking at all the General Assembly races in 2008, 72 of 187 races were uncontested by one of the major parties.  In addition, in three state races and 11 state house races, a major party candidate received less than 20% of the vote.  Thus, in 2008, 86 of 187 (46%) General Assembly races were either uncontested by one of the major parties, or resulted in one of the major party candidates receiving less than 20% of the vote.

In 2008, there were 40 minor party candidates, not including cross-endorsed major party candidates, five fewer than in 2006.  Out of those 40 minor party candidates, 14 received less than 3% of the vote; two received between 3% and 3.99%; one received between 4% and 4.99%; eight received between 5% and 9.99%; six received between 10% and 14.99%; four received between 15% and 19.99%; and five received over 20% of the vote.  Therefore, in 2010, under the currently enacted CEP, six minor party candidates would be eligible to receive a one-third CEP grant under the prior vote provision; four would be eligible for a two-thirds grant; and five would be eligible for a full CEP grant, provided those candidates, or a member of their party, succeeds

in collecting the necessary number of qualifying contributions.[30]

        2.     *Statewide elections in 2006*

            a.     The Major Parties

In the 2006 gubernatorial race, Republican Governor Jodi Rell won reelection with 63.2% of the vote.  The Democratic candidate, John DeStefano, received 35.4%.[31]  Connecticut Secretary of the State, 2006 Election Results, http://www.ct.gov/sots/cwp/view.asp?a=3188&q=392578 (last visited August 26, 2009). Democrat Susan Bysiewicz won reelection as Secretary of the State with 69.8% of the vote; her Republican challenger, Richard Abbate, won 26.4%.  *Id.*  Democrat Denise Nappier won reelection as State Treasurer with 64.4% of the vote; her Republican challenger, Linda Roberts, received 32.0% of the vote.  *Id.*  In the State Comptroller race, Democrat Nancy Wyman won reelection with 64.4% of the vote; her Republican challenger, Cathy Cook received 31.7%.  *Id.* Finally, in the Attorney General race, Democrat Richard Blumenthal won reelection over his Republican challenger Robert Farr, by a margin of 74.8% to 24.2%.  *Id.*

------------------------------------

[30] The state hastens to add that, due to the cross-endorsement of major party candidates, 12 additional Working Families Party candidates would be eligible for partial or full CEP grants in 2010.  March 4, 2009 Proulx Supp. Decl. ¶ 33.  The director of the Connecticut Working Families Party, Jon Green, testified at the March 2009 bench trial, however, that getting candidates elected on the Working Families Party ticket is not the principal goal of the party and that the party will likely continue to cross-endorse in the future, rather than take advantage of CEP eligibility.  03/12/09 Tr. at 303-04, 313, 340-41 (testimony of Jon Green).

[31] Because candidates for Governor and Lieutenant Governor run on the same slate in the general election, there are no separate vote totals for Lieutenant Governor.  In 2006, Rell's running mate for Lieutenant Governor was Michael Fedele and DeStefano's running mate was Mary Messina Glassman.  Connecticut Secretary of the State, 2006 Gubernatorial Election Results, *available at* http://www.ct.gov/sots/cwp/view.asp?a=3188&q=392578 (last visited August 26, 2009).

b.      The Minor Parties

Minor parties have not historically fared well at the statewide level, with the notable

exception of Lowell Weicker's 1990 gubernatorial victory as a minor party candidate.  In the

most recent statewide elections, held in 2006, the Green Party was the only party to run a full

slate of candidates for each statewide office.  *Id.*  The Concerned Citizens Party and the

Libertarian Party also fielded candidates for some statewide positions.  In the race for Governor

and Lieutenant Governor, the Green Party slate won 0.9% of the vote and the Concerned Citizens

Party slate won 0.5% of the vote.  In the election for Secretary of the State, the Green Party

candidate, plaintiff Michael DeRosa, won 1.7% of the vote.  The Libertarian and Concerned

Citizens candidates won 1.2% and 0.8% of the vote, respectively.  In the race for State Treasurer,

the Green Party candidate won 1.3%, the Libertarian candidate won 1.5%, and the Concerned

Citizens candidate won 0.8% of the vote.  In the State Comptroller race, the Libertarian candidate

won 2.3% and the Green Party candidate won 1.5%.  Finally, in the Attorney General race, the

Green Party candidate won 1.7% of the vote.

The most successful minor party candidate in recent Connecticut electoral history has

been Governor Lowell Weicker.  Running as a minor party gubernatorial candidate on the A

Connecticut Party ticket, Weicker beat his Democratic and Republican opponents with just over

40% of the vote in 1990.  Governor Weicker attributes his victory as a minor party candidate in

1990 to the "reservoir of financial and organizational support" that he had accrued over his 30

years in public service.  Pl. Ex. A-2, Weicker Decl. ¶ 11.  Prior to running for Governor as a

minor party candidate, Weicker had served in the Connecticut State House of Representatives,

the United States House of Representatives, and the United States Senate as a Republican.  *Id.* ¶

2.  In his gubernatorial bid, Weicker mobilized over 1,500 supporters to collect the necessary

signatures to get on the ballot, eventually collecting approximately 100,000 signatures over the

course of two months.  *Id.* ¶ 15.  For sake of comparison, a minor party candidate seeking a one-

third CEP grant in 2010 would need to collect over 110,000 signatures; a full grant would require

collecting twice as many signatures as Weicker did, i.e, 200,000.  *Id.*  Weicker described his

network of support as "the broad-based type . . . most commonly associated with the party

structure of the major parties."  *Id.* ¶ 11.  Weicker expresses "no doubt that a lesser candidate

without [his] name recognition and political base would fail to collect the hundreds of thousands

of signatures necessary to qualify – even for a partial grant."  *Id.* ¶ 15.

Significantly for Weicker, he was able to tap into his established base of high-dollar

contributors from his years as U.S. Senator, raising over $2.7 million in campaign contributions.

*Id.* ¶ 6.  Most of those contributions were between $500 and $1000; Weicker "cannot envision" a

minor party gubernatorial candidate "collecting the $250,000 in small dollar contributions that is

necessary" to qualify for public funding.  *Id.* at ¶¶ 16, 18.  Weicker further believes that the

organization expenditures and matching fund trigger provisions will put minor party candidates

who lack "unlimited resources" at a "permanent disadvantage."  *Id.* ¶ 26.  In Weicker's opinion,

those provisions mean that participating candidates are "virtually assured of maintaining a

spending advantage" over any self-financed or non-participating minor party candidates.  *Id.* ¶

27.  Because the matching funds mean that an independent candidate will never be able to

outspend his participating opponent, Weicker believes the outcomes of elections will be affected.

*Id.* ¶ 21.

Weicker was the driving force behind the success of the A Connecticut Party.  In 1994, its

gubernatorial candidate, the incumbent Lieutenant Governor, Eunice Groark, won 19% of the

vote.  Pl. Ex. 30 at 4.  By 1998, the A Connecticut Party had stopped running candidates for

statewide office.  *Id.* at 5.

        3.    *Voter Registration*

As of March 26, 2009, there were 2,091,048 registered voters in Connecticut.[32]  March

26, 2009 Notice of Intervenor-Defs.' and Defs.' Submission of Supp. Data Ex. 2, Party

Registration, Table 3.  Connecticut has 777,061 (37.2%) registered Democrats, 423,630 (20.3%)

registered Republicans, and 7,613 (0.4%) registered minor party voters.  Notably, unaffiliated

voters, at 882,744 (42.2%), comprise the largest group of registered voters in Connecticut.

It is useful to examine the registration statistics on a district-level basis.  In 19 out of 36

state senate districts, or 52.8% of such districts, registered Republicans account for less than 20%

of the district's registered voters.  Five of those districts have less than 10% registered

Republicans; in two of those districts, Republicans comprise less than 5% of the registered

voters.[33]  *Id.*  There are no senate districts with less than 20% registered Democrats.  In 13 out of

36, or 36.1%, state senate districts, the disparity between registered voters of the major parties is

greater than 20%, making the dominant party eligible for increased primary grants.

On the house side, in 76 out 151 state house districts, or 50.3%, registered Republicans

account for less than 20% of the registered voters.  Twenty-two of those districts have less than

10% registered Republicans; in twelve of those districts, Republicans account for less than 5% of

---

[32] Although Table 3 states there are 2,091,050 registered voters, when added together the number of registered voters actually comes to 2,091,048.

[33] Those districts are the 10th and 23rd Senate Districts, which comprise New Haven and Bridgeport, respectively.

the registered voters.[34]  *Id.*  There are no house districts with less than 20% registered Democrats. In 61 out of 151, or 40.4%, of state house districts, the disparity between registered voters of the major parties is greater than 20%, making candidates from the dominant major party eligible for increased primary grants.  *Id.*

In most districts, minor parties account for less than 1% of registered voters; a minor party has greater than 1% of the registered voters in one senate district and eight house districts. No district has more than 2% registered minor party voters.

4.    *Campaign Expenditures*

a.    Pre-CEP Campaign Expenditures

In setting the CEP grant levels, the legislature relied on expenditure data from the 2002 statewide contest and the 2004 legislative elections.  The CEP expenditure limits (CEP grant plus qualifying contributions) are ostensibly pegged to match the average expenditures in a competitive election, as reported by the Office of Legislative Research ("OLR").  Garfield Decl. II, Ex. 2, Working Group Meeting Tr. 08/11/05 at 85-90 (testimony of Sen. DeFronzo, explaining that the figures were pegged to the average cost of a "contested" race rather than all races).

In 2002, the major party gubernatorial candidates averaged $3,951,096 in expenditures – the Republican candidate, incumbent Governor John Rowland, spent $6,117,067 and the Democratic candidate, Bill Curry, spent $1,785,124.  Pl. Ex. 17, OLR Research Report: Campaign Expenditures by Statewide Office Candidates ("OLR Statewide Candidate Expenditure Report").  When setting the CEP grant levels for gubernatorial candidates, the

---

[34] Those districts are the 1st, 3rd, 4th, 5th, 7th, 92nd, 93rd, 94th, 95th, 124th, 128th, and 130th House Districts, which comprise Bloomfield, Hartford, New Haven, and Bridgeport, respectively.

Working Group essentially "threw out the [2002] race" because of the "inordinate" amount of

money expended by Rowland and considered the average expenditures over the previous three

cycles combined.  Garfield Decl. II, Ex. 2, Tr. 08/11/05 Working Group Meeting at 76 (testimony

of Sen. DeFronzo).  According to the OLR report, the average expenditure for a major party

gubernatorial candidate in 1994, 1998, and 2002 was $3,869,023.[35]  Pl. Ex. 17, OLR Statewide

Candidate Expenditure Report.

The major party candidates for Lieutenant Governor averaged $333,784 in expenditures

over the three statewide election cycles from 1994 to 2002.  *Id.*  Candidates for Secretary of the

State averaged $445,696; candidates for State Treasurer averaged $417,133; candidates for State

Comptroller averaged $352,262; candidates for Attorney General averaged $260,718.  *Id.*

Turning to the 2004 state legislative races, the average candidate expenditure was

$65,669.76 for state senate candidates and $16,807.89 for state house candidates.  Pl. Ex. 18,

OLR Research Report: Campaign Expenditures – 2004 Legislative Races ("OLR 2004

Legislative Campaign Expenditure Report"), at 5-18.[36]  The median expenditure was $47,415.70

---

[35] In 1998, John Rowland also spent over $6 million ($6,184,102) in his quest for reelection; his Democratic challenger had $2,401,592 in expenditures.  Pl. Ex. 17, OLR Statewide Candidate Expenditure Report.  In 1994, Rowland spent $4,030,62 and his Democratic challenger spent $2,695,649.  *Id.*

[36] The "average" and "median" expenditures for all senate and house candidates reported in Table 4 of the OLR 2004 Legislative Campaign Expenditure Report, Pl. Ex. 18, do not match the average and median of the expenditure amounts reported in Tables 5 and 6.  Rather than rely on the erroneous figures in Table 4, using the expenditure data in Table 5 (state senate) and Table 6 (state house), I compiled my own chart to determine the average and median expenditures in 2004.  Appendices A & B.

In addition, Table 6 misidentifies Nancy Burton in the 135th House District as an exempt Working Families candidate, when in fact, she ran on the Green Party ticket and raised $6,325 in campaign contributions.  *See*

for state senate candidates and $14,210.80 for state house candidates.  In state senate races contested by candidates from both major parties, the average expenditure was $74,122.82; the median was $65,898.41.[37]  Focusing on the eight state senate races that were "competitive" in 2004, the average expenditure was $114,013.33; the median expenditure was $120,443.35.  In the 18 state senate districts with minor party candidates, the average expenditures were $45,954.44; the median expenditures were $33,172.56.  In nine, or 25%, senate districts, one or more of the candidates spent in excess of $100,000.00 – the expenditure limit for CEP-participating candidates for state senate.

In state house races contested by candidates from both major parties, the average expenditure was $18,741.59; the median was $18,760.[38]  Focusing only on those races that were "competitive," the average expenditure was $21,336.40; the median expenditure was $21,490.99.  In the 55 state house districts with minor party candidates in 2004, the average expenditure was $16,933.83; the median expenditures was $13,857.32.  There were 24, or 16%, house districts

---

http://www.followthemoney.org/database/StateGlance/state_candidates.phtml?s=CT&y=2004&f=H&so=O&p=6#sorttable (last visited August 26, 2009).  Accordingly, I have listed her expenditures as "unavailable" rather than "exempt" in Appendix B.

[37] The figures for this group do not take into account the exempt minor party candidates, the one exempt major party candidate, or the two major party candidates for whom expenditure data was not provided in the OLR Research Report.

[38] The figures for this group do not take into account the exempt minor party candidates, the 16 exempt major party candidates, or the seven major party candidates for whom expenditure data was not provided in the OLR Research Report.

It is worth noting that I compiled the average and median numbers from the data provided in OLR Research Report: Campaign Expenditures – 2004 Legislative Races, Pl. Ex. 18, not the data relied upon by the state in the July 9, 2008 Declaration of Bethany Foster, which, although purporting to state campaign expenditures, actually relies on candidate receipts (i.e., amount raised) rather than campaign expenditures.

where one or more of the candidates spent in excess of $30,000 – the CEP expenditure limit for participating candidates for state representative.

>   b.    2006 Legislative Campaign Receipts

Because both the plaintiffs and the state rely on candidate receipts (as opposed to candidate expenditures) for the 2006 election, that is the measure I will use to discuss the 2006 election cycle.[39]

In 2006, Jodi Rell raised $4,052,687 and her Democratic challenger John DeStefano raised $4,163,548 for both his primary and general election contests.  DeStefano's primary challenger, Dan Malloy, raised $3,229,916.  The Republican candidate for Lieutenant Governor, Michael Fedele, was nominated by the Republican Party to be Rell's running mate and, therefore, faced no primary contest.  Nevertheless, he raised $33,731 to that end.  The Democrats had a contested primary for Lieutenant Governor, with the winning candidate raising $565,033 and the losing candidate raising $181,063.  The Republican candidate for Secretary of the State, Richard Abbate, raised $48,682; the Democratic incumbent Susan Bysiewicz raised $815,144 for her reelection.  Republican Linda Roberts raised $39,005 and Democrat Denise Nappier raised $356,199 in the race for State Treasurer.  In the State Comptroller race, the Republican candidate Cathy Cook raised $0 and the incumbent Democratic candidate Nancy Wyman raised $469,285. The Republican candidate for Attorney General, Robert Farr, raised $72,851 and the Democratic incumbent Richard Blumenthal raised $520,676.  Combined, the non-gubernatorial slate statewide candidates raised an average of $290,230.25 in 2006.  Only one statewide candidate

---

[39] Both sides retrieved their figures from the website www.followthemoney.org.  Unless otherwise noted, that is the data I will rely on when discussing the 2006 election cycle.

out of the eight (12.5%), raised over the $750,000 general election CEP grant; none of the Republican candidates broke the $100,000 mark.

For the 2006 state senate campaigns, the average amount raised was $71,473.97 for state senate candidates; the median amount raised was $57,763.50.[40]  In the 27 state senate districts that were contested by both major parties, the average amount raised was $75,663.43; the median amount raised was $65,387.[41]  In the 10 districts that were considered "competitive" in 2006, the average amount raised by major party candidates was $110,075.10; the median amount raised was $100,721.00.  In the 7 state senate districts with minor party candidates, the average amount raised was $68,327.40; the median amount raised was $51,638.50.  There were 13 (36%) state senate districts where one or more of the candidates raised campaign contributions of at least $100,000, the CEP expenditure limit for participating state senate candidates.

The average amount raised by state house candidates in 2006 was $20,437.26; the median amount raised was $19,078.00.[42]  In the 90 state house districts that were contested by both major parties, the average amount raised was $22,106.32; the median amount raised was $21,639.[43]  In the 26 "competitive" house races in 2006, the average amount raised was $34,564.29; the median

---

[40] Disregarding the minor party state senate candidates who did not run as exempt does not significantly alter the average and median receipts for major party state senate candidates in 2006.  The average major party candidate raised $72,108.88 in 2006; the median was $59,683.00.

[41] Two major party candidates in those districts claimed exempt status, and therefore, were not included in the averages and medians.

[42] Disregarding the minor party state house candidates who did not run as exempt does not significantly alter the average and median receipts for major party state house candidates in 2006.  The average major party candidate raised $20,592.13; the median amount was $19,126.

[43] Eleven major party state house candidates in contested races claimed "exempt" status in 2006, and are not included in these figures.

amount raised was $33,337.  In the 34 house districts with a minor party candidate, the average

amount raised was $16,621.69; the median amount raised was $12,611.50.  Only 45 (30%) out

151 state house districts had candidates raise campaign contributions in excess of $30,000, the

CEP expenditure limit for participating state house candidates.

According to Garfield, in 2006, designated political action committees ("PACs") and

party committees provided $776,532 in "organization expenditures" to state senate candidates.[44]

Garfield Decl. III ¶ 26.  On average, state senate candidates each received $15,531 in

organization expenditures.[45]  Id. ¶ 27.  On the house side, designated PACs and party committees

provided $703,452 to candidates for state representative.  Id. ¶ 26.  On average, each candidate

for state representative received $3,782 in organization expenditures.  Id. ¶ 27.

> c.    2008 Legislative Campaign Receipts & Expenditures

2008 marked the first election cycle with candidates participating in the CEP public

financing scheme.[46]  The average receipts for all state senate candidates was $81,216.83, up 14%

---

[44] "Organization expenditures" is a concept introduced by the CFRA.  Prior to the introduction of the CFRA's limits on organization expenditures, there were no limits on the amount of monetary and in-kind contributions a party committee or PAC not established by a business entity or a labor union could contribute to a candidate committee.  In addition, there were no limits on the number of PACs one individual could establish or control.  Garfield Decl. III ¶ 11.  To determine the 2006 "organization expenditure" totals, Garfield calculated the monetary and in-kind contributions by party committees and PACs established or controlled by legislative caucuses and legislative leaders or their agents.  Id. ¶ 19.

[45] Garfield fails to indicate whether the 2006 total includes both major and minor party candidates; I am assuming that Garfield's 2006 organization expenditure analysis applies only to major party candidates.  No chart demonstrating how much each candidate actually received in organization expenditures was provided to the court.

[46] The data on CEP grant disbursements and amount of monies returned following the election, included in Appendices E & F, is drawn from the March 4, 2009 Declaration of Beth Rotman ("March 4, 2009 Rotman Decl.").  The graphs attached to that declaration purport to

from $71,473.97 in 2006.  Turning to median receipts, in 2008, the median amount raised by

state senate candidates was up 73% to $100,000.00 from $57,763.50 in 2006.  Looking at the

expenditures for CEP-participating candidates,[47] candidates for state senate who received a CEP

grant in 2008 spent, on average, $89,387.85, up 36% from $65,699.76 average expenditure for

state senate candidates in 2004.  The median amount spent in 2008 by CEP-participating state

senate candidates was up 104% to $96,891.65 from $47,415.70, the median amount spent by all

state senate candidates in 2004.  As a result of CEP participation, there were 27 (75%) senate

districts where one or more of the candidates had access to at least $100,000, up from 13 districts

in 2006 where the amount of campaign funding available to at least one candidate exceeded

$100,000.

Turning to the state house data for 2008, average receipts for all state house candidates

was $24,338.06, up 19% from $20,437.26 in 2006.  Median receipts in 2008 were up 57% to

$30,000 from $19,078.  Looking at CEP-participating candidates' expenditures, the average

---

show which candidates participated in the CEP, how much public funding they received, and
how much CEP funding they returned after the election was over.  That chart is not entirely
accurate because the "Grant Monies Released minus Grant Monies Returned" column does not
take into account any CEP grant money disbursed for a candidate's primary.  The chart also does
not take into account the amount in qualifying contributions a candidate must raise in order to
become eligible for CEP funding.  Nor does the chart indicate whether a primary loser took
advantage of the CEP funding; it only includes those candidates who made it to the general
election.  Also, it does not have any receipt or expenditure data from those candidates not
participating in the CEP.  Therefore, I have created Appendices E & F, which includes all
candidates, their receipts, and their expenditures (receipts minus surplus returned) where
available for the 2008 elections.  For those candidates who did not participate in the CEP, I took
the receipts data from www.followthemoney.org because that website only calculates receipts
and not expenditures.  Therefore, the "expenditure" data will only be used when analyzing CEP-
participating candidates.

[47] Again, the record contains only expenditure data for CEP-participating candidates in
2008.

CEP-participating candidate spent $25,712.14, up 53% from $16,807.89, the average expenditure

in 2004.  The median amount spent in 2008 by CEP-participating candidates was up 98% to

$28,171.11 from $14,210.80.  As a result of CEP participation there were 95 (63%) house

districts were one or more of the candidates had access to $30,000, up from 45 districts in 2006.

According to Garfield, the amount of organization expenditures for General Assembly

candidates in 2008 was well below the 2006 figure due to the restrictions on such expenditures

implemented by the CFRA.  Garfield Decl. III ¶ 25.  In 2008, organization expenditures made on

behalf of state senate candidates totaled $253,405, down 68% from 2006.  *Id.* ¶ 26.  On average,

each state senate candidate received $6,849 in organization expenditures.[48]  *Id.* ¶ 27.  On the state

house side, organization expenditures made on behalf of state house candidates totaled

approximately $211,081, down 70% from 2006.  *Id.* ¶ 26.  On average, each candidate for state

representative received $1,649 in organization expenditures.  *Id.* ¶ 27.  The record does not

include a breakdown of organization expenditures by candidate.  The section of Garfield's

declaration on minor party committee spending does not show precisely how much of the

committees' total yearly spending would be designated "organization expenditures" made on

behalf of candidates for the General Assembly.  *Id.* ¶¶ 29-32.  For that reason, I do not find the

total yearly expenditures made by individual minor party committees relevant to this analysis.

---

[48] I assume that Garfield's analysis includes only organization expenditures made on
behalf of major party candidates because there are very few minor party committees that actually
qualify to make organization expenditures and because he has separated his analysis about such
minor party committee organization expenditures in 2008 into a separate section in his
declaration.  *See* ¶¶ 20-32.

**II.**     **Discussion**

   A.     COUNT ONE: Qualifying Criteria and Public Financing Distribution Formulae

   In count one of their amended complaint, plaintiffs challenge the CEP's qualifying

criteria for public financing and distribution formulae on the ground that those provisions operate

to discriminate against minor party candidates in violation of the First Amendment and the Equal

Protection Clause of the Fourteenth Amendment.  In *Green Party I*, 537 F. Supp. 2d at 367 n.10,

I treated the plaintiffs' First Amendment claim in count one as part and parcel of their Fourteenth

Amendment equal protection claim, which treatment the parties have not subsequently disputed.

The First Amendment issues raised by the CEP inform the determination whether the CEP

operates as an unconstitutional, discriminatory burden on the exercise of fundamental rights.  *See*

*Libertarian Party of Indiana v. Packard*, 741 F.2d 981, 984 n.2 (7th Cir. 1984) (discussing the

interplay between the First and Fourteenth Amendments with respect to a similar claim);

*Greenberg v. Bolger*, 497 F. Supp. 756, 774-81 (E.D.N.Y. 1980) (in public financing context,

analyzing statute under both First Amendment and equal protection jurisprudence); *see also*

*Buckley v. Valeo*, 424 U.S. 1, 92-93 (1976) (initially rejecting plaintiff's First Amendment claim

before addressing plaintiffs' Equal Protection claim); *Police Dept. of Chicago v. Mosley*, 408

U.S. 92, 95 (1972) (analyzing picketing ordinance, which affected expressive activity protected

by the First Amendment, in terms of the Equal Protection Clause of the Fourteenth Amendment

because the ordinance treated picketers differently).  *Cf.* Erwin Chemerinsky, Constitutional

Law: Principles and Policies 648-49 (2d ed. 2002) (noting that equal protection analysis is

sometimes used "if the government discriminates among people as to the exercise of a

fundamental right").

My understanding of the plaintiffs' claim in count one is as follows: the CEP's distinctions between major party and minor party candidates are unconstitutional, both facially and as-applied, because those provisions discriminate between candidates with respect to the exercise of their fundamental rights protected under the First Amendment without a compelling state interest for those distinctions; put differently, the CEP's different treatment of major and minor party candidates imposes an unconstitutional, discriminatory burden on minor party candidates' exercise of fundamental rights for no compelling reason.

      1.    *Overview*

To reach a decision on the plaintiffs' equal protection challenge to the CEP, I must determine, first, what rights are actually at issue; second, whether the CEP burdens the exercise of those fundamental rights in a discriminatory way; and third, whether, using the requisite level of scrutiny, that burden is justified by the state's proffered interests in enacting the CEP.

The parties do not dispute that the rights at issue in this case – rights of political speech and association and political opportunity – are accurately characterized as "fundamental rights" as that term is generally understood in constitutional jurisprudence.

The parties also do not dispute that, on its face, the CEP sets different qualifying criteria for major and minor party candidates.  The first issue in dispute is whether the additional qualifying criteria for minor party candidates operate as a discriminatory burden on the exercise of those rights by minor party candidates.  The plaintiffs contend that the CEP burdens the political opportunity of minor party candidates by discriminatorily enhancing the relative strength of major party candidates without imposing any countervailing hardships or disadvantages for participating in the CEP.  The state vigorously disputes that the CEP represents any burden on

minor party candidates' political opportunity; according to the state, the relatively weak position of minor party candidates is not the result of any discrimination, the CEP does not reduce minor party candidates' political opportunities or tilt the playing field in favor of major party candidates, and the CEP actually enhances the political opportunity of minor party candidates by providing substantial, transformative benefits through participation in the CEP.  Because I conclude that the CEP enhances the relative strength of major party candidates to the detriment of the political opportunity of minor party candidates, as discussed more fully below, I conclude that the CEP imposes a discriminatory burden on minor party candidates' fundamental rights.

Having concluded that the CEP burdens the exercise of fundamental constitutional rights, I must next address the appropriate level of scrutiny.  The plaintiffs argue that strict scrutiny applies, meaning the CEP can only survive the constitutional challenge if the state demonstrates it was enacted to further a compelling government interest and that it is a narrowly tailored means for achieving that interest.  The state contends that intermediate scrutiny should apply, meaning that the CEP will survive the plaintiffs' constitutional challenge, so long as the state can demonstrate important regulatory interests that are sufficient to justify the discriminatory burden. As explained below, I conclude that strict scrutiny is the appropriate level of scrutiny to apply to the CEP and that the state, although it has successfully proved compelling government interests, has failed to demonstrate how the CEP is a narrowly tailored means for achieving those interests.

## 2.    *Identification of the Right at Issue*

In count one, plaintiffs allege that the CEP's qualifying criteria and distribution formulae violate the First and Fourteenth Amendments to the United States Constitution because the Act disproportionately burdens the political opportunity of minor party candidates.  Am. Compl. ¶ 53.

There is no dispute that the CEP touches on political speech rights at the core of First Amendment protection, specifically access to and participation in the political process, i.e., "political opportunity." First articulated in the context of ballot access cases, *e.g., Lubin v. Parish*, 415 U.S. 709, 716 (1974), "political opportunity" represents one aspect of the First Amendment protections of political speech and association. For instance, the *Buckley* Court discussed political opportunity in the context of deciding whether the eligibility formulae for the public financing of presidential campaigns amounted to "a denial of the enhancement of opportunity to communicate with the electorate that the formulae afford eligible candidates," and, thus, whether the public financing scheme amounted to a "restriction[] on access to the electoral process." *Buckley v. Valeo*, 424 U.S. 1, 94-95 (1976). The *Buckley* Court, however, did not further define the nature and scope of the right of political opportunity. Instead, the Court focused the bulk of its analysis on explaining how and why the federal public financing scheme for presidential campaigns did not impinge on minor party candidates' rights of political opportunity.

In addition, full participation by minor party candidates in the electoral process has long been considered a necessary component of a well-functioning, healthy democratic system, because such candidates and parties challenge established norms and serve as checks on traditional parties and their representatives in government. *Buckley*, 424 U.S. at 96-97 (recognizing there are constitutional restraints against "inhibit[ing] . . . the present opportunity of minor parties to become major political entities if they obtain widespread support" and stating that reducing "the potential fluidity of American political life" would be a detriment to the nation) (internal quotation omitted); *Sweezy v. New Hampshire*, 354 U.S. 234, 250-51 (1957)

("All political ideas cannot and should not be channeled into the programs of our two major

parties.  History has amply proved the virtue of political activity by minority, dissident groups,

who innumerable times have been in the vanguard of democratic thought and whose programs

were ultimately accepted."); *Greenberg v. Bolger*, 497 F. Supp. 756, 799 (E.D.N.Y. 1980);

*Socialist Workers Party v. Rockefeller*, 314 F. Supp. 984, 989 (S.D.N.Y. 1970) (three-judge

court), *aff'd*, 400 U.S. 806 (1970) (noting that the "competition in ideas" offered by minority and

dissident political views "is at the core of our electoral process, representative democracy, and

First Amendment freedoms").

Because the state is not challenging the plaintiffs' assertion that the CEP's alleged impact

on minor party candidates' rights of political opportunity implicates core First Amendment

protections of political speech and association, I need not attempt to further define the scope of

the right to political opportunity, but will instead focus on the state's argument that the CEP does

not burden the plaintiffs' rights, or alternatively, even if it does, that the CEP survives the

requisite level of scrutiny because it advances an important or compelling government interest.

### 3.    *Burden on Political Opportunity*

The next issue I must decide is whether the CEP "unfairly or unnecessarily burden[s] the

political opportunity of any party or candidate." *Buckley*, 424 U.S. at 96.  The plaintiffs have

identified six reasons why the qualifying criteria for public funding distort the political playing

field in favor of major party candidates, thereby burdening minor party candidates' political

opportunity: (1) the use of a statewide proxy for legislative district elections; (2) the provision of

windfall grants that far exceed the historical fundraising and spending levels for major party

candidates; (3) the provision of primary grants for major party candidates only; (4) onerous

qualifying burdens for minor party candidates that operate to virtually shut them out of the public funding scheme; (5) the large disparity in the size of grants disbursed for participating major and minor party candidates who qualify for public funding; and (6) the benefits provided by the CEP are not off-set by any burden for participating candidates because the CEP does not impose any meaningful expenditure limits.  According to the plaintiffs, those six factors combine to burden the political opportunity of minor party candidates.

The state counters that the CEP does nothing to distort or alter the strength of minor party candidates below pre-CEP levels.  The state points out that minor party candidates in Connecticut have historically been unable to garner substantial public support and, therefore, the CEP should not be considered a contributing factor to minor parties' relatively narrow appeal. Second, the state contends that political opportunity cannot be considered a "zero sum game" – providing public financing to one candidate does not necessarily reduce the strength of a non-participating opponent.  The state primarily argues that the CEP does not diminish the First Amendment-protected right of political opportunity because the plaintiffs have failed to demonstrate that the CEP will diminish minor party candidates' ability to raise funds privately or that it will otherwise alter such candidates' normal course of campaigning.  The state also contends that the CEP is merely a substitute for private funding, not a subsidy, and that the plaintiffs cannot prove that, but for the CEP, minor party candidates would not still be materially outspent by major party candidates.  The state further argues that, far from being a burden on minor party candidates' political opportunity, the CEP provides the opportunity for minor party candidates to gain access to far greater amounts of funding than they would otherwise be able to garner, which will make those candidates more competitive and will substantially benefit their

party's infrastructure and public visibility.  In other words, the state argues that the CEP will

transform minor party candidates "from perpetual losers into viable competitors."  Defs.' and

Intervenor-Defs.' Mem. of Law in Support of Motion for Partial Summary Judgment, at 68.

It is well-established that individuals generally do not have a First Amendment right to

government-subsidized speech.  *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S.

819, 834 (1995) ("the Government is not required to subsidize the exercise of fundamental

rights"); *see also Regan v. Taxation with Representation*, 461 U.S. 540, 546, 549-50 (1983)

("We again reject the notion that First Amendment rights are somehow not fully realized unless

they are subsidized by the State. . . . 'although government may not place obstacles in the path of

a [person's] exercise of . . . freedom of [speech], it need not remove those not of its own

creation.'") (quoting *Harris v. McRae*, 448 U.S. 297, 316 (1980)).

When the government enters the arena of political speech, however, it must do so in a

way that does not alter the status quo by unfairly and unnecessarily burdening the political

opportunity of disfavored minor parties.  "[T]he concept that government may restrict the speech

of some elements of our society in order to enhance the relative voice of others in wholly foreign

to the First Amendment." *Buckley*, 424 U.S. at 48-49; *see also Schulz v. Williams*, 44 F.3d 48,

60 (2d Cir. 1994) (overturning state statute granting free voter lists to major parties because,

although "[t]he State is not required to provide such lists free of charge, . . . when it does so it

may not provide them only for the large political parties and deny them to those parties which

can least afford to purchase them") (quoting *Socialist Workers Party*, 314 F. Supp. at 996).  A

public financing law operates to burden the political opportunity of minor party candidates where

it "disadvantages nonmajor parties by operating to reduce their strength below that attained

without any public financing." *Buckley*, 424 U.S. at 99.  One way to calculate the burden on minor party candidates imposed by a public financing scheme is to determine whether the public financing scheme artificially enhances the political opportunity of favored *major* party candidates beyond what it would have been in the absence of public financing, thus altering the political environment in which all candidates compete.  *Id.* at 95 n.129.

The state spends significant effort contending that, because the minor parties' political prospects were dim before the CEP, the fact that minor party candidates might continue to do poorly cannot be attributed to the CEP and, therefore, any benefit to major party candidates is not evidence of diminished political opportunity for minor party candidates.  Measuring the ability of minor party candidates to get on the ballot, raise money privately, and attract votes before and after the enactment of the CEP, however, is only one half of the picture.  Even assuming that the minor parties' absolute political strength will remain constant, the fact that the public financing scheme artificially enhances major party candidates' fundraising and campaigning abilities without any countervailing disadvantages increases major party candidates' *relative* political strength to the plaintiffs' disadvantage.  *See Greenberg*, 497 F. Supp. at 775-76, 778-79; *Socialist Workers Party*, 314 F. Supp. at 995-96.

In *Greenberg*, the Court held that a postal subsidy provided only to major parties was an unconstitutional burden on minor party candidates' exercise of fundamental rights of speech and association, particularly because the major party candidates did not receive any countervailing disadvantage by accepting the discounted postage rate.  497 F. Supp. at 775-76, 778-79, 781.  According to the Court, by enacting the postal subsidy the government had impermissibly "chosen to benefit those with popular views and burden those with unpopular views," labeling

-66-

the subsidy as essentially speech censorship.  *Id.* at 776.  The fact that minor party candidates

continued to pay the same postal rate as before was not a mitigating factor for the Court.  "The

realities of the process for building financial and popular support for a political party, the integral

role played by mailings, and the extremely tight budgetary constraints under which most third

and independent parties operate all mitigate against the proposition that the government could

facilitate access for one political party and not necessarily burden all other parties that are in

competition with the benefitted party."  *Id.* at 778.  As the Court reasoned, "in a competitive

intellectual environment assistance to one competitor is necessarily a relative burden to the

other."  *Id.*  Finally, the subsidy was distinguishable from the scheme at issue in *Buckley*; because

the postal subsidy was "not conditioned on any sacrifice regarding receipt or expenditure of

private funds," the discount could not, "in any way, act to the advantage of the non-qualifying

parties."  *Id.* at 779.  *See also Socialist Workers Party*, 314 F. Supp. at 995-96 (invalidating New

York statute providing free voter lists to major parties, but not minor party candidates, because

the state had failed to demonstrate a "compelling state interest nor even a justifiable purpose for

granting what, in effect, is a significant subsidy only to those parties which have the least need

therefor").

   The following hypothetical is instructive on the issue of changing the "relative" strength

of political candidates.  Imagine that two candidates are invited to debate their positions before a

live audience.  At the debate, although both candidates are given equal time to address the

audience, answer questions, and respond to points made by their opponent, the debate committee

chooses to give only one candidate the benefit of a microphone.  Although it is true that the

candidate who must speak without a microphone has not had his opportunity to be heard

diminished below what it was prior to the introduction of the microphone – he is still permitted equal time to speak and present his ideas to the audience – it is hard to dispute that his political opportunity is nevertheless burdened by the benefit bestowed upon his opponent who now has an advantage in reaching more of the audience.  By giving the opponent a microphone, the debate committee has enhanced the opponent's ability to express and disseminate his or her viewpoints to the electorate.  *Cf. First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784-85 (1978) (noting that "the First Amendment is plainly offended" when the legislature attempts to give one group "an advantage in expressing its views to the people").

The issue is not whether the government may discriminate between major and minor party candidates when crafting a public financing statute – the government certainly has an interest in "not funding hopeless candidacies with large sums of public money, [which] necessarily justifies the withholding of public assistance from candidates without significant public support."  *Buckley*, 424 U.S. at 96 (internal citation omitted).  The government, however, in creating such a public campaign financing scheme to combat the influence and appearance of corruption in politics, may not simultaneously disadvantage minor party candidates' political opportunity.[49]  As the *Buckley* Court recognized, public financing schemes have the potential "to

---

[49] Although not directly on point because it does not address a public financing scheme, the Supreme Court's recent decision in *Davis v. FEC*, __ U.S. __, 128 S. Ct. 2759 (2008), is nevertheless instructive on this issue.  The Court struck down the so-called "Millionaire's Amendment," which raised contribution limits for candidates facing high-spending, self-financed opponents, as an unconstitutional burden on the self-financing candidate's speech rights.  In doing so, the *Davis* Court affirmed the concept that the government may not infringe on political candidates' First Amendment rights in order to level the playing field between candidates possessing different levels of wealth.  *Id.* at 2772-73.  The Court held that the government's interest in "'equalizing the relative ability of individuals and groups to influence the outcomes of elections'" was not sufficient to justify raising contribution limits for candidates facing wealthy self-financed opponents.  *Id.* at 2773 (quoting *Buckley*, 424 U.S. at 48-49).  As the *Davis* Court

give an unfair advantage to established parties, thus reducing, to the nation's detriment, the potential fluidity of American political life." *Id.* at 97 (internal alterations and quotations omitted).

In upholding the constitutionality of the federal public financing scheme at issue in *Buckley*, it was significant to the Court that the scheme did not have an effect on the parties' relative standing. Importantly for the *Buckley* Court, the public financing scheme did "not *enhance* the major parties' ability to campaign," but rather "substitute[d] public funding for what the parties would raise privately and additionally impose[d] an expenditure limit." *Id.* at 95 n.129 (emphasis added). Any disadvantage to non-participating minor party candidates was "limited to the claimed denial of the enhancement of opportunity to communicate with the electorate," which was tempered by the scheme's expenditure ceiling for participating candidates, which the Court described as a "countervailing" disadvantage not imposed on non-participating candidates. *Id.* at 95. For that reason, the *Buckley* Court held that the federal public financing scheme for presidential elections was not a burden on ineligible minor party candidates' political

_____

further noted, "'[t]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment.'" *Id.* (quoting *Buckley*, 424 U.S. at 48-49). The Court reiterated that "it is a dangerous business for Congress to use the election laws to influence the voters' choices." *Id.* at 2774 (citing *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 791 n.31 (1978) (The "[g]overment is forbidden to assume the task of ultimate judgment, lest the people lose their ability to govern themselves.")).

It surely follows that, just as the government is not permitted to level the playing field by removing advantages from certain candidates, it is equally prohibited from advantaging certain candidates, i.e., slanting the playing field, so that it enhances the relative position of one candidate over another. "The argument that a candidate's speech may be restricted in order to 'level electoral opportunities' has ominous implications because it would permit Congress to arrogate the voters' authority to evaluate the strengths of candidates competing for office." *Id.* at 2773.

opportunity.  The CEP is distinguishable from the scheme in *Buckley* precisely because (1) the

*Buckley* public financing scheme applied to a single race – the presidential race – which has

always been competitive between the major parties, unlike many state and legislative elections to

which the CEP is applicable; (2) the CEP employs a single state-wide proxy to numerous district-

wide elections, thus distorting the political strength of the major parties in many districts by

disregarding the composition, demographics, and voting history of those particular districts, and

(3) the CEP does not impose a true countervailing disadvantage to participating candidates

because the expenditure limits are illusory in practice.[50]

There is no question that, on its face, the CEP's qualifying criteria and distribution

formulae discriminate between major party candidates and minor party candidates.  Minor party

candidates who collect the necessary level of qualifying contributions must satisfy a second

qualifying threshold before becoming eligible for a CEP grant, and unlike major party candidates

who collect the necessary qualifying contributions, may only become eligible for a partial CEP

grant.  Major party candidates who achieve the qualifying contribution threshold automatically

receive a full CEP grant without the need to satisfy any additional qualifying criteria.  Because

treating major and minor party candidates differently for purposes of public funding is not

necessarily unconstitutional, *id.* at 97, the issue becomes whether that discriminatory treatment

provides major party candidates an unfair advantage, thereby enhancing major party candidates'

relative strength and thus burdening the minor party candidates' political opportunity.  Whether

the CEP represents a burden on minor party candidates turns on the following issues: (1) whether

---

[50] For a more in-depth discussion on why the scheme at issue in *Buckley* is distinguishable
from the CEP, see my ruling in *Green Party I*, 537 F. Supp. 2d at 371-78.

the CEP's public funding grants are mere substitutes for what the participating candidates would have raised privately or whether they actually enhance the major party candidates' abilities to campaign beyond their normal capabilities; (2) whether the CEP's expenditure limits represent a true countervailing disadvantage for participating candidates; and (3) whether minor parties have a legitimate shot at qualifying for a CEP grant.  In addition, it is necessary to address the state's argument that the CEP enhances the political opportunity of minor party candidates.

I conclude that the CEP enhances the relative strength of major party candidates in ways that represent a severe burden on the political opportunity of minor party candidates for the following reasons: (1) it provides participating major party candidates public financing at windfall levels, well beyond what most major party candidates would typically be able to raise on their own from private fundraising sources; (2) it permits major party candidates who are as equally "hopeless" as minor party candidates in many districts to become eligible for full funding without first requiring such hopeless major party candidates to make the same threshold showing of public support required of minor party candidates through the additional qualifying criteria; (3) the additional qualifying criteria for minor party candidates are nearly impossible to achieve, thus ensuring that minor party candidates will only very rarely qualify for the "enhancing" benefits made available by CEP participation; and, (4) in the event a minor party candidate does qualify for partial CEP funding, it handicaps that participating minor party candidate by automatically granting full funding to his or her participating major party opponent, and by prohibiting the partially-funded minor party candidate from raising private contributions, up to the full grant amount, in increments greater than $100.

    a.  Public Financing Grants Are Windfalls Because They Do Not
        Correspond to Past Candidate Expenditures or Fundraising Levels

The evidence demonstrates that the CEP has dramatically increased the funding and resources of major party candidates well beyond what they have been historically able to raise and spend in any given election, which has led most districts with CEP-participating candidates to become awash in public financing. Pegging the CEP's grant levels to the most competitive races has burdened minor party candidates' political opportunity because, by providing major party candidates financing in amounts much higher than typical expenditure levels, it slants the political playing field in favor of major party candidates.

Examining past candidate expenditures and receipts for General Assembly seats demonstrates this point. In setting the CEP grant levels and expenditure limits, state legislators relied on 2004 state legislative election data. The CEP expenditure limits – CEP grant plus qualifying contributions – were based on the average expenditures in the most competitive races: $100,000 for state senate candidates ($15,000 in qualifying contributions plus $85,000 CEP grant) and $30,000 for state house candidates ($5,000 in qualifying contributions plus $25,000 CEP grant).

The CEP expenditure limits, however, are well above the average expenditures for all but the most competitive General Assembly races. In 2004, the average expenditure for state senate races contested by both major parties was $74,122.82; the average expenditure for state house races contested by both major parties was $18,741.59. For races considered "competitive" between the major parties, i.e., where the major party candidates' vote totals were within 20% of one another, the average expenditure increased to $114,013.33 for state senate races and

$21,336.40 for state house races.  Considering all races, however, the average expenditure was

$65,669.76 for all state senate candidates and $16,807.89 for all state house candidates; the

median amount expended was $47,415.70 for state senate candidates and $14,210.80 for state

house candidates.[51]  There can be no dispute that the amount of money available through the CEP

exceeds historical amounts expended in most races and, therefore, does not represent a

disadvantageous expenditure ceiling for most participating candidates.

Because the CEP purports to be a substitute for private fundraising, it is useful to

examine how much General Assembly candidates were able to raise, on average, prior to the

enactment of the CEP.  For the 2006 state legislative campaigns, the average amount raised was

$71,473.97 for state senate candidates and $20,437.26 for state house candidates; the median

amount raised was $57,763.50 and $19,078, respectively.  Again, those averages and medians are

well below the CEP grant plus qualifying contribution levels of $100,000 and $30,000 for state

and house candidates, respectively.

When examining contested and competitive districts, the average receipts get closer to the

CEP funding levels: in 2006, in the state senate districts contested by both major parties, the

average amount raised was $75,663.43; in contested state house districts, the average amount

raised was $22,106.32.  The CEP grant levels and expenditure limits are pegged to the most

expensive and competitive races: in those races where the major party candidates finished within

---

[51] Those figures, notably, do not include those candidates claiming exempt status,
meaning the candidate pledged he or she would raise and spend less than $1,000 for their
campaigns.  In 2004, there were 18 major party General Assembly candidates who claimed
exempt status; 17 of those candidates ran in contested races against another major party
candidate.  Obviously, including exempt candidates would only reduce the averages and medians
set forth above.

20% of the vote from one another, i,e, the "competitive" districts in 2006, the average amount raised in those 10 state senate districts was $110,075.10 and the average amount raised in those 26 state house districts was $34,564.29.

Those averages belie the actual fact that, in 2006, most major party General Assembly candidates raised nowhere near the CEP funding levels: only 13 state senate districts, or 36%, had candidates who raised campaign contributions of $100,000 or more; only 45 state house districts, or 30%, had candidates raise in excess of $30,000.

The funding and expenditure statistics from the 2008 General Assembly elections demonstrate how the CEP has injected much more money into state legislative races than was previously spent and raised in prior election cycles.  The CEP's effect is readily apparent from the increased number of districts that have candidates with access to significant amounts of campaign funding.  Starting with the state senate races, only 13 districts in 2006, or 36% of senate districts, had at least one candidate with access to $100,000 of campaign funding; that number grew to 27 out of 36 districts, or 75%, in 2008.  Average receipts for state senate candidates were up 14% to $81,216.83 from $71,473.97; median receipts were up 73% to $100,000.00 from $57,763.50 in 2006.  Even more tellingly, average expenditures for CEP-participating candidates were up 25% to $89,387.85 from $65,669.76, the average amount spent in 2004; median expenditures were up 104% to $96,891.65 from $47,415.70, indicating most CEP-participating candidates are finding ways to expend their entire CEP grant.

The number of house districts where at least one candidate had access to $30,000 in campaign funding grew to 95 out of 151 districts, or 63%, from 45 districts in 2006.  Average receipts for state house candidates in 2008 were up 19% to $24,338.06 from $20,437.26; median

receipts were up 57% to $30,000 from $19,078.  Average expenditures for CEP-participating

state house candidates in 2008 were up 53% to $25,712.14 from $16,807.89; median

expenditures grew by 98% to $28,171.11 from $14,210.80 in 2004.  Like candidates for state

senate, participating candidates for state house are finding ways to spend the bulk of their CEP

grants.

*Buckley*'s acceptance of the federal public financing scheme at issue in that case was

grounded, in large part, on the grants representing true limits to a candidate's expenditures and

merely substituting what the candidates would have raised privately.  Given the stark contrast

between CEP funding and average receipts from major party candidates' previous private

fundraising efforts, it is not possible to characterize the CEP's one-size-fits-all grants as

"substituting" rather than "subsidizing" major party candidates' private fundraising capabilities.

Furthermore, because the grants are well beyond what is necessary to mount a competitive

campaign in most races, the CEP cannot fairly be said to set a true expenditure ceiling either.

With so much money now available it has become next to impossible to spend very little money

and still run a meaningful campaign.  The CEP sets such a high fundraising threshold for non-

participating candidates that it virtually compels participation in the program by major party

candidates, and thus drowns out the voices of minor party candidates who have been historically

incapable of raising anything close to full CEP grant levels.

Participating major party candidates facing a major party opponent presumptively qualify

for full grants regardless whether that other major party candidate is participating or not.  In turn,

that major party candidate is incentivized to either participate in the CEP or raise an equivalent

amount of money privately.  The so-called "reduced" grant level provision for participating

major party candidates facing only minor party competition or who run unopposed does not alleviate the funding deluge created by the CEP. Once the minor party candidate raises private contributions that are equal to the qualifying contribution level and/or the minor party candidate becomes eligible for even a partial CEP grant, the participating major party candidate receives the full grant amount. The reduced funding for participating major party candidates facing minor party competition is applicable, therefore, only in situations where the other major party decides not to contest the district and the minor party candidates raises less than $15,000 in a state senate race and less than $5,000 in a state house race.

Analyzing minor party candidates' historical electoral record, the CEP's funding provisions create an evident paradox for minor party candidates. The evidence demonstrates that minor party candidates have typically been unable to raise money from a wide swath of the electorate. Their success has come most frequently by targeting those fundraising resources in districts where the major party candidate has run unopposed and/or did not spend a sizable amount of money on the campaign. Thus, in 2004, only one minor party candidate for the state senate did not run as "exempt" – plaintiff DeRosa. That year, DeRosa reported $150.08 in campaign expenditures in his race against one major party candidate and another minor party candidate. Despite this lack of fundraising success, in the four election cycles prior to 2008, 33 minor party candidates have received over 10% of the vote. The high levels of funding that the CEP injects into state legislative races has all but eliminated the existence of "low-cost districts" where the cost of mounting a campaign was well under the CEP grant levels. It is unlikely, therefore, that a minor party candidate running a low-cost campaign will be able to replicate anywhere near the same level of success from pre-CEP election cycles.

Comparing the average and median receipts in districts where minor party candidates competed in 2006 with the average and median receipts of the districts where minor party candidates competed in 2008 demonstrates the increase in money, due to the influx of public funding provided by the CEP, in those districts where minor party candidates ran.  On average, receipts for state senate districts where minor party candidates ran was up 24% to $84,917.43 in 2008 from $68,327.40 in 2006; median receipts in those districts were up 94% to $100,000.00 in 2008 from $51,638.50 in 2006.  There were CEP-participating major party candidates in six out of the seven state senate districts with minor party candidates in 2008.   Those CEP-participating candidates in the minor party districts spent, on average, $101,737.86, up 121% from $45,954.44 in average expenditures in districts with minor party candidates in 2004; median expenditures rose 188% to $95,404.21 from $33,172.56 in those districts.  Only two out of seven minor party candidates for state senate in 2008 did not run as exempt – plaintiff DeRosa, who collected $150, and Cicero Booker, who qualified for a full CEP grant.

In state house districts with minor party candidates, the average amount raised was up 37% from $16,621.69 in 2006 to $22,819.39 in 2008; the median amount raised was up 138% from $12,611.50 in 2006 to $30,000 in 2008.  There were CEP-participating major party candidates in 25 out of the 29 state house districts with minor party candidates in 2008.   In 2008, those CEP-participating candidates spent, on average, $24,118.08, up 42% from $16,933.83 in average expenditures in districts with minor party candidates in 2004; median expenditures rose 65% to $22,851.87 from $13,857.32 in those districts.  Twenty out of 33 minor party candidates for state house in 2008 ran as exempt.  Of the 13 minor party candidates who did not run as exempt in 2008, three qualified for a partial CEP grant and two for a full CEP grant; the

-77-

remaining eight minor party candidates averaged $2,376.25 in receipts from private fundraising sources.

Most participating major party candidates receive more money through the CEP than they could have raised privately and are subject to expenditure limits well above the average expenditures in prior election cycles.  Thus, at historic minor party fundraising levels, the participating major party candidate's campaign funding and expenditures will increase relative to the minor party candidate's funding and expenditures, thus increasing the major party candidate's relative strength in most districts.  The windfall funding enhances participating major party candidates' ability to campaign without any corresponding disadvantage and, therefore, operates as a burden on minor party candidates' political opportunity.

> b.   The Use of a Statewide Proxy Artificially Enhances Major Party Candidates' Competitiveness

The use of a statewide proxy to determine eligibility for public funding on the legislative district level enhances the relative strength of major party candidates because it does not require them to first demonstrate any threshold of public support in a district before becoming eligible for full funding.  In *Bang v. Chase*, 442 F. Supp. 758, 768 (D. Minn. 1977), the Court rejected a distribution method that relied on state-wide party preferences to distribute public campaign funding to candidates at the legislative district level.  According to *Bang*, "the aggregate political party preferences expressed by all state taxpayers . . . have no rational relation to the support for particular parties or for particular candidates within legislative districts."  The Court concluded that, because the distribution scheme permitted a party with a statewide plurality to "unfairly disadvantage its opponents in those districts where it enjoys little district support," the public

financing distribution method "invidiously discriminates between candidates of different political parties and abridges the First Amendment right of political association." *Id.*

Under the CEP, to qualify for the same level of funding as a major party candidate, a minor party candidate must have garnered at least 20% of the total vote in the previous election for that seat or must collect signatures equal to at least 20% of the total vote in the previous election. In one-party-dominant districts, the undisputed evidence demonstrates that not all major party candidates, if subject to the same qualifying criteria, would be automatically eligible to receive full CEP funding. If the same qualifying criteria applied to major party candidates, in 2008, one of the major party candidates would not have been eligible to receive automatic funding under the CEP in fully 44% of General Assembly districts (82 of 187) because, in 2006, that district was either uncontested by a candidate from that major party or the major party's candidate in the previous election won less than 20% of the vote.

Looking forward to the 2010 General Assembly elections, the same holds true. If major party candidates were required to comply with the qualifying criteria applicable only to minor party candidates, in 2010, one of the major party candidates would not be eligible to receive automatic funding under the CEP in 46% of General Assembly districts (86 of 187) because, in 2008, that district was either uncontested by a candidate from that major party or the major party's candidate in the 2008 election won less than 20% of the vote.

The state would have me summarily conclude that it would be an exercise in futility for the CEP to have required major party candidates to prove their support in those historically uncompetitive and/or uncontested districts because major party candidates will *always* meet the 20% petitioning threshold based on the inherent two-party nature of U.S. elections and the major

parties' superior networks and organizational structures.  The state, however, fails to

acknowledge two fundamental problems with that assertion.  First, in pointing to the major

parties' consistent vote totals over 20%, the state is relying on data from 2004 that does not take

into account the very districts where the statewide proxy's utility is called into question: those

districts abandoned by one of the major parties.  Second, and more troubling, the legislature has

chosen for its "major party threshold," a prior vote percentage that can be best described as the

proverbial "magic number," i.e., a threshold that major parties will almost always reach yet one

that the minor parties will almost never reach.[52]  There is no reason, however, to believe that

achieving a 20% vote threshold is any more predictive of electoral success or, conversely, renders

a candidate less "hopeless," than a candidate who garners some statistically lower percentage of

the vote.

    In 2006, for example, in the 27 of 36 state senate districts that were contested by

candidates from both major parties, a major party candidate won by more than 20% of the vote –

a landslide margin –  in 17, or 62%, of those contested races.  Similarly, on the state house side,

of the 90 races with two major party candidates, a major party candidate won by more than 20%

of the vote in 64, or 71%, of the races with major party competition.  Thus, in a significant

majority of state legislative districts, the losing major party candidate was not "competitive"

despite receiving more than 20% of the vote.  Certainly those candidates did "better" than their

minor party competition, however, they still lost resoundingly to the other major party candidate

by any measure of electoral competitiveness.  The fact is that, if coming within at least 20% of

---

[52] Although Republican Party registration is now perilously close to the 20% threshold, a
popular Republican gubernatorial candidate can still save Connecticut from the prospect of
having only one major party.

your opponent can be said to be a "competitive" race, only 28% of state senate races and 17% of

state house races were actually competitive, notwithstanding the fact that in non-competitive,

contested elections most major party candidates received more than 20% of the total vote.

In further support of their claim that major party candidates will always receive more than

20% of the vote in any race, the state relies on some misleading party identification statistics.

Although it is true that less than 1% of *affiliated* voters identify with a minor party rather than a

major party, nearly half of Connecticut's registered voters – 42.2% – are unaffiliated with any

party, major or minor.  On a district-wide basis, one of the major parties – the Republicans –

account for less than 20% of registered voters in 19 out of 36, or 52.3%, of state senate districts

and in 76 out of 151, or 50.3%, of state house districts.  In Hartford, New Haven, and Bridgeport,

where Republicans comprise less than 5% of registered voters, the Republican Party is, for all

intents and purposes, a minor party.

It is important, therefore, to reiterate the effect of the statewide proxy in state legislative

elections: the CEP provides full funding to any major party candidate who enters any General

Assembly election and raises the requisite qualifying contributions, regardless of that candidate's

historical odds of competing with any degree of success in that particular district.  And, in

choosing the magic 20% threshold by which to measure "major" versus "minor" party, the state

legislature chose a percentage that would ensure that Democrats and Republicans would remain

eligible for full funding under the CEP without having to prove the likelihood of electoral

success, while not truly capturing whether that candidate has the requisite electoral support to be

"successful."

I reject the state's argument that reputational concerns will temper major parties' desire to

seek CEP funding in every district and that major parties' internal vetting processes will ensure

that only candidates with a viable shot at winning the election will attempt to qualify for CEP

funding so that, therefore, there will be no "hopeless" major party candidates qualifying under

the less stringent major party requirements for CEP funding.  One need only look at the number

of CEP-participating major party candidates who nevertheless lost by landslide margins in 2008.

On the state senate side, in the 16 races that were not competitive between the major party

candidates, in eight of those districts, the losing major party candidate qualified for a full CEP

grant.  On the state house side, in the 55 races that were not competitive between the major party

candidates, in 32 of those districts, the losing major party candidate qualified for a full CEP

grant.

The parties' own valuation of a candidate as potentially successful does not guarantee that

that candidate will receive a commensurate level of support from voters.  Using an internal

screening process to vet potential candidates to run on a major party ticket is not analogous to

having broad public support that renders the additional petitioning or prior success requirements

superfluous.  As demonstrated by the non-competitiveness of the majority of General Assembly

districts, major party candidates are equally capable of falling flat with the electorate, albeit with

a higher level of support, as unsuccessful minor party candidates.  By favoring those hopeless

major party candidates with a statewide proxy and reduced eligibility requirements, which

ensures that virtually any and all major party candidates will be able to qualify for full CEP

grants regardless of their record of historical failure in certain districts, the CEP favors hopeless

major party candidates, thereby artificially enhancing those candidates' ability to campaign.

I conclude, therefore, that the CEP substantially enhances the relative strength of major

party candidates compared to minor party candidates because it encourages major parties to field candidates for historically uncompetitive seats, without regard to their likelihood of success, by providing full funding with a minimal requirement of collecting the requisite number of qualifying contributions. Based on the high number of uncontested General Assembly districts in Connecticut, major parties have historically had reason not to field candidates in those one-party-dominant districts, whether it was lack of popular support or difficulty in raising the necessary funds to be competitive. The CEP removes those inhibiting factors without regard to the likelihood of success or the fundraising prowess of major party candidates – the very reasons why the state argues minor party candidates must be subjected to higher standards for qualifying. In doing so, the CEP unfairly favors competition between major party candidates over competition from minor party candidates and thereby burdens the political opportunity of minor party candidates.

   c. Additional Qualifying Criteria Make It Unlikely That Minor Party Candidates Will Qualify for Public Funding

   Another reason that the CEP impermissibly burdens minor party candidates' right to political opportunity is that the onerous qualifying criteria make it extremely difficult for minor party candidates to become eligible for even partial public funding. For all practical purposes, therefore, the CEP operates as a one-sided benefit for major party candidates only.

   In addition to collecting the requisite number of qualifying contributions, minor party candidates must meet one of two additional qualifying criteria that do not apply to major party candidates. A minor party candidate may qualify for partial or full CEP funding if he or she, or the previous candidate from that party, garnered at least 10%, 15%, or 20% of the total vote from

the previous election for that particular seat.  If the minor party candidate fails to qualify under the prior success requirement, he or she may attempt to qualify under the petitioning requirement. Under the petitioning requirement, a minor party candidate must collect the signatures of registered voters from that district equal to 10%, 15%, or 20% of the prior vote total for that office.

Very few minor party candidates who ran for the General Assembly between 2002 and 2006 would have been eligible for even partial CEP funding in their subsequent elections under the prior success requirement.  In the three election cycles within that period, there were 179 minor party candidates on the ballot, but only 25 of those candidates received at least 10% of the vote.  In three election cycles, only four minor party candidates received over 20% of the vote, or approximately one General Assembly candidate per election cycle.  As a point of comparison, if 5% was the threshold level for full CEP funding under the prior success requirement,[53] 72 minor party candidates over three election cycles would have been potentially eligible for a full grant in the subsequent election, or approximately 24 General Assembly candidates per election cycle.[54]

Achieving at least 10% of the vote will only become more difficult for minor party candidates in the future, because the CEP's incentives encourage major party candidates to compete in districts they had previously abandoned, where minor party candidates have historically had their greatest successes.  Of the 25 minor party candidates who received over

---

[53] I use 5% as a comparison both because that is the level proposed by Garfield in 2006 as a sufficient safe harbor for CEP eligibility, Pl. Ex. 5 at 2, and because that is the threshold adopted by the federal election program and upheld as constitutional in *Buckley*, 424 U.S. at 103.

[54] Looking forward to 2010, under the CEP as currently written, under the prior vote provision, five minor party candidates would be eligible for a full CEP grant.  Under a 5% prior vote requirement, that number would increase to 23 minor party candidates.

10% of the vote between 2002 and 2006, 23 ran against only one major party candidate.

Similarly, in 2008, of the 15 minor party candidates who received over 10% of the vote, 13 ran

against only one major party candidate.  With increased competition comes a smaller piece of the

electoral pie for all candidates, thus making the 10% threshold even more onerous over time as

more districts become contested by candidates from both major parties.  *See* Tr. 12/10/08 at 291-

92, 305 (testimony of Donald Green).

      Turning to the petitioning requirement, there is convincing evidence that achieving the

CEP's 10/15/20% signature gathering threshold is a nearly impossible task given the time and

expense of such a petition drive.  I begin with the number of signatures that are actually required

to qualify under the CEP's petitioning requirement.  The state's petitioning expert, Harold

Hubschman, advises that a successful petition campaign would need to collect 150% of the

threshold number of signatures in order to have a sufficient cushion against signature invalidity.

Hubschman Supplemental Decl. at ¶ 9.  Based on the 2008 voter turnout, a minor party candidate

for state senate petitioning to qualify for a one-third grant in 2010 would need to collect between

2,352 and 5,427 valid signatures of registered voters, depending on the district.  Table 6 to the

Narain Decl.  Using Hubschman's extra 50% cushion, to successfully qualify for the lowest level

of CEP funding, a candidate would, as a practical matter, need to collect between 3,528 and

8,141 signatures of registered voters in that district.  To qualify for a *full* CEP grant, using the

150% guide, a successful minor party candidate would need to collect between 7,056 and 16,283

valid signatures.  On the state house side, using the 150% rule of thumb, to qualify for a one-third

grant in 2010 a minor party candidate would need to collect between 489 and 2,075 signatures

and between 980 and 4,149 signatures for a full grant, depending on the district.  On the senate

side, the average number of signatures needed to qualify for a one-third grant is 3,958 and 7,916

for a full grant.  On the house side, the average number of signatures needed to qualify for a one-

third grant is 918 and 1,836 for a full grant.  Table 6 to the Narain Decl.  At the statewide level in

2010, a minor party gubernatorial candidate, using the 150% guide, would need to collect

168,511 signatures to qualify for a one-third grant and 337,024 for a full grant.

As a matter of comparison, in his 1990 gubernatorial bid, Governor Weicker collected

just 100,000 signatures by deploying an unprecedented 1500-plus volunteers working in all 169

towns in Connecticut.  Pl. Ex. A-2, Weicker Decl. ¶¶ 9,15.  Weicker credits the success of his

campaign to his "broad-based type of organizational support that is most commonly associated

with the party structure of major parties."  *Id.* at ¶ 11.  If 100,000 signatures was a Herculean feat

for Governor Weicker, who was the most successful minor party candidate in the history of the

state, and who was a major public figure with a 30-year record as an elected official and a major

party-like organizational structure, it is difficult to see how any minor party gubernatorial

candidate will come close to qualifying for even a one-third CEP grant.

In most cases, to successfully collect the requisite number of signatures, a minor party

candidate would need to hire paid petitioners at between $1.00 and $2.00 per signature.

Hubschman opined that a "reasonably well organized" minor party candidate should have

equivalent success with a band of dedicated, unpaid volunteers.  Hubschman Supp. Decl. at ¶7.

There are several reasons, however, why that opinion is not convincing.  First, the state does not

seriously contest the notion that petition campaigns generally employ paid petitioners; at the

bench trial, the state's other expert, Donald Green, conceded that most petition campaigns would

need to hire paid petitioners at $1.50 to $2.00 per signature in order to meet the petitioning

requirement.  Tr. 12/10/08 at 320, 323, 325-28 (testimony of Donald Green).  Second,

Hubschman's hypothesis regarding the ease of using unpaid volunteers is based solely on petition

drives he has been hired to conduct on behalf of major party candidates; he has never been

involved in any petition campaign for a minor party candidate other than Joe Lieberman, who

was an incumbent Democratic senator at the time of the petitioning drive, with the attendant

name recognition and established base of supporters.  Pl. Ex. 32, Hubschman Dep. at 44.

Therefore, Hubschman does not have any knowledge about the unique difficulties facing minor

party candidates seeking to connect with members of the electorate, without name recognition or

major party identification to help them.  Third, the state has urged in other portions of its

briefing, and I agreed in my findings of fact, that minor parties generally lack established

organizational structures.  Therefore, it is unlikely that a minor party could ever mount a

sufficiently well-organized campaign to collect the necessary signatures in the time period

allotted, i.e., between January and August of an election year.  I will, therefore, continue my

analysis under the premise that qualifying under the CEP petitioning requirement would require

hiring paid signature gatherers.

At $1.00 to $2.00 per signature, the minor party candidate for state senate would need to

spend, on average, $3,958 to $7,916 to collect enough signatures to have a shot at qualifying for

a one-third grant.  To qualify for a full grant, the minor party candidate for state senate would

need to spend $7,916 to $15,832.  These figures are consistent with the experience of minor party

candidates, as demonstrated by the efforts of Cicero Booker, the Working Families candidate in

the 15th Senate District who qualified for a full CEP grant in 2008.  According to Jon Green, the

director of the Connecticut Working Families Party, Booker needed to collect 2,703 valid

signatures to qualify for a full CEP grant; his campaign actually submitted in excess of 5,300

signatures.  Jon Green Supp. Decl. ¶ 8.  As of September 4, 2008, Booker's campaign had spent

$9,210 for a professional canvassing service to collect CEP petition signatures and to raise

Booker's qualifying contributions.[55]  *Id.*  ¶ 9.  According to Jon Green, out of that $9,210, the

cost of gathering signatures was $3,010, which works out to approximately $1.75 per signature.

*Id.*

The cost of a petitioning campaign highlights the next difficulty faced by minor party

candidates: the CEP's prohibition on permitting professional canvassing services or other

consultants hired to help qualify for CEP funding to work "on spec," i.e., "with hopes of but no

assurance of payment."  Random House Webster's Unabridged Dictionary (2d ed. 1998).  Under

the SEEC's regulations, "it is impermissible for a participating candidate to bargain for and

accept services with the understanding that he or she will receive those services no matter what

but will pay for them, in part or in full, only if the candidate qualifies for a grant."  March 10,

2009 Rotman Decl. ¶ 8 (citing Conn. Agencies Reg. § 9-706-2(b)(16)).  Although the regulation

does not require the candidate to pay up front, and therefore candidates may incur a short-term

debt to the canvassing service, the candidate is obligated to eventually pay for the services

rendered, out of personal funds, if the candidate fails to qualify for the CEP.  *Id.*  According to

the state's own expert, Professor Donald Green, the reasonableness of the CEP's petitioning

requirement is contingent upon the ability of petitioning candidates to hire consulting services on

spec.  Tr. 12/10/09 at 322-26.  Because candidates seeking to qualify for the CEP are prohibited

---

[55] Notably, Booker spent an additional $75,990 on his canvassing service, Citizen's
Services, Inc., before the end of the 2008 election cycle.  Pl. Exs. 106 & 109.

from hiring consultants and paid petitioners to work on spec, even the state's own expert believes

that the qualifying criteria are not reasonable.[56]  Furthermore, because seeking a CEP grant limits

the amount of money a candidate can collect from individuals – up to $100 – in order to qualify

for CEP funding by satisfying the petitioning requirement, a minor party candidate must be

willing and able to pay thousands of dollars in personal funds to canvassing services in the event

he or she fails to garner enough signatures and qualifying contributions to qualify for a partial or

full CEP grant.[57]

---

[56] It appears that Professor Green's thesis that the CEP's thresholds for funding eligibility are reasonable and do not create unrealistic obstacles for participation by minor party candidates, is founded upon the belief that the CEP grants will provide incentives for the creation of a "cottage industry" of political consultants "whose main role will be to facilitate [minor party candidates'] qualifying campaigns." Tr. 12/10/09 at 281-82. Green testified that the prospect of a significant grant will make it worth it for consultants to agree to work on behalf of a minor party candidate seeking to qualify for the CEP. *Id.* at 325. As he explained, "the qualification threshold is just de minimis . . . especially since the state is effectively subsidizing it." *Id.* at 306. "[A] [consulting] firm would be quite happy, I'm sure, to do it on spec. [The firms'] expected value is the probability that they'll meet the requirements times the number of dollars that they'll receive should they meet the requirement *minus the risk associated with not getting paid*." *Id.* at 323 (emphasis added). As Green's testimony revealed, however, he was unaware that the CEP prohibits candidates from hiring consulting services "on spec:"

GREEN:  [T]o the extent that [the consulting service] would charge you, say, $20,000 to conduct this campaign, or $15,000 to conduct the campaign and bill you after you've gotten the CEP grant, you would be . . . well to look in terms of that transaction.

Q: And if that option you just described was, in fact, illegal, . . . your opinion would change about the reasonableness of the qualifying criteria?

GREEN:   Yes, if it were, but I do not believe that it is.

*Id.* at 325.  In fact, according to SEEC regulations, the CEP prohibits candidates from entering contracts for services that are contingent upon the receipt of a CEP grant.  March 10, 2009 Rotman Decl. ¶ 8 (citing Conn. Agencies Reg. § 9-706-2(b)(16)).

[57] I am mindful that the unsuccessful minor party candidate also would have the option to attempt to retire his campaign debt with a fundraising drive after the election.  Given the

Putting the cost of gathering signatures aside, there are several further difficulties that every petitioning minor party candidate seeking to qualify for public funding must face, regardless whether they are relying on paid petitioners or volunteers.  First, Connecticut does not require private property owners or merchants, such as grocery stores, to give access to their property to signature gatherers.  Hubschman Decl. ¶ 22.  Yet the most efficient location to collect signatures, according to petitioning expert Hubschman, is outside a grocery store.  *Id.* Therefore, if private property owners elect not to permit petitioners on their property, the process of petitioning becomes more time-consuming by forcing petitioners to go door-to-door or to collect signatures outside less trafficked, public locations such as post offices or commuter rail stations.  Second, unlike unknown major party candidates who benefit from widespread party identification among voters, minor party candidates cannot draw on a wide base of latent support among the electorate – there is no dispute that gathering signatures on behalf of a Democrat or a Republican is easier to do than for a minor party candidate.  Therefore, the process of collecting signatures for minor party candidates requires more effort with a lower chance of success.  That lack of latent support is compounded by the problem that supporters of the major party candidate who is ideologically closer to the minor party candidate will lack the incentive to sign a petition for the minor party candidate to obtain CEP funding if that candidate has the potential to siphon votes from their preferred candidate.  This leaves the petitioning minor party candidate with the prospect of collecting signatures equal to 15%-30% of the vote from substantially less than 100% of the electorate, which, realistically, is daunting if not impossible.  To put this in context, in

difficulty that even high-profile candidates have had with the process of retiring campaign debt, I do not believe this would be a feasible way for unsuccessful minor party candidates to escape using personal funds to pay for the petitioning services.

Connecticut, to get on the ballot as a gubernatorial candidate, a candidate must gather 7,500 from registered voters statewide.  Conn. Gen. Stat. § 9-453d.  In contrast, to qualify for CEP funding, a state senate candidate must collect, on average, even more signatures – 7,916 – from within a single senatorial district.[58]

The state defends the CEP's qualifying criteria as not insurmountable, pointing to the five minor party candidates who managed to qualify for partial or full funding grants in 2008.  Although a handful of minor party candidates have managed to surmount the very high qualifying criteria, that fact does nothing to diminish the substantial burden facing minor party candidates who wish to qualify for CEP funds.  Moreover, that burden necessarily focuses a minor party candidate on the task of qualifying for the CEP rather than the activities of campaigning.

The additional qualifying criteria imposed on minor party candidates set nearly impossible hurdles in the path of minor party candidates, unduly burdening minor party candidates seeking to qualify for CEP funds.  Without the prospect of meaningful minor party participation, the CEP operates as a benefit conferred only on major parties, thus burdening minor party candidates' political opportunity.

---

[58] I would also point out that the pool from which qualifying contributions can be collected is much larger than the pool from which signatures can be gathered.  Although qualifying contributions – which the major party candidates are also required to collect in order to become eligible for CEP funding – may come from mere "residents" of their district, a minor party candidate seeking to qualify for a CEP grant under the petitioning requirement must collect signatures from a (necessarily) smaller pool of registered voters from that district.  *Compare* Conn. Gen. Stat. § 9-704 (stating qualifying contributions must come from a certain number of "individuals residing" in the state or district) *with* Conn. Gen. Stat. § 9-705(c)(2), (g)(2) (stating signatures must come from "qualified electors").

> d.     The CEP's Discriminatory Funding Scheme Discourages Minor
>        Party Participation

Finally, the CEP's distribution scheme itself discourages minor parties from even trying

to qualify for CEP funding.  Where a participating major party candidate is running against only

a non-participating minor party candidate who has raised private donations totaling less than the

qualifying contribution amount for that office, the participating major party candidate is eligible

for a reduced CEP grant worth only 60% of the full grant amount.  Conn. Gen. Stat. § 9-

705(j)(4).  As soon as the minor party candidate qualifies for a partial CEP grant or privately

collects contributions equal to the qualifying contribution amount for that office, however, the

participating major party candidates's grant is automatically increased to the full amount.[59]  The

participating minor party candidate, however, is only able to seek additional funding up to the

full grant amount by collecting private campaign donations of $100 or less.  Therefore, even if

the minor party candidate is successful at raising the necessary amount in qualifying

contributions, he or she has the incentive to forgo public funding and continue to raise private

contributions that would not be subject to the same strict $100 contribution limit based on his or

her opponent's increased funding.  Conversely, minor party candidates have an incentive to

collect less than the threshold qualifying contribution amount and forgo participation in the CEP

in order to keep their major party opponents' grant amount at 60%.  For example, if a minor party

candidate for state house keeps his or her contributions below $5,000, his or her major party

opponent will only be eligible for a $15,000 grant.  As soon as the minor party candidate reaches

the $5,000 threshold, his or her opponent's public funding shoots to $25,000, making it that

_____

[59] In other words, a minor party candidate who qualifies for 33.3% CEP funding triggers
his opponent's receipt of an additional 40% CEP grant.

much more difficult for the minor party candidate to wage an effective campaign against his publicly-funded opponent. Therefore, the minor party candidate faces a strong incentive to avoid raising contributions in excess of $5,000, whether or not that candidate hopes to become eligible for the CEP.

e.      Conclusion on the Issue of Burden

For those foregoing reasons, I conclude that, the CEP operates as a subsidy for major party candidates by enhancing their relative strength beyond their past ability to fundraise and campaign, without imposing any countervailing disadvantages or requirements on participants. Accordingly, both individually and collectively, the aspects of the CEP discussed above severely burden minor party candidates' political opportunity. The state's argument that the CEP represents a transformative opportunity for minor party candidates fails because too few minor party candidates can qualify for even a partial grant or have the incentive to do so.

4.      *Applicable Level of Scrutiny*

Having concluded that the CEP burdens the fundamental rights of minor party candidates, I must now determine what level of scrutiny to apply in determining whether that burden is nevertheless constitutional. The plaintiffs urge that I apply strict scrutiny as I did in my ruling denying the state's motion to dismiss, arguing that campaign finance regulations are subject to strict scrutiny. The state contends that the appropriate level of scrutiny is determined using the Supreme Court's test set forth in the election law and ballot access cases of *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). The state argues that, under the *Anderson-Burdick* balancing test, because the plaintiffs have failed to demonstrate that the CEP represents a "severe" burden on their First Amendment rights, intermediate scrutiny

must apply.

Because the *Anderson-Burdick* line of decisions focuses on whether a state's election and ballot access laws have impermissibly burdened the rights of *voters* to associate or to choose among candidates, rather than the speech rights of *candidates* affected by campaign finance regulations, the balancing test set forth in those cases is not applicable here. In *Burdick,* a voter challenged Hawaii's prohibition on write-in voting, 504 U.S. at 430; *Anderson* involved a challenge by several voters to Ohio's early filing deadline for independent candidates' seeking to be placed on the general election ballot. 460 U.S. at 782-83. The *Burdick* Court acknowledged that voting was "of the most fundamental significance under our constitutional structure," but declined to hold that strict scrutiny must apply in every case challenging election laws that burden voters' rights because it "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." 504 U.S. at 433. Because achieving legitimacy for the democratic electoral process requires balancing the rights of voters to have freedom of choice and association with the need for order and efficiency in running elections, the *Burdick* Court, citing *Anderson*, concluded that a more deferential and "flexible" standard applied to challenges to state election laws. *Id.* at 434. In such cases, a court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* (quoting *Anderson*, 460 U.S. at 789). Necessarily, the extent to which the challenged regulation burdened the voters' First and Fourteenth Amendment rights dictated the level of scrutiny that should apply. *Id.*

-94-

Those cases simply have no bearing on the issues presented by this challenge to

Connecticut's public campaign financing law by minor parties and minor party candidates.

Accordingly, I decline to apply the *Anderson-Burdick* test and conclude, instead, that "exacting

scrutiny," i.e., strict scrutiny, should apply given the significant impact the CEP has on minor

party candidates' political speech rights.[60]  *See, e.g.*, *Daggett v. Comm'n on Gov't Ethics &*

*Election Practices*, 205 F.3d 445, 466 (1st Cir. 2000) (applying strict scrutiny to Maine's public

campaign financing law); *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1553 (8th Cir. 1996) (applying

strict scrutiny to Minnesota's public financing law).  Therefore, the CEP will survive the

plaintiffs' constitutional challenge only if the government can demonstrate that it is narrowly

tailored to further a compelling government interest.

>   5.   *Government Interest*

The state contends that the CEP, with its statutory preference for major party candidates,

serves five separate, but related, compelling government interests: to eliminate actual and

perceived corruption, to free candidates and elected officials from the burden of political

fundraising, to encourage a significant level of candidate participation in the public financing

program, to protect the public fisc, and to avoid providing incentives for the creation of

splintered parties and unrestrained factionalism.

The plaintiffs do not seriously dispute that the prevention of actual and perceived

---

[60] Even if I am wrong and the *Anderson-Burdick* test is the appropriate way to determine the level of scrutiny that must be applied in this case, I would still conclude that the plaintiffs have satisfied their burden of demonstrating the CEP is a "severe" burden on their right of political opportunity, and therefore, strict scrutiny would nevertheless apply.  *See Burdick*, 504 U.S. at 434 (noting that, where the rights protected under the First and Fourteenth Amendments are subject to "severe restrictions," the "regulation must be narrowly drawn to advance a state interest of compelling importance") (internal quotation omitted).

corruption in state politics is a well-recognized compelling government interest. *Rosenstiel*, 101

F.3d at 1553; *Republican Nat'l Comm. v. FEC*, 487 F. Supp. 280, 284-85 (S.D.N.Y. 1980).  As I

stated in *Green Party I*, 537 F. Supp. 2d at 379, the CEP is designed to serve the interest of

eliminating the appearance of corruption by encouraging candidates for state office to abstain

from raising private donations, the traditional source of political contributions and logical basis

of potential corruption, in exchange for public funding.  As a corollary interest, courts have

recognized that freeing candidates' time, which would otherwise be devoted to private

fundraising, to engage in a competitive debate or discussion of the issues is also a compelling

state interest advanced by a public financing scheme. *Rosenstiel*, 101 F.3d at 1553; *Republican*

*Nat'l Comm. v. FEC*, 487 F. Supp. at 284-85.  Courts have also recognized that a state has a

compelling interest in encouraging candidate participation in the public financing program.

*Rosenstiel*, 101 F.3d at 1553 (citing cases).  Finally, the *Buckley* Court recognized that the

government has at least an important public interest in protecting the public fisc by "not funding

hopeless candidacies" and "against providing artificial incentives to splintered parties and

unrestrained factionalism." *Buckley*, 424 U.S. at 96 (internal quotation omitted).  Although

*Buckley* identified those last two interests as "important," rather than "compelling," because it

does not affect my decision in this case, I will treat those interests as compelling state interests

for purposes of this ruling.

     As a final note, the rationale for treating minor party and major party candidates

differently for purposes of CEP eligibility, which operates as a burden on those candidates'

fundamental rights protected under the First Amendment, "must be genuine, not hypothesized or

invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996);

*Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n.16 (1975) ("This Court need not in equal protection cases accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose could not have been a goal of the legislation.").

> 6.   *Narrow Tailoring*

In order to survive strict scrutiny, the state must successfully demonstrate that the CEP is narrowly tailored to further the compelling government interests outlined above. *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 878 (2d Cir. 2008) (citing *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000), and *Reno v. ACLU*, 521 U.S. 844, 874 (1997)). If the CEP either does not advance those interests, or there are less restrictive means for achieving those interests that do not infringe so severely on the political opportunity of minor party candidates, it cannot survive strict scrutiny. *Id.*

There can be no dispute that a public financing scheme, generally speaking, serves a compelling state interest in removing actual and perceived corruption by cutting off avenues for influence by eliminating the need for, and opportunity to make, large campaign contributions. Certainly no state lawmakers have admitted to being unduly influenced by contributors who make significant donations to their campaigns. No such admission is necessary. There exists a natural connection in the public's mind between large contributions and increased influence and access to lawmakers, which a public financing system goes a long way towards eliminating. The state is to be commended for the on-going efforts to reverse the state's "Corrupticut" public image wrought by the recent corruption scandals detailed above. Nothing in this opinion should be taken as criticizing the state's overall effort to improve the electorate's perception of state

government by enacting far-reaching anti-corruption legislation.  Efforts to improve the transparency and integrity of the political process serve to strengthen our system of representative democracy.  *Buckley*, 424 U.S. at 26-27 (on the constitutionality of contribution limits, noting that "[t]o the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined").  Connecticut is at the forefront of such efforts and should be proud of the new legacy it is creating with its campaign finance reform efforts.

The issue, therefore, is not whether a public financing scheme can further the compelling state interest of reducing actual and perceived corruption; it certainly can do that.  It is also beyond doubt that a public financing scheme can free candidates and elected officials from the burden of political fundraising and, therefore, can engage more directly with voters and each other in debating the pertinent issues.  Rather, the issue is whether the particulars of the public financing scheme, i.e., requiring minor party candidates to undertake additional qualifying criteria and, in turn, setting what those thresholds would be, are appropriately tailored to further the state's compelling interests.  For example, the state argues that it chose to require minor party candidates to undertake additional qualifying criteria before becoming eligible for a CEP grant because it wanted to prevent a raid on the public fisc.  The constitutionality of the CEP, therefore, will turn on whether it has been narrowly tailored to achieve that interest.

    a.    Different Qualifying Criteria for Major and Minor Party
          Candidates

The state first asserts that the additional qualifying criteria for minor parties are necessary to protect the public fisc.  Certainly the state, when distributing public funds, may set

requirements for candidates to prove "some preliminary showing of a significant modicum of support." *Buckley*, 424 U.S. at 96. The state, however, has chosen to require major and minor party candidates to submit to different requirements in order to prove that necessary modicum of support before receiving public financing. According to the state, in the absence of sufficiently high qualification and eligibility standards, many minor party candidates with little or no chance of winning election to office could qualify for funding, thus squandering public monies on hopeless candidacies. By requiring the minor party candidates to prove a demonstrated ability to attract voters and run a competitive race through the prior success or petitioning requirements, the state argues it ensures that the public funding will not be wasted on candidates without a true chance of winning the election.

Of course, this argument relies on the proposition that the two major parties have equal standing, bases of support, and history of success across all electoral districts so that it would be administratively burdensome and unnecessary for major party candidates also to satisfy those preliminary eligibility thresholds. The evidence demonstrates that that proposition is demonstrably false. Connecticut has historically been comprised of one-party-dominant districts, meaning one of the major parties consistently wins office, causing the other major party to either abandon the district or run candidates who lose by landslide margins.

The 2006 elections represent a good snap-shot of the pre-CEP electoral landscape in Connecticut. Out of 36 state senate districts, only 27 were contested by candidates from both major parties. Of those 27 districts, one of the major party candidates won by a landslide – more than 20% of the vote – in 17 races. Thus, in only 10 senate districts, or 28%, did the major parties get within 20% of the vote of one another. On the state house side, 90 out of 151 districts

had candidates from both major parties.  Of those 90 races, one of the major party candidates

won by a landslide margin in 64 races.  Thus, in only 26 house districts, or 17%, did the major

parties run competitively against one another.  Furthermore, in three state senate races and nine

state house races, one of the major party candidates received less than 20% of the vote, not to

mention the nine state senate districts and 61 state house districts where one of the major parties

did not run a candidate at all.  Therefore, in 44% of the General Assembly districts, 82 of 187,

one of the major parties would not have qualified for automatic, full CEP funding in 2008 if

major party candidates were subjected to the same qualifying criteria as minor party candidates.

The 2008 election results demonstrate that, in the 2010 elections, in 46% of General Assembly

districts, a major party candidate would not be eligible to receive automatic funding under the

CEP if subjected to the minor party candidates' qualifying criteria.

The evidence of major parties' superior organization and internal vetting process is not

enough to overcome that marked deficit of support across so many districts.  Although a major

party under the CEP is any party that has more than 20% of the state's registered voters or that

won more than 20% of the vote in the previous gubernatorial election, those definitions do not

hold true on a district-wide level, particularly in a state where a plurality of the state's voters are

registered as "unaffiliated."  In 53% of state senate districts and 50% of state house districts,

Republicans account for less than 20% of registered voters.

Furthermore, even if name recognition and latent party identification are enough to push

the non-dominant major party candidate over the magic 20% threshold most of the time, no

matter which district the candidate runs in, there is no evidence in the record that suggests why

using a 20% threshold is the appropriate arbiter of electoral competitiveness.  In a district where

a Democrat beats his or her Republican opponent 75% to 25%, no one would argue that the

Republican candidate's vote total represented a realistic chance of winning or even a showing of

significant strength.[61]  Rather, one would consider that Republican candidate just as unlikely to

win an election as a candidate achieving only 5% of the vote.  Both of those candidates are, for

all intents and purposes, "hopeless" candidates, and yet the CEP gives the 25% vote-earner a

tremendous advantage in the next election.

　　　　The evidence demonstrates that major parties are just as capable of running hopeless

candidates as minor parties.  The state, however, has failed to demonstrate how its interest in

protecting the public fisc is served by treating hopeless minor party candidates differently from

hopeless major party candidates.  In fact, it is more likely that favoring hopeless major party

candidates over hopeless minor party candidates will result in a raid on the public fisc because it

is easier for such candidates to become eligible for public financing and because more hopeless

major party candidates than hopeless minor party candidates run for office.  There is no evidence

to suggest that major parties will self-regulate and run only those candidates who have a true

chance of success in a particular district; in fact, the non-dominant major party has no incentive

to accept the status quo in such a district.  Major parties have every incentive to run candidates as

challengers to entrenched incumbents in one-party-dominant districts, even with no hope of

---

[61] This also illustrates the fallacy of the state's explanation that the CEP has high
qualifying thresholds for minor party candidates because the aim of the CEP is to provide public
funding only for candidates who have a realistic chance of winning an election.  If that were truly
the aim of the CEP, it would have to use much higher thresholds of 40% or 45%, applied to both
major and minor party candidates, in order to ensure that only candidates with a legitimate
chance of winning an election would receive a grant.  Because the CEP currently funds many
major party candidates who have no realistic chance of winning, the state cannot claim with a
straight face that the CEP is only meant to fund candidates with a legitimate shot at winning an
election.

actually winning, as part of a long-term effort to build candidate and party recognition over time in a particular district, i.e., to use free public monies to slowly chip away at the dominant party's foothold.  In that scenario, not only is the major party is using public financing to fund its party-building efforts, but with more major party candidates incentivized to run, more public funds are being expended.

Next, the state argues that it is necessary to subject minor party candidates to more rigorous eligibility requirements in order to avoid splintered parties and unrestrained factionalism.  Any measure aimed at preventing splintered parties and unrestrained factionalism, however, must be narrowly crafted to avoid drowning out the independent, third party voices in the marketplace of ideas.  *See Greenberg*, 497 F. Supp. at 764, 768-72 (discussing the tension between preventing factionalism and the historical value such third parties have played in developing new policies and challenging established norms).

The state has not explained why the CEP's qualifying contributions and additional qualifying criteria, as written, are necessary to achieve the state's interest in preventing a rise of factionalism and splintered parties from taking advantage of the CEP.  It is true that a handful of the legislature's Working Group expressed concern that third parties could be used to destabilize support for the other major party candidate or engage in other abusive electioneering tactics. Garfield Decl. II, Ex. 4 at 121 (statement of Sen. DeFronzo); *id.* at 123 (statement of Rep. McCluskey); *id.* at 128 (statement of Rep. O'Brien); *id.* at 130 (statement of Rep. Caruso); Garfield Decl. I, Ex. 19 at 74 (statement of Rep. McCluskey).  The state, however, has failed to present anything beyond those theoretical concerns about the potential for factionalism and splintered parties; put simply, there is no evidence in the record to suggest that the thresholds and

additional qualifying criteria for minor party candidates are necessary to prevent the hypothetical

doomsday predictions of unrestrained factionalism from becoming a reality.

When the Working Group was presented with testimony by the administrators of the

Maine and Arizona public financing schemes, which both operate on a party-neutral basis –

meaning major party and minor party candidates are subject to identical qualifying criteria –

neither administrator reported having a problem with splintered parties or factionalism.  *See*

Garfield Decl. I, Ex. 19 at 5-93 (testimony of Barbara Lubin and Jonathan Wayne).  Rather, each

testified that the problems each state had experienced with administering its program involved

corrupt or inappropriate uses of public financing, rather than candidates seeking to splinter

parties or generate destabilizing factionalism.  *Id.* at 26-27 (testimony of Barbara Lubin); *id.* at

28, 57 (testimony of Jonathan Wayne).  An updated report about Maine's clean election program

from state senator Peter Mills does not report any problems with factionalism or splintered

parties; instead, the problems that have surfaced in Maine all involve the misuse of public funds

for personal or other corrupt purposes.  Mills Decl. ¶ 14.  Similarly, in a declaration submitted in

November 2008, the Executive Director of the Maine Commission on Governmental Ethics and

Election Practices, Jonathan Wayne, reports that Maine has recently experienced some abuses of

its system, including at least three instances where campaign consultants attempted to recruit

candidates to qualify for public funding so that they could take substantial commissions from

those public grants.  November 26, 2008 Wayne Decl. ¶¶ 7, 10.  Those problems, again, deal

with corrupt uses of public funding, not attempts by major parties to run stalking-horse

candidates[62] in order to game the system and split the vote for their preferred candidate or a splinter group seeking to use the public funding for its own party-building efforts.  Even defendant Garfield, testifying before the Government Administration and Elections Committee following passage of the first version of the CEP, assured lawmakers that Arizona and Maine had experienced no problems with factionalism or splintered parties.  Garfield Decl. II, Ex. 4 at 129.

The only evidentiary source presented by the state in support of its argument that having easier qualifying criteria for minor party candidates would lead to more stalking-horse candidates is a declaration from Jackie Thrasher, an incumbent Democratic candidate for the Arizona House of Representatives in 2008.  In her declaration, Thrasher claims that her Green Party opponent was actually a Republican in disguise, egged on by her Republican opponents to draw votes from her.  December 2, 2008 Thrasher Decl. ¶ 8.[63]  Even taking Thrasher's speculative theory as true, i.e., that the Green Party opponent in her race was a stalking-horse candidate who entered the race to help ensure Thrasher's defeat as the Democratic candidate, that would be the only example of such conduct in Arizona or Maine in the ten-plus years those states have had a public financing scheme in place.  Thrasher's declaration contains no information regarding whether or not the "pseudo" Green Party candidate would have been prevented from qualifying for public funding under more stringent qualifying requirements such as Connecticut's – the only relevant

---

[62] A stalking-horse candidate is "a political candidate used to conceal the candidacy of a more important figure or to draw votes from and cause the defeat of a rival."  Random House Webster's Unabridged Dictionary (2d ed. 1998).  It is worth noting that the stalking-horse candidate problem is relevant only in especially competitive races, not a common scenario in Connecticut.

[63] I excluded the fifth sentence in paragraph eight as inadmissible hearsay because it was based on information read in a newspaper article, rather than her own personal knowledge. 12/10/08 Tr. at 258-59.

issue.  Presumably, a determined stalking-horse candidate, with sufficient under-the-table

backing from a major party, would be well-equipped to surmount any obstacle erected by a

public financing program.  One example in the ten years of Arizona's public financing program

is not sufficient establish that the program's lack of additional qualifying criteria for minor party

candidates has lead to increased factionalism, splintered parties, and stalking-horse problems so

that Connecticut's additional qualifying criteria are necessary to combating those issues.

There is simply no evidence in the record to support the argument that the additional

qualifying criteria for minor party candidates are a narrowly tailored way to further the state's

interest of limiting the growth of factionalism or splintered parties.

In short, the state has failed to demonstrate how treating major and minor party

candidates differently for purposes of CEP eligibility furthers its stated interests for doing so –

protecting the public fisc and preventing factionalism.

b.      10/15/20% Thresholds

Even assuming the use of different qualifying criteria for major and minor parties is not

necessarily unconstitutional, notwithstanding the failure of such criteria to further either of the

state's proffered compelling interests, the next question is whether the eligibility thresholds set

by the qualifying criteria are narrowly tailored.  In order to qualify for a one-third CEP grant, a

minor party candidate, after collecting the necessary qualifying contributions, must have won at

least 10% of the vote from the prior election or collected enough signatures of qualified electors

to equal 10% of the prior election's vote total.  To qualify for a two-third grant, that threshold

jumps to 15% for both requirements; to qualify for a full grant, the threshold jumps again to 20%.

Again the state claims the 10/15/20% thresholds further the compelling interests of protecting the

public fisc and preventing the rise of factionalism and splintered parties by requiring minor party candidates to demonstrate they have a sufficient base of public support and a chance of winning election to office.  The plaintiffs argue that the state's interests could have been achieved using, at most, thresholds of 3/4/5% for one-third, two-third, and full grants, respectively, and that, therefore, the 10/15/20% thresholds are not sufficiently narrowly tailored.

The state relies on Professor Green's opinion that the 20% threshold is not unreasonable and that it is a satisfactory threshold for determining a modicum of popular support and electability.  Professor Green's testimony about the "de minimus" nature of the CEP's 20% threshold was undermined by his insistence that the qualifying criteria threshold had to be set high enough to prevent embarrassing, fiscally corrupt candidates who might undermine the electorate's opinion about the integrity of the public financing system and so-called stalking-horse candidates.  12/10/08 Tr. at 279, 306.  If the 10/15/20% thresholds are truly a de minimus requirement for minor party candidates to achieve, then they cannot logically also keep out stalking-horse candidates or those candidates seeking to use the funds for personal gain.  *Id.* at 342.  The state cannot have it both ways: it cannot claim that the high thresholds are necessary to prevent the entry of candidates who will not run legitimate campaigns, while simultaneously holding up the thresholds as remarkably easy for any reasonably competent candidate to surpass.

The state's purpose in enacting the 10/15/20% thresholds, over the 3/4/5% thresholds recommended by Garfield, becomes even more dubious when considering what the legislature actually relied upon in setting those thresholds.  First, the General Assembly's joint Government Administration and Elections Committee was presented with testimony from defendant Garfield that a safe harbor of 5%, along with the requisite qualifying contribution requirement, would be

sufficient to achieve the state's purpose of restricting hopeless candidates' access to CEP

funding.  *See* Garfield Decl. II, Ex. 4 at 118.  Second, when asked at the bench trial what the

legislature had consulted when setting the 10/15/20% threshold, defense counsel cited an OLR

Research Report entitled Past Performance of Petitioning and Minor Party Candidates in

Connecticut.  12/10/08 Tr. at 393-94; Pl. Ex. 30.  Notwithstanding the fact that the report post-

dates the passage of the CEP, and was presumably submitted as part of the legislative review of

proposed amendments in March 2006, that report details the vote totals for the 168 minor party

candidates who ran for the General Assembly between 2000 and 2004.[64]  Pl. Ex. 30.  The report

states that 77 candidates received less than 3% of the vote; 15 received between 3% and 3.99%;

14 received between 4% and 4.99%; and 61 candidates received more than 5% of the vote.  *Id.*

More specifically, 12 minor party candidates received between 10% and 14.99%; six between

15% and 19.99%; and four received over 20% of the vote.  *Id.*  Therefore, over three election

cycles, according to the report, under the present qualifying criteria thresholds only 22 minor

party candidates would have been eligible for even a partial CEP grant and, of those 22

candidates, only four would qualify for a full CEP grant.

It is not difficult to discern from this report that the legislature essentially set the

threshold criteria at the level guaranteed to ensure extremely minimal minor party participation in

---

[64]  As explained above, the OLR Report includes four extra minor party candidates for
state senate in 2002.  Because the legislature presumably relied on the summary in the report
rather than consulting the report's tables that reveal the discrepancy, for purposes of discussing
the sources consulted by the legislature when considering the additional qualifying criteria for
minor party candidates, I will use the figures reported in the OLR report's summary.  In truth,
there were 74, not 77, minor party candidates who received less than 2.99% of the vote and 11,
not 12, minor party candidates who received between 10% and 14.99% of the vote in 2000, 2002,
and 2004.  Pl. Ex. 30, comparing summary on page 2 with the Tables on pages 6 to 12.

the CEP.  Faced with a choice of providing full CEP funding to an average of 20 minor party

General Assembly candidates per election cycle versus 1.33 minor candidates per cycle, the

legislature chose the latter.  That decision raises the specter of major party entrenchment – by

setting a 20% prior vote total threshold, the General Assembly ensured that virtually no minor

party candidates would be eligible for CEP funding under the prior success requirement.  At the

same time, the legislature picked a threshold of "strength" that major party candidates would

always be able to reach – provided they could rely on the state-wide vote total proxy, rather than

a district-based prior vote total, to get around abandoned districts in which they have a prior vote

total of zero.

Although the Supreme Court has recognized the political reality that electoral districts

within the United States operate in a two-party system, it has historically rejected attempts by the

legislature to solidify the Democrats and Republicans as *the* two parties.  In *Williams v. Rhodes*,

393 U.S. 23, 24-25, 34 (1968), the Court rejected, as a violation of the Equal Protection Clause,

Ohio's ballot access law requiring minor parties to collect signatures equal to 15% of the prior

gubernatorial election in order to have their presidential candidates placed on the ballot.

Although the Court recognized that the state has an interest in promoting the stability afforded by

a two-party system, the ballot access law tended to favor not just a two-party system, but "two

particular parties – the Republicans and the Democrats," effectively giving those parties "a

complete monopoly."  *Id.* at 32.  Noting that "[c]ompetition in ideas and governmental policies is

at the core of our electoral process and of the First Amendment freedoms," the Court concluded

that there was "no reason why two parties should retain a permanent monopoly on the right to

have people vote for or against them."  *Id.*  In other words, although a state cannot be faulted for

designing its electoral regulations within the parameters of a two-party system, it does not get to choose which two parties to favor.  Although the state is not obligated to fund all candidates equally, it may not design a public financing scheme that effectively treats hopeless major party candidates more favorably than hopeless minor party candidates.  In doing so, the state has effectively passed a law that will have the effect of entrenching the political strength of the two current major parties, the Democrats and Republicans, when the evidence provides little support for treating those two parties equally in every district.

Turning back to the question of tailoring, i.e., whether the 10/15/20% thresholds are narrowly tailored to achieve the dual interests of protecting the public fisc and preventing splintered parties and unrestrained factionalism, there is no evidence to suggest that those two interests would not be equally well-served by lower thresholds, such as the 3/4/5% thresholds recommended by the SEEC in March 2006.  To the contrary, "a safe harbor is attained with a 5% standard that could be satisfied either with 5% of total votes cast for the office at the preceding election, or a 5% additional petition signature requirement for such candidates."  Pl. Ex. 5, Written Testimony of Jeffrey Garfield before the  March 13, 2006 GAE Committee Hearing, at 2.

Finally, most evidence in the record supports the conclusion that the CEP could further the compelling state interests even without requiring minor party candidates to submit to additional qualifying criteria.  There is compelling evidence to suggest that the fundraising criteria set by the qualifying contribution requirement alone would present a significant hurdle for most minor party candidates to overcome.  The evidence in the record demonstrates that minor party candidates have had little success in fundraising generally; historically most minor party candidates have run as "exempt."  In 2006, for example, only two minor party candidates

for state representative did not claim exempt status, raising $4,283 and $1,125, respectively, still below the $5,000 qualifying contribution threshold for state house candidates seeking to qualify for the CEP.  Only one minor party candidate for state senate in 2006 did not claim exempt status, raising $600, well below the $15,000 qualifying contribution amount.  Only in 2004 did a handful of minor party candidates have successful fundraising efforts.  In 2004, at least nine minor candidates for state representative raised over $1,000, with six of those candidates raising over $5,000 and two of those in excess of $10,000.  On the state senate side in 2004, minor party candidates fared less well in their fundraising efforts, with only three candidates claiming non-exempt status and only one candidate actually raising more than $1,000.

The state has repeatedly asserted that the minor parties do not deserve to be treated equally to major parties based, in part, on the minor parties' alleged incompetence when it comes to fundraising.  Taking the state's proposition that minor parties are not capable of significant fundraising as true, the state could have easily set much lower thresholds to achieve its purported purpose of ensuring that only viable candidates would be eligible for public funding.  The pre-CEP data demonstrate that minor party candidates' fundraising efforts were not so significant to suggest that setting a party-neutral qualifying contribution threshold would not be challenge enough for minor party candidates seeking to demonstrate their electoral bona fides.

Furthermore, the Maine and Arizona programs studied by the General Assembly prior to passing the CEP, which both operate on a party-neutral basis, demonstrate that such programs do not create raids on the public fisc or the threat of splintered parties.  For that reason, they are appropriately considered less restrictive alternatives to the CEP, as currently written.

(i).    Maine[65]

In 1996, Maine voters approved the Maine Clean Elections Act, Me. Rev. Stat. tit. 21-A

§§ 1121, *et seq*. ("Maine Act"), which created a voluntary system of public funding in which

candidates for Governor, state senate, and state house may elect to participate.  Me. Rev. Stat. tit.

21-A § 1122.  To qualify for public funds under the Maine Act, all candidates, regardless of party

affiliation, must raise a certain amount of "qualifying contributions."  Me. Rev. Stat. tit. 21-A §

1124(3).  A qualifying contribution is a $5 donation to the Maine Clean Election Fund made by

registered voters within that district.  Me. Rev. Stat. tit. 21-A § 1122(7).  Candidates for

Governor must obtain at least 3,250 qualifying contributions, candidates for state senate must

obtain at least 150 qualifying contributions, and candidates for state house of representatives

must obtain 50 qualifying contributions.  Me. Rev. Stat. tit. 21-A § 1125(3).  Once the candidate

raises the required number of qualifying contributions, the candidate is qualified to receive public

funds, as long as the candidate has complied, and continues to comply, with the Act's other

provisions.  Me. Rev. Stat. tit. 21-A § 1125(5).  The Maine Act is party-neutral; it has no prior

success formula, and imposes no other qualifying criteria only on minor party candidates.

The amount of public funds that a participating candidate will receive depends upon

whether the election is contested or uncontested and how much candidates spent, on average,

over the prior two election cycles.  Me. Rev. Stat. tit. 21-A §§ 1125(8)(C), (8)(D).

The Maine Act differs from the CEP in at least two respects.  First, the Maine Act

---

[65] For a more in-depth description of the Maine and Arizona clean election programs and the various constitutional challenges that have been mounted against those programs, as well as a description of the public financing programs in place in North Carolina, Minnesota, Massachusetts, Vermont, and others, *see Green Party I*, 537 F. Supp. 2d at 381-90.

contains no distinctions between major party candidates and minor party candidates; all

candidates are treated equally regardless of party affiliation.  Second, the amount of public funds

available to participating candidates is not one-size-fits-all like the CEP, which sets the amount

of funding based on the most competitive and expensive races in the state.  Instead, the amount

of public funding depends on the average amount of campaign expenditures from the prior two

election cycles for that office.  *Daggett v. Commission on Governmental Ethics & Election

Practices*, 205 F.3d 445, 451 (1st Cir. 2000).

(ii).    Arizona

In 1998, Arizona voters adopted, as an initiative, the Citizens Clean Elections Act, Ariz.

Rev. Stat. §§ 16-901, *et seq*. ("Arizona Act"), which created a voluntary system of public funding

in which candidates for Governor, Secretary of State, Attorney General, Treasurer,

Superintendent of Public Instruction, Corporation Commissioner, Mine Inspector, and state

legislature may elect to participate.  *See* Ariz. Rev. Stat. § 16-950(D).  To qualify for public

funds, all candidates, regardless of party affiliation, must raise a certain amount of "qualifying

contributions."  Ariz. Rev. Stat. § 16-950.  Qualifying contributions are defined as a $5 donation

to the candidate's election fund.  Ariz. Rev. Stat. § 16-946.  Once the candidate raises the

required qualifying contributions, which vary depending upon the office sought,[66] the candidate

is qualified to receive public funds as long as the candidate has complied, and continues to

---

[66] Candidates for Governor must obtain 4,000 qualifying contributions, candidates for Secretary of State and Attorney General must obtain 2,000 qualifying contribution, candidates for Treasurer, Superintendent of Public Instruction and Corporation Commissioner must obtain 1,500 qualifying contributions, candidates for mine inspector must obtain 500 qualifying contributions, and candidates for the legislature must obtain 200 qualifying contributions.  Ariz. Rev. Stat. § 16-950(D).

comply, with the Act's other provisions.  Ariz. Rev. Stat. § 16-950.  The Arizona Act is

substantially party-neutral; it has no prior success formula, and imposes no other qualifying

criteria only on minor party candidates.

Although the Arizona Act's qualifying criteria are similar to those of the Maine Act, the

distribution formulas differ slightly.  Instead of averaging the amounts spent in prior elections

and setting a specific value for the gubernatorial race, the Arizona Act sets specific values for

each election and adjusts those values to account for inflation.  Ariz. Rev. Stat. § 16-959.[67]  Like

the Maine Act, the Arizona Act adjusts for uncompetitive districts.  Ariz. Rev. Stat. § 16-952.

Unlike the Maine Act, however, the Arizona Act does not reduce a participating candidate's

general election grant in a "one-party-dominant"[68] race, but rather, gives the candidate the option

to reallocate a portion of the candidate's general election funds to the primary election.  Ariz.

---

[67] The specific grants for the primary and general elections are set forth in a table compiled by the Secretary of State.  Ariz. Rev. Stat. §§ 16-959, 16-961(H).

It worth comparing Connecticut's grant amounts to the grant amounts provided under the Arizona public financing scheme.  The spending limits for the 2008 elections under the Arizona Act are as follows: $736,410 for the Governor; $155,042 for Secretary of the State; $155,042 for Attorney General; $77,513 for Treasurer; and $19,382 for legislature.  Ariz. Rev. Stat. §§ 16-959, 16-961(H).  In contrast, the expenditure limits under the CEP are: $3.25 million for Governor; $825,000 for Secretary of the State, Attorney General, and State Treasurer; $100,000 for state senator; and $30,000 for state representative.  Conn. Gen. Stat. § 9-705(a)(2), (b)(2), (e)(2), (f)(2).

The disparity between Connecticut's limits and Arizona's limits is particularly stark given the fact that Arizona (approximately 6.3 million people) has almost twice the population as Connecticut (approximately 3.5 million people), and that Arizona (113,998 square miles) is more than 20 times the geographic size of Connecticut (5,543 square miles).

[68] The Arizona Act defines "a one-party-dominant legislative district" as "a district in which the number of registered voters exceeds the number of registered voters registered to each of the other parties by an amount at least as high as ten percent of the total number of voters registered in the district."  Ariz. Rev. Stat. § 16-952(D).

Rev. Stat. § 16-952(D).  Finally, the Arizona Act also makes some distinctions in distributions

based upon party status.  It provides that qualifying independent candidates receive a grant equal

to 70% of the sum of the original primary election spending limit and the original general

election spending limit.  Ariz. Rev. Stat. § 16-951.  That lump sum is distributed at the beginning

of the primary season and may be used in both primary and general elections.  *Id.*  Notably this

"reduced" grant amount applies only to truly independent candidates, i.e., those candidates not

running as the nominee of a party on the official ballot.  *See* Arizona Citizens Clean Elections

Commission, Participating Candidate Guide: 2007-2008 Election Cycle, *available at*

http://azcleanelections.gov/Libraries/2007-2008-docs/Participating_Candidate_Guide.sflb.ashx

(last visited August 27, 2009).  Minor parties are treated the same as major parties for purposes

of the Arizona Act.  Ariz. Rev. Stat. § 16-951.

c.      Grant Amounts

Finally, the state defends the CEP grant amounts as necessary to encourage a significant

level of candidate participation in the public financing program.  As described above, however,

those funding levels are set much higher than historic levels for all but the most expensive

campaigns.  The level of funding provided to candidates is well above the amount raised and

expended during the average campaign; it is worth noting, additionally, that those averages do

not take into account the lack of fundraising or expenditures in those districts abandoned by one

of the major parties.  The evidence suggests that the CEP provides funding at levels well beyond

the fundraising capabilities of even most major party candidates, and therefore, well beyond what

is necessary to encourage a significant level of candidate participation.  Furthermore, financing

campaigns at platinum levels is contrary to the state's purported interest in protecting the public

-114-

fisc.  If the state were truly concerned about limiting the amount of money it disburses pursuant to the CEP, it could well have established lower thresholds of public grants, which would not overwhelm the modest campaigns of non-participating minor party candidates and yet still attract significant levels of participation.  Money is not the only factor that encourages candidate participation in a public financing scheme – as demonstrated by the legislators' testimony in support of the CFRA, having more time to campaign on the issues rather than fundraising and being able to tout one's freedom from the influence and control of special interests are also attractive incentives achieved by participation in a public financing scheme.

7.    *Conclusion re: Count One*

For the foregoing reasons, I conclude that the CEP imposes a severe, discriminatory burden on the political opportunity of minor party candidates and, despite presenting compelling government interests, the state has failed to demonstrate how the CEP is narrowly tailored to advance those government interests.  During the bench trial in this case, the state advocated strictly delineating the evidence relevant to the plaintiffs' facial challenge from the evidence relevant to their as-applied challenge.  I believe most of the evidence presented is relevant to both challenges.

To succeed on their facial challenge, the plaintiffs' must demonstrate that the CEP's burden on their political opportunity is apparent on the face of the statute.[69]  In an as-applied

---

[69] In most First Amendment cases challenging a statute or regulation, the inquiry is whether the law is unconstitutional in all its applications, *Washington State Grange v. Washington State Republican Party*, __ U.S. __, 128 S. Ct. 1184, 1190 (2008), or "because 'a substantial number' of its applications are unconstitutional."  *Id.* at 1190 n.6 (quoting *New York v. Ferber*, 458 U.S. 747, 769-71 (1982)).  This is not a case where the state has argued that the plaintiffs are interpreting the statute too broadly or that there are alternative, constitutional constructions of the CEP.  Here, there is no dispute regarding the construction of the statute.

challenge the plaintiffs must demonstrate that the perceived burden really exists in practice, i.e.,

the CEP, as applied, actually does burden the political opportunity of minor party candidates.  I

believe that the plaintiffs have met their heavy burden of demonstrating that the CEP is

unconstitutional both on its face and as applied, because they have successfully demonstrated

how and why the CEP's burden on the political opportunity of minor party candidates is apparent

on the CEP's face, and have shown, through the evidence of the 2008 election cycle, and in

particular, the large amount of campaign funding granted to major party candidates by the CEP,

that the CEP actually severely burdens the political opportunity of minor party candidates.

The state argues that the plaintiffs cannot prevail in their as-applied challenge unless they

demonstrate how the CEP has diminished the political strength of minor party candidates.[70]  The

---

Accepting the state's interpretation of the statute and how it actually operates in practice, the
CEP operates to burden the fundamental rights of minor party candidates.

[70] The state also argues that the Supreme Court's recent decisions in *Washington State
Grange*, 128 S. Ct. at 1191, and *Crawford v. Marion County Election Board*, __ U.S. __, 128 S.
Ct. 1610, 1621-23 (2008), exhibit a strong distaste for facial challenges over as-applied
challenges, and that I should, therefore, disregard the plaintiffs' facial challenge entirely in favor
of the as-applied challenge.  Beyond the obvious distinguishing feature – both decisions
addressed election laws, rather than a campaign finance law – neither case forecloses my
consideration of the plaintiffs' facial challenge.  In *Crawford*, there is no mention of as-applied
challenges, let alone a preference for them.  128 S. Ct. at 1621-23.  In the sections highlighted by
the state, the Court was merely concluding that the plaintiffs had failed to meet the burden
required for facial challenges.  *Id.*  In *Washington State Grange*, the Court stated that facial
challenges are "disfavored" because they "often rest on speculation" and "raise the risk of
'premature interpretation of statutes on the basis of actually barebones records.'" 128 S. Ct. at
1191 (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)).  First, although the Court did
note the difficulty of mounting successful facial challenges, the Supreme Court did not squarely
reject the concept of facial challenges.  *Id.*  Second, the Supreme Court's concerns are simply not
a factor in this case.  In *Washington State*, the law had yet to be enacted and the harm – that
voters would be confused by the new ballot rules – was entirely speculative.  *Id.* at 1193-94.  In
this case, not only does the law expressly discriminate in its treatment of major party and minor
party candidates, but it was operating during the most recent election cycle, and most
significantly, the plaintiffs' theory has been well supported by a full record, including the results

state focuses on the fact that there was no significant difference in the number of minor party candidates or the average percentage of the vote they garnered from 2006 to 2008. The state's focus on absolute numbers, however, is misplaced. The issue in this case is the effect of the CEP on the parties' relative strengths.

Regardless of the ballot access, fundraising results, and vote outcomes in 2008, the CEP, in fact, funneled large amounts of money to major party candidates in 2008, thus dramatically enhancing their relative ability to reach the electorate beyond their past ability to raise contributions and campaign, but without any countervailing disadvantage to those participating candidates. As a result, the relative strength of the major party candidates has been dramatically increased and the relative strength of the minor party candidates has been dramatically diminished. The facts show that, in 2008, major party candidates received and spent public funds at windfall levels; the statewide proxy permitted hopeless major party candidates to easily qualify for CEP funding despite poor or non-existent levels of public support in their own districts; that the CEP's additional qualifying criteria are extremely onerous because very few minor party candidates are eligible under the prior success requirement and the alternative petitioning requirement is nearly impossible to achieve; and the CEP contains incentives for minor party candidates to forgo raising large amounts of campaign contributions or qualifying for CEP funding lest their major party opponents receive even larger public grants. Therefore, as

---

of the 2008 election. Considering Connecticut's electoral history as a party-dominant state, the effects of a public financing system, which on its face: (1) employs a statewide proxy as the basis for distributing public funding, (2) distributes windfall grants, and (3) operates for the benefit of primarily major party candidates, cannot be legitimately characterized as speculative. Furthermore, because I conclude that the plaintiffs have met their burden for establishing both their facial and as-applied challenges, the state's argument that I refrain from considering the facial challenge in favor of the as-applied challenge is moot.

explained more fully above, I conclude that the facts demonstrate that the CEP actually burdened the political opportunity of the minor party and minor party candidate plaintiffs in 2008. Accordingly, the CEP is both facially unconstitutional and unconstitutional as-applied to the plaintiffs.

B.     COUNTS TWO AND THREE: CEP Trigger Provisions[71]

In counts two and three, the plaintiffs allege that the CEP's excess expenditure and independent expenditure trigger provisions, which release additional grant money to participating candidates under certain circumstances, violate the First Amendment rights of non-candidates, non-participating candidates, and their supporters.  According to the plaintiffs, the trigger provisions act as de facto expenditure limits on non-participating candidates and non-candidates by discouraging such persons from engaging in constitutionally protected First Amendment expression for fear of releasing additional campaign funding to their political opponent or disfavored candidate.

I previously granted the state's motion to dismiss counts two and three in *Green Party I*, 537 F. Supp. 2d at 391-92.  The plaintiffs moved for reconsideration of my ruling following the Supreme Court's decision in *Davis v. FEC*, 128 S. Ct. 2759 (2008).  On October 10, 2008, I granted the plaintiffs' motion for reconsideration and vacated my order dismissing those counts. The state now seeks summary judgment on counts two and three on the ground that the plaintiffs lack standing to challenge the trigger provisions.  Alternatively, the state contends that the

---

[71] Counts two and three of the plaintiffs' amended complaint are best understood as alternative challenges to the specific CEP trigger provisions in the event their all-encompassing challenge to the CEP is rejected.  I will decide the plaintiffs' alternative constitutional challenges to forestall a remand in the event my ruling on count one is reversed on appeal.

provisions survive strict scrutiny because they are narrowly tailored to further the state's

compelling interests in incentivizing participation in the CEP and protecting the public fisc by

keeping down the value of the initial CEP grants.  Because the parties have submitted trial briefs

on counts two and three and have had the opportunity to argue the merits of their positions on

those counts at the bench trial held in December 2008 and March 2009, I will consider the claims

raised by counts two and three on the merits, rather than under the summary judgment standard

of review.

<blockquote>1.   <em>Factual Background</em></blockquote>

<blockquote>a.   Excess Expenditure Trigger Provision</blockquote>

The CEP's excess expenditure trigger provision provides matching funds to participating

candidates who face a high-spending non-participating candidate.  Conn. Gen. Stat. § 9-713.

Under section 9-713, a participating candidate receives additional primary or general election

grants once the non-participating candidate spends, or receives contributions, in excess of the

participating candidate's expenditure limit, i.e., the amount of qualifying contributions plus CEP

grant for that particular office.  <em>Id.</em>  Once the non-participating candidate spends or receives

contributions in amounts equal to 100%, 125%, 150%, and 175% of the participating candidate's

expenditure limits, matching funds are released in grants equal to 25% of the original CEP grant.

<em>Id.</em> at § 9-713(a)(1)-(4).  Accordingly, the participating candidate is eligible to receive up to four

matching fund grants in additional funding, totaling 100% of his or her original CEP grant

amount, under the excess expenditure provision.  <em>Id.</em>  For example, if a non-participating

candidate for state house spends or receives contributions of one dollar over $30,000, the

participating candidate would receive $6,250 in matching funds, 25% of $25,000, to spend

immediately.  If the non-participating candidate then spends or receives contributions that exceed $37,500, the participating candidate receives another $6,250 grant, and so on.

Whether the excess expenditure provision has been triggered is determined by looking at the non-participating candidate's individual receipts and expenditures; in other words, the excess expenditure provision is triggered only if the expenditures and/or receipts of one candidate exceed the expenditure limit for the participating candidate.  In the event that there are multiple non-participating candidates in a single race, those candidates' expenditures and receipts are not aggregated together for the purposes of determining whether the excess expenditure provision has been triggered.  *See* Tr. 12/10/08 at 243-49 (counsel for the Attorney General representing that section 9-713 does not provide for aggregation across multiple non-participating candidates).  As discussed below, this procedure differs from how expenditures and receipts are calculated for purposes determining whether the independent expenditure provision has been triggered.

The excess expenditure provision imposes additional reporting requirements on non-participating candidates.  Conn. Gen. Stat. § 9-712.  Non-participating candidates in races with participating opponents must report to the SEEC once they have made expenditures or received contributions that equal 90% of the participating candidate's expenditure limit.  *Id.*  Once one non-participating candidate reaches that 90% threshold, the CEP requires *all* non-participating candidates in that race to submit supplemental campaign finance statements on a biweekly or weekly basis, depending on when the election is scheduled to take place.  *Id.* § 9-712(a)(3).  In addition, the high-spending non-participating candidate must report to the SEEC once he or she receives contributions and makes expenditures in amounts exceeding 100%, 125%, 150%, and 175% of the participating candidate's expenditure limit.  *Id.* § 9-712(a)(4).  Failure to comply

with these filing requirements could result in fines of up to $1,000 for the first failure to timely

file the required campaign finance statement and up to $5,000 for each subsequent failure.  *Id.* §

9-713(c).

> b.      Independent Expenditure Trigger Provision

The CEP's independent trigger provision provides matching funds to participating

candidates when there are independent expenditures made "with the intent to promote the defeat"

of that participating candidate.  Conn. Gen. Stat. § 9-714.   The SEEC has broadly defined such

expenditures as those either:

> 1. Conveying a public communication containing a phrase including, but
> not limited to, "vote against," "defeat," "reject," or a campaign slogan or
> words that in context and with limited reference to external events, such as
> the proximity to the primary or election, can have no reasonable meaning
> other than to advocate the defeat of one or more clearly identified
> candidates; or
>
> 2. Making a public communication which names or depicts one or more
> clearly identified candidates, which, when taken as a whole and with
> limited reference to external events, contains a portion that can have no
> reasonable meaning other than to urge the defeat of the candidate(s), as
> evidenced by factors such as the presentation of the candidate(s) in a
> unfavorable light, the targeting, placement, or timing of the
> communication, or the inclusion of statements by or about the candidate.

Pl. Ex. 36, Conn. Agencies Reg. § 9-714-1.  Consequently, there is a significant potential for any

uncoordinated communication that is critical of a participating candidate to be construed as an

independent expenditure for purposes of triggering matching funds for the participating candidate

under the independent expenditure trigger.

The amount of additional money released to the participating candidate is equal to the

amount of the independent expenditure on a dollar-for-dollar basis.  *Id.* § 9-714(a).  Participating

candidates are eligible to receive matching funds worth up to 100% of the original grant amount under the independent expenditure trigger provision.  *Id.* § 9-714(c).  In races with only CEP-participating candidates, the release of matching funds equal to the amount of the independent expenditure is automatic.  *Id.* § 9-714(a)-(b).  In races where the participating candidate faces a non-participating candidate, matching funds for the participating candidate are released when the amount of the independent expenditure, combined with the amount of all the non-participating candidates' expenditures, exceeds the amount of the participating candidate's CEP grant amount.  *Id.* § 9-714(c)(2).  Therefore, in races with two or more non-participating candidates, the amount of both non-participating candidates' expenditures plus the amount of the independent expenditure are aggregated for purposes of determining whether matching funds should be issued.  For example, in a state house race where one non-participating major party candidate spends $24,000 and a non-participating minor party candidate spends $1,000, if a non-candidate makes $5,000 independent expenditure advocating the defeat of the participating candidate, the participating candidate would receive $5,000 in matching funds pursuant to the independent expenditure provision because the two non-participating candidates' expenditures totaled $25,000, the amount of the participating candidate's grant.

Persons making independent expenditures advocating either the success or the defeat of a participating candidate in excess of $1,000 are required to report such expenditures to the SEEC or face civil penalties.  *Id.* § 9-612(e).[72]

_____

[72] If such independent expenditures are made more than 20 days before election day, the report must be made within 48 hours of the expenditure.  Conn. Gen. Stat. § 9-612(e)(2).  If the independent expenditure is made within 20 days of an election, the report must be made within 24 hours of the expenditure, *id.*, presumably to facilitate the disbursement of matching funds, if necessary.

Taking the trigger provisions together, if the participating candidate faces a high-spending non-participating candidate and a vocal, uncoordinated opposition campaign from an independent political group, that participating candidate can potentially receive public financing worth up to three times the amount of the original full public grant – the initial grant plus one additional full grant based on the excess expenditure provision and another additional full grant based on the independent expenditure provision. Accordingly, for example, the expenditure limit for a participating state house candidate could potentially increase from $30,000 to $80,000, including $75,000 in public funding. On the state senate side, the expenditure limit for a participating candidate could increase from $100,000 to $270,000, which would include $245,000 in public funding.

   2.  *Standing*

The state contends that I should not reach the merits of the plaintiffs' First Amendment claims in counts two and three because the plaintiffs lack standing to assert those claims.[73] According to the state, the plaintiffs have failed to prove how they are likely to be harmed by the trigger provisions because they have failed to demonstrate how minor parties or minor party

---

[73] The state does not challenge the plaintiffs' standing to challenge the trigger provisions as part of their claims in count one, namely, that the matching fund provisions contribute to the discriminatory burden on minor party candidates' right of political opportunity in violation of the First and Fourteenth Amendments. Indeed, I have already concluded, in *Green Party I*, that the plaintiffs have standing to challenge the trigger provisions in the context of their claims asserted in count one. 537 F. Supp. 2d at 367 n.9 ("The triggers are nevertheless applicable to plaintiffs' other First and Fourteenth Amendment claims, namely, that the CEP crowds them out of races, especially in one-party-dominant districts, and that the CEP is effectively a subsidy to major party candidates, not a substitute for private campaign contributions. Plaintiffs have standing to raise those First and Fourteenth Amendment claims."). Because I originally dismissed their claims in counts two and three as being without merit, I have not yet addressed the merits of the state's standing argument with respect to counts two and three. *See* Tr. 10/10/08 at 4.

candidates will ever spend enough during an election to trigger matching funds under either

provision.  Plaintiffs argue that they have standing to challenge both trigger provisions because

those provisions will chill their political speech and because any expenditures that they may

make as candidates or as non-candidates engaged in independent advocacy, however modest,

could be the basis for triggering additional funding under the independent expenditure provision.

To satisfy Article III standing, "a claimant must present an injury that is concrete,

particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior;

and likely to be redressed by a favorable ruling."  *Davis v. FEC*, __ U.S. __, 128 S. Ct. 2749,

2768 (2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Where the

alleged injury is prospective in nature, a party has standing to sue "where the threatened injury is

real, immediate, and direct."  *Id.* at 2769.  Courts have recognized that a statute's prospective

chilling effect on the exercise of First Amendment rights is a sufficiently concrete and

particularized injury to confer standing.  In *Initiative & Referendum Institute v. Walker*, 450 F.3d

1082, 1089 (10th Cir. 2006), the Tenth Circuit formulated a test for determining standing in suits

based on a chilling effect of speech:

> [P]laintiffs in a suit for prospective relief based on a "chilling effect" on
> speech can satisfy the requirement that their claim of injury be "concrete and
> particularized" by (1) evidence that in the past they have engaged in the type
> of speech affected by the challenged government action; (2) affidavits or
> testimony stating a present desire, though no specific plans, to engage in such
> speech; and (3) a plausible claim that they presently have no intention to do so
> because of a credible threat that the statute will be enforced.

*Id.*  The Court reasoned that in such cases a plaintiff need not demonstrate a "present intention"

to engage in speech "at a specific time in the future" because "[a] plaintiff who alleges a chilling

effect asserts that the very existence of some statute discourages, or even prevents, the exercise

of his First Amendment rights." *Id.* Plaintiffs establish standing by satisfying the above criteria; "it is not necessary to show that they have specific plans or intentions to engage in the type of speech affected by the challenged government action." *Id.*

In *North Carolina Right to Life Committee Fund for Independent Political Expenditures v. Leake*, 524 F.3d 427, 434-35 (4th Cir. 2008), the Fourth Circuit considered whether the plaintiffs had standing to challenge a public campaign financing program's trigger provisions, despite having insufficient funds to make an independent expenditure that would have triggered any matching funds. The Court first held that "a plaintiff may establish the injury necessary to challenge campaign finance regulations by alleging an intention to engage in a course of conduct arguably affected with a constitutional interest" and that a plaintiff may make "conditional statements of intent" that he or she "would engage in a course of conduct but for the defendants' allegedly illegal action" thereby establishing the requisite the injury in fact. *Id.* at 435 (internal quotations omitted). Accordingly, the Court concluded that the plaintiffs had standing because they had sufficiently established "that they would have made contributions and expenditures but for the challenged provisions."

Similarly, the First Circuit has held that a plaintiff had sufficient standing to challenge a public financing scheme where she had demonstrated that the scheme had affected her political strategy during the campaign. *Vote Choice, Inc. v. DeStefano*, 4 F.3d 26, 36-37 (1st Cir. 1993). Although in that case the plaintiff had already conducted her campaign, the key point for the Court was that the public financing scheme's "impact on the strategy and conduct of an office-seeker's political campaign constitutes an injury of a kind sufficient to confer standing." *Id.* at 37. *See also American Civil Liberties Union of Nevada v. Heller*, 378 F.3d 979, 984 (9th Cir.

2004) (holding that plaintiffs' allegation that they would self-censor their speech in the future on account of the statute was sufficient to confer standing in a challenge to the statute on First Amendment grounds).

I conclude that plaintiffs seeking prospective relief based on the chilling effect of the trigger provisions have standing to challenge those provisions where they can adequately demonstrate that they have engaged in the type of speech affected by the provisions in the past; that they have a present desire, but no specific intention to engage in such affected speech, which can include altering the conduct and strategy of their 2010 campaigns and beyond, due to the trigger provisions; and a plausible claim they will alter their behavior or not engage in the protected speech as they otherwise would based on the threat that such conduct will trigger additional campaign funding for their opponents.

The plaintiffs in this case have demonstrated standing to challenge the constitutionality of the independent expenditure trigger provision. Because the independent expenditure provision contemplates aggregating the campaign expenditures of all non-participating candidates with any independent expenditure by a non-candidate individual or advocacy group, there is no minimum amount of money that a non-participating minor party candidate must expend in order to trigger matching funds for participating candidates. For example, if a minor party candidate for state house spends $1,000 – a fundraising threshold which many minor candidates have surpassed and are likely to do so again in the next election in 2010 – and another non-participating major party candidate in that race spends $24,000, whenever there is a subsequent independent expenditure advocating the defeat of the participating candidate, matching funds will be released. In that scenario, the minor party candidate's expenditures directly caused the release of matching funds

-126-

and he or she will be directly impacted by the operation of the independent expenditure trigger provision, even without personally spending over the participating candidate's grant amount. In addition, any person or group making an independent expenditure over $1,000 is subject to separate, mandatory disclosure requirements, regardless whether that expenditure would result in matching funds being triggered or not.

Furthermore, in races with two participating candidates, *any* level of independent expenditure will trigger matching funds for the participating candidates. According to DeRosa, the CEP's difficult qualifying criteria will encourage the Green Party to engage in more direct forms of advocacy, such as independent expenditures expressly advocating the defeat of a participating candidate rather than solely focusing on running candidates on the Green Party platform. Pl. Ex. A-9, DeRosa Supp. Decl. at ¶ 21. In 2006, for example, the Green Party actively supported Democrat Diane Farrell in her race against Republican incumbent United States Representative Chris Shays, based on the Green Party and Farrell's shared political objectives on issues including the environment and the war in Iraq. *Id.* at ¶¶ 22-23. In a race for state office with participating candidates, any similar mailing, advertisement, or other form of public advocacy promoting the defeat of a participating candidate would automatically trigger CEP matching funds equal to the cost of such advocacy. DeRosa believes that the existence of the independent expenditure provision will chill the Green Party from engaging in such efforts because the party will have to consider whether it would be worth engaging in the political speech that would trigger increased public funding for the candidate they oppose. *Id.* at ¶¶ 20-21, 25-26.

Because there is no question that minor parties will continue to run in races with CEP-

participating opponents, and because their campaign expenditures and independent advocacy efforts will be aggregated with other candidate expenditures and independent expenditures to trigger matching funds under the independent expenditure provision, I conclude that the trigger provision will chill the plaintiffs' desire to enter those races or to expend any amount of money on independent advocacy. Therefore, the plaintiffs stand to suffer a real, immediate, and direct injury as a result of the independent expenditure provision; thus they have standing to challenge the provision's constitutionality.

Although the excess expenditure provision presents a closer question on the issue of standing, I nevertheless conclude that the plaintiffs have demonstrated sufficient likelihood of injury to establish the necessary standing to challenge the constitutionality of that trigger provision. According to the plaintiffs, the immediate injury being caused by the excess expenditure provision is the chilling effect that it is having, and will continue to have, on their efforts to negotiate around the CEP. Because minor party candidates face difficult obstacles to qualifying for public financing, the logical route that the minor parties will take – and indeed, the only route available to the Libertarian Party and its candidates, who have eschewed participation in the CEP entirely – is to undertake self-financed and/or privately financed races. *Id.* at ¶¶ 28-29. Based on the high amount of public funding that participating candidates will receive through CEP grants, minor parties must logically attempt to raise contributions that exceed that public funding in order to be competitive. The minor parties' search for viable candidates capable of running self-financed campaigns, or who have a solid base of high-donor contributors, will be made more difficult by the existence of the excess expenditure fund because it will immediately wipe away any incentive created by superior fundraising, for those potential

candidates to run on a minor party platform.  *Id.* at ¶¶ 37-38.  As Governor Weicker's experience

demonstrates, his superior fundraising capabilities provided a significant key to his success as a

minor party candidate for Governor in 1990.  Pl. Ex. A-2, Weicker Decl. ¶ 20.  Because

outspending major party candidates has proven successful for minor party candidates in the past,

and because the plaintiffs' efforts to try to recruit new types of candidates are being chilled, and

will continue to be chilled, by the existence of the excess expenditure provision, the plaintiffs

have asserted the requisite concrete injury attributable to the excess expenditure provision.   Like

the proverbial sword of Damocles, which need not fall for its impact to be felt, the threat of the

CEP's trigger provisions alone is sufficient to prospectively chill First Amendment-protected

expression.

Furthermore, the excess expenditure provision imposes mandatory disclosure

requirements for all non-participating candidates in a race where one of those candidates spends

or receives contributions equal to 90% of the participating candidate's expenditure limit.  Once

that threshold is reached, the CEP requires all non-participating candidates to file regular

supplemental campaign finance statements.  Therefore, even if the minor party candidate does

not individually spend or receive enough contributions to trigger the excess expenditure

provision, if he or she is in a race with another non-participating candidate who *does* near the

excess expenditure trigger, the minor party candidate will then become subject to the burden of

additional campaign finance disclosure requirements.  Failure to make those timely disclosures

could result in heavy civil penalties even for candidates who do not make enough expenditures or

collect enough contributions to trigger the disclosure requirements and matching funds in the first

place.

Consequently, based on those threatened injuries that are real, immediate, and direct, the plaintiffs have sufficiently demonstrated the necessary standing to challenge the constitutionality of the excess expenditure trigger provision.

3.  *Discussion*

Relying on the Supreme Court's decision in *Davis v. FEC*, the plaintiffs contend that the CEP trigger provisions impermissibly burden the exercise of their First Amendment rights. According to the plaintiffs, because the provisions act as indirect expenditure limits on non-participating candidates and independent advocacy groups, those provisions must be struck down independently from the CEP's constitutional infirmities raised in count one.  Because the matching funds are triggered when non-participating candidates or independent advocacy groups and/or non-candidate individuals engage in political speech in excess of the participating candidate's expenditure limits, the plaintiffs contend that the trigger provisions deter, or "chill," such political speech by discouraging the non-participating candidates and non-candidates from making those types of expenditures in the first place.  The plaintiffs maintain that the choice forced upon non-participating candidates and non-candidate individuals and groups – i.e., abide by the participating candidate's expenditure limit or else confer a benefit upon that opposing candidate in the form of additional funding – is an unconstitutional burden on those non-participating candidates and non-candidates' exercise of First Amendment rights.

The state counters that *Davis* is not controlling on the issue whether a public financing scheme's matching funds violate the First Amendment rights of non-participating candidates and non-candidate individuals and groups engaged in independent political speech.  The state contends that the decisions upholding matching fund trigger provisions in public financing

programs survive *Davis*, and that, accordingly, the trigger provisions are a constitutional feature of the CEP.  The state further contends that, even if the matching funds do burden the speech rights of non-participating candidates and non-candidates, the provisions are narrowly tailored to further a compelling state interest, i.e., to increase participation in the CEP and to protect the public fisc by keeping down the amount of initial CEP grants.

In *Green Party I*, I dismissed the plaintiffs' claims in counts two and three because I agreed with the state that the prevailing caselaw at the time supported the conclusion that, because a non-participating candidate or independent advocacy group was not literally prevented from speaking nor subject to any expenditure limit, the release of matching funds to the participating opponent did not burden the First Amendment rights of the non-participating candidate or group.  537 F. Supp. 2d at 391 (citing *Daggett v. Comm'n on Governmental Ethics & Election Practices*, 205 F.3d 445, 465 (1st Cir. 2000) (holding public funding system's matching fund provision based on independent expenditures did not burden speakers' First Amendment rights); *Jackson v. Leake*, 476 F. Supp. 515, 529 (E.D.N.C. 2006) (rejecting argument that trigger provisions in public campaign financing scheme impairs speaker's First Amendment speech rights); *Ass'n of Am. Physicians & Surgeons v. Brewer*, 363 F. Supp. 2d 1197, 1199-1203 (D. Ariz. 2005) (rejecting plaintiffs' First Amendment challenge to public financing scheme's matching fund provisions and adopting reasoning of *Daggett*); *Wilkinson v. Jones*, 876 F. Supp. 916, 927-28 (W.D. Ky. 1995) (rejecting constitutional challenge to trigger provision that increased participating candidate's expenditure limit based on the expenditures of privately-financed candidates)).  Indeed, even after my decision in *Green Party I*, but before the Supreme Court's decision in *Davis*, the Fourth Circuit, relying on *Daggett*, rejected the argument

that the state's public funding scheme's matching fund provisions burdened the First Amendment rights of non-participating candidates and non-candidate advocacy groups because those persons remained free from any expenditure limits and were not prevented from engaging unlimited political speech. *Leake*, 524 F.3d at 437-38 (affirming district court's holding in *Jackson v. Leake*, 476 F. Supp. 2d at 529), *cert denied by Duke v. Leake*, 129 S. Ct. 490 (2008).

The only decision supporting plaintiffs' claim at the time was the Eighth Circuit's decision in *Day v. Holahan*, 34 F.3d 1356, 1359-60 (8th Cir. 1994), which held that matching funds for independent expenditures advocating the defeat of the participating candidate impaired the speech of the individual or group making the independent expenditure. According to the *Day* Court, "[t]he knowledge that a candidate who one does not want to be elected will have her spending limits increased and will receive a public subsidy . . . as a direct result of that independent expenditure, chills the free exercise of that protected speech." *Id.* at 1360. The Eighth Circuit was concerned that the provision would result in "self-censorship" by persons who would have otherwise engaged in protected political speech, but for the matching provision that would increase the disfavored candidate's campaign funding. *Id.* The *Day* Court further rejected the state's argument that its matching fund provision served a legitimate, let alone compelling, state interest. *Id.* at 1361-62.

In *Davis*, the Supreme Court considered a First Amendment challenge to the so-called "Millionaires' Amendment," section 319(a) and (b) of the Bipartisan Campaign Finance Reform Act of 2002. *Id.* at 2766. Briefly, the Millionaires' Amendment altered contribution limits for congressional candidates facing a self-financed opponent whose personal campaign expenditures exceeded $350,000. *Id.* Candidates facing such a high-spending, self-financed opponent would

then be permitted to collect individual contributions worth up to $6,900, three times the normal contribution limit of $2,300.  *Id.*  The self-financed opponent, however, would remain limited to collecting individual contributions of $2,300 or less.  *Id.*  The *Davis* plaintiff, a high-spending, high-net worth candidate for the United States House of Representatives, challenged the increased contribution limit provision on the ground that it burdened his exercise of First Amendment rights to make unlimited personal campaign expenditures because, by allowing his opponent to raise more money than otherwise permitted, it counteracted and diminished the effectiveness of his own political speech.  *Id.* at 2770.

Acknowledging that the Millionaires' Amendment did not impose an outright cap on self-financed candidates' personal campaign expenditures, the Supreme Court nevertheless concluded that the provision was constitutionally objectionable because it forced those candidates "to choose between the First Amendment right to engage in unfettered political speech and subjection to discriminatory fundraising limitations."  *Id.* at 2771-72.   According to the Court, the self-financed candidate who chooses to spend over $350,000, thus increasing his opponent's contribution limit, "must shoulder a special and potentially significant burden" because that choice produced fundraising advantages for his opponent.  *Id.* at 2772 (citing *Day*, 34 F.3d at 1359-60).  In practice, the Court noted, the Millionaires' Amendment required candidates to either limit one's own expenditures or accept the burden of triggering increased contribution limits for his or her opponent.  *Id.*  The Court concluded that the choice "impose[d] a substantial burden on the exercise of the First Amendment right to use personal funds for campaign speech," and determined that the government had failed to advance any compelling interest that would justify that burden on the exercise of political speech rights.  The Court was troubled by the

government's position "that a candidate's speech may be restricted in order to 'level electoral opportunities'" because that would allow the government to "arrogate the voters' authority to evaluate the strengths of candidates competing for office." *Id.* at 2773. "Leveling electoral opportunities means making and implementing judgments about which strengths should be permitted to contribute to the outcome of an election," a power conferred by the Constitution on voters, not the government. *Id.* Finally, the Court noted that "it is a dangerous business for Congress to use the election laws to influence the voters' choices." *Id.*

There is no question that the Supreme Court's decision in *Davis* has breathed new life into the legal reasoning of *Day*. Although *Davis* did not directly address the constitutionality of a public financing scheme's matching fund provisions, its focus on whether it is constitutional for the government to benefit a candidate's opponent on the basis of that candidate's exercise of his or her First Amendment right to make unfettered personal campaign expenditures is pertinent to the issues presented in this case. The state's argument that the reasoning of the *Daggett* line of cases survives *Davis* rests on too narrow a reading of *Davis*. Although it is true that the campaign finance provision at issue in *Davis* was a discriminatory, asymmetrical contribution limit for candidates in the same race, and not a matching funds provision in a public financing scheme, the holding was founded on the same principle advanced by the plaintiffs in this case: that it is a substantial burden on the exercise of First Amendment rights to force a candidate to choose between engaging in his or her right to make personal campaign expenditures, which then confers a benefit on an opponent, or adhering to a self-imposed limit on campaign expenditures.[74]

---

[74] The state urges me to decide that *Davis* is not controlling on the issue of matching funds in public financing schemes because the Supreme Court declined to grant certiorari in *Leake*, after it had decided *Davis*. The Court decides to grant or deny certiorari for a host of

Although the benefit to CEP-participating candidates is not the same – rather than having contribution limits increased as in *Davis*, the CEP releases additional public funding grants – the effect is the same.  The non-participating opponent making excess expenditures or the non-candidate making independent expenditures must choose whether to forgo his or her additional spending on speech or see his or her opponent receive an additional infusion of public funding. Like the Millionaires' Amendment, there are no expenditure limits on the non-participating candidate or non-candidate's ability to expend funds.  But, also like the Millionaires' Amendment, "it imposes an unprecedented penalty on any candidate who robustly exercises that First Amendment right [to self-finance his or campaign]" because it requires the non-participating candidate and/or the non-candidate to choose between engaging in "unfettered political speech" or self-limiting one's expenditures.[75]  *Id.* at 2771.

Arguably the benefit conferred by the CEP trigger provisions is more constitutionally objectionable than increasing an opponent's individual contribution limits.  In the latter scenario, the opponent must still go out and raise the additional contributions; there is no guarantee that increasing contribution limits will actually result in increased contributions.  The CEP, by contrast, ensures that there will be additional money to counteract the excess expenditures by the non-participating candidate, or the independent expenditures by the non-candidate or

---

reasons; I decline to speculate that it did so specifically because it believed *Davis* was not controlling on the issue presented by *Leake*.

[75] In the case of the independent expenditure provision, the amount of non-participating candidate expenditures and non-candidate expenditures that will trigger additional funding is actually less than the participating candidate's expenditure limit.  Conn. Gen. Stat. § 9-714(c)(2). The independent expenditure provision is triggered, and additional funds are released, once the expenditures are in excess of the participating candidate's *grant* amount, not full expenditure limit.  *Id.*

independent political advocacy group, because the participating candidate automatically receives additional funding.  By making those expenditures, the non-participating candidate or advocacy group is guaranteed to see the participating candidate's funding increase.  Therefore, following the reasoning set forth in *Davis*, the trigger provisions unquestionably burden the exercise of First Amendment rights.

Finally, the state has failed to advance a compelling state interest that would justify the substantial burden placed on First Amendment rights by the trigger provisions.  The state claims the matching funds are necessary to promote participation in the CEP, while expressly disclaiming that the matching funds are meant to "level the playing" field.  Practically speaking, however, there is no real difference between those two concepts – candidates are encouraged to participate in the CEP with the guarantee that their funding will be increased in the event they face a high-spending, non-participating candidate.  In other words, the CEP's matching fund provisions ensure candidates that the playing field will be leveled so that the baseline grants and expenditure limits imposed by the CEP will never hamstring their ability to mount a successful campaign against a high-spending opponent or active non-candidate individual or group advocating the candidate's defeat.  The *Davis* Court expressly declined to hold such interest as sufficiently compelling to withstand strict scrutiny.

As for the state's claim that the matching funds are necessary to prevent against wasting the public fisc with high initial grant amounts, that argument falls flat in light of my conclusion that the initial grants, as they are currently structured, give most major party candidates more money than they could historically have been able to raise or spend.  Therefore, the state's argument that the matching funds are necessary to keep the size of the initial grant "down" is

without merit.

I conclude that the trigger provisions place a substantial burden on the exercise of First Amendment rights and the state has failed to advance a compelling state interest that would otherwise justify that burden.  Accordingly, the operation and enforcement those provisions must be enjoined.

## III.    Conclusion

I find in favor of the Green Party of Connecticut, S. Michael DeRosa, and the Libertarian Party with respect to the claims in count one, two, and three.[76]  A declaratory judgment shall issue that the CEP unconstitutionally burdens the plaintiffs' rights to political opportunity and that the CEP's trigger provisions burden their First Amendment speech rights.

The state defendants – Jeffrey Garfield and Richard Blumenthal – are permanently enjoined from operating and enforcing the CEP.  Therefore:

**IT IS ORDERED** that the defendants, Jeffrey Garfield, in his official capacity as Executive Director and General Counsel of the State Elections Enforcement Commission, and Richard Blumenthal, in his official capacity as Attorney General of the State of Connecticut, and their agents, officers, directors, trustees, employees, and anyone acting in concert with them who receives actual notice of this order, are hereby permanently enjoined from operating and enforcing the CEP.  This injunction issues without a bond.

All pending motions are denied as moot.  The clerk shall enter judgment and close this

---

[76] Judgment entered against the remaining plaintiffs' claims in count four on February 11, 2009 (doc. #333).

case.

It is so ordered.

Dated at Bridgeport, Connecticut, this 27th day of August 2009.


_____/s/ Stefan R. Underhill_____
                    Stefan R. Underhill
                    United States District Judge